QUINN EMANUEL URQUHART & SULLIVAN, LLP
Kathleen M. Sullivan (CA Bar No. 242261)
kathleensullivan@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

John M. Potter (CA Bar No. 165843)
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

David M. Cooper (*pro hac vice* application granted)
51 Madison Ave., 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Attorneys for Respondents
1955 CAPITAL FUND I GP LLC AND
1955 CAPITAL CHINA FUND GP LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

GLOBAL INDUSTRIAL INVESTMENT LIMITED and CHINA FORTUNE LAND DEVELOPMENT,

Petitioners,

v.

1955 CAPITAL FUND I GP LLC and 1955 CAPITAL CHINA FUND GP LLC,

Respondents.

Case No. 4:21-cv-08924-HSG

**RESPONDENTS' NOTICE OF MOTION AND MOTION TO VACATE ARBITRATION AWARD AND OPPOSITION TO PETITION TO CONFIRM ARBITRATION AWARD**

**FILED UNDER SEAL**

Date: April 14, 2022

Judge: Hon. Haywood S. Gilliam, Jr.

# TABLE OF CONTENTS

I. Background ..... 3

A. The Parties' Agreements ..... 4

B. Petitioners' Attempt To Withdraw From The Funds ..... 7

C. The First Arbitration ..... 8

D. The GPs' Capital Calls And Investments Following The First Arbitration ..... 9

E. Petitioners' Serial Litigation Against Mr. Chung, Mrs. Chung, And The GPs Following The First Award ..... 11

1. GIIL's Lawsuit Against Mr. Chung And Mrs. Chung In China ..... 12

2. Petitioners' Attempt to Vacate the First Award ..... 13

3. Petitioners' Lawsuit Against Mr. Chung in California ..... 13

4. Petitioners' Public Campaign Against Mr. Chung, Mrs. Chung, And 1955 Capital ..... 14

F. The Second Arbitration ..... 15

G. Events Following The Second Arbitration ..... 18

II. Argument ..... 19

A. The Award Cannot Be Confirmed Because It Is Not Final ..... 34

B. The Award Should Be Vacated Because Petitioners' Claims Are Precluded Based On The Res Judicata Effect Of This Court's Prior Decision ..... 19

1. The Res Judicata Issue Is For This Court To Decide ..... 19

2. This Case Satisfies All Requirements Of Res Judicata ..... 22

1. The Question Whether The Remedy Conflicts With The Agreements Is For This Court To Decide ..... 27

3. Vacatur On This Ground Requires Remand To A New Arbitrator ..... 32

III. Conclusion ..... 35

**TABLE OF AUTHORITIES**

**Cases**

Adams v. Cal. Dep't of Health Servs., 487 F.3d 684 (9th Cir. 2007) .......... 25
Anheuser-Busch, Inc. v. Local Union, No. 744, 280 F.3d 1133 (7th Cir. 2001).......... 27
Anheuser-Busch, Inc. v. Local Union, No. 744, 280 F.3d 1133, 1146 (7th Cir. 2001).......... 30
Aspic Eng'g & Constr. Co. v. ECC CENTCOM Constructors, LLC, 268 F. Supp. 3d 1053 (N.D. Cal. 2017).......... 29
BridgeLux, Inc. v. Ensure Enter., Inc., 2009 WL 10709801 (N.D. Cal. Mar. 6, 2009).......... 34
Caprio v. Hartford Life Ins. Co., 2008 WL 1766747 (N.D. Cal. Apr. 15, 2008) .......... 20
Chiron Corp. v. Ortho Diagnostic Systems, Inc., 207 F.3d 1126 (9th Cir. 2000) .......... 19
Coast Trading Co. v. Pac. Molasses Co., 681 F.2d 1195 (9th Cir. 1982).......... 28, 29
Collins v. DR Horton, Inc., 505 F.3d 874 (9th Cir. 2007).......... 20
Community State Bank v. Strong, 651 F.3d 1241 (11th Cir. 2011) .......... 22
Cruz v. Select Portfolio Servicing, Inc., No. 19-CV-00283-LHK, 2019 WL 2299857 (N.D. Cal. May 30, 2019) .......... 24
Delphi Easter Partners Ltd. P'ship v. Spectacular Partners, Inc., 1993 WL 328079 (Del. Ch. Aug. 6, 1993) .......... 33
First Options of Chi., Inc. v. Kaplan, 514 U.S. 938 (1995) .......... 28
GIIL v. Chung, 2020 WL 5355968 (N.D. Cal. Sept. 7, 2020).......... 14, 22, 23, 25
Harry Hoffman Printing, Inc. v. Graphic Commc'ns Int'l Union, Local 261, 950 F.2d 95 (2d Cir. 1991) .......... 30
Harry v. KCG Americas LLC, No. 20-CV-07352-HSG, 2021 WL 2711746 (N.D. Cal. July 1, 2021) .......... 24
Headwaters Inc. v. U.S. Forest Service, 399 F.3d 1047 (9th Cir. 2005) .......... 21
Hells Canyon Preservation Council v. U.S. Forest Service, 403 F.3d 683 (9th Cir. 2005).......... 22
Immersion Corp. v. Sony Computer Entm't Am. LLC, 188 F. Supp. 3d 960 (N.D. Cal. 2016) ... 21
In re Y & A Group Securities Litigation, 38 F.3d 380 (8th Cir. 1994).......... 19
Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Silver State Disposal Serv., Inc., 109 F.3d 1409 (9th Cir. 1997) .......... 33, 34
John Hancock Mut. Life Ins. Co. v. Olick, 151 F.3d 132 (3d Cir. 1998) .......... 19
Kanuth v. Prescott, Ball & Turben, Inc., 949 F.2d 1175 (D.C. Cir. 1991) .......... 27
Kelly v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 985 F.2d 1067 (11th Cir. 1993) .......... 19
Kemner v. Dist. Council of Painting, 768 F.2d 1115 (9th Cir. 1985).......... 35
Leed Architectural Prods, Inc. v. United Steelworkers of Am., Local 6674, 916 F.2d 63 (2d Cir. 1990) .......... 30
McClain v. Apodaca, 793 F.2d 1031 (9th Cir. 1986) .......... 21
McClatchy Newspapers v. Cent. Valley Typographical Union, No. 46, 686 F.2d 731 (9th Cir. 1982) .......... 33
Mich. Mut. Ins. Co. v. Unigard Sec. Ins. Co., 44 F.3d 826 (9th Cir. 1995).......... 29
Mike Rose's Auto Body, Inc. v. Applied Underwriters Captive Risk Assurance Co., 389 F. Supp. 3d 687 (N.D. Cal. 2019), appeal dismissed, 2019 WL 5207988 (9th Cir. Aug. 27, 2019).......... 35
Millmen Local 550, United Bhd. of Carpenters & Joiners of Am., AFL-CIO v. Wells Exterior Trim, 828 F.2d 1373 (9th Cir. 1987).......... 35
Mpoyo v. Litton Electro-Optical Sys., 430 F.3d 985 (9th Cir. 2005).......... 22
Muskegon Cent. Dispatch 911 v. Tiburon, Inc., 462 F. App'x 517 (6th Cir. 2012).......... 34
Ortega v. Ritchie, No. 18-CV-02944-HSG(PR), 2019 WL 251482 (N.D. Cal. Jan. 17, 2019)..... 24
Pac. Motor Trucking v. Automotive Machinists, 702 F.2d 176 (9th Cir. 1983) .......... 29
Pac. Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp., 935 F.2d 1019 (9th Cir. 1991) .......... 35
Phoenix Newspapers, Inc. v. Phoenix Mailers Union Local 752, Int'l Broth. Of Teamsters, 989 F.2d 1077 (9th Cir. 1993).......... 27, 29, 32
Prime Mgmt. Co., Inc. v. Steinegger, 904 F.2d 811 (2d Cir. 1990) .......... 23
Seymour v. Nationstar, 2020 WL 804456 (E.D. Cal. Feb. 18, 2020).......... 26
Southern Ry. Co. v. Clift, 260 U.S. 316 (1922).......... 20

Stockman v. Heartland Indus. Partners, L.P., 2009 WL 2096213 (Del. Ch. July 14, 2009) ......... 33
Thomas Kinkade Co. v. Hazlewood, 2007 WL 9812853 (N.D. Cal. June 6, 2007) ...................... 28
Thomas Kinkade v. Hazelwood, 2007 WL 2462149 (N.D. Cal. Aug. 29, 2007) .......................... 34
Trustmark Ins. Co. v. ESLU, Inc., 299 F.3d 1265 (11th Cir. 2002) ............................................. 23
Turtle Island Restoration Network v. U.S. Dep't of State, 673 F.3d 914 (9th Cir. 2012) ............ 23
W. Radio Servs. Co. v. Glickman, 123 F.3d 1189 (9th Cir. 1997) ............................................... 22

**Out of State Cases**

9 U.S.C. § 10(a)(4) ........................................................................................................................ 1

**-DO NOT EDIT OR RENAME-**

Restatement (Second) of Judgments § 24 ........................................................................... 23
Restatement (Second) of Judgments § 25 ........................................................................... 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

11105-00001/13102733.6

**NOTICE OF MOTION**

On April 14, 2022, before this Court, Respondents 1955 Capital Fund I GP LLC and 1955 Capital China Fund GP LLC (collectively, "Respondents" or "GPs"), who are the general partners of two Delaware limited partnership venture capital investment funds, 1955 Capital Fund I LP ("Fund I") and 1955 Capital China Fund LP ("China Fund") (collectively, the "Funds"), hereby move to vacate the arbitration award. Petitioner Global Industrial Investment Limited ("GIIL") is the sole limited partner in the Funds and the wholly owned subsidiary of Petitioner China Fortune Land Development ("CFLD"). By and through their counsel, Respondents file the instant combined opposition to GIIL and CFLD's petition to confirm the award (Dkt. 1 ("Petition")) and memorandum in support of their motion to vacate the arbitration award.

Respondents respectfully request that the Court deny confirmation and enter an order vacating the arbitration award pursuant to the FAA because this is the rare case in which the arbitrator "exceeded [his] powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). Respondents base their request on the instant motion, the declaration of Respondents' counsel, David M. Cooper, filed in support of this motion, and all documents filed in this action.

**MEMORANDUM OF POINTS AND AUTHORITIES**

Petitioners are investors and limited partners in two Funds managed by Respondent GPs, and when Petitioners faced economic problems after their first payment into the Funds (culminating in CFLD becoming the biggest international defaulter on record from China), they attempted to withdraw from the Funds and refused to make follow-up payments. But the agreements required those payments and did not permit them to withdraw, so Petitioners resorted to serial litigation, along with a PR campaign and threats against Andrew Chung (the managing member of the GPs), his family, and portfolio companies. After failing in one arbitration against the GPs (the "First Arbitration") and while failing in this Court in a suit against Mr. Chung, Petitioners brought another arbitration (the "Second Arbitration"), alleging breaches of fiduciary duty in connection with the same agreements between the same parties as in the prior disputes,

[REDACTED]. The Second Award defies both this Court's prior decision and the parties' agreements regarding the limited powers of the arbitrator.

While the general rule is that arbitrators receive great deference, this Court should deny confirmation and vacate here because this is the rare case that triggers two exceptions to this rule: (a) it is for the court to decide whether an arbitration award is barred by res judicata based on a prior decision of that court, and (b) it is for the court to decide whether an arbitrator has exceeded his authority by issuing a remedy in conflict with the parties' agreement. The Ninth Circuit has recognized both exceptions, which necessarily follow from fundamental principles of law. A court must have the authority to decide the preclusive effect of its own judgment. And an arbitrator's power derives from the parties' agreement, so the arbitrator cannot aggrandize his remedial authority by defying the limitations stated in the agreement. Applying these settled exceptions here, this Court should deny the Petition and enter an order vacating the Second Award.

*First*, this Court should vacate the Second Award because Petitioners' claims in the Section Arbitration are barred by the res judicata effect of this Court's prior judgment. The Court should not reward Petitioners for repeatedly litigating the same basic claims over and over again until they found a receptive audience in the second arbitrator. Petitioner GIIL brought claims in this Court against Mr. Chung for breach of fiduciary duty for his management of the Funds, and [REDACTED] by barring Mr. Chung from performing any actions with respect to them (the "Chung Action"). This Court (Koh, J.) dismissed the claims with prejudice, holding that they were barred by res judicata based on the First Arbitration. The Chung Action now precludes the Second Arbitration because they concern the same parties (or those in privity), the same agreements, [REDACTED]. All of the alleged breaches in the Second Arbitration could have been brought in the Chung Action and they both rest on many of the same facts. Under these circumstances, this Court and others consistently hold that res judicata does not permit a second litigation.

*Second*, the Sole Arbitrator exceeded his authority [redacted]. The parties' contracts [redacted]. The Sole Arbitrator disregarded the agreements' express limitation on his authority, [redacted] The Ninth Circuit and this Court have held repeatedly that arbitrators must respect such remedial limits, and awards should be vacated where, as here, they fail to do so. In addition, the Sole Arbitrator ordered that [redacted]. In sum, the Sole Arbitrator [redacted], including in the arbitration agreement itself, and thus exceed his authority within the meaning of the FAA.

[redacted]. These determinations should be remanded for further consideration before a new arbitrator, as (once there is a final award) the Sole Arbitrator no longer has authority over these proceedings. Regardless, a new arbitrator is warranted given the Sole Arbitrator's demonstrated unwillingness to follow the parties' agreement.

*Third*, and in any event, the Court should deny the Petition as premature because the Second Award is not final. There is a pending Application for Correction before the Second Arbitrator [redacted]. Under well-established law, such an application renders the Second Award non-final, and this Court cannot confirm a non-final arbitration award. The Petition should be denied on that basis, but if the Second Award is considered at this time, it should be vacated for the reasons set forth below.

## I. BACKGROUND

Petitioners are serial litigators who, over the past five years, have pursued a vendetta against

Respondents, Mr. Chung, and Mr. Chung's family in two arbitrations, multiple court proceedings in multiple jurisdictions, and the court of public opinion, [redacted]. Petitioners initiated their campaign to cripple the Funds and ruin Mr. Chung's reputation after Respondents and Mr. Chung successfully held them to account for refusing to honor their contractual obligations to the Funds under their investment agreements. This proceeding is Petitioners' latest salvo.

### A. The Parties and Their Agreements

Andrew Chung is the founder of venture capital investment firm 1955 Capital ("1955 Capital") and serves as the managing member of Respondents and the general partner of other 1955 Capital funds. Mr. Chung is a prominent venture capitalist who has been successfully operating in the VC space for nearly twenty years. Mr. Chung received his undergraduate degree from Harvard University in 1999 and his Master of Business Administration from the Wharton School of Business in 2006. Ex. A (First Witness Statement) ¶¶ 9, 12. Mr. Chung has dedicated his career to investing in health and sustainability. Earlier in his career, Mr. Chung worked at Lightspeed Ventures and then as one of six general partners at Khosla Ventures, two of the preeminent VC firms in Silicon Valley. *Id.* ¶ 11. Mr. Chung founded 1955 Capital in 2015.

From 2013 to 2015, Mr. Chung met several times with Wang Wenxue, a billionaire industrialist in China, as well as CFLD's founder, majority shareholder, and Chairman of its Board of Directors. Ex. B (First Award) ¶ 55. CFLD is a goliath in the Chinese real estate market. *See* Ex. C (Feb. 4, 2021 Wall Street Journal Article); Ex. D (Mar. 3, 2021 Wall Street Journal Article). At meetings in Beijing in August 2015, Mr. Chung and Mr. Wang discussed the possibility of Mr. Chung starting his own VC fund and being funded by a substantial seed investment from Mr. Wang of USD 200 million. First Award ¶ 55. Mr. Chung then conducted negotiations with members of CFLD's private equity team regarding what would become investments in the Funds. *Id.*

In November 2015, the parties agreed to move forward with the Funds. In particular, the parties agreed on limited partnership agreements ("LPAs") for China Fund and Fund I in which GIIL would be the sole initial limited partner. *Id.* ¶¶ 55-56. GIIL and the GPs also executed

subscription and escrow agreements, with respect to a USD 150 million investment in China Fund and a USD 50 million investment in Fund I, totaling USD 200 million to be invested in the Funds. *Id.* ¶ 4. The LPAs, subscription agreements, escrow agreements, and Appendix 1 constitute the investment agreements. *Id.* ¶ 18. During negotiations, CFLD insisted on, and Mr. Chung consented to, the multiple-document format of the investment agreements to ensure that its Board would be able to review and approve of the agreements, which it ultimately did. *Id.* ¶¶ 98, 113, 173-78.

As explained in the expert testimony presented in the Second Arbitration by Ilya Strebulaev, a professor at Stanford University's Graduate School of Business, and one of the world's foremost experts on the Silicon Valley VC industry,[1] [redacted] Ex. E (Strebulaev Rpt.) ¶¶ 1, 35-38. [redacted] *Id.* ¶¶ 35-42.

The parties' investment agreements here are consistent with that industry standard. *Id.* ¶¶ 41, 43. Notably, they reserve for the GPs sole managerial authority: "The General Partner shall have the sole and exclusive right to manage, control, and conduct the business of the Partnership and to do any and all acts on behalf of the Partnership . . . ." Dkt. 1-6 (China Fund LPA) and Dkt. 1-7 (Fund I LPA) § 8.1(a). In contrast, "[t]he Limited Partners shall take no part in the control or management of the business or affairs of the Partnership," and "[e]xcept as specifically set forth in this Agreement, the Limited Partners shall have no right to withdraw from the Partnership." *Id.* § 8.2. The Funds are designated to have only one limited partner, with others to be added at the GPs'

[1] Professor Strebulaev is also the founder and Faculty Director of the Stanford GSB Venture Capital Initiative that brings together academic researchers, students, and practitioners to advance knowledge of venture capital. Strebulaev Rpt. ¶ 3. Among his prominent research is the largest ever survey of VC firms to date, in which he and his co-authors analyzed all aspects of decision-making by venture capitalists as well as the relationships between GPs and LPs. *Id.* ¶¶ 3, 46-47.

discretion (and, for China Fund, with the additional consent of GIIL). *See id.* § 3.2. Further, a GP "shall ***not*** be deemed to have breached any duties (including ***fiduciary duties***) it owes to the Partnership or any Limited Partner in taking any action that is permitted by the terms of this Agreement." China Fund LPA § 14.4(g); Fund I LPA § 15.4(g) (emphases added).

The agreements further state that GIIL is required to make certain payments, and the GPs have sole discretion for calling capital and enforcing any failure to make required payments. In particular, "[t]he Limited Partners shall contribute capital to the Partnership in cash in installments *pro rata* in proportion to their Remaining Commitments." China Fund LPA and Fund I LPA § 4.2(a).[2] The GPs "shall be entitled to enforce the obligations of each Limited Partner to make the contributions of capital set forth in paragraph 4.2(a), and the Partnership shall have all remedies available at law or in equity in the event any such contribution is not so made." China Fund LPA § 4.4(a), Fund I LPA § 4.5(a). In addition, the GPs can "call capital at any time . . . as may be necessary to fund the expenses and liabilities of the Partnership's operations . . . to make investments which the Partnership has committed in writing to make . . . or to make follow-on investments in one or more pre-existing investments of the Partnership." China Fund LPA § 4.2(c), Fund I LPA § 4.2(d). And "should any Limited Partner fail to make any of the capital contributions required under this Agreement, such Limited Partner shall be in default, and the General Partner may, in its sole discretion, elect to enforce one or more of the provisions of this paragraph," which include (among other things) requiring interest payments for the overdue contribution. China Fund LPA § 4.4(b), Fund I LPA § 4.5(b). Strebulaev Rpt. ¶¶ 42-44, 137, 141. *Id.*

[2] Pursuant to the escrow agreements, and in respect of the investments described in the subscription agreements, CFLD advanced an initial USD 80 million to GIIL, which GIIL deposited in the designated escrow accounts, and GIIL agreed to make two further sets of installments of USD 60 million into the Funds' escrow accounts on December 1, 2016 and December 1, 2017. First Award ¶¶ 55, 60; Second Award ¶¶ 3, 132.

The LPAs state that China Fund shall continue for seven years, and Fund I for ten years, each with the possibility of two one-year extensions at the option of the GPs. China Fund LPA and Fund I LPA §§ 2.1, 10.1. Early termination is permitted only upon "(i) the occurrence of an event of withdrawal with respect to the General Partner of the Partnership within the meaning of Section 17-402 of the Act; *provided, however*, that the General Partner shall not voluntarily withdraw from the Partnership; or (ii) the election by both (A) the General Partner, in its sole and absolute discretion, and (B) a Majority in Interest of the Limited Partners." *Id.* § 10.2(a). The GPs intended to raise USD 100 to 150 million of additional capital from other potential limited partners after GIIL's seed investment, but were unable to do so following Petitioners' defaults and hostile actions described below. First Award ¶¶ 139, 143, 146, 339, 397, 471; First Witness Statement ¶ 125.

**B. Petitioners' Attempt To Withdraw From The Funds**

In early 2016, CFLD began raising concerns regarding the pace of investment and its expectation that the Funds would channel investee companies to CFLD's industrial parks in China. First Award ¶ 55. That concern was unfounded, as the GPs were conducting deep due diligence on potential portfolio companies at this time, and CFLD's expectation was not supported by the parties' exchanges and investment agreements. First Award ¶¶ 340-47. Later public reporting revealed that CFLD had been experiencing liquidity issues and accumulating nearly USD 5 billion in dollar-denominated debt alone, a portion of which it defaulted on in February 2021. Mar. 3, 2021 Wall Street Journal Article; Feb. 4, 2021 Wall Street Journal Article. As of March 3, 2021, CFLD became "the biggest international defaulter on record from China." Mar. 3, 2021 Wall Street Journal Article.

By the end of September 2016, CFLD and GIIL were already planning how to withdraw from their commitments and recover the money they had committed and deposited under the investment agreements. First Award ¶ 396. In furtherance of that objective, in October 2016, Mr. Chung met with CFLD representatives in Beijing, including three individuals posing as "risk and compliance" officers and later revealed to be attorneys employed by CFLD's outside law firm. *Id.* ¶ 55. The attorneys challenged the format of the investment agreements and suggested it had been

used to deceive CFLD—despite that CFLD itself had insisted on that format, over the GPs' preference to use a more standard format. *Id.* This was the first instance of CFLD's strategy of making false allegations to intimidate Mr. Chung and force the termination of the Funds. Mr. Chung explained that CFLD's concerns were misplaced. *Id.* But at a follow-up meeting the next day, CFLD representatives accused Mr. Chung of fraud, demanded that he resign and return the money in escrow, and threatened to force a shutdown of the Funds. *Id.* The next month, Mr. Chung and the GPs received a letter from CFLD's outside law firm stating that Mr. Chung and his companies had defaulted in their obligations, [redacted] Ex. F (Nov. 11, 2016 Letter from GIIL to Mr. Chung), 2; First Award ¶ 55.

Under the investment agreements, the second installments of GIIL's escrow deposits—totaling USD 60 million—were due on December 1, 2016. First Award ¶ 55. GIIL defaulted on those installments. *Id.* Thus, in December 2016, the GPs notified GIIL that it was in default and that if GIIL failed to pay within 10 days, the GPs would consider exercising their remedies, [redacted] *Id.*; Strebulaev Rpt. ¶¶ 139-141.

### C. The First Arbitration

In light of these defaults, Mr. Chung and the GPs initiated an arbitration against Petitioners before arbitrator Gerald W. Ghikas, Q.C. ("Arbitrator Ghikas"), in which they ultimately succeeded in all material respects. Mr. Chung and the GPs claimed that Petitioners had, among other things, falsely accused Mr. Chung of fraud, violated the covenant of good faith and fair dealing, and breached their investment agreements by failing to make the agreed-upon transfer of USD 60 million. First Award ¶¶ 60-63. Mr. Chung and the GPs sought a declaration that Petitioners were required to make the payments specified in the agreements, as well as damages and fees. *Id.* ¶ 370. Petitioners responded with nineteen counterclaims, including alleged mismanagement of the Funds, which they asserted provided a basis for rescinding the contracts and terminating the Funds. *Id.* ¶¶

67-80, 330-331.[3]

While the first arbitration was ongoing, GIIL failed to make USD 60 million in escrow deposits due December 1, 2017. Second Award ¶ 3. Petitioners thus failed to deposit USD 120 million of the USD 200 million that they had committed. [redacted] *Id.* ¶ 228.

On June 26, 2019, Arbitrator Ghikas issued the First Award, ruling in Respondents' favor in virtually all respects. The First Award found that CFLD had materially breached the agreements by failing to make the required escrow deposits on December 1, 2016. First Award ¶ 395. It also found that CFLD had breached the implied covenant of good faith and fair dealing at the October 2016 meetings by deploying bad faith tactics to escape the consequences of the bargains GIIL had made on its behalf, including falsely accusing Mr. Chung of fraud. *Id.* ¶¶ 396-98. Arbitrator Ghikas determined that the investment agreements remained in effect and remained binding on the parties and rejected Petitioners' requests for rescission. *Id.* ¶¶ 422, 476. Arbitrator Ghikas also rejected 18 of Petitioners' 19 counterclaims outright, accepting only one immaterial counterclaim concerning the GPs' post-closing changes to the LPAs (which he found lacked "practical consequences"). *Id.* ¶¶ 56, 114-15, 349, 393. Arbitrator Ghikas thus concluded that the GPs were the prevailing parties, ordered Petitioners to pay the GPs USD 9.3 million in fees and costs, declared the investment agreements valid and enforceable, found the GPs were entitled to benefit from them, declared that CFLD and GIIL were liable to perform their obligations thereunder, and awarded each side nominal damages. *Id.* ¶¶ 431, 487, 492.

### D. The GPs' Capital Calls And Investments Following The First Arbitration

After the First Award, [redacted] Strebulaev Rpt. ¶¶ 62-73. In response, the GPs were forced to deploy several of the contractual penalty provisions. As Professor Strebulaev explained in his expert testimony, [redacted]

[3] Petitioners also successfully moved to dismiss Mr. Chung from the first arbitration on the ground that he was not a signatory to the investment agreements. Ex. S (First Partial Award) ¶ 201. In granting that motion, Arbitrator Ghikas noted that Mr. Chung's claims were "closely connected to and factually intertwined with the other matters to be determined in this arbitration." *Id.* ¶ 182.

See id. ¶¶ 74-141.

Ex. R (Hrg. Tr. Excerpts) 935:13-936:9.

Second Award ¶¶ 229, 362. And in November 2019, the GPs sent Petitioners capital calls, styled as draw-down notices for , intended "for funding a follow-on investment in one of the Funds' existing portfolio companies and making initial investments in a number of new portfolio companies." *Id.* ¶ 231.

Thereafter, the GPs undertook extensive due diligence and . Second Award ¶¶ 233, 236; Strebulaev Rpt. ¶¶ 81-84.

Second Award ¶ 250; Strebulaev Rpt. ¶ 76.

. Second Award ¶¶ 252-254; Strebulaev Rpt. ¶¶ 106, 115.

Second Award ¶ 255.

*Id.*

*Id.* ¶ 272. *Id.* ¶ 273.



*Id.* ¶¶ 266, 275; Ex. G (Second Witness Statement) ¶ 6; Ex. H (Suppl. Witness Statement) ¶¶ 3-9. Strebulaev Rpt. ¶¶ 62-73. Second Witness Statement ¶¶ 6, 37; Suppl. Witness Statement ¶ 2; Ex. I (Strebulaev Suppl. Dec.) ¶ 2. Ex. J (GPs' Post-Hrg. Br.) ¶ 165; Second Award ¶ 39; Hrg. Tr. 1152:15-19, 1298:15-1299:5, 1331:11-1332:22 (Chung); *id.* 1513:2-15 (Strebulaev).

**E. Petitioners' Serial Litigation Against Mr. Chung, Mrs. Chung, And The GPs Following The First Award**

The First Award "extremely disappointed and upset" Mr. Wang, who appointed Patrick Wong ("Mr. Wong," formerly known as Peng Wang) to represent CFLD and GIIL in its further dealings with Mr. Chung and the GPs. Second Award ¶ 184. Consistent with CFLD's objectives throughout, Mr. Wong's goal was "to terminate the funds and the relationship with Andrew [Chung] and get as much money returned as possible" through Second Award ¶¶ 184, 534; Ex. K (Oct. 9, 2019 Email from P. Wong to A. Spiegelberg et al.), 2.

Soon after the First Award, Petitioners asserted, for the first time, that Ex. L (July 17, 2019 Letter from Petitioners' Counsel to GPs' Counsel), 1. Despite Arbitrator Ghikas' ruling that the investment agreements were valid and enforceable,

*Id.* at 2.

Second Award ¶¶ 312-315; Strebulaev Rpt. ¶¶ 23-24.

Second Witness Statement ¶ 66.

First Witness Statement ¶ 93.

Hrg. Tr. 1243:2-1245:15, 1246:8-17. Indeed, after losing the first arbitration, Petitioners engaged in numerous litigations and reputational attacks against Mr. Chung, his wife Coral Chung ("Mrs. Chung"), and their livelihoods. Notably, —a Wharton and Stanford Business School graduate and founder of the global Senreve fashion brand— Second Award ¶ 217; First Witness Statement ¶¶ 66, 103-04, 110.

**1. GIIL's Lawsuit Against Mr. Chung And Mrs. Chung In China**

Second Award ¶ 207; First Witness Statement ¶¶ 93-95; Hrg. Tr. 408:19-409:16

Second Award ¶¶ 207-208.



Id. ¶ 208; Ex. M (Aug. 29, 2019 Letter from Petitioners' Counsel to GPs' Counsel), 4. First Witness Statement ¶ 97. Aug. 29, 2019 Letter from Petitioners' Counsel to GPs' Counsel, 5. . *Id.* at 6. First Witness Statement ¶¶ 95, 97; 2021.05.25 Hrg. Tr. 407:22-408:18; Second Award ¶ 209.

**2. Petitioners' Attempt to Vacate the First Award**

In October 2019, Petitioners moved in this Court to vacate the First Award. Case No. 19-cv-07043-VC, Dkt. 1. This Court (Chhabria, J.) denied Petitioners' motion on January 31, 2020, *see id.*, Dkt. 52, and the Ninth Circuit affirmed on March 26, 2021, *see id.*, Dkt. 73-1.

**3. Petitioners' Lawsuit Against Mr. Chung in California**

In November 2019, while moving to vacate the First Award and initiating the Second Arbitration (discussed below), Petitioners sued Mr. Chung personally in California Superior Court, alleging breaches of fiduciary duty largely identical to those alleged against the GPs in the First Arbitration. Case No. 19-CV-07670-LHK, Dkt. 1. Mr. Chung removed that action to this Court, and on March 23, 2020, Petitioners filed an amended complaint. *Id.*, Dkt. 29. Mr. Chung moved to dismiss, explaining that Petitioners' claims were barred by res judicata because the two actions

involved the same claims, the First Arbitration resulted in a final judgment on the merits, and the parties were in privity. *Id.*, Dkt. 32. This Court (Koh, J.) agreed and dismissed with prejudice. *GIIL v. Chung*, 2020 WL 5355968, at *5-8 (N.D. Cal. Sept. 7, 2020).

**4. Petitioners' Public Campaign Against Mr. Chung, Mrs. Chung, And 1955 Capital**

, *see* Strebulaev Rpt. ¶¶ 38-40, Second Award ¶ 212; Oct. 9, 2019 Email from P. Wong to A. Spiegelberg et al. . Second Award ¶ 212.

In November 2019, Petitioners distributed press releases that accused Mr. Chung of enacting "a scheme to steal $80 million of [GIIL's] money," and asserted that investing in three of the Funds' portfolio companies did not comply with the Funds' alleged investment mandate. *Id.* ¶¶ 213-14. With Mr. Wong's knowledge, these press releases, or information contained therein, were also transmitted to *Id.* ¶ 218 n.270.

Also with Mr. Wong's knowledge, around November and December 2019, Petitioners created several websites and Facebook, Instagram, and Twitter accounts to attack Mr. Chung, Mrs. Chung, and 1955 Capital. *Id.* ¶ 216. The websites included 1955capitalviolations.com, 1955capitalnews.com, and truthabout1955capital.com. *Id.* Mr. Wong suggested that the Petitioners "do another website, truthaboutandrewchung.com that focuses on his lavish life style." *Id.* ¶ 216 n.265. Petitioners also purchased advertisements on Google and Facebook. *Id.* ¶ 216. Singer Associates told Mr. Wong that such ads "would promote the new website, one ad would target Andrew Chung and 1955 Capital and one ad would target Senreve [*i.e.*, Mrs. Chung's business] and Andrew and Coral Chung." *Id.* ¶ 216 n.268. . *Id.* ¶ 217.



*Id.* ¶ 219 *Id.* ¶ 221. *Id.* ¶ 220.

First Witness Statement ¶¶ 83, 172-77; Strebulaev Rpt. ¶¶ 18-19, 38-40, 63, 66, 101.

**F. The Second Arbitration**

In October 2019, Petitioners initiated a new arbitration against the GPs before arbitrator Arif Hyder Ali (the "Sole Arbitrator"), which resulted in the Second Award now before this Court. Second Award ¶ 143 & n.115; Strebulaev Rpt. ¶¶ 83-84.

GPs' Post-Hearing Brief ¶¶ 36-37; Hrg. Tr. 1616:11-1617:19; 1619:5-11.



Second Award ¶¶ 317-21, 383. . *Id.* ¶¶ 321, 383. *Id.* ¶¶ 320, 383.

On October 29, 2021, the Sole Arbitrator issued the Second Award. *Id.* ¶¶ 417-419, 469. *Id.* ¶¶ 431, 434. *Id.* ¶¶ 463, 465. . *See supra* at 14-15. . Second Award ¶¶ 419, 504. *Id.* ¶ 397. *see* China Fund LPA § 14.4(g), Fund I LPA § 15.4(g), , *see* Strebulaev Rpt. ¶¶ 78-141.



Second Award ¶ 405

*Id.* ¶¶ 422-425.

*Id.* ¶¶ 429-30.

*Id.* ¶ 436.

*id.* ¶¶ 437-49;

*id.* ¶¶ 450-57;

*id.* ¶¶ 458-60.

*Id.* ¶ 412.

*Id.* ¶¶ 483, 491-92.

*Id.* ¶¶ 503-04, 508

*Id.* ¶¶ 483, 497-504.



*Id.* ¶¶ 515, 598.

. *Id.* ¶ 598(j).

*Id.* ¶¶ 596-97, 598(k).

**G. Events Following The Second Arbitration**

. Ex. N (Application for Correction) ¶ 1.

. *Id.* ¶¶ 1, 19-33.

*Id.* ¶ 40.

Ex. O (Nov. 22, 2021 Letter from Petitioners' Counsel to GPs' Counsel).

[REDACTED]. Ex. P (Dec. 2, 2021 Letter from GPs' Counsel to Petitioners' Counsel).

## II. ARGUMENT

### A. The Award Should Be Vacated Because Petitioners' Claims Are Precluded Based On The Res Judicata Effect Of This Court's Prior Decision

The Award should be vacated because Petitioners' claims in the Second Arbitration could have been raised before this Court in the Chung Action, and thus are barred by res judicata.

#### 1. The Res Judicata Issue Is For This Court To Decide

The Ninth Circuit has explained that while the res judicata effect of a prior *arbitration* is a question for the arbitrator, the res judicata effect of a prior decision of *this Court* is a question for this Court. *See Chiron Corp. v. Ortho Diagnostic Systems, Inc.*, 207 F.3d 1126, 1132-34 (9th Cir. 2000). *Chiron* held that the res judicata effect of a prior arbitration was itself an issue for the arbitrator to decide, but expressly distinguished the situation involving a prior court decision and explained that its reasoning did not apply in that context. In particular, *Chiron* held that two other circuit court cases were "distinguishable in that both involved the court determining the res judicata effect of its *own* prior judgment on a subsequent arbitration proceeding." *Id.* at 1334 (citing *In re Y & A Group Securities Litigation,* 38 F.3d 380 (8th Cir. 1994); *Kelly v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 985 F.2d 1067 (11th Cir. 1993)). As *Chiron* explained, "the court issuing the original decision is best equipped to determine what was considered and decided in that decision and thus what is or is not precluded by that decision." *Id.*; *see also John Hancock Mut. Life Ins. Co. v. Olick,* 151 F.3d 132, 138 (3d Cir. 1998) ("We conclude that a decent respect for a precedent of this court dictates that we resolve the issue in favor of district court jurisdiction to decide the res judicata defense as it relates to a prior judgment."). The alternative would undermine the proper authority of the federal courts, as a losing party could then seek to arbitrate the very same claim, and if the arbitrator chose to disregard it, the federal court would have no recourse.

When the issue arose again specifically in the context of a prior court judgment, the Ninth

Circuit confirmed the authority of courts to decide the res judicata issue. The Ninth Circuit "h[e]ld [that] arbitrators are not free to ignore the preclusive effect of prior judgments under the doctrines of res judicata and collateral estoppel." *Collins v. DR Horton, Inc.*, 505 F.3d 874, 882 (9th Cir. 2007) (quotation marks and alterations omitted). *Collins* ultimately did not vacate the arbitration award at issue because "arbitrators possess the same broad discretion possessed by district courts to determine when to apply offensive non-mutual collateral estoppel." *Id.* at 880. But this reasoning is inapposite here because the issue is not non-mutual collateral estoppel, but res judicata. And "[r]es judicata is not a discretionary doctrine." *Caprio v. Hartford Life Ins. Co.*, 2008 WL 1766747, at *2 (N.D. Cal. Apr. 15, 2008) (citing *Southern Ry. Co. v. Clift*, 260 U.S. 316, 319 (1922) (noting that res judicata "supersedes [discretion] and compels judgment")).

Indeed, this is the prototypical case for the court to ensure application of res judicata, and to prevent Petitioners from being rewarded for bringing the same essential claim time and again until they finally found one arbitrator to accept it. Such conduct destroys the repose, finality, and judicial economy that res judicata is meant to preserve. Petitioners filed the Chung Action in November 2019, less than five months after they lost the First Arbitration and while their motion to vacate that award was pending. Such a scattershot approach is improper.

Furthermore, this Court's application of res judicata is necessary because the Second Award did not consider the res judicata effect of the dismissal of the Chung Action. *Collins* noted that arbitrators "generally are entitled to determine in the first instance whether to give the prior judicial determination preclusive effect." 505 F.3d at 880. Here, however, the Second Award considered only the res judicata effect of the First Arbitration, not the Chung Action. *See* Second Award ¶¶ 339-64, 380-81.

To the extent Petitioners may fault Respondents for not raising the res judicata effect of the Chung Action before the Sole Arbitrator, such an argument is meritless. The Chung Action was not resolved at the time of Respondents' pleading in the Second Arbitration.



See GPs' Post-Hrg. Br. at 36 but the Sole Arbitrator was well aware of the Chung Action, *see* Second Award ¶¶ 204-05, *See* GPs' Post-Hrg. Br. at 36 *id.* at 38 Thus, the Sole Arbitrator had every opportunity to consider the res judicata effect of the Chung Action.

This Court has held that, where the facts are before the arbitrator and the issue is raised at least in a general way, there is no waiver and the argument can be raised on a motion to vacate the award. *See Immersion Corp. v. Sony Computer Entm't Am. LLC*, 188 F. Supp. 3d 960, 974 (N.D. Cal. 2016). In *Immersion*, the prevailing party "object[ed] to Sony's public policy arguments on the basis that Sony did not raise its public policy concerns during the arbitration." *Id.* at 967. But this Court noted that this issue was "ultimately one for resolution by the courts," and "Sony argued during the arbitration that the scope of the arbitration should include its invalidity defense." *Id.* (quotation marks omitted). "[A]lthough Sony did not expressly argue that the arbitrator was violating public policy during the arbitration, Sony raised the facts it now uses to support its public policy argument," and the issue thus could be addressed in the district court. *Id.* Likewise, here, the res judicata issue is ultimately one for this Court, all of the facts were before the Sole Arbitrator, and Respondents' raising of the res judicata issue more than suffices to avoid waiver. In any event, a strict waiver rule does not apply to the issue of res judicata, where courts consistently recognize that courts can raise the issue *sua sponte* regardless of whether the issue was raised before or at all. *See Headwaters Inc. v. U.S. Forest Service*, 399 F.3d 1047, 1054 (9th Cir. 2005) ("[A] court may, *sua sponte*, dismiss a case on preclusion grounds where the records of that court show that a previous action covering the same subject matter and parties had been dismissed.") (quotation marks omitted); *McClain v. Apodaca*, 793 F.2d 1031, 1033 (9th Cir. 1986) ("McClain's complaint

in his second action referred to the earlier judgment. It is consistent with these principles to permit a court which has been apprised by the plaintiff of an earlier decision arising out of the same contract upon which the action before the court is based, to examine the res judicata effect of that prior judgment *sua sponte*."); *see also, e.g.*, *Community State Bank v. Strong*, 651 F.3d 1241, 1261 n.17 (11th Cir. 2011) (similar).

**2. This Case Satisfies All Requirements Of Res Judicata**

"Res judicata, also known as claim preclusion, bars litigation in a subsequent action of any claims that were raised *or could have been raised* in the prior action." *W. Radio Servs. Co. v. Glickman*, 123 F.3d 1189, 1192 (9th Cir. 1997) (emphasis added). Claim preclusion "applies when the earlier suit (1) involved the same claim or cause of action as the later suit, (2) reached a final judgment on the merits, and (3) involved identical parties or privies." *Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985, 987 (9th Cir. 2005) (quotation marks and alterations omitted).

The second and third requirements are clearly satisfied here. This Court dismissed GIIL's amended complaint with prejudice, *see GIIL*, 2020 WL 5355968, at *8, and such a dismissal is a "final judgment on the merits" for purposes of res judicata, *see Hells Canyon Preservation Council v. U.S. Forest Service*, 403 F.3d 683, 686 (9th Cir. 2005) ("Final judgment on the merits is synonymous with dismissal with prejudice.") (quotation marks and alterations omitted). Moreover, this Court already held that there are "identical parties or privies" between the First Arbitration and the Chung Action. *GIIL*, 2020 WL 5355968, at *7-8 (explaining that "Chung and the GPs are in privity," and "Chung was the sole managing member of the GPs" and "certainly shared a commonality of interest with the GPs in the arbitration") (quotation marks omitted); *see also id.* at *1 (noting that CFLD is GIIL's "corporate parent"). Because the parties in the First Arbitration and the Second Arbitration are identical—GIIL and CFLD on one side, the GPs on the other—this reasoning regarding privity applies equally to the Second Arbitration and the Chung Action.

The "same claim or cause of action" element is also satisfied here. Courts "examine four factors to determine whether there is an 'identity of claims': (1) whether the two suits arise out of the same transactional nucleus of facts; (2) whether rights or interests established in the prior

judgment would be destroyed or impaired by prosecution of the second action; (3) whether the two suits involve infringement of the same right; and (4) whether substantially the same evidence is presented in the two actions." *ProShipLine Inc. v. Aspen Infrastructures Ltd.*, 609 F.3d 960, 968 (9th Cir. 2010) (quotation marks omitted). The first factor "is the most important." *Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914, 917-18 (9th Cir. 2012).

The first factor—"same transactional nucleus of facts"—strongly supports application of res judicata here. "Whether two suits arise out of the same transactional nucleus depends upon whether they are related to the same set of facts and whether they could conveniently be tried together." *ProShipLine*, 609 F.3d at 968 (emphasis and quotation marks omitted). "In most cases, the inquiry into the 'same transactional nucleus of facts' is essentially the same as whether the claim could have been brought in the first action." *Turtle Island*, 673 F.3d at 918.

The factual basis for the claims in the Second Arbitration is closely related to the facts in the Chung Action, and the claims certainly could have been brought in the same action. The Chung Action concerned GIIL's claim that "Chung owed fiduciary duties to Plaintiff as the managing member of the GPs" and "Chung allegedly breached his fiduciary duties" in managing the Funds. *GIIL*, 2020 WL 5355968, at *1. [REDACTED]. *See supra* at 15-18. [REDACTED].

Courts consistently hold that where claims are based on the same agreement—even if they identify different breaches—there is a nucleus of fact that warrants application of res judicata. *See, e.g.*, *Trustmark Ins. Co. v. ESLU, Inc.*, 299 F.3d 1265, 1270 (11th Cir. 2002) (A "series of breaches of the same contract, all occurring before filing suit, should be brought in that suit."); *Prime Mgmt. Co., Inc. v. Steinegger*, 904 F.2d 811, 816 (2d Cir. 1990) (holding that "res judicata will preclude the party's subsequent suit for any claim of breach that had occurred prior to the first suit"); *see also* Restatement (Second) of Judgments § 24 cmt. d (1982) ("When a defendant is accused of

successive but nearly simultaneous acts, or acts which though occurring over a period of time were substantially of the same sort and similarly motivated, fairness to the defendant as well as the public convenience may require that they be dealt with in the same action.”). [redacted] rather than breaches of contract, the same logic holds—the claims all concern the parties’ relationship and conduct under the investment agreements, along with interpretation of the rights and obligations set forth by the agreements.

This Court also has repeatedly recognized that res judicata applies where additional alleged violations in the second action are related to the ones alleged in the prior action. For instance, this Court held: “The fact that plaintiff adds new allegations regarding different incidents . . . does not alter the Court’s conclusion that there is an identity of claims between the 2015 action and the present action. A plaintiff cannot avoid the bar of claim preclusion merely by alleging conduct by the defendant not alleged in the prior action, or by pleading a new legal theory.” *Ortega v. Ritchie*, No. 18-CV-02944-HSG (PR), 2019 WL 251482, at *2 (N.D. Cal. Jan. 17, 2019) (Gilliam, J.). Similarly, this Court has held that “new facts or a worsening of the earlier conditions” does not “preclude[] the application of the [res judicata] doctrine” where “this case does not raise new claims or present new allegations that could not have been brought in the” prior case. *Harry v. KCG Americas LLC*, No. 20-CV-07352-HSG, 2021 WL 2711746, at *5 (N.D. Cal. July 1, 2021) (Gilliam, J.). And specifically in the commercial context, this Court has held “there is no doubt that the instant litigation arises out of the ‘same transactional nucleus of facts’” where the claims all “relat[e] to the [same] loan repayment and agreement . . . and the related deed of trust”—despite the very different claims, one concerning alleged lack of proper disclosure and another concerning allegedly improper foreclosure. *Cruz v. Select Portfolio Servicing, Inc.*, No. 19-CV-00283-LHK, 2019 WL 2299857, at *4 (N.D. Cal. May 30, 2019).

Here, as in these cases, Petitioners’ claims in the Chung Action and Second Arbitration certainly could have been brought together. They concerned the same essential question as to whether the GPs (and Mr. Chung as their Managing Member) acted in conformance with the investment agreements and the fiduciary duties thereunder in making investments for and managing

the Funds. Even beyond this essential connection between the actions, the same alleged facts underlie both actions. For instance, the Chung Action focused on allegations of "making and concealing unauthorized changes to the limited partnership agreements," *GIIL*, 2020 WL 5355968, at *1, [redacted] *see* Second Award ¶¶ 160-72, 299, 512. In addition, the Chung action alleged that Mr. Chung "devot[ed] his time and focus to raising other funds," *GIIL*, 2020 WL 5355968, at *1, [redacted] *see* Second Award ¶¶ 427-31. Moreover, the Chung Action alleged that Mr. Chung "fail[ed] to appropriately staff the funds or identify new investments," *GIIL*, 2020 WL 5355968, at *1, [redacted] *see* Second Award ¶¶ 414-19. Thus, there is no question that the claims were substantially overlapping and that the claims could have (indeed, should have) been brought in one action. And while there was some different evidence of the supposed breaches in the Second Arbitration, that is irrelevant as a matter of law. As the Ninth Circuit has explained, "[t]he fact that some different evidence may be presented in this action . . . does not defeat the bar of res judicata." *Adams v. Cal. Dep't of Health Servs.*, 487 F.3d 684, 691 (9th Cir. 2007) (quotation marks omitted); *see also* Restatement (Second) of Judgments § 25, Comment b ("A mere shift in the evidence offered to support a ground held unproved in a prior action will not suffice to make a new claim avoiding the preclusive effect of the judgment").

Furthermore, the timing of the Chung Action shows that the claims made in the Second Arbitration all could have been brought there. The operative pleading in the Chung Action *post-dated* the operative pleading in the Second Arbitration. *See* Case No. 19-CV-07670, Dkt. 29 (First Amended Complaint filed March 23, 2020); Ex. Q (Amended Demand for Arbitration filed Feb. 28, 2020). Thus, there is no plausible argument that the claims in the Second Arbitration were unavailable at the time of the Chung Action. Indeed, [redacted]

4 [redacted] Second Award ¶ 405; [redacted]



The second factor is also satisfied because the "rights and interests established in the prior judgment" were impaired by the Second Award. *See, e.g.*, First Witness Statement ¶ 2.

The third factor is likewise satisfied, as "the two suits involve infringement of the same right." Thus, both actions concern Petitioners' same rights under the agreements and .

*id.* ¶¶ 422-25; *id.* ¶¶ 259-61, 429-30; *id.* ¶¶ 437-49; . ¶¶ 450-57; *id.* ¶¶ 458-60; . ¶ 412.

**B.** [redacted]

There is a further, independent ground to deny confirmation of and vacate the Second Award: [redacted] exceeds the arbitrator's authority under the plain terms of the parties' agreement. The Court should not permit such a stunning reward to CFLD for yet again defaulting on their contractual obligations to a business partner—in flat contravention of the terms of the parties' agreement.

**1. The Question Whether The Remedy Conflicts With The Agreements Is For This Court To Decide**

This Court should vacate an arbitrator's remedy as exceeding his authority under the FAA where that remedy conflicts with the parties' agreement. In this case, the remedy directly conflicts with substantive provisions of contracts *and* directly contravenes the grant of authority set forth in the arbitration agreement. The Ninth Circuit has held that although "[g]enerally, an arbitrator's remedy . . . deserves deference," the "remedy, however, must still draw its essence from, and is therefore limited by, the [parties'] agreement." *Phoenix Newspapers, Inc. v. Phoenix Mailers Union Local 752, Int'l Broth. Of Teamsters*, 989 F.2d 1077, 1081-82 (9th Cir. 1993). For instance, where an arbitrator ordered the parties to negotiate "additional compensation," it effectively "established a new term and condition of employment—'additional hourly compensation'—for which the parties did not bargain." *Id.* at 1082. "Thus, the arbitrator impermissibly altered the bargaining relationship," and the award was properly vacated. *Id.* Indeed, courts have not hesitated to vacate awards where the arbitrator's remedy exceeded the remedial powers set forth in the agreement. *See Kanuth v. Prescott, Ball & Turben, Inc.*, 949 F.2d 1175, 1180 n.10 (D.C. Cir. 1991) (collecting cases in which arbitrators lacked authority under contract to construct remedy ordered); *see also, e.g.*, *Anheuser-Busch, Inc. v. Local Union No. 744*, 280 F.3d 1133, 1140, 1144-45 (7th Cir. 2001).

Moreover, deference to the arbitrator does not extend to his interpretation of his remedial powers under the terms of the parties' agreement. For instance, where the party defending an award

argued that "[s]ince construction of the agreement is for the arbitrators . . . courts should not be allowed to look at the merits of the award," the Ninth Circuit nonetheless held that "the arbitrators exceeded the authority given them by the consent of the parties" by issuing a remedy of extending the date for delivery of the products at issue. *Coast Trading Co. v. Pac. Molasses Co.*, 681 F.2d 1195, 1198 (9th Cir. 1982). The Ninth Circuit explained that, while "it is not for the courts to examine the merits of an award . . . the award will not be shielded from judicial scrutiny intended to insure that the award is grounded on the agreement of the parties and the issues they present for resolution." *Id.* This reasoning follows from the more general principle that "arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). Thus, *Coast Trading* concluded: "Because the inherent nature of arbitration as a method of dispute resolution involves the agreement of the parties, we vacate this arbitration award as being contrary to remedies provided in the contract and as beyond the authority of the arbitrators under the submission." 681 F.2d at 1198.

Similarly, this Court has vacated awards of remedies that conflict with the agreement, with little or no deference to the arbitrator. For instance, this Court vacated an arbitration award where "[t]he Panel's award of lost profits and business value therefore plainly exceeded its authority." *Thomas Kinkade Co. v. Hazlewood*, 2007 WL 9812853, at *7 (N.D. Cal. June 6, 2007). The defendants (who had prevailed at arbitration) argued that this was a matter of contract interpretation, and that the court must defer to the panel's interpretation. *Id.* But this Court ruled that, "'where the arbitrator exceeds the express limitations of his contractual mandate, judicial deference is at an end,' and jurisdictional challenges focusing on whether an award is grounded in a contract are considered *de novo*.'" *Id.* (quoting *Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'rs Beneficial Ass'n*, 889 F.2d 599, 602 (5th Cir. 1989)). This follows from the principle that "[a]rbitrators are not free to interpret commercial agreements to give themselves more power than the parties bargained for." *Id.* Similarly, this Court vacated an award where "[t]he Arbitrator decided that Aspic should not [be] held to the strict provisions of the subcontract agreements . . .

and proceeded to award Aspic costs and lost profits presumably unavailable to Aspic pursuant thereto." *Aspic Eng'g & Constr. Co. v. ECC CENTCOM Constructors, LLC*, 268 F. Supp. 3d 1053, 1059 (N.D. Cal. 2017) (quotation marks omitted).

Regardless of whether review is labeled *de novo* (as in *Thomas Kinkade*), the careful analysis of the contractual language in *Phoenix Newspapers* and *Coast Trading* establishes unequivocally that the Court must examine for itself whether the remedy conflicts with the agreement. More generally, the Ninth Circuit has held that, where "[t]he arbitrator disregarded a specific contract provision to correct what he perceived as an injustice," and the arbitration ruling "conflicts directly with the contract, the court properly vacated the award." *Pac. Motor Trucking v. Automotive Machinists*, 702 F.2d 176, 177 (9th Cir. 1983) (vacating award where "[t]he arbitrator disregarded a specific contract provision to correct what he perceived as an injustice"). "Although an arbitrator has great freedom in determining an award, he may not 'dispense his own brand of industrial justice.'" *Id.* (quoting *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597). This Court likewise has explained that an arbitrator may not "refus[e] to apply the terms of the agreement to the dispute." *Aspic Eng'g*, 268 F. Supp. 3d at 1059. An "award is legitimate only so long as it draws its essence from the . . . agreement." *Coast Trading*, 681 F.2d at 1197-98 (citation omitted); *see also Mich. Mut. Ins. Co. v. Unigard Sec. Ins. Co.*, 44 F.3d 826, 830 (9th Cir. 1995) (where "arbitrators stray[] from the limitations imposed by the parties, they exceed[] their powers").

Here, the language of the investment agreements confirms the propriety of judicial review to ensure that the remedy does not conflict with the agreements and an explicit limitation on the arbitrator's authority set forth in the arbitration agreement itself. [redacted]



. Courts consistently recognize that such provisions prohibit an arbitrator from acting in conflict with the agreement.[5]

[5] *See, e.g.*, *Leed Architectural Prods, Inc. v. United Steelworkers of Am., Local 6674*, 916 F.2d 63, 64 (2d Cir. 1990) (holding award should be vacated where agreement provided that "arbitrator had no authority to add to, subtract from or in any way modify its terms," and that the decision of arbitrator would be final only so long as it "was not contrary to law *or the provisions of the agreement*" (emphasis added)); *Harry Hoffman Printing, Inc. v. Graphic Commc'ns Int'l Union, Local 261*, 950 F.2d 95, 100 (2d Cir. 1991) (concluding that arbitration decision premised on extra-contractual principal was not permissible because agreement included a "no modification" clause that prohibited the creation of new contractual terms); *Anheuser-Busch, Inc. v. Local Union No. 744*, 280 F.3d 1133, 1140, 1146 (7th Cir. 2001) (holding award should be vacated where arbitrator exceeded authority because "zipper clause" prohibited arbitrator from modifying contract).



CASE NO. 4:21-CV-08924-HSG

- 31 -

RESPONDENTS' MOTION TO VACATE ARBITRATION AWARD AND OPPOSITION TO PETITION TO CONFIRM

11105-00001/13102733.6



*See supra* at 18-19.

Courts repeatedly reject as improper any rough "industrial justice" that the Sole Arbitrator might have been trying to dispense here, *See supra* at 15-18. *See supra* at 16-17. The Award thereby flies in the face of the agreements, and certainly fails to "draw its essence from, and [to be] limited by, the [parties'] agreement." *Phoenix Newspapers*, 989 F.2d at 1082.

**3. Vacatur On This Ground Requires Remand To A New Arbitrator**

.



the proper course is to remand to a new arbitrator.  "Arbitrators are not and never were intended to be amenable to the 'remand' of a case for 'retrial' in the same way as a trial judge."  *McClatchy Newspapers v. Cent. Valley Typographical Union No. 46*, 686 F.2d 731, 733 (9th Cir. 1982).  "It is [a] fundamental common law principle that once an arbitrator has made and published a final award his authority is exhausted and he is *functus officio* and can do nothing more in regard to the subject matter of the arbitration." *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Silver State Disposal Serv., Inc.*, 109 F.3d 1409, 1411 (9th Cir. 1997) (citation omitted).  Thus, because an arbitrator is

*functus officio* after issuance of a final award, "where a vacated award is remanded and requires a reopening of the merits of a claim, remand to a new arbitrator is appropriate." *Muskegon Cent. Dispatch 911 v. Tiburon, Inc.*, 462 F. App'x 517, 527 (6th Cir. 2012).

Likewise, here, once there is a final award (after resolution of Respondents' Application for Correction), the Sole Arbitrator is *functus officio*, and a remand to him would be improper. *See BridgeLux, Inc. v. Ensure Enter., Inc.*, 2009 WL 10709801, at *4 (N.D. Cal. Mar. 6, 2009) (holding that an award is final for purposes of *functus officio* where it "expressly state[s] that it was [a] 'Final Award' and was 'in full settlement of all claims submitted to this Arbitration'"). There are three exceptions to the *functus officio* doctrine: "an arbitrator can correct a mistake which is apparent on the face of his award, complete an arbitration if the award is not complete, and clarify an ambiguity in the award." *Silver State*, 109 F.3d at 1411; *see also Thomas Kinkade v. Hazelwood*, 2007 WL 2462149, at *3 (N.D. Cal. Aug. 29, 2007) ("[I]t is clear that this Circuit . . . allows for remand only in cases where some discrete error or ambiguity remains to be resolved by the Panel."). None of these exceptions applies here, [redacted] Thus, the Sole Arbitrator is *functus officio*, and a remand to a new arbitrator is necessary.

Finally, even assuming remand to the Sole Arbitrator were permissible, this Court should exercise its discretion to remand to a new arbitrator. This Court has recognized that even where there is no "bias or corruption," remand to a new arbitrator is justified where there is "a pattern of shenanigans and open acrimony among all parties involved" and "[t]he specific issues to be decided on remand [were] sufficiently narrow to avoid the necessity of a full protracted litigation." *Thomas Kinkade*, 2007 WL 2462149, at *4. That is precisely the situation here, and a new arbitration is further warranted given the Sole Arbitrator's blatant disregard for the investment agreements.

### C. The Award Cannot Be Confirmed Because It Is Not Final

In any event, the Petition for confirmation of the Second Award is premature because there is an outstanding Application for Correction of the Award, which makes it non-final. The parties' agreements state that "[a]bsent the filing of an application to correct or vacate the arbitration award

under applicable law, each party shall fully perform and satisfy the arbitration award within 15 days of the service of the award." Second Award ¶ 592. Respondents' filing of the Application within 15 days of service of the Second Award, *see supra* at 18, meaning that the Second Award is not final. An arbitration award is "final and binding" only if the award "leaves nothing for the court to do but execute the judgment." *Millmen Local 550, United Bhd. of Carpenters & Joiners of Am., AFL-CIO v. Wells Exterior Trim*, 828 F.2d 1373, 1375-76 (9th Cir. 1987). Here, there is something critical left for the Sole Arbitrator to do: decide the Application, which addresses an issue that is critical to the Award itself, namely, the amount owed between the parties.

As a matter of law, this non-final, non-binding Award is not the proper subject of a petition for confirmation. "The Ninth Circuit has said that because of the Congressional policy favoring arbitration when agreed to by the parties, judicial review of *non-final* arbitration awards should be indulged, if at all, only in the most extreme cases." *Pac. Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019, 1022 (9th Cir. 1991) (internal quotation marks omitted). Thus, "a court should refrain from reviewing an arbitrator's work until a final and binding award is issued." *Kemner v. Dist. Council of Painting*, 768 F.2d 1115, 1118 (9th Cir. 1985). For instance, when the parties disputed how to calculate damages in an arbitration award, this Court denied the motion for confirmation as premature. *See Mike Rose's Auto Body, Inc. v. Applied Underwriters Captive Risk Assurance Co.*, 389 F. Supp. 3d 687, 692 (N.D. Cal. 2019), *appeal dismissed*, 2019 WL 5207988 (9th Cir. Aug. 27, 2019). Here, likewise, there is no award to confirm when the Sole Arbitrator is still considering the proper amount of the award, and this Court's consideration of the Petition—prior to a decision on the Application—would be premature and improper. If, however, this Court does address the Petition at this time, it should be denied and the Second Award should be vacated for the reasons set forth *supra* Parts A and B.

## III. CONCLUSION

For the foregoing reasons, the Petition for confirmation should be denied and the Award should be vacated, or, in the alternative, the Award should be vacated in part and remanded for further proceedings before a new arbitrator.

Dated: December 17, 2021

By: */s/ David M. Cooper*

Kathleen M. Sullivan (CA Bar No. 242261)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

John M. Potter (CA Bar No. 165843)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

David M. Cooper (*pro hac vice* application granted)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

*Attorneys for Respondents 1955 Capital Fund I GP LLC and 1955 Capital China Fund GP LLC*