# EXHIBIT D

## American Arbitration Association

## International Centre for Dispute Resolution

Global Industrial Investment Limited
(Claimant)

v.

1955 Capital Fund I GP LLC
1955 Capital China Fund GP LLC
(Respondents)

v.

China Fortune Land Development
(Counterclaim-Respondent)

Case # 01-19-0003-4556

Date Submitted: 30 October 2020

### FACT WITNESS STATEMENT OF ANDREW CHUNG

**Arif Hyder Ali**
DECHERT LLP
1900 K Street, NW
Washington, D.C. 20006-1110
arif.ali@dechert.com

**Sole Arbitrator**



Andrew Chung

**1955 CAPITAL**
650B Fremont Ave., #155
Los Gatos, CA 94024

CONFIDENTIAL – ATTORNEYS' EYES ONLY

1.      My name is Andrew Chung.  I solemnly affirm that the following testimony is true and correct to the best of my knowledge and belief, based on my personal knowledge, observations, and experience.

2.      I am the founder of 1955 Capital, a venture capital firm, and the managing member of the General Partners, or GPs, of 1955 Capital Fund I, LP and 1955 Capital China Fund, LP, which I refer to as the Funds in my testimony below.  As such, I was involved in the preliminary discussions and negotiations with China Fortune Land Development, which I refer to below as CFLD, including Wang Wenxue (the Chairman of CFLD, who is frequently referred to as Chairman Wang), Cheng Tao and Xu Shaoyi (who were senior members of CFLD's private equity team), and CFLD's Board office that led to the creation of the Funds and the adoption of their governing documents, which I will refer to as the Investment Agreements.  I have been intimately involved in all aspects of running the Funds, including identifying, negotiating, and supporting investments, throughout the Funds' existence.

3.      I was present at the October 2016 "ambush" meetings in which CFLD made unfounded accusations against me and demanded that I shut down the Funds and return the money that had not been invested, and I was the GPs' primary representative during the prior arbitration.  I read all briefs and witness statements submitted in connection with the arbitration and was present during all hearings.

4.      After the Final Award was issued in the arbitration, I led, and actively participated in, the Funds' efforts to refocus on making portfolio company investments, which had largely been placed on hold during the arbitration, and after CFLD made the accusations and demanded that I dissolve the Funds in October 2016.

5.      I also experienced, intensely, all aspects of CFLD's efforts to block the investments we were in the process of making after the prior arbitration concluded, as well as

2

CFLD's renewed attempts to threaten and intimidate me into agreeing to shut down the Funds and return uninvested money, in the same approximate time period.  As I explain in detail in my testimony below, CFLD's efforts in that regard were undertaken by filing litigation against me and my wife, Coral Chung, in the United States and China, and by spreading false statements in press releases, social media postings, and letters to portfolio companies and others.

6.      I also communicated with CFLD's representative in the United States, Peng Wang, on a number of topics in writing, in person, and on the telephone.  The topics we discussed included the threats and false statements that CFLD was making publicly and in private communications with third parties, which Mr. Wang was directing.  Mr. Wang also made threats to me personally.

7.      After it became clear that the Funds were able to line up investments despite CFLD's efforts to prevent them, and CFLD expressed interest in the investments and requested information about them, Mr. Wang and I discussed the investments at length in person and by telephone.

8.      CFLD's counsel informed my attorneys that earlier this year Peng Wang changed his name to Patrick Wong.  I will therefore refer to Peng Wang below as Patrick Wong or Mr. Wong.  Because most of the events I will discuss in this statement happened prior to Mr. Wong's name change, many of the exhibits I refer to in this statement, to the extent they reference him, refer to Mr. Wong by his prior name.

I.      MY BACKGROUND

9.      I was born in New York City into a first-generation Chinese immigrant family.  I attended Harvard University, where I graduated Phi Beta Kappa with honors in Applied Mathematics in 1999, and in 2006 I obtained an MBA from The Wharton School of Business.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

10.     I am proficient in Cantonese, which is my first language, as well as Mandarin and English, and have conducted business in all three languages.

11.     In the decade prior to founding 1955 Capital, I was a partner at Khosla Ventures and a principal at Lightspeed Venture Partners, two top-tier venture capital firms.  Prior to that, I started an e-commerce company that was acquired by a public company, worked for a technology company developing customer relationship management solutions in the automotive industry, and spent two years at Bain & Company in Hong Kong, helping global companies develop projects across China and Asia.  A true and correct copy of my biography from 1955 Capital's website reflecting my education and work experience is included in the Appendix of Exhibits as R-141.

## II.     MY EXPERIENCE IN VENTURE CAPITAL AND CLEAN TECHNOLOGY INVESTMENTS

12.     I have worked in venture capital since 2004.  In 2006, I joined Lightspeed Ventures, a global venture capital firm that manages over $10 billion in committed capital.  During my five-year tenure with Lightspeed, I helped build what is widely regarded as one of the industry's most successful cleantech portfolios.  I was directly involved with a number of companies in sustainability and health care that achieved successful public exits or reached "unicorn" status (over $1 billion in valuation), including Solazyme, Natera, Personalis, and QuantumScape (among others).  I helped build the firm's practice areas in cleantech, education, and genomics that invested early in a portfolio that represented roughly $10 billion in market value at IPO/sale or at current valuations.

13.     In 2011, I became a general partner at Khosla Ventures.  From 2011 to 2015, I was one of six GPs at Khosla, which was founded by Vinod Khosla, a co-founder of Sun Microsystems and former GP of Kleiner Perkins Caufield & Byers.  Khosla manages more than $5 billion in committed capital and had the world's largest venture capital portfolio of

4

sustainable technologies during my tenure at the firm.  I was recruited to join Khosla based on my experience and reputation in the industry to continue my focus on investing in areas beneficial to society, including clean and sustainable technologies, food and agricultural technologies, advanced health technologies, and education.  I also led the firm's activities in China and worked with many of the firm's portfolio companies to develop successful models for U.S.-China collaboration.

14.     While at Khosla, I was directly involved with a number of companies in socially beneficial sectors, including Wattpad (education), Lanzatech (carbon to bioenergy), Ecomotors (automotive), LS9 (bioenergy), Bioconsortia (agriculture), Impossible Foods (alternative proteins), and Quantumscape (energy storage).  I actively managed over $500 million in the firm's assets and served as board director or advised more than 20 portfolio companies.

15.     I also served on a White House roundtable on advanced manufacturing during the Obama Administration and have advised global leaders, including former U.K. Prime Minister Tony Blair, on energy technology and policy.

## III.   BACKGROUND ON THE VENTURE CAPITAL INDUSTRY

16.     To provide some context that may be helpful in explaining and understanding the events that I will address in my testimony, I will provide some basic background information regarding the venture capital industry, which is based on my personal experience.

17.     The venture capital industry is highly competitive.  Venture firms are private entities that compete for limited partner investors, for access to the most promising portfolio companies in which to invest, for advisors and strategic partners, and for talented employees.

18.     Venture capital firms succeed by identifying, examining, and investing in companies with emerging technologies and novel business plans, and by establishing and

5

maintaining relationships with entrepreneurs, founders, strategic advisors, limited partner investors, and prospective investors.

19.     Confidentiality, trust, discretion, and reputation are of paramount importance in virtually all aspects of the venture capital industry, to a degree well beyond their importance in business generally.

20.     Reputation is critically important in all aspects of the venture capital industry, including attracting investors, potential employees, and potential portfolio companies and the ability to work with co-investors in portfolio companies.

21.     Because the nature of the venture capital industry requires participants to regularly share a broad range of highly confidential proprietary business and technology information, maintaining confidentiality is also extremely important.  Venture capitalists obtain extensive confidential information about potential portfolio companies and gain access to proprietary information about their portfolio companies' technology, business strategy, and financial performance, which they obtain confidentially as investors and often as directors of their portfolio companies.  Disclosure of such confidential information can seriously harm existing and potential portfolio companies.

22.     Disclosure of confidential information regarding actual or prospective portfolio companies can also result in irreparable injury to venture capital firms and their principals, whose ability to make promising investments necessarily depends on their ability to hold such information in confidence.

23.     The same is true with respect to disclosure of the identity of, and confidential information regarding relationships and interactions with entrepreneurs, strategic partners, limited partner investors and prospective investors.  For many reasons, public disclosure of such confidential information is normally protected by custom and contract.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

24.     Similarly, information regarding the inner workings of a venture capital firm, including with respect to strategies, investments, evaluation of investments, and relationships with limited partner investors and prospective investors, entrepreneurs, strategic advisors, and employees and prospective employees are also held in confidence, by custom and pursuant to contracts designed to ensure confidentiality.  Disclosure of such information can seriously compromise the ability of a venture capital firm to operate effectively in a highly competitive environment.

25.     A venture capital firm's success also depends on having reliable access to capital and having a clear understanding of how much capital it will have available to invest. Uncertainty regarding these elements negatively impacts a fund's ability to get into deals, provide assurances of future support, and protect existing investments.

26.     The early stage companies that venture capitalists invest in will typically need additional capital during their pre-IPO lifecycles and need to be able to rely on existing investors to provide at least some of that capital through follow-on investments.  Questions or concerns about an existing investor's ability to participate in follow-on financings often create problems for early-stage companies.  There are a number of reasons for this, including a new investor's concern that the existing investor's unwillingness to invest stems from insider knowledge of the prospects of the portfolio company in question or a new investor's unwillingness to invest in a company if its existing investors are not in a position to support the company going forward. Also, the terms of any new investment can be very punitive to the company, including by valuing the company at a discount.

27.     Investors who are unable to participate in future rounds can also suffer negative consequences.  The terms of any new investment sometimes require that non-participating investors' preferred stock be converted to common stock, which eliminates any protective

7

provisions and investor rights attached to the preferred stock, such as anti-dilution or rights of first refusal.

28.     For these reasons, it is extremely important that limited partners honor their contractual obligations to provide capital, which are referred to as capital commitments. Because honoring capital commitments is fundamental, venture capital limited partnership agreements often include strong, enforceable default provisions to discourage defaults and avoid the havoc often wrought by them.

29.     One mechanism VC firms sometimes use to ensure reliable access to capital is escrow arrangements, as was done here.  Escrow arrangements require that a limited partner provide either a portion or all of its capital commitment upfront to be held in an escrow account until called.  Such arrangements help to ensure a capital commitment is secure, which gives comfort to the fund, to additional LP investors, and to portfolio companies that the fund will be able to draw upon capital when needed.

30.     CFLD's conduct amply illustrates why an escrow arrangement can be so important.  After meeting the initial obligation to fund the first $80 million of the $200 million it committed, CFLD has defaulted on subsequent obligations and continues to refuse to fund escrow and capital calls, as discussed below.  The initial deposit therefore represents the total amount the Funds have been able to rely on; had that deposit not been made, the Funds would have been unable to invest or fund operations.  At the same time, CFLD's ongoing failure to fund its remaining escrow commitment of $120 million has had significant negative impacts on the funds, requiring them to drastically modify their investment strategies as they were originally built to invest well in excess of $200 million of investable capital.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

IV.    **1955 Capital's Focus and Investment Mission**

31.    The purpose and mission of 1955 Capital and the Funds is, and always has been, to invest in advanced technology from the developed world to solve the most challenging problems in the developing world – starting with China.  While the technologies that can serve that purpose are varied, prominent fields in which such technologies can be deployed include clean energy, sustainable agriculture, advanced healthcare, and education.  In pursuit of its mission, the Funds have thus far invested in companies that provide sustainable meat alternatives, reduce the need for pesticides while improving crop yields, develop cost-effective energy storage solutions, improve screening for early-stage cancer, convert industrial waste into commodity materials, and make transportation greener, among other things.  Over the years, we have also given serious consideration to companies that are developing technology in healthcare screening and delivery, wastewater treatment, smart infrastructure, dairy alternatives, and many other areas.  We have never invested in, nor given serious consideration to investing in, the mobile software and services segment.

32.    CFLD understood the Funds' mission and investment focus from the outset of our relationship and agreed with and supported it from the beginning.  That was clear throughout my discussions and interactions with CFLD before and after the Funds were formed.  CFLD's representatives, including Chairman Wang, Mr. Cheng, and Mr. Xu, were also intimately familiar with my investing background, which was closely aligned with the Funds' mission and investment focus.

33.    The purpose and investment focus of 1955 Capital and the Funds were reflected in the presentations and documents I shared with CFLD while we were discussing and negotiating the investment, and in the documents CFLD created, including its public

9

announcement of the investment.  The Funds' investment plan was also reflected in the oral and written updates I provided to CFLD thereafter.

## V.   CLAIMS THAT THE FUNDS WERE REQUIRED TO INVEST IN MOBILE SOFTWARE AND SERVICES

34.     I am aware that the arbitration demand filed in this matter claims that the Funds were required to invest primarily or exclusively in mobile software and services, and that CFLD thereafter made the same essential claim regarding an "investment mandate" in public and private statements and communications, including communications directed to companies in which the Funds had invested, or were considering for investment.  There was never any such mandate.  Nor did CFLD ever express any interest in making any investment in this area, which would have been contrary to 1955 Capital's mission and investment focus as reflected in the presentations and reports that I made to CFLD and inconsistent with my track record and experience.  The topic of investing in mobile software and services never came up in any discussion, and none of the many companies that were listed in my presentations and reports to CFLD as investment targets were in that sector.

35.     CFLD's representatives, including Chairman Wang, Mr. Cheng, and Mr. Xu, understood from the outset that 1955 Capital did not intend to invest in mobile software and services, and that understanding is reflected in internal CFLD documents that were presented to me, and in CFLD public announcements and regulatory filings that I reviewed.  None of those documents mentioned mobile software and services or any supposed investment mandate.  They were all focused on our shared understanding that the Funds would be investing in other sectors.

36.     While at Khosla, I was introduced to Chairman Wang, who is the founder and Chairman of CFLD.  During the period 2013 through 2015, Chairman Wang and I met several

CONFIDENTIAL – ATTORNEYS' EYES ONLY

times in Silicon Valley and Beijing.  Our discussions picked up after we met again at a small

gathering about business relationships between the U.S. and China in April 2015.

37.     During our early discussions, Chairman Wang expressed an interest in investing

in companies from the U.S., Europe, and elsewhere that were developing advanced technologies

that might have significant applications in China, specifically including clean energy, sustainable

food and agriculture, healthcare, and education.  In 2015, Chairman Wang and I began

discussing the possibility of my establishing a venture capital firm that would focus on such

companies and technologies in which he would make a major anchor investment.  Those

discussions, which led to the creation of the Funds, did not include, and had nothing to do with,

investing in mobile software and services.

38.     In an August 20, 2015 meeting with Chairman Wang, I presented a slide deck for

a proposed fund.  The first slide of my presentation to Chairman Wang was captioned "Mission

Statement"  and described the mission of the firm through which CFLD's investment would be

made as:  "Invest in advanced technology from the developed world to solve the most

challenging problems in the developing world - starting with China."  That mission statement,

which has remained consistent to date, represented the shared understanding Chairman Wang

and I had reached regarding the objective and investment strategy for the initial venture.  A copy

of the slide deck I used in the August 20, 2015 meeting with Chairman Wang, which does not

refer to an investment mandate or mobile software and services, is included in the Appendix of

Exhibits as R-8.

39.     After the August 20, 2015 meeting, Chairman Wang assigned senior members of

CFLD's private equity team at Zenity (sometimes referred to as Chinity) Capital, to take the lead

in negotiating the terms of the investments and completing the documentation.  Cheng Tao,

Zenity's President, was initially assigned primary responsibility.  He brought in Xu Shaoyi, who

CONFIDENTIAL – ATTORNEYS' EYES ONLY

described his position as being in charge of Zenity's strategic investment department, to assume day-to-day responsibility for those tasks.  Mr. Xu then became my primary point of contact at CFLD, although I continued to interact with Chairman Wang and Mr. Cheng.

40.     I interacted and negotiated with Chairman Wang, Mr. Cheng, and Mr. Xu in face-to-face meetings, on the telephone, and through WeChat messages and email.  At no time during any of those discussions and negotiations was there ever any mention of mobile software and services in any way, shape, or form.  Rather, the discussions focused on technologies that might benefit China, including technologies that address problems relating to the environment and energy, food and agriculture, education, consumerization, and China's aging population.

41.     After I had a series of meetings and discussions with Mr. Xu and Mr. Cheng, on September 9, 2015, Mr. Xu sent me a draft document he referred to as "Meeting Minutes" in a WeChat message.  The minutes stated that "The strategic direction of the Main Fund is to invest in new cutting-edge companies (teams) in new high-tech in the Bay Area/Silicon Valley of the United States that may produce revolutionary products and form significant production capacity in the future; mainly in angel funding to series A/B rounds of funding.  The strategic direction of the Single LP Fund is to industrialize innovative technology to form significant production capacity for implementation in CFLD's new industrial city and industrial park, to promote regional economic development locally."  A copy of the "Meeting Minutes," which do not refer to mobile software and services or any investment mandate, is included in the Appendix of Exhibits as R-11.

42.     At Mr. Xu's request, I provided information and responded to questions during the review of the investment that was conducted by CFLD's Board of Directors' Office in connection with the submission of the investment to CFLD's Board for approval.  At no time during that process did anyone mention mobile software and services, or investments in that

12

sector, in any context, and none of the materials I reviewed or discussed with CFLD's Board Office referred to mobile software and services or any investment mandate.

43.     At Mr. Xu's request, I also reviewed and commented on CFLD's public announcement regarding the investment in the Funds, which was included in CFLD's securities filings made as a listed company on the Shanghai Stock Exchange.  CFLD's announcement described the investment and deal terms in detail but made no mention of mobile software and services or an investment mandate.  Rather, it described the focus of CFLD's investment as "transformative technology, with the aim of resolving major problems faced by China and other developing nations, including energy, medicine, food, agriculture, and education."  A copy of the CFLD release that I reviewed is included in the Appendix of Exhibits as R-7.

44.     In a regulatory submission that CFLD made with the Chinese State Administration of Foreign Exchange (SAFE), which I reviewed in the course of the prior arbitration, CFLD stated:  "The key investment target of the industrial fund is in overseas innovative high-tech companies with potential to develop revolutionary products and to form major production capacities."  A copy of CFLD's SAFE submission regarding its investment in the Funds, which does not mention mobile software and services or any investment mandate, is included in the Appendix of Exhibits as R-6.

45.     During the Funds' first year of operation, I frequently updated CFLD on the Funds' investment efforts, sent detailed reports regarding the specific companies that the Funds were targeting for investment, and made a PowerPoint presentation that discussed over a dozen companies the Funds were considering for investments.  A copy of my April 18, 2015 Update listing the focus of the companies that the Funds were targeting for potential investment on page 19 is included in the Appendix of Exhibits as R-12.  There was no discussion of mobile software services in connection with the update or the targeted investments, or in any discussion or written

CONFIDENTIAL – ATTORNEYS' EYES ONLY

communication with CFLD thereafter.  There was no reason for any such discussion, and, again, the topic simply never came up.

46.     In August 2016, the Funds made their first portfolio company investment, investing in Crop Enhancement, a sustainable agriculture company that has developed a product that significantly improves crop resistance to pests and diseases and decreases the need for synthetic pesticides.  The GPs disclosed this investment to CFLD, and CFLD raised no concern that it was not in the mobile software and services industry, and there was no discussion of that topic.

47.     In mid-2016, CFLD began raising concerns about the pace of the Funds' progress with regard to attracting other investors and making investments.  In October 2016 meetings, CFLD sought to intimidate me into dissolving the Funds.  Although CFLD made many unfounded accusations and assertions at those meetings, and thereafter, it did not raise any issue or complaint regarding the fact that none of the Funds' actual or prospective investments concerned mobile software and services.  There was no discussion of mobile software and services or any investment mandate at the October 2016 ambush meetings, or in the discussions that preceded and followed the meetings.

48.     I was actively involved in the prior arbitration, attended all hearings, and carefully read the voluminous statements of the case and witness statements that CFLD filed in the arbitration.  Although CFLD's statements of the case and witness statements made a great many unfounded accusations and allegations, and asserted many claims against the GPs, they did not assert any claim related to any supposed requirement that the Funds invest in mobile software and services.  Moreover, the descriptions of the purpose and focus of the investments to be made by the Funds in the witness statements submitted by Mr. Xu and Mr. Cheng did not refer to

14

mobile software and services or any investment mandate and make clear that they understood the Funds would be investing in other areas.

49.     During the pendency of the prior arbitration, the Funds invested in two additional portfolio companies:  Gridtential, an energy storage company, and Sustainable Bioproducts, a meat alternatives company.  The GPs disclosed both of these investments to CFLD.  CFLD did not object that these investments were outside the mobile software and services industry.

50.     As I describe in detail later in my testimony, after the current arbitration was filed, CFLD's U.S. representative, Patrick Wong (who at that time went by the name Peng Wang) and I corresponded, met, and had extensive discussions regarding a series of investments that the Funds described in capital calls issued on January 21, 2020, after CFLD learned that its efforts to cut off the Funds' ability to make investments had failed to achieve that objective.  During that period, Mr. Wong expressed interest in the investments and requested detailed information regarding them, which resulted in a five-hour meeting.  None of the investments listed in the capital calls had anything to do with mobile software and services.

51.     Although all of the investments listed in the January 21 capital calls would have been outside a mobile software and services investment mandate if such a restriction had existed, none of the detailed information CFLD requested regarding the investments mentioned mobile software and services.  The lengthy letter CFLD wrote in response to the capital calls and requesting information regarding the investments did not mention mobile software and services or any investment mandate, and there was no discussion of mobile software and services or an investment mandate during the five-hour meeting I had with Mr. Wong, or in any of the telephone conversations that followed.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

## VI.   AFTERMATH OF THE PRIOR ARBITRATION

52.     The Final Award in the prior arbitration, which was issued in June 2019, removed a cloud that had been hanging over the Funds because it confirmed that the Investment Agreements were binding on CFLD, and rejected all of CFLD's challenges to the contracts. (The named parties to the arbitration were CFLD and Global Industrial Investment Limited, or GIIL, which was merely the vehicle that CFLD used to make its investment. I never dealt with GIIL and will refer to CFLD and GIIL together as CFLD in my testimony.)  Based on the facts and circumstances that existed at the time of the prior arbitration, I anticipated that Arbitrator Ghikas might be willing to assist the parties in resolving what remained of their dispute after the proceeding concluded. But he found he lacked jurisdiction to do so.  Nonetheless, his ruling clarifying the right to continue operating the Funds under the terms of the Investment Agreements was critically important. That ruling enabled the GPs to resume full operation of the Funds, and to refocus on making investments.

53.     After the Funds' public launch in early 2016, the 1955 Capital team began working to identify and diligence promising portfolio companies in the Funds' focus areas. The Funds quickly developed a pipeline of several hundred potential portfolio companies, the majority of which were the result of in-bound interest due to the highly favorable press the Funds received when they publicly launched. That initial progress slowed significantly due to the dispute with CFLD beginning in October 2016, but once the arbitration resolved,  I was hopeful we would be able to quickly refocus on our primary goal of carrying out the objectives of the Funds by making new investments in promising companies, and supporting our existing portfolio companies.

54.     The China Fund had a Commitment Period, during which the Fund could make initial investments in portfolio companies, that ran until December 1, 2019. Because of CFLD's

16

actions and the cloud cast by the dispute, we had not been able to invest at the pace we had originally planned. Once the cloud of the arbitration was removed, I knew we would need to move quickly to make the most of the time remaining in the Commitment Period. We had a number of attractive investment opportunities in our active pipeline, so we were prepared to do so.

55.     At the same time, I was not naïve about how CFLD might respond to our plan to continue operating the Funds. I knew that CFLD had aggressively attacked me throughout the arbitration, making numerous claims they knew were false. I was prepared that CFLD might renew those attacks, notwithstanding the arbitration award's determination that the Investment Agreements were valid and enforceable in accordance with their terms, and that we had the legal right to operate the Funds under them.

56.     Shortly after the Final Award was issued, it became clear that CFLD would resist satisfying the $9.3 million in costs and fees it was ordered to pay. CFLD insisted that I draw that award from escrow. But because the Funds would continue to invest going forward—something that was not clear during the prior arbitration—and since there was no assurance that CFLD would meet their obligations to deposit the outstanding escrow funds or satisfy future capital calls, it was important to reserve as much of the initial escrow deposit for investing and other Fund obligations as possible. CFLD sought a ruling from Arbitrator Ghikas that the cost award was required to be drawn from the escrow, but that request was rejected.

57.     It also became clear that CFLD would attempt to avoid the arbitrator's ruling that the GPs were entitled to continue operating the Funds in accordance with the Investment Agreements. It was my intention to continue operating the Funds, as I was entitled to do, and that was communicated to CFLD. But CFLD disagreed.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

58.     They first raised the idea of terminating the Funds and suggested that it might be possible to create a different, follow-on fund.  They claimed that was a way for me to "preserve my reputation."  Their not-so veiled threat, as I understood it, was that if I did not agree to let CFLD out of its current obligations, perhaps in favor of some other unspecified arrangement, and if I insisted on payment of the $9.3 million in costs and fees I was awarded, they would use CFLD's superior resources to wage an "all-out war" against the Funds and attack my "reputation" in the industry.  CFLD also made clear that it would use a motion to vacate the arbitration award as a vehicle for these attacks.  I had no intention, however, of abandoning the Funds after fighting so hard for two years to uphold the Investment Agreements in the face of CFLD's attacks.  I also hoped CFLD would not act against its own interests by mounting such an attack.  But, as discussed below, I was wrong about that.

59.     CFLD tried to use books and records inspection rights to greatly expand the information they would typically have access to as a limited partner, which we interpreted as an attempt to increase its leverage and exert pressure on us.  In an August 29, 2019 letter, CFLD made an expansive inspection demand and asserted a right to attend at the Funds' offices a few days later.[1]  A copy of the August 29, 2019 letter is included in the Appendix of Exhibits as R-142.

60.     During this period, my team was continuing their work identifying and vetting potential portfolio companies and supporting the Funds' existing companies.  To that end, we made a small capital call on September 5, 2019 totaling approximately $2.6 million.  We also provided CFLD notice that interest was accruing under the terms of the Investment Agreements

---

[1] We have since provided CFLD with two opportunities to inspect the Funds' books and records, consistent with industry practice.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

on the amounts that they continued to fail to deposit in escrow.  CFLD's ongoing failure was causing continued uncertainty for the Funds.

61.     CFLD's threats continued, including in the context of a failed October 2019 mediation.  In advance of the mediation, the parties agreed to a short standstill, which I had hoped would result in a genuine effort to resolve the parties' differences.  In hindsight, it seems clear that the standstill was intended only to run out the clock and reduce the time available for the Funds to make investments because CFLD sought to return to war footing at the earliest opportunity following the mediation.

62.     Immediately following the mediation, and the end of the parties' standstill period, CFLD filed its motion to vacate the arbitration award on October 21, 2019, filing thousands of pages of confidential documents as exhibits, while arguing that none of the documents should be kept confidential.  It was obvious to me that this was part of the attack strategy they had threatened, and part of the threat to publicly attack my reputation and the Funds.  I reviewed the petition to vacate and the other documents that CFLD filed, and it was very clear that most of the documents included in the filing were not necessary to the petition, or even referenced.  For example, the entire transcript of the five-day arbitration hearing was included as an exhibit but only a few pages were cited in their filing.  I always understood that an arbitration under the Investment Agreements would be confidential as it would necessarily include details of investments, fund operations, fund strategy, potential limited partners, and other information. That is why the LPAs included very broad confidentiality provisions.  I was very concerned that CFLD was seeking to evade those confidentiality provisions in an effort to harm the Funds, 1955 Capital, and me by filing the arbitration record as they had.

63.     It also became clear to me that CFLD would persist in its refusal to pay the $9.3 million cost award.  In an effort to recover what the GPs were entitled to, the GPs began

19

enforcement proceedings in Hong Kong.  Ultimately, as a result of those proceedings, GIIL paid into court in Hong Kong funds sufficient to satisfy the cost award, plus interest.  Those funds were later withdrawn and used by CFLD to obtain a bond, pending the outcome of CFLD's Ninth Circuit appeal of the order confirming the prior arbitration award.  Although the enforcement award was later set aside by the Hong Kong court, those funds are still being held by the federal court as a bond pending the outcome of the appeal.

## VII.   Fund Investment Activities in the Aftermath of the Prior Arbitration

64.     Throughout the prior arbitration, 1955 Capital continued to operate on a limited scale—despite the impediments and uncertainties created by CFLD's repudiation of its obligations and ongoing efforts to force a dissolution of the Funds.  Among other things, the GPs were able to make some relatively small investments, support the Funds' portfolio companies and identify potential new investments.

65.     After the Funds' right to operate under the Investment Agreements was confirmed in the arbitration, we turned to making new and larger investments, with a highly qualified team.

66.     The 1955 Capital team consists of Venture Partner Ryan Gilliam, Ph.D., Venture Partner Benjamin Tseng, Vice President Kathy Chen, and Chief Financial Officer Jim Hinson. (Until December 31, 2019, my wife, Coral Chung, was also part of the 1955 Capital team.  Her responsibilities included advising on strategic matters and supporting portfolio companies.)

67.     Ryan Gilliam is a serial entrepreneur in the sustainability field and is an expert in multiple areas relevant to 1955 Capital's investment mission, including energy, sustainability, waste upcycling, materials innovations, and emerging technologies.  He is an operating executive with a rare combination of deep technical expertise, combined with strong leadership and business capability, and uses his expertise to assist 1955 Capital in evaluating potential portfolio

CONFIDENTIAL – ATTORNEYS' EYES ONLY

companies.  He advises the Funds in selecting the best investments and in supporting the Funds'

portfolio companies after investments are made.

68.     Ryan holds a Ph.D. from the University of Toronto in Materials Science and

Engineering and has authored more than 10 peer-reviewed papers on catalysis and

electrochemistry and is an inventor on more than 60 patents in the energy, sustainability,

products, and materials spaces.  In addition to serving as a Venture Partner at 1955 Capital, Ryan

is the CEO and founder of two companies in the sustainability and cleantech space.  One,

Chemetry Corporation, is an industry chemicals platform focused on developing new processes

for making commodity chemicals.  The second, Fortera, is focused on reducing the carbon

footprint of cement.  I have known Ryan for close to 10 years, dating back to my time at Khosla,

where he helped me and other Khosla partners with numerous technical diligence and review

efforts.

69.     Ryan first joined 1955 Capital as an unpaid advisor because he believed deeply in

1955 Capital's investment mission and potential.  In February 2017, he took on the unpaid

position of Venture Partner (for which he began being paid in April 2020), and has served as

board observer and scientific advisor to several portfolio companies.  He has assisted

management teams in a range of areas, from operating strategy to fundraising, from product

development to technoeconomic analysis, and from equipment design to manufacturing scale-up.

Ryan's advice, perspective, and expertise have played a central role in enabling 1955 Capital to

select promising investments, and in supporting them thereafter.

70.     Benjamin Tseng joined 1955 Capital as a Principal in March 2016 and became a

Venture Partner in December 2019.  He is an experienced venture capitalist and has significant

experience working with and advising start-ups.  In addition to his deep understanding of the

venture capital industry, Ben has expertise in a range of sectors relevant to 1955 Capital's

21

investment mission, including energy, healthcare, food, agriculture, and new manufacturing models.

71.      Before joining 1955 Capital, Ben was a Vice President at DCM, a leading cross-border venture fund managing over $4 billion in assets, and a management consultant at Bain Capital.  I have known Ben for over 10 years and have great respect for his ability to develop deep knowledge and expertise across a range of fields.  I attempted to hire him both at Lightspeed and at Khosla.

72.      Throughout his tenure at 1955 Capital, Ben has been an invaluable member of my team, assisting in identifying promising portfolio companies, conducting due diligence on those companies, negotiating deal terms, and advising companies in 1955 Capital's portfolio.  He is well-respected by portfolio company CEO's, has served as board observer to numerous 1955 Capital portfolio companies, and has advised management teams in a range of areas, from product and marketing strategy to fundraising.

73.      Kathy Chen joined 1955 Capital in 2016 as an Investment Consultant and was promoted to Senior Associate in July 2017, then Vice President of 1955 Capital in November 2019.  Her responsibilities include pursuing and evaluating potential portfolio companies, including their relevance to China and other parts of Asia, and supporting the companies in 1955 Capital's portfolio.

74.      Before joining 1955 Capital, Kathy worked at an Asia-based cross-border growth equity firm, Unitas Capital, which managed over US$4 billion in assets across Asia, North America, and Europe.  Among other things, she assisted in the acquisition of companies in the consumer, industrial and healthcare verticals, and supported their market expansion strategy in China.  She is fluent in Mandarin and bicultural.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

75.     At 1955 Capital, Kathy has been the lead contact for several of our portfolio companies and has served as board observer to several of our portfolio companies.  She has assisted management teams in a range of areas, from market entry strategy to fundraising to budgeting strategy.  More recently, she has worked closely with me to develop a firm perspective on how startups can survive and succeed in the pandemic environment and organized a roundtable with all of our CEO's to brainstorm solutions.

76.     As CFO, Jim Hinson oversees 1955 Capital's financial planning, financial reporting, and operational controls.  He is also the Venture Capital Practice Lead and a consulting CFO at Greenough Consulting Group and serves on Greenough's executive committee.  Greenough is a leading provider of outsourced finance and accounting services in Silicon Valley and has worked with more than 600 technology companies, and 200 venture capital and alternative investment funds, over two decades.

77.     Jim has 35 years of business experience, including 24 years in private equity and has formed four new funds as the administrative partner/CFO.  His deep understanding of the private equity space and seasoned counsel have been extremely valuable to 1955 Capital and the Funds as we have wrestled with issues created by CFLD's previous attempts to disrupt our investment efforts, including with respect to establishing litigation reserves and providing portfolio companies with assurances about the Funds' access to capital.

78.     By the time the arbitration concluded, and the Funds were finally able to resume normal investment activities, we had lost a significant portion of the time that would otherwise have been available to make investments.  Accordingly, we intensified our efforts to identify and make promising investments for the Funds.

79.     My team and I identified, carefully evaluated, and pursued multiple investments in new portfolio companies and follow-on investments in existing ones.  We conducted due

CONFIDENTIAL – ATTORNEYS' EYES ONLY

diligence, prepared investment memoranda, competed to get into the investments deemed most promising, worked with entrepreneurs and the management of prospective investee companies to structure the deals, negotiated term sheets, and performed other tasks necessary to capitalize on significant investment opportunities.  As a result of those efforts, the Funds were well-positioned to make new investments in several promising new companies during the Funds' commitment periods, as well as attractive follow-on investments in existing portfolio companies.

80.     After the arbitration award, between June 2019 and January 2020, Ben, Kathy, and I worked tirelessly to identify the companies that appeared to provide the best opportunities for the Funds.  During that time, we had discussions with or reviewed over 70 companies for potential investment, some of which were known to me from my time at Khosla and Lightspeed, some of which were introduced to us through the team's various network connections, and some of which approached 1955 Capital because of its expertise in the sustainability and healthcare fields.

81.     The team winnowed these companies down to the 28 that seemed promising and that fit within the Funds' investment mission to conduct more focused due diligence.  Ben, Kathy, Ryan, and I spent countless hours conducting detailed due diligence on a number of these companies.  This included, for each company, some or all or the following: carefully reviewing company-provided due diligence materials, interviewing company founders and management, visiting company headquarters, evaluating the company's management team, interviewing references and independent experts in relevant fields, including technical aspects of products and commercial prospects, vetting the companies' business models, assessing the relevant markets and competitors, and analyzing company financials, funding strategy, and the potential exit value and strategy.  I supervised and participated in many aspects of this process.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

82.     Throughout that period, and thereafter, I took the lead in working with managers of prospective and existing portfolio companies, and potential co-investors, to get into deals, structure investments, and negotiate terms advantageous to the Funds.  This was challenging due to the dispute with CFLD and the lack of clarity regarding whether CFLD would honor additional capital calls beyond amounts held in escrow.  The task became considerably more difficult when CFLD launched its public relations campaign in late November 2019.

83.     As I will describe in more detail below, CFLD's campaign caused great concern among the Funds' existing and prospective portfolio companies, including regarding whether the Funds were authorized to invest in the companies, whether the Funds would have access to sufficient capital to fund follow-on investments while simultaneously fighting litigation on multiple fronts, whether the arbitration award would be vacated, whether the companies would receive negative publicity, and whether the companies would be dragged into litigation themselves.  Some opportunities were lost, and we suffered serious reputational damage as a result of CFLD's actions, but we succeeded in lining up a series of attractive investments despite CFLD's efforts to block them.

84.     After substantial due diligence and negotiations, 12 companies emerged as likely candidates for investment, or in the case of existing portfolio companies, follow-on investment: Acuamark, Adarza, Ampaire, Avertana, CNGmotive, Crop Enhancement, DDM Systems, Gridtential, Icaria, Sustainable Bioproducts, Vicarious Surgical, and Woodoo.

85.     To fund an initial tranche of investments in these companies, on November 8, 2019, the GPs sent CFLD drawdown notices calling approximately $10.4 million.  That was followed by a November 19, 2019 letter in which our counsel explained the intended use for the funds called and that "1955 Capital has been hard at work identifying and evaluating investments in new portfolio companies and follow-on investments in existing ones, conducting due

diligence, preparing investment memoranda, competing to get into the investments, working with entrepreneurs and the management of prospective investee companies to structure the deal, negotiating term sheets, and performing other tasks necessary to capitalize on significant investment opportunities."  The letter further noted that as "a result of 1955 Capital's efforts after issuance of the arbitration Award," the Funds were well positioned to make investments during their respective commitment periods.  A copy of Mr. Cohen's letter is included in the Appendix of Exhibits as R-18.

86.     The Funds ultimately invested in seven promising companies after the arbitration concluded, six of which were new to the Funds and one of which, Crop Enhancement, was already a member of the Funds' portfolio.  Those companies are:

- **Acuamark**, which has developed a novel early cancer screening platform with strong cost and sensitivity/specificity advantages over more prevalent sequencing-based approaches;

- **Ampaire,** which is developing and flying hybrid-electric aircraft;

- **Avertana,** which produces a range of valuable mineral and chemical raw materials by extracting them from industrial waste, using an approach that is cost competitive with existing approaches but offers a much lower environmental footprint than traditional methods;

- **CNGmotive**, which has developed a suite of technologies to enable the freight rail industry to switch from diesel fuel to compressed natural gas (CNG), allowing rail operators to access the compelling unit economics of natural gas, which is one-third the cost of diesel on an energy-equivalent basis;

- **Crop Enhancement**, one of the Funds' early portfolio companies, which has developed proprietary sustainable bio-compatible chemistries that, when sprayed

CONFIDENTIAL – ATTORNEYS' EYES ONLY

using conventional farm equipment, beneficially protect plant surfaces—leaves, stems, and fruit—to significantly improve their resistance to pests and diseases and decrease the need for synthetic pesticides and pesticide applications;

- **DDM Systems**, which has invented a novel 3D ceramic printing process that removes the most onerous steps of the investment casting process and enables production of complex geometries, resulting in substantial cost and time savings, as well as innovation in part design that could radically disrupt a $20 billion global industry; and

- **Woodoo,** which has invented a breakthrough material whereby traditional wood is transformed into a next-generation product with advanced functionalities, including translucency for lighting/display, sensitivity for tactile touch, flexibility to be shaped/3D-formed, resistance against weather (UV, fire, water) and wear, as well as improved strength and structural resilience.

87.     These were good investment opportunities for the Funds and fit with the Funds' mission and investment focus, and we expected to make significant investments in each company.  But I also recognized that CFLD's hostile and aggressive behavior following the award in the prior arbitration, including its lawsuits and threats of negative press, posed the risk that it would not ultimately fulfill its capital obligations.  I hoped that would not be the case, and we had modeled making targeted investments for each of the companies in the $5–7 million range, but in order to mitigate that risk to the Funds and to the investee portfolio companies, we conservatively structured the new investments in the following manner:

- Most of the investments were made via convertible promissory notes;

- Instead of calling capital for the entire targeted investment (with reserves), we structured an initial tranche of investment of $1 million in total for each company;

27

- They were all agreed to prior to the December 1, 2019 expiration of the China Fund Commitment Period; and

- Additional funds would be provided through follow-on investments in each company.

88.     Obviously, this was not ideal.  If CFLD had acted reasonably, we could have structured these investments in a more advantageous way and invested more money.  Because we were forced to limit the amount of our investment in this way, the Funds left significant money on the table.  (Ampaire is currently poised to be acquired in a transaction that is expected to net the Funds a five-to-six times return on their investment in roughly a year, but, had we been working with a cooperative LP, our investment would have been much larger than $1 million and in the form of equity instead of a convertible note.)  Given the situation, this structure was likely the only way to get access to these investments in a manner that managed the risks arising from CFLD's behavior.

89.     Similarly, because of the uncertainty resulting from CFLD's actions, we were unable to take on a lead position in the financing round for a number of these companies, including Woodoo, CNG Motive, Avertana, and DDM Systems.  That was a role the companies looked to us to take, and for which we were well-suited.  The consequences of our inability to capitalize on the opportunities to make larger investments are hard to measure at this juncture, but it meant that potential funding rounds did not come together or were smaller or less advantageous than they could have been.

90.     On January 21, 2020 the GPs issued further capital calls to, among other things, fund follow-on investments in the companies in which we had made initial investments and bring them up to the targeted amounts.  The calls would also fund follow-on investments in other existing portfolio companies, and with regard to Fund I, to potentially fund investments in two companies outside the Funds' existing portfolios.  As I explain in detail later in my testimony

below, once it became clear that the Funds were able to line up promising investments despite CFLD's attempts to cut off their ability to do so, CFLD abruptly changed course; CFLD abandoned the campaign, expressed genuine interest in the investments, and met with me to obtain additional information regarding the individual investments.  But CFLD ultimately failed to honor its contractual obligation to provide additional funds.  As a result, and because CFLD's ongoing litigation efforts in multiple courts and in arbitration required the GPs to allocate substantial amounts to litigation reserves, the Funds were not able to make all of the follow-on investments planned and some of the investments made were on less advantageous terms than might otherwise have been obtained.

91.     The Funds seriously considered making investments in five other companies after the arbitration but did not complete those investments.  As I will explain further below, the Funds' failure to invest in two of those companies, Sustainable Bioproducts (now Nature's Fynd) and Vicarious Surgical, was a direct result of CFLD's campaign to sabotage the Funds' investment efforts and our ability to complete investments on favorable terms was adversely affected in multiple ways.

## VIII.   CFLD'S CAMPAIGN

92.     As noted in my testimony above, in the aftermath of the prior arbitration, CFLD threatened "all-out war" that would "bleed the Funds out" by cutting off investment and forcing them to expend their resources defending litigation claims if I did not capitulate to its demands to shut down the Funds.  CFLD further threatened to "punish" me by destroying my reputation and any future I would have as a venture capital investor.  A number of these threats were made directly to me by Peng Wang, CFLD's U.S. representative (who as noted above has since changed his name to Patrick Wong).  Other threats were made by CFLD through its counsel.  In both cases the purposes of the threats were made unmistakably clear.  If I persisted in my efforts

to operate the Funds, and refused to disband them, CFLD would attack me, 1955 Capital, and my

wife, Coral, through litigation and other avenues.

93.     In an August 29, 2019 letter to the GPs' counsel, a copy of which is included in

the Appendix of Exhibits as R-142, CFLD's counsel, Mr. Carl Oberdier, laid out CFLD's plan if

I would not yield.  The letter explained that CFLD had already filed a civil lawsuit against my

wife and me in Langfang, China.  The letter did not say how such a lawsuit could possibly be

filed in good faith or what claims it asserted.  Instead, CFLD simply threatened that the lawsuit

could require us to be present in court in China "while the lawsuit is pending."  The letter further

threatened that CFLD would file a motion to vacate the Final Award and that it was planning "an

arbitration and/or judicial proceeding based on a non-existent "mobile software and services"

investment restriction, and stated that CFLD would "not hesitate to commence" further suits.  In

later discussions, Mr. Wong advised me, using a Chinese proverb, that CFLD would continue to

seek "revenge" against me and my family, even if it took ten years or more.

94.     CFLD made good on its threats.  CFLD filed a fraud lawsuit in GIIL's name

against my wife and me in its home province, in Langfang, China, based on the same fraud

allegations that were adjudicated—and rejected—in the prior arbitration.  (The lawsuit was not

provided to me or my wife at the time, and we only received a copy from our Chinese lawyers

many months later.)  A translated copy of GIIL's initial Langfang complaint, which has since

been amended is included in the Appendix of Exhibits as R-143.

95.     The allegations in the China lawsuit are entirely baseless, but it effectively

restricts my wife and me from travelling to Mainland China, because we can be detained there

until it is resolved.

96.     The China complaint includes patently false allegations against my wife, Coral,

such as stating that she is a 1955 Capital "fund manager," that she had extensive contact with

CFLD and made promises about investors in the funds and companies we'd introduce to CFLD.  CFLD knows the falsity of these allegations, since Coral testified, under oath, about her role and responsibilities at 1955 Capital, which did not include acting as a "fund manager," and only met Chairman Wang—her only contact at CFLD—on three occasions.  Nor did she or I engage in fraud or misrepresentation related to CFLD's investment, as the prior arbitration determined.

97.    In later discussions, Mr. Wong, who at the time was known to me as Peng Wang, explicitly warned me that the Langfang suit would prevent my wife and me—and even our daughter—from safely travelling to China while the suit was pending because we could be held there against our will until the suit is resolved.  Given that all of the allegations in the Langfang complaint are false, and Mr. Wong's own representations on the matter, I presume the actual purpose of the lawsuit was to prevent Coral and I from traveling to China (which disrupts my work, Coral's work, and our personal lives) and to provide material for CFLD's public relations and social media campaign.

98.    After a mediation between the parties held in October 2019 failed, CFLD also filed its promised petition to vacate the Final Award on October 21, 2019.  As I explained above, CFLD attached to its petition and requested the court unseal thousands of pages of confidential sworn testimony, witness statements, and briefing—much of which it did not even cite in its petition to vacate—which contained highly confidential information related to the Funds that would clearly be damaging to our Funds' reputation and ability to operate.[2]

99.    Then, just as CFLD threatened, on October 29, 2019, CFLD initiated this arbitration proceeding in GIIL's name, alleging, among other things, that the Funds had violated

---

[2] Thankfully, the Federal Court ultimately rejected both the petition to vacate and CFLD's effort to make thousands of pages of confidential records public.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

a fabricated investment mandate to invest in the mobile software and services industry, and that they are "failed partnerships" that are unable to make investments.

100.    Then, on November 18, 2019, CFLD filed another lawsuit against me personally in California state court, also in GIIL's name, alleging the very same claims that had already been adjudicated in the prior arbitration (the suit was later dismissed for that reason).

101.    As I noted above, on November 19, 2019, in response to CFLD's objections to the November 8th capital calls and a request for additional information, the GPs' counsel sent a letter to CFLD's counsel that made clear that the Funds were actively pursuing investments.  It explained that the capital the GPs called in November 8, 2019 drawdown notices were "intended for funding a follow-on investment in one of the Funds' existing portfolio companies and making initial investments in a number of new portfolio companies.  The 1955 Team is actively finalizing these investment opportunities."  A copy of the letter is included in the Appendix of Exhibits as R-18.

102.    The very next day, CFLD launched its public relations campaign in earnest.  On November 20, 2019, CFLD issued—and widely distributed through multiple outlets—a press release accusing me of scheming to "steal" $80 million and announcing the suit CFLD had filed in GIIL's name against me two days earlier in California state court.  The release was titled "Andrew Chung of 1955 Capital Sued by Global Industrial Investment Limited for Breach of Fiduciary Duty in Scheme to Steal $80 Million."  In addition to trumpeting the allegations in the California suit, the release noted that "a similar lawsuit has been filed in China that alleges fraud both by Andrew Chung and his wife Coral Chung based upon promises made to GIIL there" and that "additional action by GIIL against Mr. Chung, Mrs. Chung, and others is anticipated."  A copy of the November 20, 2019 press release is included in the Appendix of Exhibits as R-64.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

103.    The November 20, 2019 press release was spread widely, as I observed in real time.  It was distributed through various outlets such as Businesswire, Bloomberg, and Yahoo Finance.  Numerous reporters who had previously covered me and 1955 Capital reached out to indicate that they had been sent the press release by CFLD's PR firm, Singer Associates.  It was also posted on various websites attacking 1955 Capital, my wife, and me, such as "thetruthabout1955capital.com" and "andrewandcoral.com," and for which Google advertisements appeared at the top of the page in results for Google searches for 1955 Capital, my name, my wife's name, or the name of my wife's company.  It was also spread widely on social media by CFLD's public relations firm in posts with pictures of my wife and me, and specifically naming my wife's unrelated business, Senreve, a well-known global luxury fashion brand that my wife founded and serves as CEO.

104.    Moreover, the press release specifically identified Coral as the CEO of Senreve, and was released shortly after high-profile news about Senreve, including the September 2019 launch of its flagship store in San Francisco and its November 4, 2019 announcement of a $16.75 million Series A funding round led by Norwest Venture Partners.  The press release was emailed directly to Senreve investors and others in Coral's professional network by email, with the subject "Coral Chung CEO of Senreve Sued for Fraud in China."  I know that several of her associates, including her lead investors at Norwest Venture Partners, expressed significant concern about the suit and allegations of fraud and that Coral was frustrated because of the difficulty in responding when we did not yet know the substance of the allegations.

105.    The November 20, 2019 press release was also emailed directly to associates of mine, including my former partners at Khosla Ventures—some of whom reached out to me to let us know of the attacks and to find out what was going on.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

106.    For both 1955 Capital and Senreve, CFLD's assault came at a critical time—less than two weeks before the new investment period for China Fund was to close and in midst of the crucial holiday season for my wife's consumer brand.

107.    A week later, on November 27, 2019, CFLD issued another press release—this one titled "Andrew Chung of 1955 Capital Faces New Legal Claim in U.S., According to GIIL." This second press release publicized the first arbitration demand filed in this action and falsely stated that "None of the investments" the Funds had made were "within the specific areas of our deal" and accused me of "continuing to target companies not within the investment mandate." As CFLD certainly knew, there was no such "investment mandate," and it was clear to me at the time that the statement was made to generate concern among the companies we were planning to invest that the investments were unauthorized.  A copy of the November 27, 2019 press release is included in the Appendix of Exhibits as R-65.

108.    The November 27 press release also stated that that "Right after receiving GIIL's investment money, 1955 Capital promptly disregarded its duties and promises" to attract businesses to China, even though the Final Award had rejected those same allegations.  It disclosed the previously non-public information that my wife had worked for 1955 Capital, "drawing a substantial salary while simultaneously launching her startup, Senreve, a luxury handbag company, facts which play a role in current and additional litigation against the couple." It further repeated that my wife and I had been sued in China for fraud and that there is "ample evidence" that I had engaged in a scheme to keep GIIL's $80 million investment for myself.

109.    The release was again widely distributed through various outlets such as Businesswire, Bloomberg, and Yahoo Finance, CFLD's attack websites, social media, as well as tagging investors in my wife's business in other tweets linking to the press release, and direct emails to associates of mine and my wife.  The release was also distributed to a major Chinese

CONFIDENTIAL – ATTORNEYS' EYES ONLY

American TV station with millions of viewers and covered on the air, where it was incorrectly stated that the investment contracts had been invalidated in an arbitration, and after which I received numerous inquiries about the story.

110.    The November 27, 2019 release also appeared on a website titled "Oakland News Now," under the title "Senreve Founder Coral Chung, Husband Andrew Chung, Sued for Fraud" and was accompanied by a picture of my wife and me alongside Madeline Albright, who was holding a photo of our then toddler-aged daughter.  Unlike what is typical for a well-respected news outlet, this article was reposted by the website frequently to generate high placement in the Google search results for me and my wife.

111.    The initial arbitration demand filed in this proceeding, which contained the Funds' confidential information, was distributed to media outlets and I observed that it appeared in its entirety on the website Valuewalk.com.

112.    I also learned, from reviewing documents produced by Claimant in this case as well as letters that were forwarded to me in real time, that on November 27, 2019, Mr. Wong sent letters to the management, directors, and advisors of three of the Funds' portfolio companies—that is, all of the portfolio companies CFLD knew by name.  The letters I reviewed stated that he was writing to "bring some important facts to your attention which might impact your corporate governance, specifically regarding the placement of Mr. Chung in a fiduciary position," and accused me of "an apparent scheme to keep the $80 million" GIIL invested in the Funds for myself, and falsely accusing me of "shirking" my "promises and duties," including by failing "to follow his investment mandate to invest only in specific areas" and failing to evaluate whether the Funds' "investments are suitable for relocation to China."  Copies of the letters Mr. Wong (then known as "Peng Wang") sent to Ryan Gilliam (who is a Gridtential advisor) and ████████████████████████████████████ which invested in Gridtential), both

of whom forwarded copies of the letters to me upon receipt, are included to the Appendix of Exhibits as R-53 and R54, respectively.

113.     In addition to making unfounded accusations, the letters CFLD's U.S. representative sent to portfolio companies, entrepreneurs, and others enclosed copies of the California complaint against me, CFLD's petition to vacate, and CFLD's press releases from November 20, 2019 and November 27, 2019.

114.     On or around December 2, 2019, repackaged versions of the November 27, 2019 press release began appearing online under headlines focusing on the fraud claim against my wife and were distributed on social media, including in numerous tweets from different accounts targeting me, 1955 Capital, and my wife's business.  I understand from reviewing emails that were forwarded to me at the time, that CFLD also emailed the press release on December 2 to a number of people in my network and my wife's—including investors in her company.  I know that shortly after receiving the emails, Senreve investors, including angel investors in Hong Kong and the Bay Area, as well as from Norwest reached out to Coral for explanations and to share their concerns.

115.     The attacks were also specifically targeted to the Funds' portfolio companies and their customers.  For example, on December 12, 2019, the Truth About 1955 Capital Twitter account tagged both Gridtential and its customers, Hoppecke and Crown Battery, in a tweet stating "Fraud lawsuit filed against @1955 CapitalFounder @achung raising questions about company's investment in @Gridtential and its partnership with #battery systems @HoppeckeUK and production run with @CrownBattery" and liking to the earlier press release.  By tagging Gridtential, Hoppecke and Crown Battery, this ensured that anyone who followed any of those companies would have received the message.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

116.     The blitzkrieg on the Google search engine results for "Andrew Chung", "Coral Chung", "1955 Capital", and "Senreve"—from the press releases to the articles that were placed by CFLD's PR firm, from the legal news coverage on the various actions to the ads that were purchased—all but ensured that anyone doing *any* research on us or our companies would find concerning information raising serious allegations against us by a public Chinese company with no public defense on the record.  The situation was made worse by the fact that the initial arbitration was a private, confidential matter, so 1955 could take no public position on the issue without generating even more news—exactly what CFLD was hoping to achieve.

117.     My wife and I continued to receive inquiries related to the campaign from friends and business associates, including portfolio companies and potential portfolio companies, over this time frame and into the December holidays.  It was a very stressful time for both of us.  Apart from the damage that CFLD's actions was doing to my ability to conduct business on behalf of the 1955 Capital and the Funds, it was particularly painful to see the harm CFLD inflicted upon my wife and the business she has worked so hard to build.  I know she wanted me to stand up to CFLD's bullying and to continue working to make 1955 Capital and the Funds a success.  If she had not been so supportive, I might have given some consideration to CFLD's demands that I shut down the Funds and release them from their obligations, to spare my wife further injury and stress.

118.     CFLD again contacted at least one of the Funds' portfolio companies through a letter sent by its counsel on January 2, 2020.  The letters falsely claimed that "1955 Capital was not entitled to invest GIIL's money" in the companies and warned that "GIIL will likely seek third-party discovery" from the companies in litigation related to 1955 Capital's investments.  The obvious purpose of these letters was, again, to sow doubt in the minds of the companies with whom we were negotiating investments regarding whether the investments were authorized, and

CONFIDENTIAL – ATTORNEYS' EYES ONLY

whether they would be drawn into litigation if they went through with the transactions. That was immediately clear to me, and the letters had their intended effect.

119.    Upon receipt of one of these letters, a representative of SBP immediately reached out to me via email with grave concerns that SBP will be pulled into the litigation between CFLD and the GPs. SBP's email and the January 2, 2020 letter from CFLD's counsel it attached is included in the Appendix of Exhibits as R-56. The January 2, 2020 letter to SBP, along with other aspects of CFLD's campaign, caused particular problems for the Funds' planned investment in SBP's Series B round, as I explain in paragraphs 152-55 of this statement.

## IX.    CFLD's Change of Course After the January 21, 2020 Capital Calls

120.    The capital calls that the Funds sent out on January 21, 2020 prompted a marked change in CFLD's conduct. Once it became clear that the Funds had identified, diligenced and negotiated terms on a series of substantial investments, and that the campaign CFLD had waged for the obvious purpose of preventing the Funds from making such investments had not cut them off, CFLD stopped writing letters to portfolio companies, took down the "The Truth about 1955 Capital" website, and stopped the barrage of social media posts and tweets. As I discuss in detail in my testimony below, there was no way to undo the severe damage CFLD's campaign had done, but the reversal of position was striking.

121.    Rather than claiming that I was engaged in a scheme to take their money, and making unauthorized investments in violation of a non-existent "investment mandate," CFLD's U.S. representative, Patrick Wong, reaffirmed the validity of GIIL's capital commitment, and expressed interest in the investments that it had previously sought to prevent. None of the investments listed in the capital calls had anything to do with mobile software and services, but the limitation that CFLD falsely claimed exists in that regard never came up in the discussions regarding those investments.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

122.     Shortly after the GPs issued the January 21, 2020 Capital Calls, I received a letter from Mr. Wong dated January 31, 2020.  The letter, which is included in the Appendix of Exhibits as R-22, stated that it was written in response to the drawdown notices the Funds issued as part of the capital calls.  The letter was encouraging in several respects, including because it acknowledged the validity of GIIL's capital commitment and indicated a willingness to fund the investments in the capital calls, which exceeded the amounts remaining in the escrow accounts.

123.     In addition, in the letter written in response to the January 21 capital calls, CFLD stated that GIIL had "never indicated its intent not to provide capital" in response to a proper capital call, that it was "prepared to be convinced' that the investments were appropriate, that it needed "to exercise diligence and care before deciding the fund more than $100 million, including $65 million in new funds," and that additional information was necessary "to make an informed decision regarding funding the investments."  The letter then asked for a host of additional detailed information, far beyond market practice for providing information in connection with a capital call, including all communications between 1955 Capital and the companies listed in the notices, and all due diligence documentation regarding those companies, as well as due diligence information regarding companies the Funds considered but decided not to invest in.

124.     Although GIIL's capital commitment is not conditioned on receipt of satisfactory information, and it was not possible nor customary in the VC industry to provide all of the information requested in the letter, the 1955 Capital team and I provided as much additional information as possible under the circumstances.

125.     Most of the information sought in the letter is proprietary and highly confidential and could not be disclosed without violating confidentiality commitments to and the expectations of the companies in which the Funds intended to invest, and severely undermining 1955

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Capital's ability to get into future deals.  Moreover, in the immediately preceding period, CFLD had been actively engaged in a public relations, social media, and direct outreach campaign in which it had disregarded nondisclosure obligations under the Investment Agreements, utilized portfolio company identities and information to send letters with false information to company managers, harassed companies by targeting their public announcements with negative and inaccurate tweets and links to false social media websites and posts as part of CFLD's efforts to block investments, and potentially damaging their prospects with other partners.

126.    Despite these concerns, we provided as many additional details as reasonably possible in an effort to satisfy CFLD's desire for further information to evaluate the investments and decide whether to fund them.  As part of that effort, we repeatedly offered (in letters written by the Funds' counsel to CFLD's counsel, including letters dated January 24, February 5, February 11, and February 12) to provide more information if CFLD would agree not to breach its confidentiality obligations or otherwise misuse it.  As one example, the February 5, 2020 letter included in the Appendix of Exhibits as R-107, which I reviewed before and after it was sent, stated:

> Our January 24 letter made clear that, notwithstanding normal market practice, the Funds would be pleased to provide even more details regarding the investments, and the reasons they present attractive opportunities, if CFLD and GIIL provide a written commitment that they will terminate their efforts to obstruct the investments, harass the portfolio companies and undermine the Funds. That offer stands, and we hope they will accept it.

127.    CFLD never provided the commitment that we requested, but we nevertheless supplied a substantial amount of the additional information CFLD said it needed in order to evaluate the investments and make funding decisions.  In doing so, we kept the names of the new investees private.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

128.    To comply with CFLD's request for information regarding the investments summarized in the January 21 capital calls, I arranged a meeting with Mr. Wong at the office of CFLD's counsel.  At that meeting, which occurred on February 13, 2020 and lasted nearly five hours, I shared a variety of written materials, provided extensive information orally, and responded to innumerable questions regarding the investments, the investee companies, the underlying technologies, our due diligence, and the reasons we believed the investments presented attractive opportunities.  Those subjects were discussed in as much detail as possible, and at length.

129.    The written materials I went over with CFLD at the meeting included:

- A detailed portfolio update review, that included, among other things, an analysis of SBP and Gridtential, in both English and Chinese, the English version of which is included in the Appendix of Exhibits as R-95;
- A presentation, in both English and Chinese, regarding the food and water industry and 1955 Capital's strategy with respect to those sectors, the English version of which is included in the Appendix of Exhibits as R-96;
- A presentation regarding the healthcare industry and 1955 Capital's strategy with respect to that industry, a copy of which is included in the Appendix of Exhibits as R-97; and
- Investment memoranda (with confidential information redacted) for the companies listed in the January 21, 2020 Fund I Capital Call notice, copies of which are included in the Appendix of Exhibits as R-98 through R-105.

130.    As part of the overall discussion of individual investments, Mr. Wong and I spent a full hour focused on a very promising potential follow-on investment in SBP in which Mr. Wong expressed particular interest.  SBP develops microbe-based proteins for meat substitutes, putting them in a similar sustainable food category as Impossible Foods and Beyond Meat, both "unicorn" companies that had brought significant attention and interest to this technology area.  SBP was also the most time-sensitive of the opportunities the Funds had secured at the time of the meeting.  I answered Mr. Wong's many questions regarding SBP, and explained that we had, at most, two weeks to confirm our ability to meet our pro rata investment

41

amount of $12 million.  The discussion included a comprehensive summary of the opportunity as well an extensive overview of the company; a detailed competitive analysis, including context on my prior experience at Khosla working with key competitors in the space (including Impossible Foods), and how SBP's low-cost manufacturing process and versatility enables it to compete effectively; the feasibility of the company's plans for scale-up and production; and an analysis of the company's China prospects, including how a number of SBP's products are especially relevant to the China market.

131.     The February 13 discussion with Mr. Wong included 1955 Capital's Food & Water Industry Presentation (in English and Chinese), which provides context on the macro opportunity, including discussing environmental concerns that are putting pressure on meat production, growth in venture capital investment in alternative meats, analysis of the leading competitors in the space, discussion of the exit potential and recognition of Beyond Meat representing one of 2019's most successful IPO's, the relevance of alternative protein to China, 1955 Capital's key criteria for investment in the space, and SBP as a case study for assessing key criteria.

132.     My discussions with Mr. Wong regarding SBP also included a detailed China Analysis Presentation for SBP, titled "Asia market potential for Sustainable Bioproducts & go to market brainstorming," that our team had prepared, which included discussion of SBP's Asia market potential, Asia's average protein consumption figures, supply challenges in the region, food safety scandals in China, dietary differences in China versus other markets, mushroom and microbial products in China, Chinese millennial eating habits, Chinese government support for alternative meats, and SBP's China go-to-market strategies.

133.     I explained why SBP would have been a particularly good company to introduce to CFLD, if CFLD had behaved in accordance with the Investment Agreements.  SBP's CEO is

42

open-minded to China, specifically chose 1955 Capital as an investor because of 1955 Capital's global perspective and ability to advise on expanding into Asia, has experience launching products in Asia, and recognizes that SBP's product addresses a major challenge in China.  I reiterated why the SBP opportunity should be enticing to CFLD, including that collaboration with the well-known lead investors could be positive branding for CFLD but that the opportunity was very time sensitive.

134.    At the February 13 meeting, I also walked Mr. Wong through the typical way that venture capitalists make reserve decisions and how 1955 Capital had made reserve decisions for SBP.  I explained that it would not be unusual for a $5-7 million investment in a Series A round to require a $10 million reserve and that reserve level would vary based on how the company did over time.  Mr. Wong asked about 1955 Capital's decision in 2018 around reserves for SBP, and I explained that we were not sure at the time what was going to happen when we invested and made reserve requirements based on having $200 million in assets under management (commonly referred to as "AUM"), but we would need to reevaluate future reserves if no further investment was going to come in from CFLD.

135.    Throughout the meeting, and with respect to the SBP investment in particular, I answered all of Mr. Wong's dozens of questions to the maximum extent possible, without providing confidential information related to capitalization, specific valuation, and investor information.  CFLD was already familiar with SBP from our initial investment in the company, and I was accordingly able to provide more information than was possible with respect to investments in new companies, which posed an additional risk of being targeted for the type of harassing tactics in which CFLD had engaged prior to the capital calls.  The information I provided to Mr. Wong regarding the SBP opportunity, and regarding other investments, went well beyond typical market practice, even without considering that here the limited partner had

43

already breached its confidentiality obligations and had engaged in a campaign to target and harass portfolio companies in an effort to disrupt the Funds' ability to invest.  Indeed, SBP had already raised serious concerns about CFLD's litigation tactics and the risk of the company and its investors being victimized by the fray, and was observing closely CFLD's continuing conduct in managing its negotiations with 1955 for this investment round.

136.    The presentation, discussion, and questions at the February 13 meeting also focused on the relevance of each of the 12 deals included in the capital calls to China, and potential for landing in CFLD's parks, in addition to the more general discussions regarding the reasons the Funds invested or should invest, descriptions of the product and market opportunities, key diligence questions and findings, 1955 Capital's value-add, the history of 1955 Capital's engagement with the individual companies, non-confidential deal dynamics, and related topics.  Each of the individual companies listed in the capital calls was discussed, with a significant portion of the discussion focused on SBP.  The discussions and questions were guided by written materials I brought to the meeting that addressed those companies.

137.    I had several follow-up discussions with Mr. Wong after the February 13 meeting, to further discuss the investments.  At various times during the February 13 meeting, and in the telephone calls that followed, Mr. Wong stated that he did not have authority regarding final decisions regarding funding the investments, and that he was consulting with senior executives at CFLD in China, who would make such decisions.

138.    As I note in paragraphs 50-51 of my testimony above, at no time during the February 13 meeting or the discussions that followed did Mr. Wong raise any issue, question, or complaint regarding the fact that none of the investments we discussed at length had anything to do with mobile software and services, or any supposed "investment mandate," or make any

CONFIDENTIAL – ATTORNEYS' EYES ONLY

suggestion that the investments were unauthorized.  Nor did Mr. Wong claim or suggest that the Funds were established or operated as a fraudulent scheme.

139.    Although CFLD ultimately declined to provide further capital, at the February 13 meeting and in the subsequent discussions, it expressed genuine interest in the investments and afterwards advised in writing that it had given serious consideration to the information provided and that CFLD was willing to consider any additional information I would provide regarding the follow-on investments and investments in new Fund I portfolio companies.

140.    The investments listed in the capital calls and discussed at length with CFLD thereafter presented promising opportunities, as reflected in the success of two of the GPs' initial investments—in Crop Enhancement, which



and SBP

SBP

## X.    IMPACTS OF THE PR CAMPAIGN

141.    Although CFLD abandoned the campaign and took down the "The Truth About 1955 Capital" website after the January 21, 2020 capital calls, the Funds have sustained significant damage as a direct result of those efforts.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

A.    RELATIONSHIPS WITH PORTFOLIO COMPANIES

142.    The PR Campaign negatively impacted the Funds' relationship with numerous portfolio companies, co-investors, potential portfolio companies, and potential co-investors in significant ways.  Fortunately, my team and I were able to somewhat dull the negative effects of the PR Campaign, largely due to our prior reputations and the relationships we had formed with the companies.  Beyond the need to spend significant time and effort assuaging concerns raised by CFLD's campaign among companies and co-investors, CFLD's campaign has led to significant losses for the Funds, including the loss of opportunities to invest in certain companies and funding rounds, as well as the loss of the Funds' ability to lead investment rounds and protect the Funds' investments.

143.    Nevertheless, as discussed above at paragraphs 86-89, the Funds succeeded in making investments in several promising companies, albeit on a significantly diminished scale than otherwise would have been possible and preferable, due to CFLD's campaign and the need to reserve funds for litigation defense costs.

1.    LOST OPPORTUNITIES TO INVEST

144.    Two examples of investment opportunities the Funds lost because the companies were unwilling to accept the Funds' investments due to concerns about becoming embroiled in litigation and/or suffering reputational harm as the result of CFLD's attacks are Vicarious Surgical and the SBP Series B round.

a.    VICARIOUS SURGICAL

145.    Vicarious Surgical is a promising company—with investors that include Khosla Ventures, Bill Gates, Jerry Yang (founder and former CEO of Yahoo), Mark Benioff (founder and CEO of Salesforce), and Eric Schmidt (former Chairman and CEO of Google)—that combines virtual reality with proprietary human-like surgical robotics to enable surgeons to

46

perform minimally-invasive surgery.  The 1955 Capital team began talks with Vicarious in September 2019 and conducted due diligence on the company through February 2020.  Our due diligence included, among other things, visiting its headquarters, interviewing outside experts, carefully reviewing materials, and engaging in multiple discussions with management to better understand the core components of the company's robotic design, near-term development initiatives, and future product roadmap.

146.   While 1955 Capital had been in pole position to lead the next investment round for Vicarious by mid-November 2019, Vicarious was not ultimately willing to accept the Funds' investment in November 2019 because of sudden concerns raised by their investors due to the PR Campaign and over the litigation between CFLD and the GPs.  They felt they simply did not have sufficient time to properly diligence the legal issues before China Fund's looming investment deadline.

147.   Nor would Vicarious accept an investment from Fund I in early 2020.  This was a consequence of Fund I's inability to commit sufficient capital due to Claimants' refusal to satisfy the January 21, 2020 Capital Call and lingering concerns related to the dispute with CFLD.  Despite the confirmation of the arbitral award and the validity of our contracts, Vicarious did not feel comfortable having us involved—at any level of commitment—given the uncertainty created by CFLD's litigious behavior.  Many of the luminary investors around the table were also uncomfortable with the reputational risk that *they* might face by associating with us as a co-investor, given CFLD's broad-based attacks around that time.

   **b.    SBP's Series B**

148.   1955 Capital made its initial investments in SBP in May 2018, ███████████ ████████████████████████████████ 1955 Capital's investment totaled $15 million— ████████████████████████████████ —of which $5 million was contributed by the

Funds and the remainder of which was contributed by special purpose vehicle, or SPV, investors

arranged by 1955 Capital.

149.    As I explained in a witness statement submitted in the prior arbitration, 1955

Capital had to use SPVs for its original investment in SBP.  Because CFLD's 2016 default on its

obligations created uncertainty regarding the Funds' access to capital, the Funds were unable to

invest $10-$15 million to lead ████████████████████████████████████████████

████████████████████    1955 Capital instead had to craft an SPV fund to secure the lead

investor position on the deal, agree to commit $5 million and invite outside investors to

contribute $5-10 million in capital to SPVs—a significantly more time-consuming, costly, and

complex process that would have been unnecessary had CFLD not initiated the dispute.

150.    In late 2019, SBP



151.    1955 Capital, through use of an SPV, acted as the lead investor on SBP's ████████

████████████████████████████████████████████████ including "pro rata

rights," i.e., the right to invest in subsequent investment rounds to maintain 1955 Capital's

percentage stake in the company.  One-third of these pro rata rights were held by the Funds,

while two-thirds belonged to 1955 Capital SPVs.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

152.     After receiving a January 2, 2020 letter from counsel as part of the campaign I described above, which notified SBP of the arbitration against the GPs to enforce an "investment mandate" that does not exist, and claimed that 1955 Capital was not entitled to invest GIIL's money in SBP, and against the backdrop of CFLD's other direct outreach, negative publicity, and meritless lawsuits against 1955 Capital and me, SBP raised significant concerns with me and Joe Wyatt, 1955 Capital's counsel for the deal, about reputational damage to itself and its other big-name investors, whether funds invested could be encumbered or otherwise challenged, whether 1955 Capital's governance role could be challenged, whether SBP could become another litigation target for CFLD, and whether its other investors' reputations would be harmed by co-investing with 1955 Capital.

153.     For example, on January 2, 2020, ████████████████████████ sent me an email, attaching the January 2 letter from CFLD's counsel, commenting that "it looks like they are trying to drag us in," and requested a meeting.  A copy of that email and its attachment is included in the Appendix of Exhibits as R-56.  This launched a long series of fraught negotiations between 1955 Capital, SBP, and SBP's other Series B investors.

154.     After receiving the January 2 letter, SBP was understandably apprehensive about accepting investment from 1955 Capital as part of the ████████████████  They also demanded that 1955 Capita ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████  Ultimately, as SBP recounted in a February 28 letter, which is included in the Appendix of Exhibits as R-145, the company appreciated "1955 Capital's valuable assistance to the Company on a variety of strategic matters," including fundraising, recruitment, product and marketing strategy, partnership and globalization strategy, technology development, and general strategic advice, and accordingly it

was willing ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████ But this all required challenging negotiations, extensive legal

support and time, as further explained below, and the change in my board status at SBP risked

further damage to my reputation.  For that reason, I had requested that SBP confirm in the

February 28 letter that none of these "gives" were in any way the result of performance issues

with 1955 Capital.

  155. Notwithstanding SBP's willingness to move forward with 1955 Capital, SBP

strongly discouraged 1955 Capital from investing CFLD's money in connection with the ███

██████████████ SBP ████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

Alternatively, 1955 Capital could invest funds from SPVs without CFLD or GIIL as a limited

partner.  Either way, 1955 Capital would be required to make a number of concessions on

material points in order to participate in the ████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████

  156. On January 21, 2020, 1955 Capital issued capital calls to GIIL for the full amount

of the contemplated follow-on investment in SBP, recommending investing at or above 1955

Capital's pro rata share ██████████████████████████ 1955 Capital issued the capital calls with

respect to the SBP investment because (1) SBP agreed that such a capital call ████████████████

████████████████████████████████████████████████████████████

(2) 1955 had discretion on allocations across entities, (3) it was uncertain whether SPV partners

would participate, and (4) it was beneficial to the Funds and to GIIL to have first access on an

CONFIDENTIAL – ATTORNEYS' EYES ONLY

attractive deal ███████████████████████████████████████████
████████████████████████████████████████████████████████████

157.    As I explained in my testimony above, at the five-hour meeting with Patrick Wong on February 13, 2020, I provided a comprehensive overview of the SBP opportunity— above and beyond the level of disclosure typical in the industry—and discussed the reasons this was an extremely compelling investment.  I also explained that the deal needed to close imminently, and that 1955 Capital had one-to-two weeks to confirm its ability to meet the requested pro rata investment amount.  Mr. Wong nevertheless made clear that CFLD did not want the Funds to invest in SBP, instructed me not to make the investment through the Funds, and made threats about actions CFLD might take if I did not comply with the instruction.

158.    Following the February 13, 2020 meeting with Mr. Wong, in an effort to mitigate damages associated with being forced by CFLD's conduct to forgo 1955 Capital's pro rata investment rights in SBP, I organized other SPV investors to invest in SBP's ████ financing round.

159.    1955 Capital ultimately invested $10 million in SBP via two SPVs: SPV II and SPV III.  Our SPV I investor chose not to invest, in part, due to the ongoing litigation between 1955 and CFLD.  In light of CFLD's instruction not to invest GIIL funds in SBP, and explicit and implicit threats if we did so, as well as SBP's aversion to accepting an investment from the Funds in light of CFLD's prior conduct and our inability to provide the assurances that SBP had required, 1955 Capital opted not to invest the remaining $2.1 million available under its pro rata rights from the Funds.  Unable to gather the remaining $2.1 million from other sources, 1955 Capital was forced to forgo the opportunity to invest the full amount allowed by its pro rata right in SPB and settle for completing $10 million of the $12.1 million target.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

160.    I understand from reviewing submissions in this arbitration that CFLD has suggested that the SPVs' use of a portion of the Funds' pro rata rights was somehow improper. Any such suggestion is obviously baseless, given the facts and CFLD's instruction not to invest the Funds' money in SBP.  In fact, contrary to what CFLD is claiming, we were actually trying to allocate to the Funds significantly more than the $4 million they were entitled to invest with their pro rata allocation.

### 2.    AVERTANA INVESTMENT PUT IN JEOPARDY

161.    Some companies reacted to the Campaign by demanding assurances that the Funds would have sufficient access to capital to continue supporting the companies in the future. One example of such a company is Avertana.

162.    As with Vicarious Surgical and SBP, Avertana was also highly alarmed by the PR Campaign and GIIL's meritless suit against me.  Immediately after CFLD launched its campaign, Avertana reached out to me requesting a call to discuss CFLD's November 20, 2019 press release and the lawsuit it trumpeted.  A copy of the November 20, 2019 email I received from Avertana is included in the Appendix of Exhibits as R-124.

163.    Unsurprisingly, Avertana sought "comfort" regarding the Funds' investment in Avertana, including "A legal opinion confirming that the fund is able to operate and has funds available, the legality of 1955 using the funds in escrow, and that there is no ability for funds invested into Avertana to be 'clawed back.'"  A copy of the November 20 through November 26, 2019 email chain between Avertana and I, in which Avertana made this request, is included in the Appendix of Exhibits as R-125.

164.    By mid-January 2020, after multiple discussions, I was able to address most of Avertana's concerns.  Avertana's chief remaining concern, as communicated to me, was whether 1955 Capital could obtain sufficient reserves for future investment.  The GPs therefore called

capital to establish reserves for additional Avertana investment, among other things, in the January 21, 2020 Capital Calls.  I communicated this to Avertana in a January 21, 2020 email, in which I explained, "[t]o address your concerns and remain in consideration for the upcoming financing, as discussed, we will call capital for this round of investment and future reserves, so that you have clarity on whether 1955 will be able to allocate sufficient funds for you in this and future rounds.  I understand that is your most critical concern with our situation at this point." Avertana responded that the course of action made sense.  A copy of this email chain is included in the Appendix of Exhibits as R-126.

165.    Unfortunately, the Funds were unable to establish sufficient reserves to satisfy Avertana because CFLD refused to satisfy the January 2020 capital call.  Since then, Avertana has begun working with other new investors that are pushing for the Funds to convert their promissory notes at an unattractive price.

### 3.    LOSS OF BARGAINING POSITION

166.    The Funds have also suffered negative impacts to their bargaining position and ability to protect their investments due to CFLD's conduct.  Due to the pall cast by CFLD's PR campaign and uncertainties created by CFLD's conduct, the Funds were unable to take the lead role in financing rounds for a number of their portfolio companies, when they otherwise would have.  Because of this, some financing rounds have not come together as expected or have required the Funds to accept less advantageous terms.  Woodoo is an example of the former, and Gridtential is an example of the latter.

### a.    WOODOO

167.    When Woodoo learned of the PR Campaign in December 2019, it reacted very negatively and was understandably concerned about whether 1955 Capital's investment in Woodoo would be subject to clawback.  Woodoo initially wanted to declare the Funds' initial

$1 million investment in Woodoo null and void and return the money to the Funds in order to avoid any legal entanglements.

168.     I thereafter engaged in lengthy negotiations with Woodoo in an attempt to salvage the relationship.  On March 11, 2020, in order to improve the Funds' relationship with Woodoo and preserve a potential ability to invest in Woodoo in the future, I signed an agreement on behalf of the Funds releasing Woodoo of any existing and future obligations in relation to the Funds' initial investment in Woodoo, if Woodoo returned the $1 million investment the Funds had made.  A copy of that agreement, which was countersigned on or about August 28, 2020, is included in the Appendix of Exhibits as R-144.

169.     To date, Woodoo has not returned the Funds' investment.  Instead, negotiations have continued.  In the meantime, Woodoo has gained access to attractive government-backed loans that have met its funding needs, and as a result ████████████████████ ████████  If the Funds had been working with a reliable and cooperative partner, they would have initially invested substantially more in Woodoo and been in a position to benefit from ██ ██████████  Sadly, however, I'm instead dealing with contentious negotiations with Woodoo to determine whether the Funds can maintain their investment in the company at all.

**b.     GRIDTENTIAL**

170.     Gridtential was in the midst of actively considering additional fundraising when CFLD launched its campaign.  Unsurprisingly, the company's management expressed great concern about whether the Funds would be able to continue supporting the company under the cloud of CFLD's accusations.  My team and I worked hard to address Gridtential's concerns. Ben and I spent a significant amount of time at a Gridtential board meeting addressing the matter.

171.    Unfortunately, when Gridtential was ready to commence fundraising, the Funds were not in a position to contribute the amount of capital Gridtential needed because of CFLD's failure to honor its capital call and other issues posed by CFLD's campaign, such as the need to reserve significant capital for litigation costs.  This has left the company underfunded and created an opportunity for a new investor to attempt to take advantage of the situation and seek to impose its own highly punitive terms, with negative consequences for the Funds.  The Funds were ultimately able to provide an alternate proposal at less-than-ideal terms in order to protect the value of this investment for the Funds.

### B.    REPUTATIONAL IMPACT

172.    Needless to say, the campaign CFLD conducted prior to the January 21 capital calls seriously harmed the reputations, standing, and operations of the Funds, the GPs, 1955 Capital, my team, my wife, and me.  Although CFLD took down its attack websites, stopped advertising for those websites, and stopped issuing press releases making accusations of fraud and other misconduct, the damage cannot be erased and will extend into the indefinite future.

173.    The assault leveled against the GPs, the Funds, 1955 Capital, my wife, and me was disseminated throughout the Silicon Valley VC community, and beyond—including to start-ups entrepreneurs, existing and prospective portfolio companies, and VC funds.  Any potential LP, portfolio company, employee, strategic partner, co-investor, and any other person or entity considering doing business with the Funds, the GPs, 1955 Capital, and/or me can (and almost certainly will) find a host of press releases and articles accusing 1955 Capital and me of engaging in a "scheme to steal $80 million," making investments in violation of a nonexistent "investment mandate" and engaging in other misconduct.  They are only a simple Google search away.  Even eight months after CFLD ceased its campaign, search results for "Andrew Chung," "Coral Chung," and "1955 Capital," continue to be infected with CFLD's negative and

CONFIDENTIAL – ATTORNEYS' EYES ONLY

misleading press, there for all our future business partners and associates to see.  While some who have learned of the litigation have confronted us directly to hear our side of the story, there is a silent majority that hasn't come forward and may never give us the benefit of the doubt.

174.     In an industry in which reputation is everything, this was a serious blow to the Funds' and the GPs.

175.     CFLD's misconduct has also undermined our ability to attract and retain top flight talent.  1955 Capital nearly lost both Ben Tseng and Ryan Gilliam due to CFLD's actions.  Ryan tendered his resignation on two occasions during the PR Campaign because of the negative impact it was having on his reputation and ability to conduct business outside of 1955 Capital.  Given his CEO role at Chemetry, he was concerned that he would lose the confidence of his existing and prospective investors after they learned that 1955 Capital was facing serious allegations.  Ryan was also concerned about the effect of the reputational impact on 1955 Capital's ability to do quality deals given numerous contacts had already reached out with concern over the litigation.  Finally, he also raised concerns over him and his family being targeted personally.

176.     At one point, Ben Tseng resigned due to concerns about the impact of the smear campaign on his career, and the stress that the original arbitration had caused on him and his family.  He had also expressed to me concerns over long-term reputational damage, as all of the partners from his old firm DCM learned of the litigation and reached out to him.

177.     I was eventually able to persuade Ryan not to resign, and to convince Ben to come back to work on a part-time basis, but we lost the benefit of Ben's services for a considerable period, and Ryan's contributions were diminished before he reversed his initial decision.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

C.    NEED TO ESTABLISH LARGE LITIGATION RESERVES

178.    Although the petition to vacate the arbitration award was denied, and the breach of fiduciary duty case has been dismissed, the GPs are still being forced to incur extremely large legal fees in defending the claims asserted in this arbitration, the China lawsuit, and an appeal of the judgment confirming the prior arbitration award, and there is no guarantee that CFLD will not file still more unfounded lawsuits and proceedings in the future.  Accordingly, the GPs have been required to allocate substantial funds that should be devoted to investments to litigation reserves.

179.    In consultation with the GPs' attorneys, 1955 Capital's Chief Financial Officer, Jim Hinson, advised me that due to CFLD's suits and threatened suits, the Funds needed to reserve substantial sums to pay or indemnify attorneys' fees and related costs.

180.    CFLD's default, and the fact that the Funds were unable to fully satisfy the capital calls from escrow, forced the Funds to reserve a higher amount of the called capital than originally planned for management fees and defense costs.  Portfolio companies had already raised questions about the Funds' ability to continue supporting the companies with follow-on investments.  The GPs have also been required to take substantial reserves to ensure that they will be able to meet the Funds' obligations to portfolio companies, and safeguard their ability to make follow-on investments.

181.    We have repeatedly advised CFLD that continuing its lawsuits would require the Funds to reserve large sums for litigation expenses and decrease the amounts available for the Funds to make investments and urged CFLD to stand down for that reason.  For example, the January 21, 2020 Capital Call notices included in the Appendix of Exhibits as R-20 and R-21 each stated that the GPs believe "it would serve the interests of GIIL and CFLD to cease efforts to impair the operation of the Fund and efforts to force the Fund to incur expenses in defending

57

the litigation, which would reduce the need to call capital to provide assurances requested by portfolio companies, and enable the Fund to devote capital consumed by defense costs to investments as originally intended.  The General Partner hereby requests that they do so." *Id.*

182.    Similarly, in a February 5, 2020 letter to CFLD's counsel, the GPs' counsel again explained that "The fact that the Funds have been forced to expend significant time and resources that could be allocated to investments, but must instead be committed to defending litigation/arbitration claims initiated by CFLD and GIIL after the Final Award was issued, further constrains investment efforts.  It also creates uncertainty regarding the availability and allocation of the Funds' capital.  As previously noted, we believe it would be in the best interests of CFLD and GIIL to cease these various efforts, and to operate in a manner that supports the Funds rather than attempting to undermine them."  A copy of this February 5, 2020 letter is included in the Appendix of Exhibits as R-107.

183.    And in a February 12, 2020 letter to CFLD's counsel, the GPs' counsel advised that "As noted in the capital calls and correspondence, several of the investments outlined in the drawdown notices are time-limited.  We expect at least two of the most attractive opportunities will require the GPs to make allocation decisions in this coming week, and the remainder in the near term.  The current uncertainties regarding GIIL's willingness to provide additional capital make it impossible for the Funds to make the investments as outlined in the drawdown notices, and severely impair their ability to realize investment opportunities that will benefit the Funds and the LPs thereafter."  A copy of this February 12, 2020 letter is included in the Appendix of Exhibits as R-109.

184.    Despite all these challenges, we pushed on in our efforts to make the Funds a success.  Although as a result of CFLD's misconduct the Funds will never be as successful as

CONFIDENTIAL – ATTORNEYS' EYES ONLY

they would have been had CFLD been a cooperative limited partner, we have made significant progress and are well-positioned to continue to achieve a substantial measure of success.

### D. DELAY IN KPMG AUDIT

185.    The array of widely publicized false statements and accusations that CFLD made in its attempt to cripple the Funds and cut off further investment came to the attention of the Funds' auditors, KPMG, just as they were finalizing an audit of the Funds' financial statements. The auditors informed 1955 Capital that they were then required by audit rules and internal procedures to undertake a lengthy investigation before they could issue an audit opinion on the statements.  That investigation, begun in December 2019, has thus far taken more than 10 months, and further delayed the audited financial statements CFLD was to receive under the LPAs.  The cost of the investigation was charged to the Funds, which also bore the burden of additional audit procedures and reviews within KPMG.

I declare under the penalty of perjury that the foregoing is true and correct.  Executed in Wilson, Wyoming this 30th day of October 2020.

CONFIDENTIAL – ATTORNEYS' EYES ONLY