# EXHIBIT E

CONFIDENTIAL

# IN AN ARBITRATION MATTER

BEFORE THE

## AMERICAN ARBITRATION ASSOCIATION

GLOBAL INDUSTRIAL LIMITED,

**Claimant(s)**

**v**

1955 CAPITAL FUND I GP LLC,
1955 CAPITAL CHINA FUND GP
LLC,

**Respondent(s)**

**v**

CHINA FORTUNE LAND
DEVELOPMENT,

**Counterclaim Respondent(s)**

**Case No. [01-19-0003-4556]**

EXPERT REPORT OF

## ILYA A. STREBULAEV

ON BEHALF OF

## RESPONDENTS

**16 APRIL 2021**

CONFIDENTIAL

CONTENTS

I.      Qualifications..................................................................................................4

II.     Assignment and Summary of Disputes ........................................................7

III.    Summary of Opinions.....................................................................................9

IV.     Overview of the Venture Capital Industry and Key Events Related to 1955 Capital..16
        A.      Overview of the Venture Capital Industry.................................................16
                1.      LPs Provide Capital While the GP Takes Responsibility for Investment and Operating Decisions.................................................17
                2.      The Process of Venture Capital Investing ...................................24
        B.      Throughout Most of the Period at Issue, 1955 Capital Operated in an Environment of Uncertainty Created by Hostile and Disruptive Actions of its Sole LP ..............34

V.      The 1955 Funds GPs Performed Remarkably Well despite the Hostile and Disruptive Circumstances They Faced ..........................................................41
        A.      The November 2019 Investments Resulted from Diligent and Skillful Efforts Undertaken by the 1955 Funds GPs under Adverse Conditions..............................43
                1.      The November 2019 Investments Were Consistent with 1955 Funds' Investment Focus ........................................................46
                2.      The 1955 Funds GPs Conducted a Comprehensive Due Diligence Process ..........................................................49
                3.      The 1955 Funds GPs Negotiated Deals that Most Suited the Unusual Uncertainty that They Faced ........................................57
        B.      The January 21, 2020 Capital Calls Were Appropriate ...........................62
                1.      Summary of the Events Related to the January 21, 2020 Capital Calls ....62
                2.      The Drawdown Amounts in the January 21, 2020 Capital Calls were Prudent and Appropriate ....................................................65
                3.      The Information the 1955 Funds GPs Provided in the January 21, 2020 Capital Calls Went Well Beyond Industry Practice....................................70
        C.      The GPs' Reliance on the Interest Accrual Default Provisions was Justified, Appropriate and Economically Sound .................................73

VI.     The Meadow Report is Incorrect in Numerous Respects, and Fails to Consider Crucial Case-Specific Facts ....................................................79

VII.    The 1955 Funds GPs Are Entitled to Benefit from the Investment Agreements..........88

        Appendix A Curriculum Vitae ..............................................................93

        Appendix B Documents Relied Upon ...................................................94

CONFIDENTIAL

**Appendix C Supporting Analysis** ...................................................................**100**

      1.      Snapshots of Fund I Default Remedies...................................................100

      2.      Snapshots of China Fund Default Remedies .........................................104

      3.      Selected Quotes from Due Diligence......................................................107

      4.      Reference Calls Made During Due Diligence .......................................111

**Appendix D Inaccurate Characterizations of the VC Industry in the Meadow Report** .....**113**

CONFIDENTIAL

# I.　　Qualifications

————

1. My name is Ilya A. Strebulaev and I am the David S. Lobel Professor of Private Equity and Professor of Finance at the Graduate School of Business, Stanford University. I am a Research Associate at the National Bureau of Economic Research. I received a Ph.D. in Finance from the London Business School, an M.Phil. in Finance from the London Business School, an M.A. in Economics from the New Economic School in Moscow, and a B.A. in Economics from the Lomonosov Moscow State University.

2. My experience with respect to venture capital includes academic research, teaching, consulting, and extensive interactions with venture capital practitioners in Silicon Valley and elsewhere. I developed a full-quarter course on venture capital and early stage company financing at Stanford GSB, and have been teaching it for more than seven years. As part of my MBA class on venture capital at Stanford GSB, I cover venture capital, and especially Silicon Valley practices, on a large range of issues, including venture capital deal sourcing and due diligence, decision-making, negotiation of contractual terms between venture capital investors and company founders, venture fund structure, organizational practices, relationship with limited partners, and compensation of venture fund managers. Over the years of teaching and developing the course, I have closely interacted with hundreds of Silicon Valley venture capitalists. Many of my students in the Stanford GSB program pursue careers in the venture capital industry after graduation, including as VC practitioners, entrepreneurs, or in early stage companies backed by venture capitalists.

3. I am the inaugural holder of the David S. Lobel Chaired Professorship in private equity, established at Stanford University in 2016 to promote research and teaching on private equity, including venture capital. I am also the founder and Faculty Director of the Stanford GSB Venture Capital Initiative that brings together academic researchers, students, and practitioners to advance our knowledge of venture capital. Under the auspices of this Initiative, I have assembled and analyzed high-quality, unique data on venture capital funds. One of my research papers on the practices of venture capitalists, including those in Silicon Valley, which is based on the work done at the Venture Capital Initiative, has been awarded the inaugural Doriot Award

CONFIDENTIAL

for the best private equity research paper.  I am also Faculty Director of the Stanford GSB program "The Emerging CFO: Strategic Financial Leadership Program," that has been attended by hundreds of senior financial leaders from around the world. As a part of the program, I teach on the Silicon Valley venture capital industry, including the way venture capitalists make decisions.

4.   I have also actively participated in the venture capital industry as a consultant, which has involved work on a wide variety of operational and strategic issues. Over the last five years, I have consulted for venture capital funds, corporate venture capital organizations, and limited partners on the broad set of issues related to venture capital, including fund manager selection, contractual negotiations, and performance evaluation. I am also engaged in consulting for domestic and international companies and investors on valuation of VC-backed companies, selection of venture capital and private equity investments and fund managers, and portfolio allocations.

5.   In the course of my research, teaching, and consulting activities, I have interviewed and interacted closely with hundreds of venture capital fund managers, limited partners, and founders of startups. I have also assembled and analyzed large datasets containing many unique documents pertaining to the venture capital industry, including hundreds of limited partnership agreements.

6.   I have published numerous articles in leading peer-reviewed finance and economics journals. My research includes studies on the activities of venture capitalists, how venture capitalists make decisions, and valuation of venture capital-backed companies. My research has been published in many academic journals, including the top three academic journals in finance: *Review of Financial Studies*, *Journal of Finance*, and *Journal of Financial Economics*. I have served on the Editorial Boards of two research publications: *Finance Research Letters,* and *Management Science*. My research has also been featured in a variety of public media, including The New York Times and The Wall Street Journal.

7.   I have been awarded a number of significant academic awards for my research, including for research related to investments in early stage companies. In addition to the Doriot Award mentioned above, those awards include the Brattle Group Prize in Corporate Finance (selected

CONFIDENTIAL

by the Associate Editors of The *Journal of Finance*), First Prize Paper for the best corporate paper published in the *Journal of Finance*, the Fama-DFA Prize for the best asset pricing paper published in the *Journal of Financial Economics*, the Trefftzs Award by the Western Finance Association, and the Best Paper by the Private Equity Research Consortium.

8.   I have also received several awards for my teaching, including the Stanford MBA Distinguished Teaching Award and the Sloan Teaching Excellence Award, as well as the inaugural Masters in Management Best Teacher Award at the London Business School.

9.   Although the vast majority of my professional efforts have been devoted to research, teaching and consulting, I have also served as an expert witness in litigation matters involving the venture capital industry.

10.   My curriculum vitae is included as Appendix A. It includes a list of the publications I have authored within the last ten years and a list of the matters where I have been an expert witness over the last four years. I am being compensated for my work in this matter at my standard hourly billing rate of $975. Staff at The Brattle Group have assisted me by performing work at my direction. All the opinions and conclusions stated in this report are my own. Neither Brattle's compensation nor my compensation is contingent upon my opinions, testimony, or the outcome of this matter.

CONFIDENTIAL

# II.  Assignment and Summary of Disputes
_____

11.  I have been asked to evaluate and comment upon claims, assertions, and opinions set forth in the Statement of Claim filed by CFLD/GIIL and supporting documents, including the expert report of Scott Meadow ("the Meadow Report"), that fall within my areas of expertise.

12.  The parties to this dispute are: 1955 Capital Fund I GP LLC (Fund I GP) and 1955 Capital China Fund GP LLC (China Fund GP), and China Fortune Land Development Co., Ltd., (CFLD) and Global Industrial Investment Limited (GIIL).

   a.  Fund I GP and China Fund GP are, respectively, the general partners of 1955 Capital Fund I LP (Fund I) and 1955 Capital China Fund LP (China Fund) (collectively, "1955 Funds GPs"). Fund I and China Fund (collectively, "the 1955 Funds" or "the Funds") are Delaware limited partnerships created by Andrew Chung ("Mr. Chung") for the purpose of engaging in venture capital investments.[1]

   b.  CFLD is a Chinese real estate company, GIIL is a Hong Kong company and is a wholly-owned subsidiary of CFLD.[2] Based on my understanding that CFLD is the entity that negotiated the investments in the 1955 Funds, and has been the principal actor thereafter, I will refer to CFLD and GIIL collectively as CFLD/GIIL, and CFLD separately, depending on the context. CFLD/GIIL is the sole limited partner of the 1955 Funds.

13.  Based on my review of the Final Award of Arbitrator Ghikas issued in the prior arbitration ("the Final Award") and other documents, it appears that CFLD/GIIL has sought to get out of its investment and contractual commitments since the fall of 2016,[3] and has taken various actions that appear directed at achieving that result. CFLD/GIIL first started raising concerns (regarding the 1955 Funds' low pace of investment and efforts to invest in companies suitable for "landing in CFLD's industrial parks" in China) in early 2016.[4] According to the Final Award, CFLD/GIIL was planning ways to withdraw from its contractual commitments to the Funds in September of

---

[1]  R-2, Case No. 01-17-0004-4839, Final Award, June 26, 2019 ("the Final Award"), ¶ 2.
[2]  Final Award, ¶¶ 14 – 15.
[3]  Final Award, ¶ 396.
[4]  Final Award, ¶¶ 55.93 – 94.

2016.[5] In late 2016, CFLD/GIIL "threatened legal action if the Funds accessed the funds held in the escrow accounts without GIIL's consent."[6] In October 2016 CFLD "accused Chung of fraud, demanded that he resign, demanded the return of the money in escrow, and threatened to force a shutdown of the Funds," and stated that "it did not intend to honor its obligation to transfer additional funds."[7] CFLD/GIIL thereafter failed to meet its scheduled escrow deposit obligation in December 2016.[8]

14.   In July 2017, the 1955 Funds GPs initiated an arbitration to bring a number of claims against CFLD/GIIL ("the prior arbitration"), in which Gerald Ghikas served as the sole arbitrator.[9] CFLD/GIIL, in return, asserted over a dozen counterclaims against the 1955 Funds GPs.[10] Among the many claims that CFLD/GIIL made in the prior arbitration, it sought to terminate the 1955 Funds by contending that the investment agreements between CFLD/GIIL and the 1955 Funds were void, invalid, and needed to be rescinded.[11] I understand that Arbitrator Ghikas rejected all but one of the claims CFLD/GIIL raised[12] and determined that "the Investment Agreements comprising the 26 November Agreements remain in effect and that Claimants [the 1955 Funds GPs] have benefited and will continue to benefit from them."[13] The 26 November Agreements include the signed Subscription Agreements ("the SAs," dated November 23, 2015),[14] the November 13, 2015 Appendix 1, the November 13, 2015 Limited Partnership Agreements ("the LPAs") and the signed escrow agreements ("the EAs," dated November 23,

---

5    Final Award, ¶ 396.

6    Final Award, ¶ 55.98.

7    Final Award, ¶ 354.

8    Final Award, ¶ 55.99.

9    Final Award, p. 1, ¶ 55.100.

10   *See* Final Award, ¶¶ 54 – 91, for a summary of the claims put forth by the parties in the prior arbitration and related facts.

11   Final Award, ¶¶ 67 – 73.

12   One claim raised by CFLD/GIIL related to what was referred to as the "Post-Closing Changes." These were four changes that were added to the LPAs post November 13, 2015, the date that CFLD/GIIL received the last version of the LPAs before they were executed. I understand that Arbitrator Ghikas found that the Post-Closing Changes were unauthorized and constituted a breach of fiduciary duty by the 1955 Funds; however, Arbitrator Ghikas determined that, "the breaches of fiduciary duty and the unauthorized alterations had not yet had any practical consequences for either party" and "it would be inequitable to rescind the relevant Investment Agreements in their entirety as claimed." Final Award, ¶¶ 56, 349, 391.

13   Final Award, ¶ 431.

14   Final Award, ¶ 4.

2015).[15] The Final Award states that the Investment Agreements "were, and remain, valid and subsisting agreements binding in accordance with their terms."[16]

15. In this arbitration, CFLD/GIIL seeks an order dissolving the 1955 Funds, and relieving it of its obligations under the Investment Agreements, and other relief, based on allegations that (among other things): (i) the 1955 Funds GPs have punitively charged interest on CFLD/GIIL's missed escrow deposits into the 1955 Funds; (ii) the 1955 Funds GPs made six inappropriate "placeholder" investments which were timed such that the 1955 Funds GPs could continue to take money out of CFLD/GIIL's escrow account and demand additional money for follow-on investments; (iii) the 1955 Funds GPs made the placeholder investments as a basis to make inappropriate capital calls to CFLD/GIIL for additional funds; and (iv) the 1955 Funds GPs refuse to comply with their obligations as set out in the 1955 Funds LPA by withholding information from CFLD/GIIL and failing to invest in mobile software and services companies.[17] In addition to an order dissolving the Funds, and thereby eliminating the Investment Agreements and CFLD/GIIL's obligations to the Funds, CFLD/GIIL also seeks an order preventing the 1955 Funds GPs from accruing interest in accordance with the Agreements, and monetary damages.[18]

## III.     Summary of Opinions

16. My opinions relating to the issues in this dispute are summarized below. My opinions are based on a careful review of the materials relevant to this case and extensive interviews with Mr. Andrew Chung ("Mr. Chung") at 1955 Capital and his team, Benjamin Tseng ("Mr. Tseng"), and Kathy Chen ("Ms. Chen"), in conjunction with my academic research and experience, and consulting experience. As noted above, my research, consulting and related experience together have involved extensive interactions with hundreds of practicing VC firms and venture capitalists in these firms, many of which are Silicon Valley VC firms, as well as investors in VC funds. I also interviewed Mr. Jim Hinson from Greenough Consulting Group, a well-respected

[15] Final Award, ¶¶ 96, 98.
[16] Final Award, ¶ 487.
[17] Statement of Claim, ¶¶ 3, 8 – 10, 12.
[18] Statement of Claim, ¶ 270.

company in Silicon Valley that provides administration services for VC firms of relatively smaller sizes and accounting and finance services to start-up companies. Mr. Hinson has been assuming the role of 1955 Capital's CFO since the fourth quarter of 2019, prior to which this role was the responsibility of another employee of Greenough Consulting Group. I understand that 1955 Capital is not the only VC firm that Mr. Hinson is working with in a CFO capacity.

17. I do not agree with CFLD/GIIL's central claim in this arbitration that, "it is not reasonably practicable to carry on the Funds' business."[19] Contrary to this claim, my analysis of the 1955 Funds' investment activities indicates that the Funds carried on, and continue to carry on, the business outlined in the Investment Agreements, and that they are doing so successfully, notwithstanding the several challenges created by CFLD/GIIL. Despite a challenging environment in which they were faced with a substantial number of hostile and disruptive actions from their sole LP, the 1955 Funds GPs have acted skilfully to source deals, perform extensive due diligence, and make investments. In other words, the 1955 Funds GPs have been "carrying on the Funds' business" and making investments in and supporting the portfolio companies, some of which have proven to be successful.

18. During most of the relevant period, the 1955 Funds GPs operated in extreme circumstances that I have not encountered in any of my research, teaching, consulting or other activities. Their sole LP was failing to fulfill its only role, which was to provide capital to the Funds, and was also attempting to undermine the operation of the Funds, injure the reputation of the GPs, and interfere with the Funds' ability to make investments. As reflected in the Final Award issued in the prior arbitration, not long after the formation of the 1955 Funds, while the GPs were focused on operating the Funds and sourcing prospective investments, their sole LP repudiated and sought to get out of its investment and contractual commitments. Although the Final Award from the prior arbitration determined that the Investment Agreements were valid and binding on CFLD/GIIL in accordance with their terms, in the period following the prior arbitration CFLD/GIIL filed lawsuits against Mr. Chung, initiated a second arbitration, and utilized a campaign of press releases, social media, and direct communications with portfolio companies and other members of the VC community to make numerous accusations against Mr. Chung and

---

[19]   Statement of Claim, ¶ 175.

1955 Capital and indicate that the Funds' investments violated an investment mandate ("the Campaign").

19. Based on my review of the facts in this case, it is apparent that the Campaign sought to interfere with the 1955 Funds GPs' ability to make further investments, and stopped after CFLD/GIIL learned that the 1955 Funds GPs had been able to successfully source and make investments (albeit not in the manner the GPs would have liked, had it not been for CFLD/GIIL's conduct) and needed further capital to support these investments. After discontinuing the Campaign, following the 1955 Funds GPs' capital calls in January 2021, CFLD/GIIL requested detailed information to evaluate the 1955 Funds GP's investments, culminating in a lengthy in-person meeting with Mr. Chung, at which the investments were discussed in detail. CFLD/GIIL then undertook an extensive internal process to review the investments and the 1955 Funds GPs' capital calls, and thereafter declined to provide the additional capital requested. These are crucial facts, and therefore must be taken into account, in understanding and assessing the 1955 Funds GPs' actions and performance.

20. As a result of CFLD/GIIL's various actions, instead of having the full four-year investment period for China Fund and readily available access to a total amount of $200 million of committed capital, the 1955 Funds GPs effectively only had less than two years and no certainty over whether they could access any of the committed capital beyond the $80 million in escrow. Nevertheless, the GPs managed to investigate a substantial number of investment opportunities, and ultimately made nine investments by November 26, 2019.[20] The 1955 Funds GPs made these investments after a comprehensive due diligence process which included extensive primary market research, reviewing academic papers and industry materials, performing financial analyses, and obtaining information and insights from relevant experts, prospective portfolio companies' existing customers, investors and board members, and individuals who have worked with the companies' CEO/executives. Given the compressed timeframes in which the GPs were forced to operate as a result of the prior arbitration and CFLD/GIIL's conduct, substantial effort

---

[20]  I understand that at the end of March 2021, Fund I made an additional investment of $1.5 million in a new portfolio company, which brings the total number of investments the 1955 Funds GPs have made to ten. Due to the recency of the investment in conjunction with the preparation of this report, I have not reviewed any material related to that specific investment. However, I understand that the 1955 Funds GPs followed their typical process in conducting diligence for the investment.

CONFIDENTIAL

from both the GPs and the portfolio companies was required in some cases to complete the investment in time, i.e., before the investment period of China Fund ended and the GPs would no longer be able to make new investments. That the 1955 Funds GPs were able to make nine investments by November 26, 2019 given their situation is a notable achievement.

21. Despite their effort, the 1955 Funds GPs were not able to structure the six investments that were made in November 2019 and included in the January 21, 2020 capital calls, ("the November 2019 Investments"), in the manner they had originally envisioned. Based on my review of the relevant documents and interviews of Mr. Chung, Mr. Tseng and Ms. Chen, it is clear that the 1955 Funds GPs had hoped and planned to make larger investments as either a lead or co-lead of equity financing rounds for the November 2019 Investments. However, a relatively large investment in an early financing round requires sufficient unused capital in reserves to commit to follow-on financing rounds (in addition to covering management fees and other expenses). At the time the 1955 Capital Funds GPs made the investments, it was uncertain whether CFLD/GIIL would provide additional capital to the Funds in accordance with the Investment Agreements, and CFLD later decided not to do so in response to the January 21, 2020 capital calls.

22. The failure of a VC fund to provide additional capital to its portfolio company in subsequent financing rounds can result in irreparable reputational damage to the fund and its GP, and make it challenging for the GP to compete for promising investments in the future. It can also damage the portfolio companies. Given the uncertainties and challenging circumstances that they faced, the 1955 Funds GPs decided to negotiate smaller convertible note deals, which incorporated clauses that allow for future investments and other rights in the portfolio companies. These deals provided the GPs with the needed flexibility to not commit too much capital, leave sufficient capital in escrow for management fees and follow-on investments if needed, and gain the right to larger investments in the future should CFLD/GIIL decide to honor its contractual obligations. The use of small convertible notes deals by the 1955 Funds GPs in this case makes economic sense.

23. Following the November 2019 Investments, the 1955 Funds GPs acted in a prudent manner and called for capital in order to complete the investments as they had planned, make new and follow-on investments, and establish reserves to ease the concerns of some portfolio companies

as a result of CFLD/GIIL's Campaign. In my experience, capital calls are usually brief, mostly to specify the amount of capital needed. Specific information about prospective portfolio companies and the investments is not usually provided, since this type of information is typically deemed as confidential, and the VC industry and its players are particularly concerned about confidentiality. The normal concerns over confidentiality issues were particularly acute in this case as a result of CFLD/GIIL's Campaign.

24. GPs usually are not asked to justify their investment decisions since it is the role of a GP to select and negotiate investments. An LP does not play any role in the investment activity of a VC fund other than providing the committed capital. The information and explanations that CFLD/GIIL requested the 1955 Funds GPs to provide as part of their capital calls went well beyond industry practice. Although the 1955 Capital Funds GPs did not provide all of the information that CFLD/GIIL requested, due to understandable and justified confidentiality concerns, the written and oral information that was provided to CFLD/GIIL in support of the capital call notices greatly exceeded the information usually provided in connection with a capital call. CFLD/GIIL ultimately failed to provide the requested capital despite receiving such information.

25. As a result of CFLD/GIIL's default on its capital commitment (through failing to transfer the remaining committed capital to escrow to meet the 1955 Funds' capital needs), the 1955 Funds GPs exercised one of the default remedies made available to them under the Investment Agreements, which permits the GP to accrue and charge interest on amounts that an LP fails to contribute to the fund in accordance with contractual obligations. The GPs notified CFLD/GIIL that interest would start accruing on the defaulted amounts starting from the date that the default occurred.

26. From my experience, including in reviewing hundreds of LPAs, it is standard practice to include harsh penalties in an LPA in the unlikely event of an LP defaulting on its capital commitment. Default remedies are necessarily severe in order to deter LPs from defaulting, and also to reflect the fact that the default of an LP, especially a sole LP such as in this case, can put the partnership, the VC fund, and its GP in jeopardy. The default remedies included in the 1955 Funds' Investment Agreements, in my experience, are less severe than in many other LPAs.

CONFIDENTIAL

Based on the nature and function of the interest accrual default remedy, and my review of the facts and circumstances of this case, the 1955 Funds GPs' reliance on these default remedies is appropriate, justified, and necessary. Among other things, there were investment opportunities that the GPs considered but were not able to invest in, and opportunities that they wanted to invest more in but were not able to, that have proven to be successful. Had it not been for CFLD/GIIL's conduct, the 1955 Funds, their GPs, and CFLD/GIIL itself, would have been able to benefit from these missed opportunities. The magnitude of the interest owed by CFLD/GIIL might appear to be substantial, but the missed opportunities and corresponding missed benefits for the Funds and the GPs are likely to also be very substantial. Further, the interest amount in this case is large because CFLD/GIIL continued its default without any attempt to rectify the situation: the longer an LP stays in default, the longer the interest is accrued and the larger the amount becomes.

27. I do not agree with the conclusions in the Meadow Report in relation to the 1955 Funds' investment activities. Many of the statements in the Meadow Report regarding the VC industry and industry norms are incorrect, particularly with respect to VC practices in Silicon Valley. These incorrect statements might reflect Mr. Meadow's experience with the specific VC funds that he has been associated with but fail to recognize that there is a wide variation within the VC industry. In my experience, there is no "template" or "commonly accepted" approach to VC investing. The approaches or strategies required are often determined by the venture capitalists and the circumstances at hand.

28. The biggest shortcoming of the Meadow Report is that it fails to account for (or even to mention) crucial facts in this case, including (i) the impacts and challenges that resulted from CFLD/GIIL's hostile actions and failure to fulfill the only substantial role accorded to an LP, which is providing the 1955 Funds with capital, and (ii) the facts regarding the actions taken by the 1955 Funds GPs in connection with the November 2019 Investments and January 2020 capital calls. By basing his opinions entirely on what he inaccurately claims to be industry standards and customary practices, Mr. Meadow simply ignores the crucial facts regarding the unusual environment in which the GPs were forced to operate, and the facts concerning what the 1955 Funds GPs actually did, both of which are critical to any understanding or evaluation of the 1955 Funds' investment activities.

CONFIDENTIAL

29. Mr. Meadow also does not offer any discussion or evidence to support a number of CFLD/GIIL's central claims, including the claims that the 1955 Funds GPs are bound by a particular investment mandate, that the reliance on the interest remedies by the GPs was improper, and that "it is not reasonably practicable to carry on the Funds' business."[21] I detail in my report that: the investments made by the 1955 Funds GPs were consistent with the Funds' investment focus and Mr. Chung's prior background and expertise, and some have proven to be successful; the reliance on interest remedies by the 1955 Funds GPs in light of CFLD/GIIL's defaults was justified and prudent; and the GPs have been carrying on the Funds' business and should be able to realize the benefit of the Investment Agreements, including both the near-term management fees and the long-term benefits of their investments.

30. The remainder of my report is organized as follows. In section IV, I provide a discussion of the venture capital industry based on my extensive experience researching and interacting with VC firms and other key parties to the VC industry. Also in section IV, I provide a summary of the essential facts specific to this case. In section V, I discuss my analysis of the 1955 Funds GPs' investment activities, the January 21, 2020 capital calls that the GPs made to request further capital to support their investments, and the GPs' justified reliance on default remedies in this case. I provide a direct critique to the Meadow Report in section VI, and discuss other central claims put forward by CFLD/GIIL that Mr. Meadow does not opine on in section VII. All documents cited in my report are listed in Appendix B. I include further exhibits and supporting analysis to my opinions in Appendix C. In addition, in section VI I only focus on the key opinions presented by Mr. Meadow in relation to the 1955 Funds and their investment activities. I detail the inaccurate statements in the Meadow Report about the general VC industry in Appendix D.

---

[21]    Statement of Claim, ¶ 175.

CONFIDENTIAL

# IV.   Overview of the Venture Capital Industry and Key Events Related to 1955 Capital

————

31. In this section, I first provide a discussion of the venture capital ("VC") industry and common features of the relationship between the general partner and limited partners of a venture capital fund ("VC fund") (subsection A). The discussion in subsection A relies heavily on my academic research and experience, and consulting experience, which together have involved extensive interactions with practicing VC firms and provided insights into hundreds of venture capitalists and the venture capital funds they manage, as well as investors in these venture capital funds. In particular, in my recent research projects, my coauthors and I surveyed venture capitalists at hundreds of VC firms in Silicon Valley and throughout the United States, which account for 63% of all US VC assets under management. One important finding from this research is that there are wide variations in VC firms' practices and strategies, and no single template against which they can be measured. Beyond this general variation, this case is even more unusual given the actions CFLD/GIIL took toward the 1955 Funds GPs, including CFLD/GIIL's refusal to meet its capital commitment and undertaking a negative publicity campaign. I summarize the facts specific to this case in subsection B.

## A.   Overview of the Venture Capital Industry

32. A VC firm is a type of financial intermediary that raises capital from investors and manages the funds it raised by investing in early-stage high-growth private companies ("the portfolio companies"). VC firms are usually relatively small organizations, organized as partnerships comprising several professionals. These professionals are commonly referred to as venture capitalists, general partners, or fund managers. A VC firm manages one or more VC funds. A VC fund is a private limited partnership with a finite lifetime (typically ten years with a possibility to extend the horizon by a few more years), with investors acting as limited partners ("LPs" / an "LP") and venture capitalists acting as the general partner ("GP") of the fund. LPs are often institutional investors such as large corporations, pension funds, or endowment funds. To manage their underlying VC funds, VC firms typically organize a management company

CONFIDENTIAL

partnership to provide day-to-day business operations (e.g., paying salaries, renting office space, etc.).

33.  I note that the term general partner can be used to refer to the professionals within a VC firm, or to the entity that is the general partner of a specific VC fund. To avoid confusion, I use "general partners," "VC fund managers," or "venture capitalists" to refer to the professionals within a VC firm. I use "GP" to refer to the entity that is an investment manager of a limited partnership. In the context of this case, 1955 Capital is the management company, and Fund I GP and China Fund GP are the GP entities of two VC funds managed by 1955 Capital. "GP" thus can refer both to 1955 Capital and to the 1955 Funds GPs. Mr. Chung is the general partner of 1955 Capital, and Mr. Chung's team can be referred to as VC fund managers or venture capitalists.

34.  In subsection 1 below, I discuss the respective roles and expectations of the GP and LPs of a VC fund. I then discuss the process of VC investing (including general industry statistics and the process of deal sourcing and investment selection) in subsection 2.

## 1.      LPs Provide Capital While the GP Takes Responsibility for Investment and Operating Decisions

35.  At the onset of a VC fund (i.e., when capital for the fund is "raised"), LPs promise to put up a certain amount of capital over a specific period of time. The total amount of capital committed by LPs over the lifetime of the VC fund is often referred to as "committed capital." The year a VC fund starts investing is called the "vintage year" of that VC fund. The committed capital is not commonly provided in its entirety at the onset, but instead is provided by the LPs at the discretion of the GP over the life of the fund.[22] A typical VC fund makes investments in new portfolio companies in the first four to six years, a period often known as the "commitment period" or "investment period." Once this period is over, the VC fund typically can only make follow-on investments in its current portfolio companies (i.e., companies that it has already invested in).

---

[22]  Some funds require a portion of the committed capital to be contributed at closing, others do not. Some funds have a set schedule for capital contribution, others request capital as it is needed. Under normal circumstances, in my experience, most funds request capital as needed.

CONFIDENTIAL

36. In managing a VC fund, the GP is solely responsible for the investment and operating decisions regarding the fund. In serving as the GP of a limited partnership, a VC firm is compensated through "management fees" and "carried interest" (also referred to as "the carry").

    a. The management fee is an essential component of GP compensation. It is necessary because the expenses of VC investing, such as salaries, business development activities, expenses associated with due diligence, travel, office rents etc., start straightaway, even though the return on VC investments can take years. Any residual amount from the management fee can serve as profit to the management company. One of the common arrangements is for the GP to charge a set percentage (2.0 – 2.5 percent on an annualized basis) of committed capital as management fee. My research and experience indicate that, while relatively large VC funds tend to charge a fee of 2.0 percent, smaller funds (generally those with capital of $200 million or less under management) tend to charge a larger fee of 2.5%. This makes sense, because managing a VC fund involves a fixed cost independent of the fund size. The management fee is usually paid in equal quarterly installments. In many cases, management fees stay the same over the lifetime of the VC fund. In some other cases, management fees can be reduced after the investment period or they could be charged as a percentage of managed capital (i.e., the amount of capital currently invested by the VC fund) rather than of committed capital. Management fees paid to the GP are paid out of the committed capital. In addition, VC funds often charge some additional expenses, such as fund formation costs, to the fund directly rather than pay those costs from the management fee.

    b. The second source of VC compensation, the carried interest, or carry, is designed to enable the GP to participate in the profits of the fund, and thus align the incentive of the GP (to identify investment opportunities with high returns and manage these investments) with the LPs. The carry typically allows the GP to receive a portion of the realized profit, i.e., the amount of proceeds upon exiting the investments that the VC fund makes in excess of the committed capital or contributed capital. The GP usually receives carry of between 20 to 30 percent.[23] In my research and experience, if the VC fund turns out to be successful, the carry will provide the largest portion of GP compensation. However, some VC funds might not have enough success to receive any or substantial carry, and for such a fund, the management fee is the main source of compensation to the GP.

37. VC investing is a long-run business, meaning that often VC investors must wait several years before seeing a return on their capital. LPs put up capital for the GP to manage with no predetermined promise of return and no control over the policy and investment decisions of the

---

[23] In some cases, the carry features the so-called step-up provision, in which the carry increases from, say 20% to 25% if the fund performance is above a pre-specified threshold.

CONFIDENTIAL

GP. LPs receive only limited information regarding the investments made by the GP, usually through periodic updates about the status of the GP's investment activity, which could be in the form of quarterly updates and an annual report of the fund's performance. These reports usually contain summary information on portfolio companies as well as the current financial status of the fund, including the financial metrics of the investments made by the fund to date, both on realized and unrealized terms. In between these reports, the GP also informs its LPs if a portfolio company experiences a liquidity event and whether the LPs are due to receive any allocations. GPs might also organize annual LP meetings, to which all LPs are invited. At such a meeting, the GP would present information about the performance of the fund's portfolio, and some details on individual companies. When such a meeting is held, management teams of some portfolio companies are sometimes also present. It is not common for a VC fund's GP or management teams of portfolio companies to present any substantial details related to financial or operational information of underlying portfolio companies of the fund, because such information is typically deemed confidential.[24]

38. A GP operates a VC fund under the expectation that the LPs will honor their capital commitments, and that it (the GP) has a contractual right to benefit from running the fund. The immediate benefit from running a VC fund lies in the management fees and any potential carry; however, it does not stop there. Since VC funds have finite lives, VC firm general partners periodically raise capital for new VC funds to stay in operation and make investments in new companies. Venture capitalists thus build a long-term career by relying on their performance in one fund, and the associated reputation, to establish the next fund and so on. Typically, VC firms raise new VC funds every 2 to 5 years. Many venture capitalists raise successively half a dozen or more VC funds. As such, the "benefit" from running a VC fund has a far longer-term impact than the immediate near-term compensation. My research and experience indicate that the timely fulfillment of the capital commitment by the LPs (either at the request of the GP or at the times set in the contract) is critical to the operation and success of a VC fund, as well as to the career of the venture capitalist, especially in the context of new VC firms for several reasons. Some of these are as follows:

---

[24]   The GP might also call periodic advisory board meetings to collect feedback and ideas from LPs; however, the investment decisions are made solely by the GP.

CONFIDENTIAL

a.  First, the nature of VC investing is to "fund the internal growth of companies,"[25] meaning that VC firms invest to build new businesses, not to acquire existing ones. These new businesses need to raise capital often (every 12-24 months), and many financing rounds, especially those of the most sought-after companies, close very quickly. Once the round is closed, the invested amount is usually wired to the portfolio company right away (so that the portfolio company can start using the capital to grow its business). A VC fund thus needs to be able to commit to provide the money to the portfolio company promptly in order to secure its participation in the financing round.

b.  Second, if a GP negotiates a deal with a potential portfolio company but is unable to uphold its commitment to provide the funding, the likely result will be irreparable harm to the GP (and the individual venture capitalists within the GP), because the VC industry is a small and tight-knit community where reputation is of critical consideration and value. The VC industry is also very competitive. The reputation of a VC fund and its GP is critical for competing with other VC funds in securing promising investments on favorable deal terms. A VC fund might source a deal (i.e., an investment opportunity) directly or it might be introduced to the deal by another investor. If start-ups have concerns that a VC fund might not have sufficient capital or uphold its obligation to wire the invested amount promptly, they will prefer to seek capital elsewhere or will impose additional constraints and conditions on the VC fund.[26] Further, other investors are less likely to invite such a VC fund to participate in an investment syndicate. From the perspective of the individual venture capitalists within the GP of a VC fund, reputation is also crucial to their future effort of creating new VC funds.

c.  Third, since VC-backed start-ups raise funding often, the existing investors of a start-up typically negotiate so-called "pro-rata rights" that allow them to invest in the same company in the future. It is a common view in the VC industry that using the pro-rata rights to participate in future rounds of the most successful portfolio companies determines the success and reputation of the VC fund and its GP. Inability to invest in the future rounds because of lack of timely access to committed capital from LPs hinders such opportunities and damages the VC fund's performance and its GP's reputation. In fact, many funding contracts, especially in the context of a syndicate of investors, specify a "pay-to-play" provision, whereby certain penalties will be imposed if an investor (a VC fund) does not invest again in future financing rounds. Further, with each round of financing, VC-backed companies tend to issue a new class of equity. Classes of equity issued in different financing rounds may have different "seniority ranking" with regard to their cash flow rights, and often

---

[25]  Andrew Metrick and Ayako Yasuda, 2011, *Venture Capital & the Finance of Innovation 2nd Edition*, John Wiley & Sons, Inc., p. 3.

[26]  As I discuss further in ¶ 117, this is the case with the 1955 Funds and some of the portfolio companies that they invested in.

CONFIDENTIAL

classes that were issued earlier are junior to those issued more recently. Such financing practice means that once a VC fund has invested in an early financing round, it is important to continue backing its portfolio company. Otherwise, the VC fund risks having its claim become junior to later round investors or diluted. In addition, because successful investments will attract more competition from other VC investors, if a VC fund does not use its pro rata rights, those rights are forfeited for future rounds too, and it would be difficult to get a chance to invest in the subsequent rounds of the most successful investments of the VC fund. I explain the competition in the VC industry further in the next subsection. For all these reasons, it is considered crucial for GPs to be able to back their existing investments in their future financing rounds.

39. It is not just important for the GP that their LPs honor their capital commitment. Reputational concern in the VC industry is also important from an LP's perspective, particularly in the typical situation in which an LP intends to invest in future VC funds. Just as there is an intense competition for entrepreneurs with a promising investment thesis to attract funding from VC funds, and a competition among VC funds to compete for promising deals, there is also a competition among investors (i.e., prospective LPs) to develop relationship with highly sought-after venture capitalists. As such, for an existing LP (such as CFLD/GIIL) to be accepted as an investor in the future (either in VC funds or as a direct investor), it is essential that they show commitment to their current VC fund and its GP. In other words, it is in the interest of an LP to not default on its existing capital commitment in order to maintain its reputation for future investments.

40. Although my research and experience interacting with hundreds of venture capitalists and investors indicate that (as a result of reputational concerns and onerous default remedies) instances of LPs defaulting on their capital commitment are extremely rare, without formal contractual obligations and remedies GPs could only rely on the creditworthiness of its LPs, as well as their ability and willingness to respond to capital calls in a timely fashion. Because committed capital is usually not fully contributed at the inception of a VC fund, and adherence to capital commitments is essential to operating a VC fund, it is critically important, and economically sound, to have enforceable contractual clauses that deter LPs from defaulting.

41. The relationship between LPs and their GP is governed by a limited partnership agreement ("LPA") and related contractual documents. LPAs vary on a case-by-case basis; however, my

research, teaching at Stanford, and experience interacting and consulting with different parties in the VC industry, indicate that limited partnership agreements usually incorporate several forms of penalties and remedies in the event that an LP defaults and fails to meet its funding commitment in a timely fashion. Indeed, the overwhelming majority of such agreements have default remedies of various types and degrees. These default remedies are often extremely costly and onerous to defaulting LPs, serving as a deterrent to LPs defaulting on their capital commitment.[27] Based on my research and experience, commonly used default remedies include high interest charges on unfunded amounts, seizure of some or all of the defaulting LP's capital account, and forced sale of the defaulting LP's interest in the fund at a reduced price. In my review of the documents governing the partnerships between the 1955 Funds and CFLD/GIIL, the language of the interest remedies and other default remedies here (including the language in the Post-Closing Changes)[28] is similar to – if not more lenient than – the remedies that I have seen in my research and experience. I revisit this topic in section V.C.

42.    In addition to default remedies, when there is uncertainty regarding whether an LP might be able to fulfill its capital commitment, a GP might also employ escrow accounts or other mechanisms to provide additional certainty for the GP and other LPs. Such a scenario might arise from concerns regarding geopolitical risk and regulatory risk, and/or the lack of diversification if there is only one LP to the partnership, such as in this case. In the case of CFLD/GIIL, the uncertainty also arises from the fact that even though CFLD/GIIL is a sophisticated entity, it is less experienced in VC investing and therefore might not know or follow what is typically expected of an LP. The use of an escrow account requires that the LP deposits the committed capital in pre-determined installments. The money stays in the escrow account and is not immediately contributed to the VC fund but will subsequently be used to meet capital calls at the discretion of the GP.

43.    In my interviews of Mr. Chung I learned that he sought to create a VC fund with explicit assurances from prospective LPs on capital contribution. Mr. Chung explained that the reason

---

[27]    I note that the Meadow Report acknowledges this fact, stating that default provisions and penalties, including provisions authorizing accrual of interest, are commonly used "as a tool to incentivize limited partners to keep their capital commitments." Meadow Report, p. 45.

[28]    I provide an excerpt of the default remedies from the Investment Agreements in Appendix C.1 and Appendix C.2.

why such explicit assurance was needed in this case was due to the history of defaults among Chinese investors, which is precisely what happened here, as I discuss in section B. I understand that Chinese LPs pose well-known risks to VC funds due to historical difficulties surrounding government-imposed currency transfer restrictions, defaults on capital commitments, and the limited legal recourse available to GPs in the case of such defaults.[29] Therefore, many GPs adopt strategies to ensure the availability of capital from Chinese LPs, such as requiring the LPs to make capital contribution to the funds upfront or on an accelerated timeline ahead of other investors. These strategies are used as a protective mechanism for not just the VC funds but also other LPs of the funds. I also learned from my interviews of Mr. Chung that he chose an approach whereby capital contributions are deposited to an escrow, but not immediately contributed to the VC fund, as a less aggressive alternative to help ensure the availability of committed capital and safeguard the interests of the Funds and GPs. In my interview with Mr. Hinson, I also asked about the use of escrow accounts and learned that the approach used by 1955 Capital is not unusual and has been used by other VC firms.  Further, my review of the relevant documents indicates that prior to the formation of the 1955 Funds, Mr. Chung had explained to CFLD/GIIL's chairman the importance of meeting capital calls and, after a series of negotiations, both parties agreed that CFLD/GIIL would provide 40% of the total committed capital, or $80 million, upfront, with the remaining committed capital to be provided (to the escrow) in two equal installments on the first two anniversaries of the Funds.[30]

44.  The event of the GP requesting the LP to provide a certain amount of committed capital is typically referred to as a capital call or drawdown. My academic research, including survey work, interviews and compilation of datasets, along with my consulting work and other interactions with venture capitalists, have provided extensive empirical information regarding capital calls. Based on that information, it is clear that most capital calls simply take the form of a short letter from a GP to the LPs, stating the amount of capital needed and necessary logistics

---

[29]  Fang Xue, et al, "Recent Trends and Issues in Outbound Acquisitions by Chinese Companies," The M&A Lawyer, 20(10), 2016. Charles Ching, "China Tightens Regulatory Approvals for Outbound Investments," Weil, Gotshal & Manges, March 17, 2017, https://privateequity.weil.com/insights/china-tightens-regulatory-approvals-outbound-investments/. Jan Bogaert, "China Newsletter: Challenges to Chinese outbound M&A in the year of the rooster," Stibbe, March 3, 2017, https://www.stibbe.com/en/news/2017/march/china-newsletter-chinese-outbound-ma-in-the-year-of-the-rooster.

[30]  R-218 (Fund I Escrow Agreement), clause 2. R-138 (Fund I Subscription Agreement), pp. 3 – 4. R-217 (China Fund Escrow Agreement), clause 2. R-137 (China Fund Subscription Agreement), p. 3.

information such as bank account details and legal addresses. Sometimes additional information, such as a brief description of the purpose of the capital call, might also be provided in a capital call. For example, the capital call may state that the fund will be making a new or a follow-on investment. The capital call can also contain information on the management and miscellaneous fees if the GP requests these fees to be paid at that time. Capital calls rarely provide any detailed discussion of the portfolio companies or terms of specific investments because such information is often deemed unnecessary and confidential. The VC industry and its players are particularly concerned about confidentiality, and, therefore, rarely provide unnecessary information to other participants, including to LPs in capital calls. Since LPs neither participate in the day-to-day life of the VC fund nor manage investments or decide on specific investments, providing information to LPs regarding specific investments is not mandatory, customary, or even useful. In some cases, LPs learn about portfolio companies only through annual letters and annual LP meetings, as I explained above.

## 2.        The Process of Venture Capital Investing

45.   In this section, I provide an overview discussion of the VC industry and the process of VC investing. I first present some general statistics on the size of VC funds and their investment focus. I then summarize the role of GPs in the investment process. Where appropriate, I provide brief commentary on how the 1955 Funds compare to the VC industry statistics and point out instances where the Meadow Report mischaracterizes industry norms. I provide a detailed critique of the Meadow Report in section VI.

46.   The discussion in this section relies on my teaching, research and consulting experience, through which I have interacted with, and gathered data regarding, numerous VC firms, including many in Silicon Valley. As mentioned above, for a recent academic study, my coauthors and I surveyed 885 venture capitalists at 681 VC firms, which accounts for 63% of all US VC assets under management and comprises 76% of the top 50 and nine of the top ten VC firms. Until recently this was the largest ever survey of the VC industry. In the summer of 2020, we

conducted a follow up survey of more than 1,000 VC firms, which is the largest ever study of this kind to date. For brevity, I refer to the first study as "my survey paper."[31]

47.   Although there is frequent news coverage regarding VC firm successes, including in backing big names such as Amazon, Apple, Facebook, etc., my survey paper is the first comprehensive empirical study that investigates and sheds light on many questions relating to what VC firms actually do and how they create value. One important advantage of such a comprehensive survey is that it provides information regarding many features of the VC industry that were previously little known, such as the internal processes of VC firms, and the GP-LPs relationship. Moreover, while many practitioners and academics know only of the specific funds they have been associated with, my survey paper reveals there is a great deal of variation across VC funds. My research and experience interacting with different parties in the VC industry indicate that VC firms (and the individual venture capitalists in these firms) operate in different ways, have different philosophies, and take vastly different strategies and approaches to success. There is no "template," "secret sauce," or "commonly accepted" approach to VC investing. As I explain below, the approaches or strategies required are often determined by the circumstances at hand.

**VC Fund Size and Investing Orientation**

48.   In the sample of VC firms that I surveyed, the average VC fund size (i.e., committed capital) is $286 million, with a median of $100 million, as summarized in Table 1. I also summarize the historical statistics on VC fund size between 2010 and 2020 using data from the National Venture Capital Association's and Pitchbook's quarterly Venture Monitor reports in Figure 1. The mean and median VC fund size in recent years are greater than in earlier years. This means the 1955 Funds, with total committed capital of $200 million,[32] are relatively small compared to the average VC fund, but are still larger than many other VC funds, especially during 2015 and 2016, when the 1955 Funds were created. Most VC firms have three to five investing general partners, depending on their size. Many VC firms are very small, with some having only one

---

[31]   Paul Gompers, Will Gornall, Steven Kaplan, and Ilya Strebulaev, "How Do Venture Capitalists Make Decisions?," *Journal of Financial Economics*, 135 (2020).

[32]   R-138 (Fund I Subscription Agreement), p. 1, R-137 (China Fund Subscription Agreement), p. 1.

individual. A team of one general partner and a few junior investment professionals is common in many VC firms.

**TABLE 1:**
**VC FUND SIZE STATISTICS**

|  |  | 75th Percentile [A] | Mean [B] | Median [C] | 25th Percentile [D] | Std. Dev [E] |
|---|---|---|---|---|---|---|
| Fund size ($ millions) |  |  |  |  |  |  |
| Surveyed | [1] | 286 | 286 | 120 | 58 | 775 |
| Dow Jones VentureSource | [2] | 253 | 370 | 100 | 34 | 1,335 |
| NVCA & Pitchbook (2020) | [3] | 252 | 236 | 76 | 13 | NA |

Sources:

[1] - [2]: Ilya Strebulaev, et al, "How Do Venture Capitalists Make Decisions?," Journal of Financial Economics, 135 (2020), p. 174.

[3]: "Venture Monitor, Q4 2020," National Venture Capital Association and Pitchbook, December 31, 2020, p. 31, https://nvca.org/research/pitchbook-nvca-venture-monitor/.

**FIGURE 1:**
**HISTORICAL US VC FUND SIZE STATISTICS**



Source: "Venture Monitor, Q4 2020," National Venture Capital Association and Pitchbook, December 31, 2020, p. 31.

49.   The majority of VC firms (more than 60% in the sample in my survey paper) specialize in a particular "stage" (i.e., the level of development/growth of the portfolio companies). More funds

specialize in seed- or early-stage companies than mid- or late-stage companies.[33] As the portfolio companies progress, an early-stage VC fund might end up with a portfolio of both early-stage and mid- or late-stage companies. However, the notion put forward by the Meadow Report that VC funds are customarily "stage agnostic"[34] is plainly incorrect, and is contradicted by my empirical research evidence and generally available evidence. While there are some funds that take a more generalized approach, typically those with a very large amount of capital under management, such as NEA with over $20 billion in capital under management,[35] more funds focus on particular stages of investment. Many of these funds are early stage funds, which invest from seed to early stage (typically Series A and B) VC rounds. I would characterize the 1955 Funds as early stage funds.[36]

50. My survey also asked VC firms to indicate whether they had industry specialization. A large number of VC firms (almost 40% of my survey sample) are generalists without an industry focus. More VC firms invest in three or more industries, compared to VC firms that invest in a single industry. As noted above, there is no consistent approach, standard "recipe" or single prevailing strategy that VC firms follow. The Meadow Report, again, is incorrect in characterizing industry specialization, including referring to VC firms concentrating their investment in one or two industries,[37] as the industry norm. There are many VC firms, including the so-called "micro VC firms" with relatively little capital, which are generalists and invest in a wide variety of industrial verticals. Often, this is driven by the value proposition of individual venture capitalists. For example, some venture capitalists have expertise in a specific industry, such as biotechnologies, and thus invest mostly in start-ups in that domain. Venture capitalists

---

[33] Early-stage financing refers to investment in companies where products are mostly in testing or pilot production or might have just been made commercially available. Mid- and late-stage financing refer to investments in companies that are further advanced in their development (for example, companies that are producing and shipping/selling products or companies that have reached a fairly stable growth rate). *See* Andrew Metrick and Ayako Yasuda, 2011, *Venture Capital & the Finance of Innovation 2nd Edition*, John Wiley & Sons, Inc., p. 15.

[34] Meadow Report, ¶ 36.

[35] "History," New Enterprise Associates, https://www.nea.com/history, accessed April 6, 2021.

[36] "Andrew Chung and 1955 Capital, a New Fund to Bridge China, U.S.," *The Startup Magazine*, March 1, 2020. ("Looking to the future, Chung indicated that his approach with 1955 Capital is to focus on funding those technologies that can be commercialized in from one to three years following investment. Based on that criteria, the venture capital firm offers funding as low as $500,000 and as high as $15 million. 1955 can invest in seed to Series B rounds, but would typically look to invest in technologies that are close to bring a product to market.")

[37] Meadow Report, ¶ 30.

that are particularly skilled in networking and have connections with many investors and others in the ecosystem tend to invest more broadly, often across a wide variety of industries. Investing broadly across industries is frequently pursued by venture capitalists in Silicon Valley, where the 1955 Funds are located. Venture capitalists choose among an array of strategies based on their circumstances and strengths.

51.  Although VC funds seek to generate the highest return possible given the risk that the VC fund takes,[38] the nature of investing in new businesses is such that most of the companies they invest in ultimately fail. The high failure rate of start-up firms (ranging from a third to over 70%) is well understood and documented in the academic literature and in practice.[39] This means that often the average return of the VC industry, or the claimed return of a particular VC fund, is driven by a few very successful investments, which offset many failed investments that VC funds make (i.e., investments that do not provide a positive financial return to an investor or simply fail outright): "the biggest source of our [VC] returns is our ability to double down on our winners."[40] The success versus failure rate of portfolio companies also resembles that of VC funds. The bulk of the return in the VC industry is made up of the high return to a small number of VC funds. These high-performing VC funds are typically associated with a small number of VC firms and fund managers. This again illustrates the importance of "reputational capital" in

---

[38]  There are different ways VC returns can be measured, which I do not address in detail here.

[39]  Andrew Metrick and Ayako Yasuda, 2011, *Venture Capital & the Finance of Innovation 2nd Edition*, John Wiley & Sons, Inc., p. 124. ("[B]y five years after the initial investment, 12.7 percent of all companies have had an IPO, 24.1 percent have been acquired, 26.1 percent are defunct (out of business), and 37.1 percent are still private. By 10 years after the initial investment, the respective percentages are 15.4 percent for IPO, 35.5 percent for an acquisition, 33.4 percent for defunct, and 15.7 percent for still private."); Jay Yarow, "Blood in the Water –90% of the billion dollar unicorn startups are in trouble," Business Insider, January 26, 2016, ("He says there is "blood in the water," and we are entering a 90-10 situation for the unicorn class of startups with billion-dollar valuations in which 90% of the startups will be repriced or die and 10% will make it. When asked why valuations got so out of control, Breyer said a lot of deals in the past year had ratchets and downturn protections to give founders the lofty valuations they requested from venture capitalists."); Manju Puri, and Rebecca Zarutskie, "On the Life Cycle Dynamics of Venture-Capital and Non-Venture-Capital-Financed Firms," *The Journal of Finance*, Vol LXII No. 6, December 2012, p. 2249 ("After the length of a typical VC investment, we find that 39.7% of VC-financed firms fail, 33.5% are acquired, and 16.1% go public. In contrast, 78.9% of non-VC-financed firms fail, 1.04% get acquired, and 0.02% go public."); Paul Gompers, Will Gornall, Steven Kaplan, and Ilya Strebulaev, "How Do Venture Capitalists Make Decisions?," *Journal of Financial Economics*, 135 (2020), p. 185. ("It is also possible that VCs monitor their investment closely, because even late-stage VC companies have a relatively high rate of failure.").

[40]  Paul Gompers, Will Gornall, Steven Kaplan, and Ilya Strebulaev, "How Venture Capitalists Make Decisions," *Harvard Business Review*, March – April 2021 Issue.

the VC industry: high-performing individuals are more likely to attract further capital, which in turn is more likely to attract high-quality investments, which in turn reinforces the individuals' reputation. The economics of VC funds is another aspect that is incorrectly described in the Meadow Report, which advances the notion that minimizing "loss ratio" is an important consideration for a GP.[41] The "loss ratio" as defined in the Meadow Report is, by default, expected to be high for a VC fund, and it is the overall return that matters to VC investors. Moreover, in my academic, research, consulting, and other experience in the VC industry, I have never encountered the concept of the "loss ratio" in the context of VC investing as described by the Meadow Report. While this concept is well known in finance and used in other industries and investments that are very different from VC investing (e.g., in commercial banks lending to customers or in the bond markets), it is not used in the VC industry (for the reasons I have described).

**The Deal Funnel Process**

52.   The ultimate objective of a GP of a VC fund is to identify promising investment opportunities that might become the ultimate success story. In my survey paper, my coauthors and I specifically asked VC firms about how they source deals, select and structure investments, and manage portfolio companies post-investment. I describe this process in the next several paragraphs.

53.   Deal sourcing, i.e., the ability to generate a pipeline of high-quality investment opportunities, is an important determinant of success for a VC fund. Most VC deal flow comes from the GPs' networks, such as professional networks, and referrals from other investors or from their existing portfolio companies, and from GPs initiating contact with entrepreneurs. An experienced and reputable venture capitalist is more likely to have a broad network and be presented with high potential investment opportunities. That is particularly true in Silicon Valley, where 1955 Capital is located. For example, in the case of 1955 Funds, the investment memoranda that I reviewed, as well as my interviews with Mr. Chung, Mr. Tseng and Ms. Chen indicate that multiple leads were generated via network connections that Andrew Chung and his team had established previously, whereas others were generated with the 1955 Funds team proactively initiating

---

[41]   Meadow Report, ¶¶ 34 – 35.

contact with the potential portfolio company. I further discuss my analysis of the investment activity of 1955 Funds in section V.

54.   To sort through investment opportunities, VC firms typically use a process sometimes referred to as the "deal funnel," as illustrated in Figure 2 below. In the typical paradigm, the funnel starts with a member of the GP generating and considering the opportunity. If the investment opportunity is promising, a member of the GP meets the management of the potential portfolio company before bringing the opportunity to other GP members for their review. If the investment passes through the first part of the funnel, a due diligence process is then started, frequently with further reference calls (on the portfolio company's founding and management team, the market potential, and the underlying technology) and industry analysis. As I noted above, some venture capitalists have deep industry expertise and invest in specific industries, whereas other venture capitalists have networking expertise and invest more broadly across industries.[42] In such firms, the due diligence process often involves soliciting opinions of others within the GP's network. At the end of the due diligence process, if the GP decides to go ahead with the investment, it will present a term sheet that summarizes the conditions for financing, which is then negotiated with the potential portfolio company. While VC funds make investments throughout the life of the funds, the number of investments on a year-to-year basis and across funds can vary. A new fund, especially a venture capitalist's first fund, might start off with no or just a few investments at the beginning of the commitment period but invest more towards the end of the commitment period.

---

[42]   Take, for example, Michael Moritz of Sequoia Capital: "Michael Moritz of Sequoia Capital does not have either entrepreneurial or operational expertise. He was a business journalist with Time magazine and crossed paths with Don Valentine, founder of Sequoia while he was working on a book." *See* Mahendra Ramsinghani, 2014, *The business of venture capital: insights from leading practitioners on the art of raising a fund, deal structuring, value creation, and exit strategies.* John Wiley & Sons, Inc., p. 36. *See also* Michael Eisenberg & Harry Stebbings (February 8, 2021), *The Twenty Minute VC* [Audio podcast], https://www.thetwentyminutevc.com/michael-eisenberg/, accessed April 6, 2021. ("I'm a generalist mostly because I don't know much about anything. I don't understand technology terribly well, I have a pretty uncertain view of markets as a general proposition, and I think the one thing I semi-understand is people," 24:07).

CONFIDENTIAL

**FIGURE 2:**
**TYPICAL "DEAL FUNNEL"**



55. The effort and resources required in the typical deal funnel process can vary significantly depending on a variety of circumstances, including factors such as whether the fund managers have a prior relationship and knowledge of the founding and management team of the prospective portfolio company, input from members of the GP's network and whether the VC fund is the lead or co-lead investor in the capital raise. The due diligence required for a company that the fund managers have no prior knowledge of might take weeks or months, whereas the due diligence required for a company that the fund managers have previously investigated (for example, from their prior experience at a different VC firm) might take several hours or days. Some fund managers might "free-ride" from the lead and co-lead investor's due diligence and conduct little (or less) due diligence on their own.

56. Though VC funds almost always reject many more deals than they accept, competition amongst VC funds can be intense when they spot a company they like. Vinod Khosla, the founder of Khosla Ventures, and with whom Mr. Chung served as one of six general partners for four years, told my co-authors and me that the power dynamic can quickly flip when VC funds become excited about a start-up, particularly if it has offers from other VC firms. "The best start-ups with inspiring entrepreneurs have intense competition to fund them," he explained. "For VCs, having a clear message about what you will and will not do, how you provide real venture assistance,

and how you approach bold visions is key to winning these types of opportunities. And they matter tremendously for fund returns."[43]

57. When surveyed, VC firms indicated that they consider several factors before making their investment decisions, with some factors playing a more important role than others. The factor that tends to be considered most important is the characteristics of the management team of the potential portfolio company (such as ability, industry experience, passion, entrepreneurial experience, and teamwork). Business related factors such as business model, product, market, industry, and intellectual property are also important considerations. About half of the VC firms in my survey sample mentioned "fit with the fund" as a factor of some importance. Valuation of the potential portfolio company and the ability of the VC firm to add value were also mentioned, but do not appear to be perceived as important as other factors.[44] For promising deals, the conclusions on the key factors considered, as well as reasons to invest, are typically summarized in an investment memorandum ("investment memo").[45] The format of an investment memo varies across VC funds. A large VC fund with several decision-making fund managers might require more formal investment memos, with more detail and documentation which can be used for the discussion among the different managers of the fund, many of whom will not have played a significant role in the underlying due diligence. In a small VC fund in which due diligence is performed by a handful of individuals who will participate in the investment decision with one key decision maker, as was the case with the 1955 Funds, investment memos often take a more informal form and are used as a way to communicate due diligence across a small team and keep the record of discussions and a plan of action.

---

[43] Paul Gompers, Will Gornall, Steven Kaplan, and Ilya Strebulaev, "How Venture Capitalists Make Decisions," *Harvard Business Review*, March – April 2021 Issue.

[44] The fact that valuation is not cited as the most (or among the top few) important factors is rather counterintuitive. Further, in valuing the potential portfolio company, some VC firms in my survey report that they do not use any financial metrics, and not many firms use valuation methods suggested by finance theory (such as a discounted cash flow or net present value analysis). Many VC firms, especially early-stage firms, also do not perform any forecast of future cash flows, most likely due to the uncertainty and lack of operating information – a common characteristic of the portfolio companies that they consider. Some funds do perform cash flow forecasting for a three-to-four-year period, but report that not many portfolio companies meet projections.

[45] The records keeping for investment opportunities that are considered but decided against can be much less formal. For examples, some VC funds might just keep a spreadsheet recording the list of firms they have considered and a brief reason as to why they decided not to invest.

58.   The role of a GP does not stop at identifying investment opportunities and negotiating deals. GPs are also actively involved in advising and helping to manage their portfolio companies, serving as either board members or board observers, meeting or conversing frequently (often on a weekly basis) with the portfolio companies' management, and playing an important role in hiring and strategic decisions (including connecting the portfolio companies with future investors, customers, potential board members and prospective employees).

**VC Deal Structure**

59.   Under normal circumstances, VC firms predominantly use convertible preferred stock to invest in their portfolio companies. Convertible notes are used by VC firms as an alternative to convertible preferred stock, in particular in a very early stage transaction, and can be used to provide flexibility in a variety of contexts. Convertible notes are debt instruments that might be converted into equity at a later date. Historically, convertible notes have been used in very early "bridge rounds" to provide funding to seed- and early-stage companies (i.e., companies that are usually still in the midst of developing and refining their product concepts). Such a convertible note round often takes place in situations where a start-up company needs to raise financing from its investors to stay in operation until the next round of capital can be raised. In these cases, the use of convertible notes offers certain benefits to the investors.

a.   Should the company not survive to raise additional financing, the fact that the investors held debt means that they have a senior claim (relative to equity holders) on the residual assets of the company in a dissolution. Alternatively, if the company becomes successful and is able to attract additional investment, the investors can convert the notes into equity, and can also participate in later rounds of financing of the company.

b.   The use of convertible notes also helps the investors save the time and effort involved in valuing the start-up company. Due to the uncertain prospects of a seed- or early-stage company, it can be difficult for the entrepreneur and the investors to agree on the value of the company and the financing terms for an equity investment. Using a convertible note structure allows the noteholders to "free-ride" on the valuation process undertaken by investors in later rounds. Convertible notes therefore are often considered as a "deferred" equity investment rather than debt.

60.  More recently, convertible notes have been used for larger capital raises as well.[46] As I discuss in more detail in section V, in the context of this case convertible notes were used to provide the 1955 Funds GPs with much needed flexibility that was necessary to accommodate uncertainty regarding whether CFLD/GIIL would honor its capital commitment in connection with substantial capital calls.

61.  The discussion above describes the general attributes of the VC investing process. However, in this case, during much of the relevant period, the 1955 Funds GPs faced a series of challenging circumstances that are critical in understanding and assessing their actions and performance. I discuss the facts specific to this case in the next subsection.

B.      Throughout Most of the Period at Issue, 1955 Capital Operated in an Environment of Uncertainty Created by Hostile and Disruptive Actions of its Sole LP

62.  As mentioned in section II above, not long after the formation of the 1955 Funds, while the 1955 Funds GPs were actively engaged in sourcing and selecting prospective portfolio companies, CFLD/GIIL repudiated and sought to get out of its investment and contractual commitments, and attempted to force a shutdown of the Funds.[47] Based on my review of the Final Award issued in the prior arbitration, which was initiated by the 1955 Funds GPs, I understand that the arbitrator determined that CFLD/GIIL's attempt to evade its capital commitments and other contractual obligations was undertaken in bad faith and "because CFLD did not wish to live with the consequences of the bargains GIIL had made on its behalf,"[48] that CFLD/GIIL breached its contractual obligation to provide additional capital to the Funds,[49] and that the LPAs and other

---

[46]  For example, Beyond Meat, Inc. recently announced a $1 billion convertible note offering. *See* "Beyond Meat, Inc. Prices Upsized $1 Billion Convertible Senior Notes Offering," Beyond Meat Press Release, March 2, 2021, https://investors.beyondmeat.com/news-releases/news-release-details/beyond-meat-inc-prices-upsized-1-billion-convertible-senior, accessed April 8, 2021.

[47]  Statement of Counterclaim, ¶¶ 1 – 4.

[48]  Final Award, ¶¶ 354, 394 – 398.

[49]  Final Award, ¶ 395.

CONFIDENTIAL

investment agreements were valid and binding on CFLD/GIIL in accordance with their terms.[50]
The arbitrator further determined that CFLD/GIIL's actions in demanding a return of the money
already held in escrow, threatening to force a shutdown of the Funds, and stating that
CFLD/GIIL did not intend to honor their obligation to provide additional capital to the Funds[51]
constituted a "clear and unequivocal anticipatory repudiation of the 26 November
Agreements."[52] The Final Award also explained that "the fact the anchor investor in the Funds
was making allegations of fraud and had stated its intention to unwind its investment"
undermined the 1955 Funds GPs' ability to obtain commitments from other potential investors in
the Funds.[53]

63. Based on my review of documents in this case, as well as interviews of Mr. Chung and others on
his team, I learned that during the period following the Final Award, CFLD/GIIL filed lawsuits
against Mr. Chung, initiated the current arbitration, and then commenced the Campaign. The
Campaign utilized press releases, social media, and direct communications with portfolio
companies and other members of the VC community to make numerous accusations against Mr.
Chung and 1955 Capital, and sought to interfere with the 1955 Funds GPs' ability to make
further investments, including by indicating that the GPs' investments were unauthorized
because they violated an investment mandate.[54] As I discuss below, the Campaign appears to
have been designed to undermine the GPs' ability to make new investments in a compressed
time frame, and created substantial difficulties in that regard. The Campaign appears to have
been ceased after capital calls on January 21, 2020, which revealed that the GPs had assembled a
series of promising investments despite those difficulties. A chronology of some of the
significant events beginning with the formation of the Funds is provided in Figure 3 below.

---

[50]  Final Award, ¶ 492.
[51]  Final Award, ¶ 354.
[52]  Final Award, ¶¶ 357, 372.
[53]  Final Award, ¶ 397.
[54]  Statement of Counterclaim, section III.D.

**FIGURE 3:**
**SUMMARY TIMELINE OF KEY EVENTS**



Notes: White boxes signify major developments for the 1955 Funds. Yellow boxes signify major hostile and disruptive actions by CFLD/GIIL on the 1955 Funds. Blue boxes signify investments made by the 1955 Funds.
Sources:
Final Award, ¶¶ 55.86, 55.92, 55.96, 354, 361, 396, p. 141.
Statement of Counterclaim, ¶¶ 24, 73, 82.
R-22, R-110, R-219, R-220, R-260 (1955-2020ARB-0008907), R-261 (1955-2020ARB-0008923).

64. As Figure 3 illustrates, during most of the relevant period,[55] the 1955 Funds GPs operated under unique and extreme circumstances in which their sole LP was not only failing to fulfill its only role, which was to provide capital to the 1955 Funds, but also was attempting to undermine the operation of the Funds, injure the reputation of the GPs, and interfere with the Funds' ability to make investments.[56] Although CFLD/GIIL terminated those efforts after the January 21, 2020 capital calls,[57] it decided not to honor the calls and refused to provide capital.

65. As a result of CFLD/GIIL's actions, the 1955 Funds GPs had no certainty regarding the actual size of capital available to complete the investments. As I explained above, it is essential for a GP to have certainty over the amount of capital it has access to, and LP defaults are very rare. VC investing typically requires the VC funds to be able to provide follow-on investments in

---

[55]   Which continued through CFLD/GIIL's abandonment of the public relations, social media, and direct outreach campaign after the January 21, 2020 capital calls. Statement of Counterclaim, ¶¶ 132 – 150.
[56]   Statement of Counterclaim, ¶¶ 75 – 90.
[57]   Statement of Counterclaim, ¶¶ 132 – 139.

accordance with their level of ownership (and other contractual rights) determined by prior rounds of financing if and when the portfolio companies require additional capital. Not knowing how much of the $200 million of committed capital they had at their disposal beyond the original transfer of $80 million, after taking into account prior investments, expenses, and reserves, made it extremely challenging for the 1955 Funds GPs to negotiate deals and make investments. CFLD/GIIL's ultimate determination not to honor the January 21, 2020 capital calls severely limited the amount of capital that could be invested, and prevented the 1955 Fund GPs from investing at levels that would have otherwise been possible, and likely beneficial for the Funds. The recent performance of the investments, as indicated by third party assessment of value,[58] suggests that CFLD/GIIL's decision not to provide capital in response to the calls might result in the 1955 Funds foregoing significant investment gains.

66. The Campaign, which was conducted during a critical investment period leading up to the January 21, 2020 capital calls, presented further severe challenges to the 1955 Funds GPs.[59] The information gathered in the course of my expert work shows that CFLD/GIIL and a public relations firm CFLD/GIIL retained issued press releases, created websites and made broad use of social media to make a variety of accusations against the GPs and Mr. Chung,[60] including accusations that attacked their integrity. In addition, CFLD/GIIL made statements indicating that the GPs were not authorized to make the investments, and that they were violating an investment mandate set forth in the Fund documents. As I discuss in section VII below, the Investment Agreements do not contain such an investment mandate.

67. CFLD/GIIL and its counsel also sent letters directly to portfolio companies, entrepreneurs and other participants in the Silicon Valley VC community that repeated the public statements' accusations and questioned Mr. Chung's fitness to hold board seats.[61] In addition, CFLD/GIIL targeted certain portfolio companies' social media posts by linking them to websites containing

---

[58]  *See* discussion in footnote 130.
[59]  Statement of Counterclaim, ¶¶ 94 – 119.
[60]  *See*, for example, R-60 (GIIL_00000418), R-64, R-65, R-67, and R-146.
[61]  Statement of Counterclaim, ¶¶ 94 – 95. *See*, for example, R-54, R-55, R-56 (1955-2020ARB-0000858), and R-63 (GIIL_00000473).

derogatory information about 1955 Capital and Mr. Chung,[62] and sent communications to portfolio companies that suggested that involvement with 1955 Capital might draw them into litigation.[63]

68.  As I discussed earlier, it is well understood that a VC's reputation is a valuable asset central to the ability of venture capitalists to raise new funds and compete for attractive investments.[64] A VC fund has to compete against other VC funds for high-quality investment opportunities. As Vinod Khosla highlighted, the competition to fund high-quality investments is often intense, and academic research has found that "high-reputation VCs are more likely to have their offers accepted than are low-reputation VCs," and that on average, "high-reputation VCs pay between 10 and 14 percent less for shares than do low-reputation VCs."[65] Reputation thus "enables VCs to get cheaper prices and more acceptances for their offers."[66] Association with allegedly fraudulent conduct, questions regarding whether the VC firm is authorized to make the investment, and a perceived risk that accepting an investment might result in litigation risk can typically be expected to deter potential portfolio companies from accepting investment from a VC firm, or even having any dealings with that firm.

69.  The fact that the 1955 Funds GPs were able to make investments at favourable terms despite these efforts by CFLD/GIIL, and despite having to operate in a compressed timeframe, especially with only a few months between the end of the prior arbitration and the end of the investment period of the China Fund, was remarkable. However, my experience strongly suggests that the adverse effects of CFLD/GIIL's actions on 1955 Capital and the GPs will inevitably be long-lasting and severe.

---

[62]  Statement of Counterclaim, ¶ 97, R-146.

[63]  *See*, for example, R-55.

[64]  "The venture capital industry is particularly well suited for examining reputation and capital raising because most venture capital organizations raise money in limited partnerships...A venture capital organization would cease operations without raising a new fund. This puts pressure on young venture capital firms to establish a reputation and raise a new fund within a short, predetermined time." Paul A. Gompers, "Grandstanding in the venture capital industry," *Journal of Financial Economics*, 42 (1996), p. 134.

[65]  Andrew Metrick and Ayako Yasuda, 2011, *Venture Capital & the Finance of Innovation 2nd Edition*, John Wiley & Sons, Inc., p. 83.

[66]  Andrew Metrick and Ayako Yasuda, 2011, *Venture Capital & the Finance of Innovation 2nd Edition*, John Wiley & Sons, Inc., p. 83.

70. In addition to the challenges presented by CFLD/GIIL's decision not to honor the January 21, 2020 capital calls and its disruptive actions taken in the Campaign, for most of the relevant period the 1955 Funds GPs were forced to spend a significant amount of time and resources on costly litigation, in addition to defending the reputational consequences of CFLD/GIIL's actions, both of which were costly in effort, time and money.[67]

71. As a result of CFLD/GIIL's prior accusations against the 1955 Fund GPs and its attempts to force a shutdown of the Funds, and the protracted prior arbitration that ended with the issuance of the Final Award in June 2019, as well as CFLD/GIIL's conduct after the Final Award, the "effective" investment period (i.e., the amount of time that the 1955 Funds GPs had available to them to pursue investment-related activities) is considerably shorter than what was contractually provided.[68] Specifically, in the case of China Fund, while the China Fund GP was contractually provided with a four-year investment period, it had at most two years in practice. Although the investment period for Fund I is longer, it has also been effectively shortened by the same period.

   a. As shown in Figure 3, CFLD/GIIL repudiated its contractual obligations and sought to force a shutdown of the Funds in October 2016, and began raising concerns in early 2016.[69] That is, just months after the formation of the 1955 Funds, CFLD/GIIL had already started raising concerns over the Funds' activities—for which GPs are solely responsible, and over which an LP exercises no control. The prior arbitration proceedings commenced in July 2017.[70] Accordingly, the 1955 Funds had less than 1.5 years (2016 and first half of 2017, minus the time required to deal with CFLD/GIIL's concerns) before entering a lengthy litigation process that was necessary to resolve CFLD/GIIL's allegations and threats, and to reaffirm the 1955 Fund GPs' right to operate the Funds pursuant to the Investment Agreements.[71]

   b. The prior arbitration, which involved CFLD/GIIL's challenge to the validity of the Investment Agreements, lasted for almost two years. During the prior arbitration and the

---

[67] I understand that due to the pressures caused by CFLD/GIIL's Campaign, Mr. Tseng resigned for a period of time, and Dr. Ryan Gilliam, a Venture Partner at 1955 Capital, indicated his intent to resign. These events caused additional disruptions to the 1955 Funds. *See* Statement of Counterclaim, ¶¶ 190 – 191; Tseng Witness Statement ¶ 22; Gilliam Witness Statement ¶ 13.

[68] The commitment period for Fund I started November 26, 2015 and ends November 26, 2021 (R-35 (Fund I LP's Limited Partnership Agreement), p. 2 and clause 8.6(b)), and the commitment period for China Fund started November 26, 2015 and ended November 26, 2019 (R-34 (China LP's Fund Limited Partnership Agreement), p. 1 and clause 8.5(b)).

[69] Final Award, ¶¶ 55.93 – 97.

[70] Final Award, ¶ 55.100.

[71] Final Award, ¶¶ 68 – 69.

events that preceded it, CFLD/GIIL's allegations and the uncertainty regarding the arbitration outcome made it challenging for the 1955 Funds GPs to utilize or commit a substantial amount of the Funds' capital for investments (and challenging for the Funds to obtain additional capital via investments from additional LPs). Although the Final Award rejected CFLD/GIIL's allegations and confirmed that the 1955 Funds' Investment Agreements were valid and binding and the GPs were permitted to operate the Funds, the GPs were left with only five months before the investment period for China Fund concluded. Moreover, during the critical period in which the 1955 Capital team had regained investment momentum and was working to identify and complete investments, CFLD/GIIL engaged in the Campaign described above in what appears to be an attempt to undermine the GPs' ability to make additional investments.

72. Based on my review of the relevant documents and the interviews I conducted with Mr. Chung and his team, I learned that CFLD/GIIL effectively abandoned the Campaign when the January 21, 2020 capital calls demonstrated that its efforts to cut off the ability of the 1955 Funds GPs to make additional investments had not succeeded.[72] On January 21, 2020, the 1955 Funds GPs sent CFLD/GIIL capital call requests of additional funds for follow-on investments, new investments, and management fees.[73] In a letter to the 1955 Funds GPs on January 31, 2020, CFLD/GIIL expressed interest in the potential investments and requested additional information regarding them.[74] CFLD/GIIL met with Mr. Chung on February 13, 2020 to discuss the potential investments, and on March 3, 2020 sent 1955 a letter explaining that it had "seriously considered" providing the additional capital necessary to fully fund the investments listed in the capital calls' investments but had decided against doing so.[75] I discuss the events surrounding the January 21, 2020 capital calls in more detail in section V.

73. In sum, during much of the relevant period, the 1955 Funds GPs faced a series of challenges emanating from hostile and disruptive actions by their sole LP. Those actions resulted in uncertainty regarding access to committed capital, raised issues among portfolio companies regarding the integrity of the GPs and Mr. Chung, the authority of the Funds to make the underlying investments, and risks of involvement in litigation, and undermined the reputations of

---

[72] Statement of Counterclaim, ¶ 138. Chung Witness Statement, ¶ 90.
[73] R-223, R-224.
[74] R-22.
[75] R-110.

the Funds, the GPs, and Mr. Chung. These are crucial facts that must be considered in assessing the actions of the GPs and rendering expert opinions on the matters addressed in the Meadow Report. As I discuss in detail in section VI below, the Meadow Report fails to do so and such failure constitutes a fundamental flaw that has significant consequences. In the next section I discuss that the 1955 Funds GPs succeeded in completing a number of notable investments notwithstanding the challenges that they faced.

## V.  The 1955 Funds GPs Performed Remarkably Well despite the Hostile and Disruptive Circumstances They Faced

_____

74. I noted that CFLD/GIIL's Statement of Claim asserts that "the GPs never intended to pursue legitimate investments to benefit GIIL."[76] This assertion is in direct contrast to the facts and documents I have reviewed in the course of my expert work, which indicate that the 1955 Fund GPs worked diligently to develop promising investments despite the extremely challenging circumstance created by CFLD/GIIL, and that they did so in a rigorous and skillful manner. My interviews of Mr. Chung, Mr. Tseng, and Ms. Chen further reinforced those conclusions, which are also supported by the early performance of some of the investments they made.

75. Despite the challenges I described in section IV.B above, the 1955 Funds GPs managed to assess and conduct due diligence for a substantial number of investment opportunities, and made nine investments by November 26, 2019. By the end of 2016, when CFLD/GIIL declined to make the second transfer of capital to the Funds, it would have become increasingly apparent to the 1955 Funds GPs that they might not have more than the amounts remaining in the escrow accounts (which was less than $80 million) at their disposal. Further, the fact that CFLD/GIIL was seeking to invalidate the Investment Agreements and require the GPs to return the remainder of its investment created additional problems and uncertainties. After accounting for litigation defense costs, management fees payable under the Investment Agreements and other expenses, the

---

[76]   Statement of Claim, ¶ 3.

amount remaining in the Funds' escrow accounts for investment purposes would be less than $40 million, of which the 1955 Funds GPs had invested $19 million by November 26, 2019.[77] My research and experience interacting with hundreds of individuals in the VC industry indicate that, even under normal circumstances (i.e., when the GP is not forced to incur extreme costs in defending litigation), VC funds would not invest more than half of the total committed capital minus expected fees and other expenses during the investment period (although there is a wide variation across VC funds). Often, for each $1 invested in a portfolio company, the GP of the VC fund would reserve around $1 for follow-on investments in these portfolio companies. The amount invested by the 1955 Funds GPs is thus well-suited to the circumstances that they faced.

76. Based on my review of the January 21, 2020 capital calls and other documents, and from my interviews with the 1955 Capital team, the total invested capital would have been substantially larger if CFLD/GIIL had honored the capital calls and if the 1955 Funds GPs had not faced the prospect of substantial ongoing litigation defense costs. Some of the investments made by Mr. Chung and his team have proven to be quite successful in a relatively short period of time,[78] and the monetary gains they are likely to produce would of course be considerably greater if the capital calls had been honored (and if there had been no need to set aside capital for litigation reserves). In my opinion, given the actions taken by CFLD/GIIL and the challenges posed by those actions, the 1955 Funds GPs' ability to source, perform due diligence, and close investments, including some successful ones, is a remarkable achievement. Even under normal circumstances, the GPs' achievement would be impressive, particularly in light of the recent performance of some of the 1955 Funds' investments that I learned about through my interviews with Mr. Chung.

77. I do not agree with the assertions, made by CFLD/GIIL and discussed in Mr. Meadow Report, that the November 2019 Investments were "suspicious", "non-standard", or "extremely irregular."[79] In subsection A, I discuss the different aspects of the November 2019 Investments, including how they fit in with the 1955 Funds' investment objectives, the deal sourcing and the selection process of the 1955 Funds GPs, the due diligence they conducted, and how they

---

[77]   *See* Table 9.
[78]   *See* footnote 130.
[79]   Statement of Claim, ¶ 95. Meadow Report, ¶ 95.

CONFIDENTIAL

structured the deals. I then discuss my opinions in relation to other areas that are at dispute in this case in subsections B and C. Specifically, in subsection B, I discuss the capital calls that the 1955 Funds GPs made on January 21, 2020, and in subsection C, I discuss the default provisions included in the Investment Agreements between CFLD/GIIL and 1955 Capital.

## A.     The November 2019 Investments Resulted from Diligent and Skillful Efforts Undertaken by the 1955 Funds GPs under Adverse Conditions

78. As noted above, instead of having four years to undertake investment activities as contractually provided for the China Fund, Mr. Chung and his team effectively had no more than two years. My review of the November 2019 Investments, which included a review of key documents and extensive interviews of Mr. Chung and two members of his team, Mr. Tseng and Ms. Chen, revealed hundreds of investment opportunities that the 1955 Funds GPs considered, of which they decided to invest in nine. I have also been provided with summaries of the 1955 Funds' investment team meetings between August 2019 and November 2021, and I find that the 1955 Funds GPs have a highly selective investment selection process. Figure 4 illustrates the flow of the Funds' prospective investment opportunities based on the number of meetings in which each opportunity is discussed.

CONFIDENTIAL

**FIGURE 4:**
**THE 1955 FUNDS DEAL FLOW PIPELINE**



Sources: 46 meeting minutes prepared by 1955 Capital between October 8, 2019 and January 11, 2021. 1955 Capital discussed a total of 104 companies across all their meetings during this period. See Appendix B.
Notes: "Deprioritized" signifies companies not mentioned in the three most recent meetings. "Remains in Pipeline" signifies companies mentioned in the three most recent meetings but not as portfolio companies. "Portfolio Company" signifies companies mentioned in the three most recent meetings as portfolio companies.

79. Mr. Chung and his team described that they sourced potential investment opportunities through their "inbound" and "outbound" efforts:

   a. Inbound deal sourcing refers to using the team members' existing professional networks to connect with attractive companies. Through Mr. Chung's and Mr. Tseng's careers at VC firms such as Khosla Ventures, Lightspeed Venture Partners, and DCM Ventures, the leading firms in the VC industry, and the many success stories that they were part of,[80] the 1955 Funds GPs enjoy access to a large pool of contacts (e.g., companies, investors, and industry experts). They also maintain connections with start-up incubators such as IndieBio and Elemental Accelerator, as well as with academic institutions such as the University of California, Berkeley, the University of Pennsylvania, and Harvard University. 1955 Capital's inbound deal sourcing process has led to its eventual investment in Nature's Fynd (formerly known as Sustainable Bioproducts or SBP), Avertana, and DDM Systems.[81]

---

[80]   See Table 3 for examples of successful companies that Mr. Chung invested in during his time at Lightspeed Venture Partners and Khosla Ventures.

[81]   See R-247 (1955-2020ARB-0002258) ("Andrew Chung has been aware of Avertana since his time at Khosla Ventures, where he led a detailed diligence process on the Series A round due to the team largely coming from Lanzatech, where Andrew served on the board") and R-252 (1955-2020ARB-0002735) ("DDM was first introduced to 1955 Capital in December 2017 by ███████████████████████   The team

CONFIDENTIAL

b.  Outbound deal sourcing refers to proactively reaching out to attractive companies that potentially fit with the 1955 Funds GPs' investment thesis. A core component of the 1955 Funds GPs' outbound sourcing strategy (which is also used to assess inbound opportunities) involves using lessons from Mr. Chung's (and his team's) prior experiences to formulate a targeted investment thesis to assess particular technologies and markets.[82]

80.  My investigation into the relevant facts revealed that Mr. Chung and his team reviewed several dozen potential opportunities in connection with the November 2019 Investments.[83] My investigation further revealed investment opportunities that the GPs considered but could not realize due to the adverse impacts of CFLD/GIIL's actions.[84] Most of the companies that were considered in the course of selecting the six November 2019 Investments were introduced to the 1955 Funds from Mr. Chung and his team's networks, while Ampaire is an example of a company that the 1955 Funds GPs identified through their outbound effort. Table 2 summarizes the six November 2019 Investments.

---

had several followup conversations with ████████████████████████ at the time to understand the market landscape as well as DDM's value proposition and unit economics.").

[82]  An example of Mr. Chung and his team's investment thesis is in the area of food technology. From their prior experience, they identified that "scalability" (i.e., the ability to be efficiently produced at large quantities), "versatility" (i.e., the ability to be used in different lines of products), and the ability/willingness to partner with current food manufacturers are the three key factors to look for. This investment thesis helped the 1955 Funds GPs assess the potential of Nature's Fynd (SBP), and eventually invest in the company, which has turned out to be a very successful investment (*See* footnote 130).

[83]  *Also see* Chung Witness Statement, ¶ 80.

[84]  *See* ¶ 101.

CONFIDENTIAL

**TABLE 2:**
**THE NOVEMBER 2019 INVESTMENTS**

| Portfolio Company [A] | Amount invested [B] | Investment Type [C] | Description [D] | How 1955 Capital was introduced [E] |
|---|---|---|---|---|
| Acuamark Diagnostics | [1] $0.99M | Preferred Stock | Developing reliable and accessible novel early cancer screening technology for asymptomatic patients | ███████ a banker, connected Acuamark with Mr. Tseng. |
| Ampaire | [2] $1.00M | Convertible Note | Developing hybrid-electric commercial aircraft technology for airlines, manufacturers, and other customers | Mr. Tseng and Ms. Chen initiated contact at an Elemental Accelerator event. Mr. Chung was an advisor to Cleantech Open/LA Cleantech Incubator, which Ampaire was a part of. |
| Avertana | [3] $1.00M | Convertible Note | Developing technology to refine steelmaking waste into high-value mineral and chemical commodities | Mr. Chung had previously led a detailed diligence process during his time at Khosla Ventures. |
| CNGmotive | [4] $1.00M | Convertible Note | Developing technology to replace diesel with low-cost, clean, and safe compressed natural gas in rail locomotives | Prototera Partners, an existing investor in CNGmotive, connected CNGmotive with Ms. Chen. |
| DDM Systems | [5] $1.00M | Convertible Note | Developing a novel 3D ceramic printing process to produce investment castings of complex engineering componenets | ███████ at Khosla Ventures and an existing investor in DDM Systems, connected ███████ (DDM Systems) with Mr. Chung. |
| Woodoo | [6] $1.00M | Convertible Note | Developing technology to transform wood into next-generation products with advanced functionality | Mr. Chung directly connected to Woodoo through ███████████████ |

Sources:
[B][1], [C][1]: R-232 (1955-2020ARB-0000348).
[B][2], [C][2]: R-256 (1955-2020ARB-0005061).
[B][3], [C][3]: R-272 (1955-2020ARB-0019601).
[B][4], [C][4]: R-266 (1955-2020ARB-0014323), R-267 (1955-2020ARB-0014340).
[B][5], [C][5]: R-235 (1955-2020ARB-0000542), R-257 (1955-2020ARB-0007407).
[B][6], [C][6]: R-236 (1955-2020ARB-0000553), R-259 (1955-2020ARB-0007432).
[D][1]: https://www.acuamarkdx.com/technology.
[D][2]: https://www.ampaire.com/flight-plan.
[D][3]: https://www.avertana.com/.
[D][4]: https://www.cngmotive.com/technology/.
[D][5]: https://www.ddmsys.com/about-1.
[D][6]: https://www.woodoo.com/our-technology/.
[E][1]: R-238 (1955-2020ARB-0000601).
[E][2]: R-164 (1955-2020ARB-0000943). Interview with Andrew Chung.
[E][3]: R-247 (1955-2020ARB-0002258).
[E][4]: R-270 (1955-2020ARB-0019576).
[E][5]: R-252 (1955-2020ARB-0002735).
[E][6]: R-254 (1955-2020ARB-0004626). Interview with Andrew Chung.

1.      The November 2019 Investments Were Consistent with 1955 Funds'
        Investment Focus

81. The materials I have reviewed in the course of my expert work showed that the 1955 Funds
maintained a consistent investment focus that was clearly articulated by their GPs.[85] The
contemporaneous documents, including slide decks used by Mr. Chung in early presentations to
CFLD/GIIL,[86] indicate that Mr. Chung formed 1955 Capital with the intention of investing in

CONFIDENTIAL

companies creating advanced technology in the developed world with the potential to address major challenges in China and the developing world.[87] Mr. Chung envisioned deploying such technology in industries such as clean energy, sustainable agriculture, advanced healthcare, and education.[88] With respect to the types of investments the 1955 Funds sought, the LPAs defined the 1955 Funds' primary purpose as purchasing, acquiring, holding, and managing "a diversified portfolio of venture capital, growth equity and other types of investments in high-tech companies or teams."[89,90] In the interviews I conducted, Mr. Chung and other 1955 Capital team members explained their investment focus and how it is consistent with the investments that they considered and made.

82. CFLD/GIIL's communications reflected a similar understanding of the 1955 Funds' investment approach. In a securities filing that CFLD/GIIL made after its board of directors approved the investment in the 1955 Capital Funds, the Funds' investment target was described as "transformative technology, with the aim of resolving major problems faced by China and other developing nations in certain fields, including energy, medicine, food, agriculture, and education,"[91] with key points of emphasis in "energy and environmental conservation, medical services, food and agriculture, education, and population aging."[92] CFLD/GIIL's submission to

---

85   As discussed in section VII below, the LPAs and the other Investment Agreements do not contain a mandate or other requirement that the Funds invest exclusively or primarily in the mobile software and services sector, which was mentioned only in a risk disclosure. Based on my interview of Mr. Chung, and my review of testimony from the prior arbitration, I further understand that the risk factor language was included as a result of a drafting error. *See* Statement of Counterclaim, ¶ 131, R-93.

86   *See*, for example, R-8 (CAP0023).

87   Chung Witness Statement, ¶ 31.

88   Chung Witness Statement, ¶ 31.

89   R-35 (Fund 1 LP's Limited Partnership Agreement), clause 1.2, R-34, (China Fund LP's Limited Partnership Agreement), clause 1.2.

90   From my interview of Mr. Chung and review of the contemporaneous documents, I understand that he met with CFLD's founder, Chairman Wang, on August 20, 2015, and presented a slide deck that characterized 1955 Capital's mission statement as to "[i]nvest in advanced technology from the developed world to solve the most challenging problems in the developing world—starting with China." The slide deck highlighted that Mr. Chung considered issues such as access to healthcare, education, energy and the environment, and food safety and supply as being important to 1955 Capital. It also highlighted certain technological innovations that were considered as promising, including carbon reduction technology, animal-free food production, genomic diagnosis, telemedicine, and next-generation assisted living. R-8 (CAP0023), pp. 4, 11, 12.

91   R-7 (CAP0279), pp. 2, 4. Statement of Counterclaim, ¶ 50.

92   R-7 (CAP0279), pp. 2, 4. Statement of Counterclaim, ¶ 50.

China's currency regulator (the Chinese State Administration of Foreign Exchange) stated that the Funds would invest "in overseas innovative high-tech companies with potential to develop revolutionary products and to form major production capacities."[93]

83. None of the evidence I reviewed indicated that the Funds were restricted to investing primarily or exclusively in the mobile software and services sector, or that there was any understanding or discussion in that regard. Rather, the documents and interviews I conducted, as well as the investments that were made and those that were considered by the 1955 GPs, all indicate that the investment focus was unrelated to that sector.

84. The 1955 Funds' investment strategy was consistent with Mr. Chung's previous VC investing experience and successes, which included many years of investing in sectors such as clean and sustainable technologies, food and agricultural technologies, advanced health technologies, and education, as well as experience working in Chinese markets.[94] In Table 3, I list investments made by Mr. Chung during his tenure at Lightspeed Venture Partners, Khosla Ventures, and 1955 Capital. The investments listed in Table 3 indicate that for every investment made at 1955 Capital, there is at least one similar investment (i.e., an investment in the same industry) that Mr. Chung had made previously at Lightspeed Venture Partners and/or Khosla Ventures.[95]

---

[93]   R-6, p. 6.
[94]   Chung Witness Statement, ¶¶ 12 – 13.
[95]   It is worth noting that many of Mr. Chung's investments in these industries while at Lightspeed Venture Partners and Khosla Ventures have been very successful, including several that achieved successful public exits or reached "unicorn" status (i.e. over $1 billion in post-money valuation), including Solazyme, Natera, Personalis, and QuantumScape (among others). Chung Witness Statement ¶ 12.

CONFIDENTIAL

**TABLE 3:**
**1955 CAPITAL INVESTMENTS**
**COMPARED WITH MR. CHUNG'S PREVIOUS INVESTING EXPERTISE**

| Industry [A] | Portfolio Company [B] | VC Fund [C] | Technology [D] |
|---|---|---|---|
| **Automotive/Aircraft** | | | |
| [1] | EcoMotors | Khosla Ventures | High-efficiency liquid fuel engines |
| [2] | Ampaire | 1955 Capital | Hybrid-electric commercial aircraft |
| **Energy/Environment** | | | |
| [3] | QuantumScape [QS] | Lightspeed Venture Partners | Solid-state lithium-metal energy storage |
| [4] | Solar Edge | Lightspeed Venture Partners | Commercial solar energy solutions |
| [5] | Ambri | Khosla Ventures | Molten-salt-based energy storage |
| [6] | Cogenra [acq by SPWR] | Khosla Ventures | Commercial-scale solar cogeneration |
| [7] | Lanzatech | Khosla Ventures | Carbon recycling for fuel and chemical production |
| [8] | LS9 [acq by REGI] | Khosla Ventures | Sustainable fuel production using synthetic biology |
| [9] | CNGmotive | 1955 Capital | Compressed natural gas for rail integration |
| [10] | Gridtential | 1955 Capital | Silicon-based energy storage |
| **Food/Agriculture** | | | |
| [11] | Solazyme [SZYM] | Lightspeed Venture Partners | Microalgae-based biofuel and oil production |
| [12] | BioConsortia | Khosla Ventures | Microbial solutions to improve crop yields |
| [13] | Impossible Foods | Khosla Ventures | Plant-based meat substitutes |
| [14] | Crop Enhancement | 1955 Capital | Sustainable pest control solutions |
| [15] | SBP (Nature's Fynd) | 1955 Capital | Microbe-based meat substitutes |
| **Health/Medicine** | | | |
| [16] | Natera [NTRA] | Lightspeed Venture Partners | Noninvasive blood-based DNA testing |
| [17] | Personalis [PSNL] | Lightspeed Venture Partners | Genomic sequencing and analytics solutions |
| [18] | Acuamark | 1955 Capital | Early cancer detection screening |
| **Industrial Materials** | | | |
| [19] | Calera (aka Fortera) | Khosla Ventures | Sustainable cement manufacturing |
| [20] | Avertana | 1955 Capital | Sustainable high-value mineral production |
| [21] | DDM Systems | 1955 Capital | 3D-printed investment casings |
| [22] | Woodoo | 1955 Capital | High-performance wood production |

Sources and Notes:
[B]: Letters in square brackets refer to the stock tickers of companies that have since become publicly available, or the publicly-availabe companies that acquired them.
[C]: https://1955.capital/team-andrew-chung/.
[D]: See Appendix B.

## 2.    The 1955 Funds GPs Conducted a Comprehensive Due Diligence Process

85. My interviews of the 1955 Capital team and review of the relevant materials in this case revealed that the 1955 Funds GPs' due diligence process for a promising investment opportunity typically lasts between four and six months, which is substantially more than that of the average VC

fund.[96] The process employed by the 1955 Funds GPs usually included initial conversations with the company's leadership, followed by expanded involvement by the 1955 Funds GPs. The GPs received input from their VC networks and perform extensive primary market research to assess potential investment opportunities. The due diligence process included reviewing academic papers and industry materials, performing financial analyses, understanding the interests and concerns of the company's customers, identifying potential suitable partners for the company, and obtaining information and insights from relevant experts. The 1955 Funds GPs undertook, on average, six or seven reference calls per company, including calls with third-party references, international references (if the company has cross-border interests), references from existing customers, investors and board members, and from individuals who have worked with the company's CEO/executives.

86.    Mr. Chung and his team indicated that during the due diligence process, they asked a wide range of questions to assess the potential economic success of a company (e.g., cost of production, ability/challenges to build supply chain, production, distribution, and business development partners). They also conducted interviews with the company's management team as well as its technicians and engineers in order to better understand the company's intangibles (i.e., mindset, vision, competence) and to assess the team's potential. Eventually, usually when term sheet negotiations begin, the 1955 Funds GPs created an investment memo to capture key points from the due diligence.

87.    To understand in more detail how the 1955 Funds GPs performed due diligence for the November 2019 Investments, I reviewed the investment memos produced by the 1955 Capital investment team, as well as the associated email communications during the due diligence process. Figure 5 summarizes the timeline of the due diligence activities undertaken by the 1955 Funds GPs. Figure 5 also reflects information about how the 1955 Funds GPs sourced these six investment opportunities. As I explained above, the source of a deal is important in assessing the due diligence effort of a GP: if a deal is identified from the venture capitalists' prior experience, or recommended by another reputable VC fund, the due diligence effort required is typically

---

[96]    The results from my survey paper shows that the average deal takes 83 days to close. *See* Paul Gompers, Will Gornall, Steven Kaplan, and Ilya Strebulaev, "How Do Venture Capitalists Make Decisions?," *Journal of Financial Economics*, 135 (2020), p. 177.

CONFIDENTIAL

much less than what it would be for an investment opportunity that the GP has not encountered previously.

**FIGURE 5:**
**DUE DILIGENCE TIMELINE FOR THE NOVEMBER 2019 INVESTMENTS**



Sources:
Final Award, p. 141.
R-260 (1955-2020ARB-0008907).
R-261 (1955-2020ARB-0008923).
R-254 (1955-2020ARB-0004626), p. 5, Woodoo.
R-164 (1955-2020ARB-0000943), p. 7, R-175 (1955-2020ARB-0000966), Ampaire.
R-270 (1955-2020ARB-0019576), pp. 6 – 7, CNGmotive.
R-238 (1955-2020ARB-0000601), p. 5, R-239 (1955-2020ARB-0000725), Acuamark.
R-186 (1955-2020ARB-0000045), pp. 4 – 5, R-248 (1955-2020ARB-0002349), Avertana.
R-252 (1955-2020ARB-0002735), p. 5, R-253 (1955-2020ARB-0002988), DDM Systems.

88.  During my interviews of Mr. Chung and his team, I learned that despite having to devote a substantial amount of time and effort to the prior arbitration, the problems and uncertainties associated with CFLD/GIIL's repudiation of its capital commitment, and the pendency of the arbitration claims, Mr. Chung worked to ensure that the Funds maintained a good relationship with prospective portfolio companies, i.e., to "keep them warm" until the arbitration concluded. The information reflected in Figure 5 shows that while the 1955 Funds GPs were initially introduced to three of the November 2019 Investments and started their due diligence process much earlier (2016 – 2018), much of the due diligence effort for the six November 2019 Investments occurred towards the end of the prior arbitration.

CONFIDENTIAL

89. Figure 5, and the information I gathered during my interviews and review of documents, further show that the 1955 Funds GPs spent months investigating the November 2019 Investments. Avertana and DDM Systems are the two investments with the shortest due diligence process (starting the month before the investments were made). Mr. Chung had previously led a detailed due diligence process into Avertana during his time at Khosla Ventures.[97] DDM Systems was also introduced to Mr. Chung and his team by Mr. Chung's contact at Khosla Ventures, when Khosla Ventures was already an investor in the company.[98] Accordingly, it is not expected that the due diligence process in cases such as these would be as lengthy, detailed, or comprehensive as would be the case if the GPs had started the process from scratch. In my opinion, the effort that the 1955 Funds GPs devoted to the due diligence of the November 2019 Investments, based on the length of time spent and actions undertaken, was comprehensive and appropriate.

90. My review of the email communications between the 1955 Funds GPs and the six companies they invested in in November 2019 shows that during the due diligence process, Mr. Chung and his team asked numerous detailed questions, via numerous emails and in-person meetings, that covered a wide range of subjects, from technological issues and data validation to development milestones, compliance, and regulations. To illustrate, Table 4 provides a timeline summary of communications that took place during the due diligence process for Acuamark.

---

[97]   R-247 (1955-2020ARB-0002258), p. 5.
[98]   R-252 (1955-2020ARB-0002735), p. 5.

CONFIDENTIAL

**TABLE 4:**
**1955 CAPITAL'S ACUAMARK DUE DILIGENCE TIMELINE**

| Date [A] | Events [B] | Source [C] |
|---|---|---|
| Summer 2018 | Banker ▪▪▪▪▪▪ connects Acuamark to 1955's Mr. Tseng | R-238 (1955-2020ARB-0000601), p. 5 |
| Summer 2018 | 1955 has reference call with external expert ▪▪▪▪▪ | R-238 (1955-2020ARB-0000601), p. 5 |
| July 2, 2018 | 1955 has call with Acuamark's CEO | R-239 (1955-2020ARB-0000725), p. 2 |
| July 5, 2018 | Acuamark's CEO sends updated slide deck with series A budget and sample data on technology | R-239 (1955-2020ARB-0000725), p. 2 |
| July 26, 2018 | Mr. Tseng sends deck to Mr. Chung | R-239 (1955-2020ARB-0000725), p. 3 |
| August 7, 2019 | Acuamark's CEO reaches out to 1955 as Acuamark is moving towards closing its first fundraising round with other investors | R-239 (1955-2020ARB-0000725), p. 4 |
| August 12, 2019 | Acuamark's CEO sends updated slide deck to 1955 | R-239 (1955-2020ARB-0000725), p. 7 |
| August 15, 2019 | 1955 has meeting with Acuamark (without Mr. Chung). After meeting, Acuamark's CEO sends responses about test costs to 1955. Mr. Tseng updates Mr. Chung with updated deck | R-239 (1955-2020ARB-0000725), p. 8 |
| August 21 - 22, 2019 | Mr. Tseng sends questions on technology, IP/licensing, and financials to Acuamark's CEO. Acuamark's CEO replies saying he is busy closing the first round with other investors and promises to answer questions later | R-239 (1955-2020ARB-0000725), p. 9 |
| September 10, 2019 | Acuamark closes financing of first round with other investors | R-263 (1955-2020ARB-0011856), p. 1 |
| September 26, 2019 | Acuamark closes license and research collaboration agreements, Acuamark's CEO replies to Mr. Tseng's questions on technology, IP/licensing, and financials | R-263 (1955-2020ARB-0011856), p. 1 |
| October 1, 2019 | Mr. Tseng replies to Acuamark's CEO seeking more detailed financials and questions on the closed round, and setting up a meeting for Acuamark's CEO to meet with Mr. Chung | R-263 (1955-2020ARB-0011856), p. 10 |
| October 2 - 10, 2019 | 1955 schedules meeting for October 11 without Mr. Chung. Mr. Tseng mentions priorities for meeting are information on the previous round, setting up time to go through on technology, and asking them about the trial approach and what they've done with testing | R-263 (1955-2020ARB-0011856), pp. 11 - 15 |
| October 16, 2019 | Acuamark's CEO sends updated financials, cap table, summary of terms, and status and product development slides/schematic to 1955. Also includes funding needs and timeline in email | R-240 (1955-2020ARB-0000756), p. 1 |
| October 17, 2019 | Mr. Tseng and Ms. Chen discuss Acuamark's term sheet, financials, timeline of sample collections, technicals, and headcount | R-240 (1955-2020ARB-0000756), pp. 3 - 4 |
| October 17, 2019 | Mr. Tseng sends email to Acuamark's CEO with questions covering cap table and financing, financials, timeline, and technological methodology | R-240 (1955-2020ARB-0000756), p. 3 |
| October 20, 2019 | Acuamark's CEO sends 1955 email with more information on detailed cap table, financials, and comments from his financial team about previous financials questions | R-240 (1955-2020ARB-0000756), p. 7 |
| October 28, 2019 | Acuamark's CEO and 1955 meet in person | R-240 (1955-2020ARB-0000756), p. 9 |
| October 30 - 31, 2019 | Mr. Tseng sends email to Acuamark's CEO with questions on cap table, financials (accounts payable and accrued expenses), technology review (testing/validation methodology and roadmap), and comparison with competitors. Acuamark's CEO responds | R-240 (1955-2020ARB-0000756), pp. 9 - 10 |
| November 2019 | 1955 meets with Acuamark's co-founder and science expert ▪▪▪▪▪▪ to review technology | R-238 (1955-2020ARB-0000601), p. 5 |
| November 5 - 8, 2019 | 1955 schedules meeting with Acuamark's CEO for November 14 | R-240 (1955-2020ARB-0000756), pp. 11 - 13 |
| November 14, 2019 | 1955 attends meeting with Acuamark's CEO | R-240 (1955-2020ARB-0000756), pp. 11 - 13 |
| November 24 - 25, 2019 | Acuamark's CEO sends email to 1955 outlining disagreements on outline of investment terms with other lead investor. Mr. Tseng negotiates with Acuamark's CEO. 1955 receives options letters from other investors | R-262 (1955-2020ARB-0011290) |
| November 26, 2019 | 1955 invests $0.99 million in preferred stock + right to purchase SAFE | R-231 (1955-2020ARB-0000077) R-232 (1955-2020ARB-0000348) |

91. Table 5 provides examples of the due diligence issues and questions raised by the 1955 Capital team as part of the due diligence process for Acuamark. I provide further examples in the case of the other investments in Appendix C.3.

**TABLE 5:**
**EXAMPLES OF DUE DILIGENCE QUESTIONS POSED TO ACUAMARK**

| Portfolio Company [A] | Source [B] | | Selected quotes [C] |
|---|---|---|---|
| **Acuamark Diagnostics** | | | |
| [1] | R-239 (1955-2020ARB-0000725) | (1) | "Can you share a bit more on how you picked / validated the ███ How many of the ████ are proprietary to Acuamark (as opposed to have been previously identified or used by other groups)?" |
| | | (2) | "The deck you shared points out that you have completed ████ █████ -- can you share some of that data with us so we understand what kind of sensitivity / specificity across different types of cancer you've seen?" |
| [2] | R-240 (1955-2020ARB-0000756) | (1) | "Does this budget include the expenditures necessary on collecting additional clinical samples?" |
| | | (2) | "What are you using for the initial ███ training & validation? Is it the same data you've collected / used for ███?" |
| | | (3) | "Based on the ██ test development slide - are you planning for the n-███ ████ to be complete prior to raising the A?" |
| | | (4) | "We think it'd be good to go set up the technology review we had discussed previously -- in particular, we'd like to better understand:<br>(i) What sort of markers have you tested I validated<br>(ii) The ███ and ███ -assay CVs<br>(iii) Other standard assay parameters (i.e. performance of spike recovery, performance under serial dilution, volume of blood required, sample prep & lab protocol/ required equipment & reagents, etc)<br>(iv) A review of what you've demonstrated on ███ and the ████<br>(v) The initial read on sensitivity & specificity and what you expect to get from ██████ and from ██████<br>(vi) A deeper comparison on approach and diagnostic attributes of Acuamark vs Grail / Freenome / Exact (and others -just picking those 3 for now)<br>(vii) Technical roadmap going forward" |

92. As part of the due diligence process, Mr. Chung and his team also relied on their prior experience, and utilized their networks to obtain references, opinions, and feedback from experts and others in related areas. As I explained above, while some venture capitalists are specialized in specific industry verticals, many venture capitalists are skilled in networking and have connections with many others in the ecosystem, and can rely on the collective expertise within their network to facilitate their investment decisions. Based on my extensive interactions with

Silicon Valley VCs, that is particularly true with respect to the highly developed VC ecosystem that exists in Silicon Valley.  Appendix C.4 provides a detailed list of reference calls made by the team at the 1955 Funds GPs for each of the November 2019 Investments. Except for Acuamark, where the 1955 Funds GPs conducted one reference call to a contact of Mr. Chung from his prior experience at Khosla Ventures, the 1955 Funds GPs conducted five to ten reference calls for each of their investments.[99]

93.  Many of the key due diligence observations and findings of the 1955 Funds GPs were included in their investment memos. Table 6 summarizes several of the key issues and topics that were investigated by the GPs as reflected in the investment memos. The investment memos produced by Mr. Chung and his team are appropriate and sufficiently comprehensive for the process the GPs employed.[100] In my experience, all factors that Mr. Chung and his team considered, as shown in Table 6, are what venture capitalists usually consider in their investment decisions, with some factors receiving more emphasis from some venture capitalists than others.[101]

---

[99]  In the case of Acuamark, I learned from the interviews with Mr. Chung that Mr. ▮▮▮▮▮▮▮ (the 1955 Funds GPs' contact for the reference call) did a deep analysis into the company.

[100]  My interviews and my review of documents revealed that although Mr. Chung is legally the sole decision maker of the 1955 Funds, he and his team work collaboratively, and an investment is not made by the 1955 Funds unless there is a consensus view from the team. That approach is not unusual in the venture capital industry: general partners often seek the input of other investment professionals within their firms and will not invest unless there is a broad consensus and enthusiasm. My interviews and my review of the relevant documents further indicated that the individuals involved in the decision-making process on the 1955 Funds' investments, principally Mr. Chung, Mr. Tseng, and Ms. Chen, were the same individuals who also performed the underlying due diligence. In that situation, the role and function of investment memos are not as formal as they are in a larger organization, where investment decisions are made in whole or in part by individuals who are not centrally involved in the underlying due diligence

[101]  The role and function of investment memos in the investment process varies depending on a number of factors, including the size of the VC firm, the manner in which due diligence is conducted, the manner in which investment decisions are made, and whether and to what extent the individuals making investment decisions are themselves involved in the due diligence process.

CONFIDENTIAL

TABLE 6:
**SUMMARY OF INVESTMENT MEMOS RELATED TO THE NOVEMBER 2019 INVESTMENTS**

| Portfolio Company [A] | Management / founding team [B] | Business model [C] | Product [D] | Market [E] | Industry [F] | Company valuation [G] | Fund fit / ability to add value [H] | Discussion of IP [I] | Deal terms [J] | Reasons to invest [K] | Investment risk factors [L] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Acuamark Diagnostics [1] | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Ampaire [2] | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Avertana [3] | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| CNGmotive [4] | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ |
| DDM Systems [5] | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ |
| Woodoo [6] | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |

Sources:
[1]: R-238 (1955-2020ARB-0000601).
[2]: R-164 (1955-2020ARB-0000943).
[3]: R-247 (1955-2020ARB-0002258).
[4]: R-270 (1955-2020ARB-0019576).
[5]: R-252 (1955-2020ARB-0002735).
[6]: R-254 (1955-2020ARB-0004626).

94. Although the 1955 Funds GPs started their due diligence investigations well ahead of November 2019, a number of email exchanges between the 1955 Funds GPs and the six portfolio companies took place close to the investment date.[102] In some cases, substantial effort from both the GPs and the portfolio companies was required to complete the investment "in time." Those communications reflect the compressed timeframes in which the GPs were forced to operate as a result of the prior arbitration and other factors discussed above. In normal circumstances, it is possible for a VC fund to obtain an extension of the commitment period set forth in the LPA to overcome compressed timeframes. The China Fund LPA provided for such an extension,[103] but my understanding based on the documents and interviews of Mr. Chung is that 1955 Capital did not believe that CFLD/GIIL would agree to such an extension, particularly in light of CFLD/GIIL's social media and public relations Campaign, which I discuss in section B.

95. After considering the many relevant documents and conducting extensive interviews, it is my opinion that the due diligence conducted by the GPs in connection with the November 2019 Investments was comprehensive and appropriate, despite the surrounding circumstances. The shortened timeframe and uncertainties regarding whether CFLD/GIIL would honor its capital commitments are also the key reason for the 1955 Funds GPs to negotiate relatively small

---

[102]   For example, on November 26, 2019, CNGmotive's CEO responded to Ms. Chen's question from the day before about CNGmotive's liabilities. *See* R-264 (1955-2020ARB-0012748).

[103]   R-34 (China Fund LP's Limited Partnership Agreement), clause 8.5(c).

convertible note deals, instead of larger equity investments, as I discuss further in the next subsection.

### 3. The 1955 Funds GPs Negotiated Deals that Most Suited the Unusual Uncertainty that They Faced

96.    As shown in Table 2 above, of the six investments made in November 2019, the 1955 Funds GPs negotiated five deals using convertible notes and one deal using preferred stock (Acuamark). I do not agree with the assertions by CFLD/GIIL and in the Meadow Report that the use of convertible notes in "placeholder" investments was "atypical" or that it indicated these were used as a "pretense to request additional capital from GIIL."[104] I explain in this section that the use of convertible notes by the 1955 Funds GPs was appropriate and reasonable under the circumstances, given the uncertainty of whether CFLD/GIIL would honor its capital commitments. Among other things, it enabled the 1955 Funds to gain exposure to promising investment opportunities (before it became too late). Further, given the challenging circumstances and the time pressure that they faced, the 1955 Funds GPs' decision to negotiate convertible note deals, which incorporated clauses that allow for future investments and other rights in the portfolio companies, made economic sense. That all these deals were closed in time is by itself a notable achievement.

97.    As I explained above, convertible notes are a legitimate form of investments used by VC funds, especially when VC funds consider an investment as an early stage opportunity. They help investors save time and effort and provide an avenue to gain an upside potential and a possibility to invest again, while also protecting investors from downside losses. In many cases, these convertible notes are issued as part of bridge rounds in anticipation of future equity financing.

---

[104]    *See* Statement of Claim, section II.J.vii and Meadow Report, section IV.B.

CONFIDENTIAL

**TABLE 7:**
**REASON FOR FINANCING FOR THE NOVEMBER 2019 INVESTMENTS**

| Portfolio Company [A] | Reason for financing [B] |
| --- | --- |



Sources:
[1]: R-238 (1955-2020ARB-0000601), p. 5. R-239 (1955-2020ARB-0000725), p. 4.
[2]: R-233 (1955-2020ARB-0000482), p. 10, R-234 (1955-2020ARB-0000492), p. 10, R-245 (1955-2020ARB-0001614), R-246 (1955-2020ARB-0001898).
[3]: R-247 (1955-2020ARB-0002258), p. 1.
[4]: R-270 (1955-2020ARB-0019576), p. 1.
[5]: R-257 (1955-2020ARB-0007407), Exhibit A.
[6]: R-254 (1955-2020ARB-0004626), p. 19.

98.   The investment memos produced by the 1955 Funds GPs, as well as my interviews, make clear that the 1955 Funds GPs' intention and plan for the six November 2019 Investments was to make larger investments as either a lead or co-lead of the equity financing round if possible. However, completing such investments required satisfaction of two conditions. First, a relatively large investment in an early financing round means a VC fund needs to have sufficient unused capital to commit to its pro-rata rights in future rounds (in addition to covering management fees and other expenses). Second, to be a lead or co-lead in a sizable financing round requires sufficient time to negotiate and structure the deal and associated terms, and to identify suitable investing partners. Those conditions could not be met in this case because CFLD/GIIL failed to honor its capital commitments.

99.   The documents I have reviewed indicate that at the time the November 2019 Investments were negotiated it was uncertain whether CFLD/GIIL would provide additional capital as required by

the Investment Agreements that were determined in the prior arbitration to be valid and binding.[105] I explored the facts regarding that uncertainty, and their impacts, in detail during my interviews of Mr. Chung, Mr. Tseng, and Ms. Chen. The documents and interviews further indicate that the 1955 Funds GPs also needed additional time to line up other investors to participate in the financing round and/or complete their negotiations. In those circumstances, convertible notes were a convenient avenue that provided the GPs with much needed flexibility (to not commit too much capital, leave sufficient capital in escrow for follow-on investments if needed, and gain the right to larger investments in the future). Following the November 2019 Investments, the 1955 Funds GPs called the additional capital necessary to fully fund the investments on January 21, 2020, which CFLD/GIIL failed to fulfill. I discuss the January 21, 2020 capital calls in section V.B. The fact that CFLD/GIIL ultimately refused to fulfill its capital commitments underscores the fact that it was prudent for the 1955 Funds GPs to negotiate deals that could provide them with flexibility, as they did. In addition to protecting the Funds, the flexible structure ensured that the companies in which the 1955 Fund GPs invested would not be impacted by a funding shortfall.

100. For the reasons explained above, by negotiating and relying on the use of convertible notes, Mr. Chung and his team were able to ensure that each of the deals featured rights to participate in future financing rounds, as illustrated in Table 8, while limiting downside risks and possible harm to portfolio companies. In the case of CNGmotive, I understand that the 1955 Funds simply inherited an existing convertible note contract that had already been pre-negotiated with various investors. Rather than spending time creating a new term sheet for CNGmotive and negotiating a new contract, Mr. Chung determined that the best course was for the 1955 Funds to commit to the already existing note.

---

[105]   As noted above, CFLD/GIIL later responded to the January 21, 2020 capital calls made to further fund the November 2019 Investments by acknowledging its capital commitments and requesting additional information regarding the investments, but ultimately declined to provide additional capital.

CONFIDENTIAL

**TABLE 8:**
**SUMMARY OF CONTRACTUAL TERMS THAT ALLOW FOR THE RIGHT TO PARTICIPATE**
**IN FUTURE FINANCING ROUNDS**

| Portfolio Company [A] | Deal Document [B] | Selected Quote [C] |
|---|---|---|
| | | |

Sources:
[1]: R-231 (1955-2020ARB-0000077), p. 1.
[2]: R-256 (1955-2020ARB-0005061), p. 7.
[3]: R-272 (1955-2020ARB-0019601), pp. 3, 8.
[4]: R-258 (1955-2020ARB-0007418), p. 6.
[5]: R-237 (1955-2020ARB-0000564), p. 6.

101. The November 2019 Investments were negotiated amid the Campaign, as described above, which appears to have been undertaken largely for the purpose of preventing the 1955 Funds GPs from completing further investments. The documents I reviewed and information gathered in the interviews show that some companies with which the GPs were negotiating learned of the accusations being circulated by CFLD, and of the associated litigation risks, and refused to complete the investment. Vicarious Surgical, Nature's Fynd (SBP), and Woodoo are the

principal examples that I found.[106] Some others who knew of the situation showed understanding and were willing to work with the 1955 Funds GPs to structure a reasonable deal (i.e., to use convertible notes as an efficient bridge round while waiting to finalize a larger financing round) but only if they could show called capital *with reserves* to enable future investments, which was the case with Avertana.[107]

102. I was also asked to consider the fact that the 1955 Funds GPs did not disclose the disputes with CFLD/GIIL to all of the prospective portfolio companies in which they sought to invest. My opinion, based on the facts and circumstances of this case, and my experience with the VC industry, is that the 1955 Fund GPs were not expected to make disclosures about litigation risks, and that it was appropriate and sensible from an economic perspective not to have done so. Disclosures of litigation risk and disputes, such as the 1955 Funds GPs' situation and disputes with CFLD/GIIL, are not customary in the VC industry, and could easily have had inflicted irreparable harm on the Funds and interfered with their ability to make promising investments. Woodoo's refusal to proceed with the investment,[108] and the refusal of Nature's Fynd (SBP) to

---

[106] The information I gathered in my work on this matter indicated that Mr. Chung and his team began due diligence for Vicarious Surgical in the fall of 2019. They met with its management team, visited its headquarters, and conducted several external reference calls (R-114 (1955-2020ARB-0004528), p. 6). However, upon learning about CFLD/GIIL's Campaign, Vicarious refused to accept the 1955 Funds' intended November 2019 investment (Chung Witness Statement ¶¶ 146 – 147. R-115 (1955-2020ARB-0008352)). Woodoo learned about the Campaign a few weeks after Mr. Chung's November 2019 investment and, out of fear of legal entanglement, immediately requested that the investment be declared null and void and returned. ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ Nature's Fynd (SBP) learned about the Campaign in January 2020 while preparing for its Series B financing round, and raised concerns with the 1955 Funds GPs about potential reputational damage to itself and its big-name investors, the legality and availability of the Funds' capital, and whether the company could become embroiled in litigation with CFLD/GIIL. Further, "SBP proposed to limit 1955 Capital's participation in the Series B Financing, exclude any protective provisions specifically for Series A investors, restrict 1955 Capital's board observer rights, reduce the number of board members to be designated by 1955 Capital, and include additional restrictions on 1955 Capital's right to designate board members." Due to CFLD/GIIL's failure to provide additional capital, and other hostile conducts of CFLD/GIIL, 1955 Funds GPs were unable to make a sufficient follow-on investment in Nature's Fynd to preserve their pro-rata rights and were forced to make several concessions in their negotiation. *See* Chung Witness Statement ¶¶ 152 – 159; Wyatt Witness Statement ¶¶ 15 – 21; R-119 (1955-2020ARB-0001153); R-150 (1955-2020ARB-0006619).

[107] For example, Avertana confronted Mr. Chung about the Campaign but agreed to continue with the convertible note investments after requesting various assurance about the legality of the 1955 Funds and their continued access to capital. R-125 (1955-2020ARB-0008342)

[108] R-271 (1955-2020ARB-0019595).

accept any investment from the 1955 Funds using CFLD/GIIL's money once they learned about CFLD/GIIL's conduct, illustrate the damage to the Funds that such a disclosure entailed.

103. As I discussed in section IV.A, prospective portfolio companies are generally averse to litigation and reputational risks, and reputation is critically important to the success of a VC fund and its GPs, including with respect to their ability to make promising investments on favorable terms. The facts regarding Woodoo, Nature's Fynd, and Vicarious illustrate the obstacles that the 1955 Funds GPs faced as a result of CFLD/GIIL's conduct, and that although Mr. Chung and his team identified a number of promising investment opportunities, after an extensive due diligence process, they were unable to complete a number of investments that would have been made under normal circumstances.

104. In summary, based on my review of the deals negotiated by the 1955 Funds GPs, the circumstances and challenges surrounding the negotiations, and the specific actions that were taken by the 1955 Capital team, it is my opinion that the 1955 Funds GPs acted skillfully and appropriately to obtain opportunities that balanced the dual prospects that CFLD/GIIL would honor its capital commitments, and that it would fail to do so. The uncertainty of the situation, and CFLD/GIIL's decision not to provide additional capital to the Funds, and other conduct by CFLD/GIIL, had a substantial impact on the timing, amounts, and structures of the deals, none of which is taken into account in the Meadow Report.

## B.     The January 21, 2020 Capital Calls Were Appropriate

### 1.     Summary of the Events Related to the January 21, 2020 Capital Calls

105. Following the 1955 Funds' closing the November 2019 Investments, the 1955 Funds GPs sought further capital to provide the full funding originally intended for their portfolio companies, as well as to provide funding for additional prospective portfolio companies. On January 21, 2020, the 1955 Funds GPs issued two capital calls to CFLD/GIIL for Fund I and China Fund, at drawdown amounts of $24.6 million and $40.8 million, respectively.[109] The capital call letters

---

[109]   R-223 and R-224.

explained that the GPs had "identified, diligenced and negotiated" follow-on investments in existing portfolio companies and, in the case of Fund I, had identified two additional prospective portfolio companies.[110] For each existing and prospective portfolio company, the GPs described the stage of financing round they intended to participate in, whether they intended to lead or co-lead the round, the technology and industry that the company was involved in, and the company's relevance to the Chinese market. For example, the capital call described Ampaire in the following manner:

> *1955 Capital recommends co-leading the next round and is aiding the company in building an investment syndicate. The technology involves hybrid/electric propulsion for aviation and electric jet manufacturing. The product has global relevance, particularly in China, given the fast-growing market for light aviation [and] the country's shift to vehicle electrification.[111]*

106. In their capital call letters, the 1955 Funds GPs explained that they were calling capital to: (i) make new and follow-on investments, (ii) establish reserves to "address certain portfolio companies' concerns regarding the Fund's ability to make future follow-on investments from GIIL's committed capital," and (iii) fund operational expenses such as management fees and litigation costs. The GPs also explained that their capital needs had arisen due in part to the need to establish reserves in connection with uncertainties and costs associated with defending the 1955 Funds from CFLD/GIIL's litigation and arbitration claims and the Campaign.

107. In response to the January 21, 2020 capital calls, on January 31, 2020, CFLD/GIIL wrote to Mr. Chung stating that it had, "never indicated its intent not to provide capital in response to properly made, contractually permissible capital calls."[112] The letter also requested additional information about the investments referred to in the calls and regarding the intended use of the capital.[113] These requests were highly unusual and contrary to custom and practice in the VC industry.

108. For each portfolio company, CFLD/GIIL asked that the GPs share their due diligence materials, including term sheets, investment memos, risk assessments, and valuation conclusions.

---

[110]  R-223 and R-224.
[111]  R-223 and R-224.
[112]  R-22.
[113]  R-22.

CFLD/GIIL also requested details about the Funds' planned financing rounds, existing investment agreements, and communications with each portfolio company regarding their plans to operate in CFLD's Chinese industrial parks. Further, CFLD/GIIL requested the Funds' bank account statements, escrow account statements, as well as detailed disclosures about the Funds' operating, litigation, and other expenses. As I explained in section IV.A.1 above, these types of information are not normally provided to LPs in connection with a capital call, and are unnecessary in light of the narrowly constrained role that LPs play in a VC fund. The information requested by CFLD/GIIL in relation to the 1955 Funds' investments would also be regarded by portfolio companies and GPs as proprietary and highly confidential.

109.   On February 5, 2020, 1955 Capital's counsel responded to the January 31 letter, and explained, among other things, that the information sought by CFLD/GIIL regarding the potential investments went well beyond what is typical in VC LPs-GP relationships, and that the 1955 Funds GPs were wary of divulging further information, or convening a meeting of the Advisory Committees, due to CFLD/GIIL's recent Campaign, which appeared to be intended to injure the 1955 Funds and the GPs, and to interfere with the Funds' ability to make investments, including by taking adverse actions directed at portfolio companies.[114]

110.   Despite these concerns, Mr. Chung agreed to a meeting with CFLD/GIIL's designated representative, Patrick Wong (whose name was Peng Wang in this timeframe), on February 13, 2020 to provide additional information about the potential investments for which the capital calls were made.[115] My review of the slide deck and other materials used by Mr. Chung at the meeting, and additional information provided by Mr. Chung in my interviews, shows that Mr. Chung shared detailed expansive information about his team's due diligence findings, investment thesis, and rationale for requesting the drawdown amounts at the February 13, 2020 meeting, which lasted nearly five hours.[116] The slide deck Mr. Chung used during the meeting reviewed

---

[114]   C-147. ("The fact that CFLD and GIIL responded to the arbitration award by initiating litigation and arbitration claims against the Funds' GPs, and then used the claims as a predicate for a public relations and social media campaign designed to undermine operation of the Funds and interfere with portfolio company investments, generates some obvious complications.")

[115]   Chung Witness Statement, ¶ 128.

[116]   Chung Witness Statement, ¶¶ 128, 134.

the 1955 Funds' portfolio, investment strategy with respect to the healthcare and food industries in detail. Mr. Chung also provided (redacted) investment memos and other information for each of the portfolio companies listed in the capital calls.[117]

111. It is highly unusual for GPs to hold meetings with LPs to provide information in connection with a capital call. As I noted earlier, the usual practice is to provide very limited information, centered on the logistics of the call. The information provided to CFLD/GIIL at the meeting, and in the January 21, 2020 capital call notices themselves, greatly exceeded the information provided to LPs in any context, including a capital call.

112. On March 3, 2020, after Mr. Chung and Mr. Wong had further discussions regarding the investments, the capital call, and related issues by telephone,[118] CFLD/GIIL wrote to 1955's counsel explaining that despite having "seriously considered" the information that was presented to them, CFLD/GIIL ultimately decided that the provided information was insufficient to overcome its "conviction that the capital calls were illegitimate, and likely an attempt to provoke a default."[119] None of the facts or evidence I have reviewed in the course of my work in this case supports a conclusion that the capital calls were in any way inappropriate or an attempt to provoke a default.

## 2.   The Drawdown Amounts in the January 21, 2020 Capital Calls were Prudent and Appropriate

113. Based on my review of the underlying documents and interviews of Mr. Chung and his team, the $65 million amount requested in the January 21, 2020 capital calls were appropriate, prudent and justified. It would have contributed to the sustained operation and success of the 1955 Funds, especially given the circumstances that they faced. I provide a breakdown of the $65 million amount in Table 9.

---

[117]   Chung Witness Statement, ¶ 129.
[118]   Chung Witness Statement, ¶¶ 137 – 139.
[119]   R-110.

CONFIDENTIAL

**TABLE 9:**
**SUMMARY OF JANUARY 21, 2020 CAPITAL CALLS**

| | | Amount Invested | | Call for Coming Quarter | | Call for Reserves | | Funding amount for November 2019 Investments as per (millions) |
|---|---|---|---|---|---|---|---|---|
| | | China Fund (millions) [A] | Fund I (millions) [B] | China Fund (millions) [C] | Fund I (millions) [D] | China Fund (millions) [E] | Fund I (millions) [F] | [G] |
| Crop Enhancement | [1] | $3.83 | $1.28 | | | | | |
| Gridtential | [2] | $2.25 | $0.75 | $3.75 | $1.25 | | | |
| Nature's Fynd (SBP) | [3] | $3.75 | $1.25 | $8.70 | $2.90 | | | |
| Acuamark Diagnostics | [4] | $0.72 | $0.24 | | | | | $2.50–7.50 |
| Ampaire | [5] | $0.75 | $0.25 | $4.28 | $1.43 | | | $7.00–8.00 |
| Avertana | [6] | $0.75 | $0.25 | $6.75 | $2.25 | $3.75 | $1.25 | $10.00 |
| CNGmotive | [7] | $0.75 | $0.25 | $0.75 | $0.25 | | | Lead in $8.00–10.00 round |
| DDM Systems | [8] | $0.75 | $0.25 | $6.53 | $2.18 | | | $6.00–10.00 |
| Woodoo | [9] | $0.75 | $0.25 | $2.25 | $0.75 | $4.13 | $1.38 | $3.00–4.00 |
| Icaria | [10] | | | | $1.00 | | | |
| Vicarious Surgical | [11] | | | | $10.00 | | | |
| Total | [12] | $14.30 | $4.77 | $33.00 | $22.00 | $7.88 | $2.63 | $36.50–49.50 |
| Total Capital Call | [13] | | | $65.50 | | | | |

Sources: R-277 (1955-2020ARB-0008810).
[G][4]: R-238 (1955-2020ARB-0000601), p. 1.
[G][5]: R-164 (1955-2020ARB-0000943), p. 1.
[G][6]: R-247 (1955-2020ARB-0002258), p. 1.
[G][7]: R-270 (1955-2020ARB-0019576), p. 1.
[G][8]: R-252 (1955-2020ARB-0002735), p. 1.
[G][9]: R-254 (1955-2020ARB-0004626), p. 1.
Notes:
[12]: Sum of [1] to [11].
[13]: Sum of [12][C] to [12][F].

114.   As shown in Table 9, most of the $65 million amount included in the January 21, 2020 capital calls was directed at new and follow-on investments, as indicated in column [A] and [B]. I understand that most of these follow-on investments were intended to be part of the 1955 Funds' original November 2019 Investments, as indicated in column [E] of Table 9, which reports the amount of investment the 1955 Funds GPs had planned in their investment memos.

115.   As I described in section IV.B above, CFLD/GIIL's actions before and after the Final Award created significant uncertainty regarding the Funds' access to capital, and necessitated substantial amounts of capital be held in reserve. It was neither feasible nor prudent for the 1955 Funds GPs to use large amounts of their available capital for investments while the prior arbitration went on, or to make large investments in November 2019 without knowing whether CFLD/GIIL would meet its capital commitments, which would be needed to fund follow-on investments and the 1955 Funds' costs associated with defending litigation and the arbitration initiated by

CFLD/GIIL, management fees and other expenses. I also explained in section V.A.3 that given the unique and challenging situation that the 1955 Funds faced as a result of CFLD/GIIL's conduct, the GPs made smaller convertible note investments to provide the Funds with flexibility to participate or lead future capital raises and to make further investments if CFLD/GIIL honored its capital commitments.

116. Table 9 also shows that some of the $65 million amount was designated for establishing capital reserves. My review of the relevant documents and interviews with Mr. Chung shows that it was necessary for the 1955 Funds GPs to establish reserves in order to reassure some portfolio companies that the Funds had sufficient access to capital, in light of the concerns that resulted from CFLD/GIIL's actions described in section IV.B above. It is unusual for a VC fund to call capital for additional reserves,[120] but it is also extremely unusual that a VC fund would be required to assure its portfolio companies that it will have access to contractually committed capital. In the extreme and unusual circumstances created by CFLD/GIIL's actions, it is not surprising that some of the 1955 Funds' portfolio companies requested assurances that the Funds would be able to continue supporting them in the future.

117. In my opinion, it was appropriate and necessary for the 1955 Fund GPs to provide such assurances, and to call capital and establish reserves for that purpose. I discuss a few examples of the communications between the 1955 Funds and their portfolio companies below.

   a.  Leading up to the 1955 Funds' convertible note investment in Avertana, its CEO specifically requested that Mr. Chung provide a legal opinion "confirming that the [1955 Funds are] able to operate and [have] funds available, the legality of [the 1955 Funds GPs] using the funds in escrow, and that there is no ability for funds invested into Avertana to be 'clawed back'.[121] Avertana also amended their agreement with the 1955 Funds to provide that the convertible note investment would first be remitted to a separate trust account while Mr. Chung worked to provide their requested legal opinion.[122] I understand that on January 21, 2020, Mr. Chung

---

[120]  It is not uncommon for VC funds to estimate the reserves needed for each investment that they make. Under normal circumstances, where a VC fund's LPs fulfil their capital commitment when called upon by the GP, reserves are simply estimated internally within the GP team. In this case, in my experience, the reserves amount usually corresponds one for one to the invested amount. For example, if a VC fund plans to invest $10 million in a start-up company, it usually will estimate another $10 million in reserves for this investment.

[121]  R-125 (1955-2020ARB-0008342).

[122]  R-273 (1955-2020ARB-0026754) and R-274 (1955-2020ARB-0026761).

emailed Avertana's CEO saying that the 1955 Funds would call capital for their upcoming round of investment and for future reserves, due to Avertana's concerns about the 1955 Funds' access to capital.[123] Based on the interviews I conducted with Mr. Chung and his team, I learned that as a result of CFLD/GIIL's decision not to fulfill its capital commitment, the GPs were unable to provide Avertana with the funds it needed and that the company has since begun working with other investors.[124]

b.  Another example is Nature's Fynd (SBP). Leading up to the 1955 Funds' series B investment in Nature's Fynd, Nature's Fynd's counsel requested Mr. Chung to confirm, if the Funds used any of CFLD/GIIL's money, that the Funds "are unrestricted and would not subject the equity purchased to clawback."[125] I understand that Nature's Fynd's counsel raised concerns about potential reputational damage to the company and its investors due to the Funds' dispute with CFLD/GIIL, whether the Funds' investment could be encumbered or challenged by CFLD/GIIL, whether the GPs' governance role could be challenged, and whether Nature's Fynd risked becoming a party to the litigation.[126]

c.  Gridtential also expressed concern about the 1955 Funds' ability to support future financing rounds. Mr. Chung and Mr. Tseng spent significant time with Gridtential's board of directors to quell those concerns.[127]

118.  While the 1955 Funds GPs still held approximately $38 million in escrow accounts at the time of their capital calls,[128] CFLD/GIIL's continued refusal to honor its contractual capital obligations created significant uncertainties about whether the 1955 Funds GPs would ever receive additional capital to make new and follow-on investments. It was also necessary and appropriate for the 1955 Funds GPs to have taken reserves for the litigation and arbitration that CFLD/GIIL initiated after the issuance of the Final Award in the prior arbitration, and in light of the fact that CFLD/GIIL might file additional litigation in the future. The GPs incurred more than $9.3

---

[123] On January 21, 2020, Mr. Chung wrote: "To address your concerns and remain in consideration for the upcoming financing, as discussed, we will call capital for this round of investment and future reserves, so that you have clarity on whether 1955 will be able to allocate sufficient funds for you in this and future rounds. I understand that is your most critical concern with our situation at this point. In the event that we are unable to call sufficient capital, then I will share what amount we can reserve from escrow so that you can decide whether 1955 should complete its work and remain in consideration for the upcoming financing." See R-126 (1955-2020ARB-0008350).

[124] Statement of Counterclaim, ¶ 180. Chung Witness Statement, ¶ 165.

[125] R-119 (1955-2020ARB-0001153).

[126] Wyatt Witness Statement, p. 5.

[127] Statement of Counterclaim, ¶ 184. Chung Witness Statement, ¶ 170. Tseng Witness Statement ¶ 24.

[128] R-225.

million in legal fees and costs during the prior arbitration alone, which CFLD/GIIL has been ordered to pay,[129] and are likely to continue to incur substantial fees and costs in connection with proceedings initiated by CFLD/GIIL thereafter.

119. My review of the facts and materials in this case indicates that CFLD/GIIL's failure to provide the 1955 Funds with committed capital in accordance with its contractual obligations deprived the Funds and the GPs of the benefits of investments that would have been made with those funds. Based on the recent performance of some of the portfolio companies that I learned from my interviews with Mr. Chung,[130] the "missed opportunities" and corresponding missed benefits for the 1955 Funds and their GPs as a result of CFLD/GIIL's default will likely be very substantial.[131]

   a.  As reflected in the January 21, 2020 capital calls and discussed in detail above in section V.A, the GPs had negotiated a series of investments that could not be completed as envisioned because CFLD/GIIL failed to provide committed capital pursuant to the calls and as contractually required. Some of the investments that could not be funded due to CFLD/GIIL's failure to honor its capital commitments have increased significantly in value.[132] The Funds and the GPs would have benefitted substantially if the capital that CFLD/GIIL withheld had been provided. Further, there were also opportunities the 1955 Funds GPs considered but were unable to invest as a result of CFLD/GIIL's hostile and disruptive actions.[133] The Funds and their GPs were also deprived of the potential financial benefits of these missed opportunities as well.

   b.  Beyond the financial benefits that the 1955 Funds and the GPs were forced to forego as a result of CFLD/GIIL's failure to provide committed capital (and other actions aimed at

---

[129] Statement of Counterclaim, ¶ 81.

[130] From my interviews with Mr. Chung, I learned that some of the investments made by the 1955 Funds GPs have proven to be successful within a short timeframe. For example, Nature's Fynd (SBP) ███████████ ████████████████████████ based on a change in pre-money valuation. Further, I learned that Nature's Fynd recently got ████████ ████████████████████████████████████████████████████ Another example is Ampaire, ████████████████ *See* Chung Witness Statement, ¶¶ 88, 150; Second Witness Statement of Andrew Chung, ¶¶ 6, 35 – 37.

[131] From the interviews with Mr. Chung, I learned that CFLD/GIIL's decision not to honor its capital commitments ultimately delayed the ability of the portfolio companies to complete the financing round and raise the amount of capital needed in a timely manner. In my experience, this is not surprising. The ability to raise the necessary amount of capital in a timely manner is essential for the success of a start-up company.

[132] See footnote 130 above.

[133] See ¶ 101.

damaging the Funds and GPs), it is likely that 1955 Capital will also be deprived of investment opportunities and investments in the future. That is particularly true in light of the fact that 1955 Capital is Mr. Chung's first VC firm in which he was the founder, and the Funds are the first funds established by 1955 Capital. It is well-established that the performance of an initial fund is a key determinant of a VC's ability to raise and benefit from future funds, which typically account for a larger portion of the returns realized by a GP or VC firm in connection with their efforts.[134] CFLD/GIIL's failure to provide the committed capital to the Funds, and its other actions,[135] severely undermined the performance of the Funds, which will undoubtedly impair the ability of 1955 Capital to benefit from future funds.

### 3. The Information the 1955 Funds GPs Provided in the January 21, 2020 Capital Calls Went Well Beyond Industry Practice

120. The 1955 Funds GPs provided far more information in and following the January 21, 2020 capital calls than is usually furnished to LPs in connection with a capital call. Indeed, based on my academic research, survey results, consulting work and interactions with hundreds of venture capitalists, which involved the review of numerous capital calls, I have not seen a capital call that was more informative.

121. As I explained in section IV.A, capital calls are often distributed as short letters from a VC fund's GP to its LPs, stating the amount of capital needed, and necessary logistics information. Capital calls (particularly capital calls in Silicon Valley) do not usually provide detailed descriptions of planned investments to the LPs, because such information is often proprietary and confidential. In my interview with Mr. Chung, he explained to me that during his time at Khosla Ventures and Lightspeed Venture Partners, GPs were not typically asked to justify their capital calls to the LPs, and often capital calls were facilitated by dedicated administrative personnel (i.e., the general partners do not have to be involved). This is entirely consistent with my

---

[134] *See*, for example, Kate Litvak, "Venture capital limited partnership agreements: Understanding compensation arrangements." *The University of Chicago Law Review*, 76 (2009), pp. 182 - 183 ("There are several sources of evidence that past performance predicts management fee." "Fund number is also a positive and significant predictor of the carry percentage. The likely underlying story is twofold. First, VC firms that have continued to raise new funds over an extended period are likely to be of high quality. Second, investors are likely to resist paying a high carry (above 20 percent) until a VC firm has proven itself through the performance of its early funds."

[135] *See* section IV.B.

experience, and with the fact that LPs neither participate in the day-to-day life of a VC fund nor its investment decisions. The information that CFLD/GIIL requested, including the 1955 Funds' due diligence materials and its term sheets for the prospective investments, not only exceeded industry practice for institutional VC funds, it is unprecedented in my research, teaching, consulting, and extensive interactions with institutional VCs and others over many years.

122. The prudent concerns of GPs regarding confidential information under normal circumstances were greatly amplified in the context of this case, due to the actions CFLD/GIIL took during the Campaign that I described in section IV.B. As part of the Campaign, CFLD/GIIL publicized allegations about Mr. Chung and directly contacted the three 1955 Funds' portfolio companies that CFLD/GIIL was aware of (Gridtential, Crop Enhancement, and Nature's Fynd (formerly SBP)), warning them that they may become embroiled in litigation for having received funding from the Funds.[136] CFLD/GIIL's Campaign even publicized a social media post that directly mentioned Gridtential and two of its business partners, writing: "[f]raud lawsuit against [1955 Capital] founder [Andrew Chung] raising questions about company's investments in [Gridtential] and its partnership with battery systems [Hoppecke] and production run with [Crown Battery]."[137]

123. This behavior by CFLD/GIIL made it essential for the 1955 Funds GPs to limit confidential information disclosure to CFLD/GIIL. If the GPs had divulged the names of the companies in which they intended to make investments in their capital calls, or in response to CFLD/GIIL's request for further information, the documents and facts I have reviewed indicate that there was a substantial risk that the information could be used to target and harass the portfolio companies. Such activity would have further damaged the 1955 Funds' relationships with their portfolio companies and would likely have created further challenges that prevented the Funds from completing their planned investments. This not only could have destroyed the Funds' efforts to date but would also have damaging consequences for the Funds' reputation and future success.

124. Although CFLD/GIIL terminated the Campaign after the January 21, 2020 capital calls, and stopped misusing the confidential information relating to the 1955 Funds' portfolio companies,

---

[136]   Statement of Counterclaim ¶ 96. R-52, R-55, R-56.
[137]   Statement of Counterclaim, ¶¶ 94 – 98. R-146, p. 2.

there remained the risk that it might do so in the future. Litigation risk, including the risk of being associated with litigation, can pose substantial harm to a start-up company, including by damaging the company's relationships with customers, business partners, and existing investors. The prospect of being embroiled in litigation can also impede a start-up company's ability to raise future capital and attract new investors. If CFLD/GIIL again misused information regarding the identity of the 1955 Funds' portfolio companies (and other confidential information about the companies' business and operations), it would almost certainly result in significant and irreparable harm to the 1955 Funds, as well as their portfolio companies. Because start-up companies and VC investors are extremely concerned about confidentiality and litigation risk, even an inadvertent disclosure by a VC of confidential information about its portfolio companies (or planned investments), and the misuse of such information, could be expected to deter start-up companies accepting investments from the VC fund, with severe consequences. That is especially true with respect to highly attractive investments and competitive deals.

125.  I also described in section V.B.1 that Mr. Chung provided extensive additional information regarding the investments, and the reasoning behind the January 21, 2020 capital calls, during a lengthy meeting with CFLD/GIIL's appointed representative on February 13, 2020 and subsequent phone calls. At the meeting Mr. Chung shared documents and spoke at length about the 1955 Funds' portfolio, its due diligence process and findings, the deal terms of its prospective investments, and the relevance of each prospective investment to China. Again, nowhere in the course of my academic research, teaching, surveys, and interactions with VCs have I seen more information provided to an LP in connection with a capital call.

126.  As I explained in section IV.A that LPs in VC funds are not usually provided with detailed information regarding investments considered by their GPs because, in addition to confidentiality issues, LPs do not play a role in selecting, authorizing or approving investments. Based on my review of Mr. Wong's witness statement, and of CFLD/GIIL's Statement of Claim, it appears that CFLD/GIIL had a basic misunderstanding of its role as an LP, and incorrectly believed that it had the right to approve or reject the January 21, 2020 capital calls and the investments that the 1955 Funds GPs considered.

a.  The January 31, 2020 letter, which Mr. Wong wrote in response to the 1955 Funds' capital calls, stated that CFLD/GIIL intended "to engage in careful due diligence – including

CONFIDENTIAL

obtaining and analyzing all relevant information before responding to [the capital calls],"[138] and requested a lengthy list of detailed information[139] needed "to evaluate" 1955 Capital's proposed investments.[140] Again, in a VC fund, the GP is responsible for selecting investments for the Fund, and LPs are contractually obligated to provide the Funds with the capital specified in the capital commitment. LPs have no responsibility or authority to decide whether or how capital is invested or allocated.

b.   Mr. Wong's witness statement reflects the same misunderstanding as in his January 31, 2020 letter. Among other things, it describes a lengthy process through which an investment committee and various other CFLD/GIIL bodies and individuals evaluated the investments described in the capital calls, in order to obtain "all internal approvals."[141] Mr. Wong's Witness Statement then states that he made the decision not to provide the called capital based "on these various inputs and my own detailed analysis."[142] The process of internal approvals that he describes, and the decision not to provide the capital called in the January 21, 2020 notices are, again, contrary to the role, rights and authority of LPs in VC funds, including the 1955 Funds.

## C.      The GPs' Reliance on the Interest Accrual Default Provisions was Justified, Appropriate and Economically Sound

127.   As emphasized throughout my report, it is critical to VC funds, their GPs, and the companies in which funds invest or commit to invest, that LPs honor their capital commitments and provide capital to the funds in response to capital calls. Failure by the LPs to do so can have a variety of significant adverse impacts, including on the GPs' ability to compete for and make optimal investments on behalf of the VC fund, and to profit from such investments if they are successful in accordance with the terms of the fund documents. VC firms compete aggressively to get into the most promising deals. As this case illustrates, questions regarding a fund's access to and ability to deliver capital can also cause start-up companies to exclude funds from lucrative deals.

---

[138]   R-22, p.1.

[139]   R-22, pp. 3, 4.

[140]   R-22, pp. 1, 5.

[141]   From "CFLD employees who serve as consultants for GIIL on matters regarding Legal, Finance, and Investment," Wong Witness Statement, ¶¶ 61 – 68.

[142]   Wong Witness Statement ¶ 68.

Portfolio companies can suffer financial and reputational harm if one of their investors (especially the lead or co-lead investor) is unable to provide the negotiated investment amount.

128. I have also explained in section IV.A, because an LP's adherence to capital commitments is fundamental to the financial success of a VC fund and its GP, it is standard practice to include harsh penalties for a failure by an LP to comply with such commitments. As Mr. Meadow recognizes in his report, a key purpose of such penalties, including accrual of interest on the portion of the commitment that an LP fails to contribute, is to incentivize LPs to contribute capital in accordance with their contractual obligations.[143] Without such incentives, LPs would be able to flout capital commitments with impunity, and, as the facts I examined in this matter demonstrate, inflict serious and long-lasting harm on a VC fund and its GP.

129. Accordingly, contract terms authorizing the GP to accrue and charge interest on amounts that an LP fails to provide to the fund, as provided in the 1955 Funds LPAs, are frequently included in VC fund's investment agreements. Other provisions, including forfeiture of an LPs' investment, forced sale of the defaulting LP's interest and locking of an LP's capital account, are also common. I discuss in this section that the 1955 Fund GPs' reliance on the Investment Agreement provisions authorizing accrual and charging of interest on amounts that CFLD/GIIL failed to provide the Funds (and therefore in violation of its contractual obligations) is justified and necessary.

130. The Investment Agreements between CFLD/GIIL and 1955 Capital require CFLD/GIIL to contribute committed capital over a series of scheduled deposits into an escrow account.[144,145] As

---

[143] Meadow Report, p. 45 footnote 85.

[144] Arbitrator Ghikas recognized the following as valid, subsisting, and enforceable agreements: R-138 (Fund I Subscription Agreement) dated November 23, 2015, R-137 (China Fund Subscription Agreement) dated November 23, 2015, R-218 (Fund I Escrow Agreement) dated November 23, 2015, R-217 (China Fund Escrow Agreement) dated November 23, 2015, R-35 (Fund I LP's Limited Partnership Agreement) dated November 26, 2015, and R-34 (China Fund LP's Limited Partnership Agreement) dated November 26, 2015. *See* Final Award ¶ 492.

[145] For Fund I, which has a capital commitment of $50 million, CFLD/GIIL was required to deposit $30 million into the escrow account by the Fund's effective date, an additional $10 million into the escrow account by the first anniversary of the Fund's effective date (or a later date as selected by the Fund's GP upon 10 business days' written notice), and an additional $10 million into the escrow account by the second anniversary of the Fund's effective date (or a later date as selected by the Fund's GP upon 10 business days' written notice). For China Fund, which has a capital commitment of $150 million, CFLD/GIIL was required to deposit $50 million

---

I explained in section IV.A, the use of escrow accounts (or similar strategies) is common and prudent when a VC fund has an LP located in China due to a variety of factors, including currency restrictions and a number of prior instances in which LPs from China have reneged on capital commitments.

131. Under the Investment Agreements, escrow accounts are the vehicles through which the LPs contribute capital. The Investment Agreements therefore provide that a failure by CFLD/GIIL to transfer some or all of its committed capital into the escrow accounts in accordance with the specified schedules is treated as a default on the capital commitment. The Investment Agreements further provide that after 10 calendar days following a notice to the LP that it has failed to make a scheduled contribution,[146] the GP is permitted to (among other things) accrue interest on the outstanding balance at an 8% interest rate per annum.[147] The interest accrual commences on the date the transfer was due, and continues until the arrearage is paid. The Investment Agreements further provide that accrued interest is deemed income to the Funds, rather than treated as an additional capital contribution.[148]

132. The Investment Agreements also included other default remedies.[149] In my experience, none of the default provisions, including the interest default provisions, in the Investment Agreements are unusual in venture capital contracts.

---

into the escrow account by the Fund's effective date, an additional $50 million into the escrow account by the first anniversary of the Fund's effective date (or a later date as selected by the Fund's GP upon 10 business days' written notice), and an additional $50 million into the escrow account by the second anniversary of the Fund's effective date (or a later date as selected by the Fund's GP upon 10 business days' written notice). *See* R-218 (Fund I Escrow Agreement), clauses 1 – 2; R-217 (China Fund Escrow Agreement), clauses 1 – 2. The effective date is November 26, 2015, *see* Final Award ¶ 492;

[146]  R-35 (Fund I LP's Limited Partnership Agreement), clause 4.5(b)(iii). R-34 (China Fund LP's Limited Partnership Agreement), clause 4.4(b)(iii).

[147]  R-35 (Fund I LP's Limited Partnership Agreement), clause 4.5(b)(iii). R-34 (China Fund LP's Limited Partnership Agreement), clause 4.4(b)(iii).

[148]  R-35 (Fund I LP's Limited Partnership Agreement), clause 4.5(b)(iii). R-34 (China Fund LP's Limited Partnership Agreement), clause 4.4(b)(iii).

[149]  R-35 (Fund I LP's Limited Partnership Agreement), clause 4.5(b); R-34 (China LP's Fund Limited Partnership Agreement), clause 4.4(b). I understand that these default remedies were included in the version of the Investment Agreements deemed valid and subsisting by Arbitrator Ghikas in the Final Award. Further, I understand that there are additional default remedies that were included in later revised LPAs, which Arbitrator Ghikas rejected. *See* Final Award, ¶ 393. I learned from my interview with Mr. Chung that these additional provisions were added on account of his being advised that they were more in line with typical LPAs. My review of the default remedies of the 1955 Capital Funds LPAs suggests that even these additional provisions

CONFIDENTIAL

133. In the course of my research and teaching at Stanford, I have reviewed hundreds of LPAs of VC funds, including many LPAs of early stage VC funds in Silicon Valley that raised capital between 2012 and 2018, like the 1955 Funds. The Stanford GSB Venture Capital Initiative maintains a proprietary and confidential dataset of such LPAs. Every single one of the LPAs that I reviewed contains default provisions and specific remedies that the GP has recourse to if an LP defaults on an obligation to contribute committed capital.

134. Events of default are generally defined in a manner very similar to the definition in the LPAs included in the Investment Agreements. The only economically meaningful difference in the manner in which an event of default is defined is in the length of time that is required to pass, during which the defaulting LP can remedy the failure to satisfy the capital call. In my experience, five business days is often used, and in no instances I have seen a period longer than one month. This makes economic sense because in the VC industry it is important for VC funds to close the investments in their portfolio companies in time, and the cost of failing to do so is very high.

135. My review of the default remedies of the 1955 Capital Funds Investment Agreements indicates that their default remedies are less "severe" than in many other LPAs.[150] The "severity" of a specific default remedy in a particular default also depends on the actions of the defaulting LP.

---

were less costly for the defaulting LP than in many other LPAs. The 1955 Funds GPs executed the LPAs (including the additional default remedies) using the Power of Attorney granted to them in the Investment Agreements. The use of Power of Attorney by GPs to execute LPAs is not uncommon in the VC industry.

[150] In many cases, the GP is required by the contract to impose default remedies and cannot waive them. The economic rationale behind such a requirement is that the GP commits itself to impose a default remedy, thus reducing any remote possibility of an LP default even further. In the case of the 1955 Funds, the GPs had the right but not the obligation to implement any default remedies prescribed by the LPA, which constitutes a more LP-friendly default provision. Among the most common default remedies is the partial or full forfeiture of the LP's interest in the partnership, including that of already contributed capital. One example of such a remedy that I have seen involved an early stage VC fund based in Silicon Valley with an LPA that provided the GP with the right to reduce the amounts otherwise distributable to a defaulting LP by 50% and allocate the residual to non-defaulting partners and the GP. The imposition of an interest penalty on the defaulting partner, as provided in the 1955 Funds LPAs, is another common provision that I have seen.

I have also observed the forced sale of a defaulted LP's interest in the partnership. Such forced sales are typically conducted at a substantial discount to book value or to the fair value of the ownership interest. The specific conditions of forfeiture often depends on the specific time at which the default takes place. Often, default penalties are much more severe if the default takes place during the investment period or when the defaulting partner contributed less than a certain fraction of its committed capital. For example, if a default takes place prior to the second anniversary of the initial closing of a fund or prior to the time at which a defaulting LP has contributed at least 50% of its committed capital, then the GP had the right to deem such a defaulting partner to have forfeited its *entire* interest in the partnership.

CONFIDENTIAL

For example, in the case of an interest remedy, the longer the defaulting LP continues to default, the more interest is accrued on the amount that the LP fails to provide. If accrued over many years because the LP fails to rectify the default, as is the case here, the accrued interest can amount to a large number, eventually exceeding the required capital contribution in the first place.

136.    Default provisions are integral to the investment agreements of a VC fund, and there are fundamental economic reasons why default provisions are always present, and why they are deliberately severe. In addition to incentivizing LPs to comply with their contractual obligations, such provisions reflect the fact that failures to provide capital to a VC fund can be expected to seriously impair the operation of the fund, and result in various forms of long-term irreparable harm to a VC fund and its GP.

137.    An LP capital default endangers the ability of the partnership and the GP to fulfill its obligations to portfolio companies, in the near term and with respect to future support. In a case such as this, when the GP has only one LP, the default of the LP would put the entire partnership at risk, making it even more essential to have strict and enforceable default provisions. If a VC fund fails to follow on a commitment to make an investment, that VC fund will find itself cut off from this and other promising investment opportunities. Such a failure can also be expected to impose significant reputational harm to the GP, and to undermine the GP's ability to compete for lucrative investments in the future. Promising start-up companies typically receive many competing offers. Further, as most investments are done in a syndicate, syndicate partners will be unlikely to invite that VC fund to participate in any future promising investment opportunity. In addition, as the facts of this matter illustrate, the failure of an LP to provide a major portion of a large capital commitment will greatly reduce the size of the investments made by the GP, and can have devastating effects on the GP's ability to benefit from the investments if they are successful.

138.    An LP's failure to supply committed capital can also have damaging consequences to the start-up company that is raising capital, especially if the GP is the lead or a co-lead investor. If a lead or co-lead investor is unable to go through with the capital raise due to their LP defaulting, this can delay or even derail the ability of the start-up company to complete the financing round. Not

being able to raise the capital needed in a timely manner can also have devastating consequences to a start-up company that needs additional capital to grow. Accordingly, the ability of a VC fund to continue to financially support their portfolio companies is essential to the reputation and success of the fund and its GP, in the near term and thereafter.

139.   As I described above, CFLD/GIIL defaulted on its contractual capital commitment to both Fund I and China Fund and failed to transfer two tranches of capital to the escrow accounts to satisfy current and future capital calls. As a result, on December 13, 2016, the 1955 Funds GPs sent letters notifying CFLD/GIIL of its default in making the second tranche of transfers, which was due on December 1, 2016.[151] On April 25, 2018 the 1955 Funds GPs sent letters notifying CFLD/GIIL of its default in making the third tranche of transfers, which was due on December 1, 2017. The December 13, 2016 and April 25, 2018 letters stated that if CFLD/GIIL remained in default for an additional 10 calendar days, then the 1955 Funds GPs "may consider exercising the various remedies available to it under [the Investment Agreements]."[152] On September 5, 2019, the 1955 Funds GPs sent further notifications to CFLD/GIIL that due to CFLD/GIIL's default on its capital commitment, the GPs would begin accruing interest on the delinquent amounts in accordance with the Investment Agreements.[153] Specifically, the September 5, 2019 letters explained that the 1955 Funds GPs would begin accruing interest at the rate of 8% per annum for each missed installment beginning on the date they were due until the date they are made.

140.   Following CFLD/GIIL's failure to fulfill the January 21, 2020 capital calls, on February 5, 2020, the 1955 Funds GPs sent further letters to CFLD/GIIL stating that "GIIL is in default in respect of the Capital Contribution… [I]f GIIL remains in default for 10 calendar days following the date hereof, the General Partner of the Partnership may consider exercising the various remedies available to it under [the Investment Agreements]."[154] On February 10, 2020, CFLD/GIIL sent a letter to 1955 Capital's counsel, stating that "[w]e are disappointed that the GPs chose to issue

---

[151]   R-30 (C72 CAP1420).
[152]   R-219 and R-220.
[153]   R-173, R-174, R-221, R-222.
[154]   R-226 and R-227.

the Default Notices," and that "[m]ost of the LPAs' default remedies, if exercised by the GPs on a self-help basis without arbitral or judicial approval, would cause irreparable injury to GIIL. We therefore need from the GPs immediate (a) written confirmation of any default remedies they actually intend to exercise, and (b) written assurance that they will give GIIL at least ten business days' notice before exercising any of the LPAs' default remedies."[155] In response, in a letter dated February 11, 2020, 1955 Capital's counsel indicated that "the GPs have not yet decided to exercise any default remedies."[156]

141.  Although the magnitude of the interest default penalty set forth in the Investment Agreements is likely to be substantial, as I explained above, from an economic perspective, to deter an LP from defaulting and to incentivise a defaulting LP to cure the default thereafter, it is essential to have enforceable default remedies that are sufficiently severe. From that perspective, the exercise of the interest default remedy by the 1955 Funds GPs in this case makes economic sense. That is true irrespective of the fact that CFLD/GIIL is the Funds' only LP, and the interest accrued on the $120 million delinquent balance does not benefit other LPs.

## VI.    The Meadow Report is Incorrect in Numerous Respects, and Fails to Consider Crucial Case-Specific Facts

142.  I have reviewed and analyzed the Meadow Report. I summarize my opinions regarding the Meadow Report in this section.

143.  The Meadow Report fails to address a number of key issues. Many of the statements in the Meadow Report regarding the VC industry and industry norms are incorrect, particularly with respect to VC practices in Silicon Valley. These incorrect statements might have stemmed from Mr. Meadow's experience with the VC funds he has been associated with, and his failure to recognize that there is a wide variation within the VC industry.

144.  Most significantly, the Meadow Report entirely sidesteps the disruptive circumstances imposed on the 1955 Funds by CFLD/GIIL's hostile actions and failure to fulfill its only role of providing

---

[155]  R-228.
[156]  R-108.

the Funds with capital. As I discussed in detail above, CFLD/GIIL took actions aimed at undermining the operation of the Funds, impugning the reputation of the GPs, and interfering with the Funds' ability to make investments. Those actions are entirely unprecedented in my experience. I have not encountered any similar conduct in my academic research, consulting work and interactions with VCs. Nor have I heard of any comparable actions, even anecdotally.

145. By entirely basing his opinions on what he (largely inaccurately) claims to be industry norms, Mr. Meadow ignores CFLD/GIIL's unprecedented conduct and its impacts, the unusual environment of uncertainty the GPs were forced to operate in, as well as many of the actions that the 1955 Funds GPs took in conducting their investment activities under extraordinarily difficult circumstances.

146. Throughout his report, Mr. Meadow emphasizes the fact that CFLD/GIIL was the 1955 Funds' "lone limited partners" and that "the Funds may not have existed without GIIL's support."[157] Mr. Meadow uses this fact to opine on what was expected of the Funds; however, he conveniently sidesteps what was expected of CFLD/GIIL, including its only responsibility of honoring its capital commitments as the sole LP, or the manner in which an LP's timely fulfillment of its capital commitment is critical to the operation and success of a VC fund and its GPs, especially in the context of a new VC firm such as 1955 Capital. I also noted that although Mr. Meadow offers a number of criticisms in relation to the 1955 Funds GP's January 21, 2020 capital calls, he does not opine that CFLD/GIIL's failure to honor its capital commitments and the capital calls were appropriate or justified.

147. Further, the Meadow Report fails to offer opinions on several other points that I understand are central to the dispute between the parties. I discuss these points in the last section of my report (section VII). In this section I focus on the most important shortcomings in the Meadow Report that are specific to the operations and investments of the 1955 Funds. For reference, I summarize the inaccurate statements in the Meadow Report regarding the VC industry and industry norms in Appendix D.

---

[157]   Meadow Report, ¶ 43.

148. The Meadow Report failed to acknowledge or account for the hostile and uncertain environment that the 1955 Funds GPs operated in as a result of CFLD/GIIL's actions throughout most of the period at issue, and the extreme challenges the GPs encountered. This failure results in Mr. Meadow's several inaccurate assertions about the 1955 Funds' achievements, in particular the November 2019 Investments, and the subsequent capital calls.

149. First, the Meadow Report argues that it is unusual that "all of the [November 2019 Investments] closed on the same day, which was the last day of the China Fund's commitment period… suggest[ing] that the [1955 Funds GPs] were scrambling at the last minute."[158] However, Mr. Meadow fails to acknowledge or mention that for most of the relevant period, the 1955 Funds' sole LP repeatedly sought to get out of its investment and contractual commitments and took several adversarial actions against the 1955 Funds GPs. Those actions, as I detailed above in section IV.B, resulted in uncertainty regarding access to committed capital, and raised issues regarding the authority of the Funds to make the underlying investments. Further, CFLD/GIIL's hostile and disruptive actions not only undermined the reputations of the 1955 Funds GPs (as well as of Mr. Chung), but also effectively shortened the Funds' investment period. Had the 1955 Funds GPs had certainty over access to the committed capital and had the full four years of investment period (for China Fund), as opposed to a compressed period, they would have preferred to lead or co-lead a relatively larger round of financing for the six November 2019 investments. However, not knowing whether they would have access to the committed capital beyond the $80 million already in escrow, and with only months left after learning that they are entitled to benefit from operating the Funds as provided by the Investment Agreements, the 1955 Funds GPs had to take actions to gain exposure to promising investment opportunities while allowing for more time to negotiate larger deals, identify other investors, and reassessing CFLD/GIIL's willingness to fulfill its contractual capital commitments. None of these facts are discussed or even mentioned in the Meadow Report.

150. Second, the Meadow Report asserts that "five of the six [November 2019 Investments] were in essence 'placeholder' investments in convertible debt as opposed to more standard equity

---

[158]  Meadow Report, ¶ 61.

investments,"[159] and that "invested amounts that generally fell short of the amounts originally contemplated despite having sufficient capital in escrow, and did not invest in company equity alongside additional investors to form a syndicate."[160] Mr. Meadow states, "[i]n my experience, it is extremely unusual for a fund to have invested less than one quarter of the capital the limited partners provided (and less than 10% of the committed capital) in a four-year period."[161] Mr. Meadow also speculates that the 1955 Funds GPs may have invested in convertible notes because it "would allow [them] to convey to GIIL that investments had been made, which could in turn be used as a pretence to request additional capital from GIIL."[162] Mr. Meadow, however, fails to acknowledge that what is extremely unusual, is for a fund's LP to fail to meet its capital commitments, to demand a return of the capital it already committed, and to seek a shutdown of the fund it had contractual obligations to. It is also unusual for a VC fund to have to spend more than half of its investment period dealing with litigation and a widespread campaign conducted by its sole LP seeking to interfere with the GP's ability to make further investments, and for a VC fund's GP to accrue millions of dollars in legal fees and costs to defend themselves against their LP. I explained in section V.A that the 1955 Funds GPs acted skilfully to serve the interests of the Funds and negotiated deals that most suited the unusual uncertainty that they faced. Given the $80 million that the 1955 Funds had access to, after subtracting out management fees and other expenses, the Funds had already invested half of its capital by the end China Fund's investment period, which, even in normal circumstances, is not unusual for a VC fund. VC funds do not invest all of their available capital during the investment period since a sizable first-time investment without sufficient certainty over access to capital for follow-on financing rounds would be likely to cause irreparable harm to the funds and to negatively affect the portfolio companies.

---

[159]  Meadow Report, ¶ 62.

[160]  Meadow Report, ¶ 63.

[161]  Meadow Report, ¶ 73. While Mr. Meadow acknowledges that the $80 million in escrow can be used to make investments and pay management fees, he fails to account for past and future management fees, which the 1955 Funds GPs are contractually entitled to, in his calculations. Net of management fees and other expenses, the 1955 Funds had less than $40 million for investment purposes, of which the 1955 Funds GPs invested almost half.

[162]  Meadow Report, ¶ 67.

151. Third, the Meadow Report goes further to conclude that "[the November 2019 Investments] were not conducive to achieving the primary goal of a venture capital firm – to achieve returns commensurate with the venture capital asset class for the fund and its investors."[163] Mr. Meadow makes such a statement without any regard to the actual performance of the investments made by the 1955 Funds to date. As I discussed above,[164] the facts I gathered during my work in this matter show that some of the Funds' investments have performed very well.

152. Fourth, the Meadow Report characterizes the January 21, 2020 capital calls as "highly unusual and improper,"[165] again disregarding the unique circumstances of this case. Mr. Meadow claims that "it is inconsistent with custom and practice to demand capital from a limited partner when there are large sums of capital readily available to the GP in an escrow account,"[166] and that "[t]ypically, capital is only required for existing companies when the company has achieved certain milestones and needs additional capital to fund work toward the next set of milestones."[167] As I explained in section V.B, the amount of funds remaining in the escrow, net of reserves for future management fees and past and expected future legal costs, was insufficient for the 1955 Funds GPs to pursue the intended investments (not even taking into account the capital need for subsequent follow-on financing rounds). CFLD/GIIL's subsequent failure to meet its capital commitments following the January 21, 2020 capital call is further demonstration of the uncertainty faced by the 1955 Funds GPs, and the prudent decisions that they took when making the November 2019 Investments.[168]

153. The Meadow Report is also incorrect about the adequate level of information that a capital call, and in particular the January 21, 2020 capitals, should include. For example, Mr. Meadow asserts, among other things, that the January 21, 2020 capital calls "did not provide sufficient

---

[163] Meadow Report, ¶ 59.
[164] *See* footnote 130.
[165] Meadow Report, ¶ 74.
[166] Meadow Report, ¶ 75.
[167] Meadow Report, ¶ 76.
[168] I also explained in section V.B that part of the amount of capital the 1955 Funds GPs requested on January 21, 2020 was to establish reserves to assure existing portfolio companies of the Funds' ability to support them during future financing rounds. Mr. Meadow, however, contends that "the 1955 GPs justification was insufficient, as I have not seen documentation from the portfolio companies supporting the 1955 GPs' assertions about their portfolio companies' capital needs." *See* Meadow Report, ¶ 76.

justification for the capital calls, as they did not include standard information that a limited partner should know before committing additional funds, including the names of the portfolio companies or detailed descriptions of what the companies do."[169] In making these statements Mr. Meadow omits any discussion of CFLD/GIIL's hostile and disruptive Campaign, which was conducted during a critical period when the Funds were attempting to conclude their investment activities prior to the January 21, 2020 capital calls. Contrary to what Mr. Meadow claims is "standard information that a limited partner should know," given CFLD/GIIL's conduct and actions, which Mr. Meadow does not mention, it would have been imprudent for the GPs to have disclosed such confidential information in connection with the January 21, 2020 capital calls.[170] I explained in section V.B that I find the content of the January 21, 2020 capital calls, and the information that the 1955 GPs provided following the capital calls, to be more informative than what I have seen from my experience having reviewed numerous capital calls and spoken to hundreds of venture capitalists, even under normal circumstances.[171,172]

---

[169] Meadow Report, ¶ 80.

[170] Meadow Report, ¶ 80.

[171] I noted in my earlier discussion (in section IV.A) that even under normal circumstances, capital calls do not usually contain detailed descriptions of portfolio companies, because such information is often deemed confidential.

[172] In addition to making incorrect statements about the type of information usually required for a capital call, Mr. Meadow also inaccurately asserts that "the 1955 GPs withheld standard information regarding the funds' financial performance and the identity of their investments that is customarily provided to limited partners." (¶ 90) For the first year of operation the 1955 Funds GPs provided three quarterly updates to CFLD/GIIL (*see* R-12 (1955-ARB-0001961), R-13 (CAP1283), and R-14 (1955-ARB-0000433)). In my experience, these quarterly updates were comprehensive and sufficient. From my interviews with Mr. Chung, I learned that the GPs stopped providing quarterly updates after CFLD/GIIL sent a letter (November 2016) which stated "we hereby provide formal notice of your defaults, and demand that you act immediately to tender your written resignation as General Partner and provide a proposal for termination of the Partnership's affairs." The same letter also directed the 1955 Funds GPs' response and inquiries to CFLD/GIIL's attorney. *See* R-229 (C70 CAP1417). Further, I understand from my interviews with Mr. Hinson, 1955 Capital's CFO from Greenough Consulting Group, that quarterly financial reports were continued to be provided to CLFD/GIIL until the first half of 2019 when, due to the uncertainty surrounding the litigation and disputes between the 1955 Funds GPs and CFLD/GIIL, it became apparent that any financial reporting might be subject to future restatements. These quarterly updates were prepared by Mr. Hinson and Greenough Consulting Group, who also provide similar services to other VC firms. I learned that Greenough Consulting Group currently has over 100 VC firm clients. This indicates that the process of quarterly financial reporting at 1955 Capital is not unusual compared to other VC firms. This is also consistent with my review of the quarterly financial statements that I have been provided with.

With regard to the "identity" of investments that Mr. Meadow stated "customarily provided to limited partners," Mr. Meadow again failed to consider the facts specific to this case, which was that CFLD/GIIL has misused such information as part of its Campaign. As I explained in section V.B.3, it was prudent for the 1955 Funds GPs to protect the confidentiality of their investments. Mr. Meadow also asserts that "the expenses summaries provided to GIIL were wholly insufficient. Expenses summaries, as well as fund budgets, are standard pieces of

154. Mr. Meadow's report distorts and overstates the role that a LP has or is expected to have in the investment process of a VC fund. For example, Mr. Meadow states that "the January 2020 Capital Calls did not provide sufficient justification for the capital calls, as they did not include standard information that a limited partner should know before committing additional funds,"[173] and that "[i]n such a situation, a limited partner would naturally be very concerned about how its capital was being used and would need to consider whether it was prudent to provide the capital at all."[174] Mr. Meadow's statements imply that a GP needs the permission of its LP before making investment decisions, which is not the case, here or in other GP-LP relationships.

155. It is widely understood that, as is explained in section IV.A, an LP's role is to provide the committed capital at the discretionary request of the GP. Although the Meadow Report appears to acknowledge this non-controversial fact and the limited role of LPs by stating that "the general partner has discretion to make the types of investments it chooses on behalf of the fund,"[175] Mr. Meadow discusses CFLD/GIIL's concern over how its capital contribution is being used at length. And he does so without mentioning the ramifications (both near-term and long-term) that CFLD/GIIL's failure to honor its capital commitment can have on 1955 Capital, and the GPs. In the end, Mr. Meadow simply states, while ignoring many critical facts, that "GIIL's decision not to provide additional capital to the Funds was thus understandable,"[176] not that it was justified or excused. Again, Mr. Meadow neither acknowledges that an LP's defaulting is extremely unusual in the VC industry, nor offers any concrete justification for why such a rare event is "understandable" in this case.

156. In addition to completely disregarding the unique circumstances of this case and making several inaccurate statements about the 1955 Funds GPs' investments, the Meadow Report also presents several inaccurate statements and opinions about the 1955 Funds' investment selection and due diligence process, which are likely to stem from Mr. Meadow's inaccurate depiction of what are

---

information provided to limited partners…[to give] the limited partners an understanding as to how efficiently the general partner is managing the fund and how the general partner is using the management fee." (¶ 94) This is incorrect. GPs are not usually required or expected to justify how they use the management fee.

[173] Meadow Report, ¶ 80.
[174] Meadow Report, ¶ 86.
[175] Meadow Report, ¶ 25.
[176] Meadow Report, ¶ 95.

claimed to be industry norms or customary practices (which I detail in Appendix D).[177] I summarize these inaccurate statements and my corresponding opinions and analysis in Table 10.

---

[177] Mr. Meadow, in his report, sets out to "[o]pine on whether the 1955 GPs' management of the 1955 Funds…has been consistent with custom and practice in the venture capital industry." He concludes that "[t]he 1955 GPs' actions were inconsistent with usual and customary practices and did not serve the interests of the 1955 Funds or its investor," Meadow Report, ¶ 23.

**TABLE 10**
**SUMMARY OF INACCURATE STATEMENTS IN THE MEADOW REPORT**
**REGARDING THE 1955 FUNDS GPS' INVESTMENT SELECTION AND DUE DILIGENCE**

| Inaccurate statements in the Meadow Report | Response to inaccurate statements in the Meadow Report |
|---|---|
| "[V]enture capital funds that specialize in a particular sector and geography tend to perform better than generalist funds... Contrary to best practice, the 1955 GPs did the opposite and invested in companies across multiple industries and geographic regions, despite having only a handful of investment professionals." (¶¶ 45 – 46) | There is no single "best practice" to VC investing strategies. Many VC funds describe themselves as generalists. The 1955 Funds' investment focus (and the investments they have made) is entirely aligned with Mr. Chung's prior experience in VC investing. See ¶¶ 50, 81, 84. |
| "[P]erforming the necessary due diligence to invest in companies in numerous industries and geographic locations would require multiple industry experts devoted to finding investment opportunities in their sector of expertise and would require office staff in multiple locations. The 1955 GPs, on the other hand, had only three generalist investment professionals, all of whom were in California." (¶ 47) | VC deal flow can come from the GPs' networks or from GPs initiating contact with entrepreneurs. Mr. Chung's and his team's former networks brought in multiple leads, and ultimately investments.  There is considerable variation in the due diligence process and the resources required across different VC firms and venture capitalists. Venture capitalists who are particularly skilled in networking and have connections with others in the ecosystem tend to invest more broadly across a wide variety of industries. The due diligence process in these cases usually involves soliciting opinions of others within the GP's network, as opposed to requiring office staff and employees in the specific sector.  See ¶¶ 50, 53, 79, 80. |
| "It would be implausible (and is inconsistent with academic findings and practitioner literature) to expect such a small investment team consisting of generalist investors to successfully diligence and monitor investments in nine companies (six of which closed on the same date) in different sectors and geographic locations." (¶ 51) | In my experience interacting with hundreds of venture capitalists and VC investors both in Silicon Valley and throughout the US, there are VC firms with just one general partner, or one general partner with a handful of venture capitalists, as is the case with 1955 Capital, that are able to successfully utilize their broader networks to make investments across a wide variety of industries and geographies.  See ¶¶ 48, 50. |
| The 1955 Funds GPs' investment memos "do not provide adequate justification for the 1955 Funds' investments," and "do not adequately summarize the [1955 Funds GPs'] efforts to independently verify information provided to them by the entrepreneurs." (¶ 53) | These opinions are a result of Mr. Meadow's inaccurate perception of a single "template" that investment memos must follow, and perhaps his experience with the VC funds and firms that he has been associated with. In my opinion, the investment memos produced by Mr. Chung and his team are appropriate and sufficiently comprehensive.  See ¶¶ 93, 171. |
| "[E]ach investment memo contains information about either the industry or the company that appear to be copied nearly verbatim from the pitch presentations." (¶ 54) | Mr. Meadow's analysis is misleading and based on cherry-picking of relevant information. What Mr. Meadow presents in his comparison (Appendix D of the Meadow Report) are selected snapshots of a very small part of the investment memos that the 1955 Funds GPs produced. These snapshots not only do not reflect the 1955 Funds GPs' assessment of the investments but also obfuscate the extensive questions and communication the GPs had with the portfolio companies in their investigation (see for example, Table 5 and Appendix C3). |
| The 1955 Funds GPs' investment memos "do not explain how the November 2019 Investments advance the stated goals of the 1955 Funds, namely, to find companies that could have a presence in GIIL's Chinese industrial parks." (¶ 58) The 1955 Funds' investment memos "do not explain how [the November 2019 Investments] help further GIIL's stated goal of finding companies for placement in its Chinese industrial parks." (¶ 53) | Mr. Meadow mischaracterizes the clearly articulated goals of the 1955 Funds, and seems to confuse the Funds' "stated goals" (based on the relevant agreements and governing documents) with "GIIL's stated goals." An LP's strategic goals are irrelevant to the VC fund's investment focus and the investment decisions of the fund's GP. This means GIIL's strategic goals are neither relevant to the 1955 Funds' investment focus nor have any implications on the Funds' investment activities and decision. In my opinion, the 1955 Funds maintained a consistent investment focus that was clearly articulated by their GPs (to CFLD/GIIL), and that the Funds' investments were consistent with their investment focus. See ¶¶ 81 – 84. |
| "The 1955 GPs appear to have made investments in the majority of companies that they reviewed." (¶ 57) | My investigation into the facts surrounding the November 2019 Investments, which included a review of key documents and extensive interviews of Mr. Chung and his team, revealed hundreds of investment opportunities that the 1955 Funds GPs considered during the Funds' investment period. See ¶ 78. |

# VII.    The 1955 Funds GPs Are Entitled to Benefit from the Investment Agreements

157. There are a number of claims central to CFLD/GIIL's Statement of Claim for which the Meadow Report does not offer any supporting opinions or discussion.

158. First, the Statement of Claim alleges that the 1955 Funds GPs are bound by a mandate to invest in companies in the mobile software & services sector, and by not pursuing these investments, the GPs are in breach of the Funds' Investment Agreements.[178] CFLD/GIIL has also included this allegation as part of its Campaign,[179] and cited it as a reason to reject the 1955 Funds GPs' January 21, 2020 capital calls.[180] From my review of the materials relevant to this case, I have not encountered any evidence that provides a reasonable basis upon which to assert such an investment mandate.

   a.  The Investment Agreements' only reference to an investment mandate does not mention the mobile software and services sector: "[t]he [1955 Funds'] primary purposes are… to (i) purchase, acquire, hold and manage a diversified portfolio of venture capital, growth equity and other types of investments in high-tech companies or teams."[181] Indeed, Mr. Meadow directly contradicts the notion that the purpose of the Funds was to invest in mobile software and services by quoting this provision in his report, and noting that it was the purpose of the Funds.[182]

   b.  None of the documents that I reviewed offer evidence of any understanding or expectation that the Funds would focus or confine their investments in the mobile software and services sector. They consistently show that the understanding and expectation were different. For example, as I discussed in section V.A.1, Mr. Chung presented 1955 Capital's mission statement in a slide deck to CFLD/GIIL while pitching the formation of the 1955 Funds. Neither in that slide deck,[183] nor in CFLD/GIIL's public disclosure[184] or regulatory

---

178   Statement of Claim, ¶¶ 209, 212.

179   Statement of Counterclaim, ¶¶ 94 – 95, 113. R-53.

180   R-110.

181   R-138 (Fund I Subscription Agreement), p. 1. R-127 (China Fund Subscription Agreement), p. 1. R-35 (Fund I LP's Limited Partnership Agreement), clause 1.2. R-34 (China Fund LP's Limited Partnership Agreement), clause 1.2.

182   Meadow Report, ¶ 17

183   R-8 (CAP0023).

184   R-7 (CAP0279).

submission about the 1955 Funds,[185] were there any references to investments in the mobile software and services sector. Additionally, Mr. Chung does not have a background investing in the mobile software and services sector during his time at Khosla Ventures and Lightspeed Venture Partners, which CFLD/GIIL would have known about at the time.[186]

c.   In the prior arbitration, by which time CFLD/GIIL had three quarterly updates from the 1955 Funds GPs summarizing the sectors of investments the Funds were considering,[187] I understand that CFLD/GIIL did not raise any question or issue regarding the fact that the investments did not relate to the mobile software and services sector. Similarly, as I summarized in section V.B, at no point during CFLD/GIIL's request for information following the January 21, 2020 capital calls, the topic of an investment mandate in the mobile software and services was discussed, despite CFLD/GIIL having full knowledge of the nature of the investments that the 1955 Funds GPs had invested in and were considering.

d.   Further, across the Investment Agreements and the materials produced relating to the formation of the 1955 Funds, I only found one reference to the mobile software and services sector. Appendix 1 of the November 23, 2015 SAs contains several risk disclosures relating to the 1955 Funds' investments. One such risk is that "[the 1955 Funds anticipate] making the majority of [their] investments in mobile software and services. Accordingly, the [1955 Funds'] assets may be subject to greater risk of loss than if they were more widely diversified among various industries."[188] That statement is not a contract provision or mandate, and does not impose or refer to any contractual obligation or restriction. It is simply a risk factor. Moreover, my understanding is that the inclusion of this risk factor resulted from a mistake made by the attorney who prepared the Investment Agreements, who forgot to delete it from an unrelated contract to an unrelated deal that was being used as a drafting template.[189]

159.   Second, CFLD/GIIL alleges that "the GPs have improperly tried to charge 8% interest on GIIL's missed escrow deposits and call an additional $65 million in capital (while charging 8% on that sum too). But the GPs have never offered a legitimate reason—in furtherance of the Funds' business, not the GPs' personal profit—for charging such interest or calling that capital."[190] I note that the Meadow Report contains no opinion that the 1955 Fund GPs' accrual of interest on the amounts that CFLD/GIIL failed to provide the Funds in accordance with the Investment

---

185   R-6.
186   *See*, for example, Table 3.
187   R-12 (1955-ARB-0001961), R-13 (CAP1283), R-14 (1955-ARB-0000433).
188   R-138 (Fund I Subscription Agreement), Appendix 1, p. 18. R-137 (China Fund Subscription Agreement), Appendix 1, p. 18.
189   Statement of Counterclaim, ¶ 131. R-93.
190   Statement of Claim, ¶ 268.

Agreements was unauthorized or invalid, or that the GPs should be prevented from exercising the interest accrual remedy. In my opinion, reliance on the Investment Agreements, which authorize imposition of the interest penalty, is appropriate and economically reasonable.

a.  I explained earlier in section IV.A that the overwhelming majority of GP-LP partnership agreements include some form of default remedies to ensure that LPs meet their funding requirements in a timely fashion. It is essential for the GP of a VC fund to have certainty over access to committed capital for the success of the fund. LP defaults pose significant danger and potential irreparable harm to a VC fund and the long-term prospects of its GP, as well as the associated venture capitalists and the underlying start-up companies.

b.  The Statement of Claim asserts that default provisions generally serve to "incentivize partners to honor their capital commitments when called to do so" and "in the event of a partner's default, they compensate non-defaulting partners that pay the defaulting partners' share."[191] The latter statement fails to acknowledge that default provisions are also intended to protect the success of the VC fund (i.e., not just non-defaulting LPs). In fact, the "illustrative example" presented in the Statement of Claim demonstrates the importance of capital to a VC fund: "Without Partner B's [the defaulting partner] contribution, Partnership [the VC fund] cannot meet its obligation to Startup [the intended investment]."[192]

c.  The Statement of Claim also asserts that there was no need for CFLD/GIIL to meet its capital commitment, nor was there a need for CFLD/GIIL to incur the interest penalty of $80 million, because the 1955 Funds have only invested $19 million in total (prior to this arbitration).[193] These assertions are flawed in that the reason the 1955 Funds were only able to invest $19 million (and not the optimal investment amount as the GPs had planned) was because the GPs only had access to $80 million, as opposed to the contractually determined amount of $200 million, and because of other hostile actions undertaken by CFLD/GIIL to seek to get out of its investment and contractual commitments. There were also investment opportunities that the Funds missed out on, and attractive follow-on investment opportunities that the GPs were not able to make, which can harm the long-term success and prospects of the Funds, as a result of CFLD/GIIL's failure to commit capital and fulfill its contractual obligations.

---

[191]  Statement of Claim, ¶ 253.
[192]  Statement of Claim, ¶ 254.
[193]  *See* Table 9.

160. Last, a central claim put forward by CFLD/GIIL in this arbitration is that "it is not reasonably practicable to carry on the Funds' business,"[194] and that "the GPs' course of conduct has made clear that they are acting with the sole purpose of enriching themselves, rather than to acquire and manage investments for the benefit of GIIL."[195] Despite CFLD/GIIL assertions that this claim was "clear" from the GPs' course of conduct, Mr. Meadow does not opine or state that it is not reasonably practicable to operate the Funds for the purposes outlined in the Investment Agreements, or that they should be dissolved, or that the Funds are being operated for the sole purpose of enriching the 1955 Funds GPs. The facts of this case indicate that none of those assertions are correct or supportable.

161. As my discussion of the 1955 Funds' investment activities in section V notes, what is clear instead is that the Funds have been carrying and continue to carry on the business outlined in the Investment Agreements, and that they are doing so successfully notwithstanding the challenges created by CFLD/GIIL. Despite a challenging environment in which they were faced with a host of hostile actions from their sole LP, the 1955 Funds GPs have acted skilfully to source deals, perform extensive due diligence, and make several investments. In other words, the 1955 Funds GPs have been "carrying on the Funds' business," and making investments, some of which have proven to be successful. When realized, the return on the invested capital would have been for the benefit of its sole LP, as provided in the Investment Agreements.

162. In the prior arbitration, Arbitrator Ghikas determined that "the Investment Agreements comprising the 26 November Agreements remain in effect and that Claimants [the 1955 Funds GPs] have benefited and will continue to benefit from them."[196] As I discussed above in section IV.A, a GP operates a VC fund under the expectation that the LPs will honor their capital commitments, and that it (the GP) has a contractual right to benefit from running the fund. Further, while the immediate benefit from running a VC fund lies in the management fees and any potential carry, it does not stop there. The success of the GP (and a venture capitalist) in a VC fund (especially a first-time fund) is essential for the career of the venture capitalist. My analysis of the investment activities of the 1955 Funds GPs (in section V) indicates that despite

---

[194] Statement of Claim, ¶ 175.
[195] Statement of Claim, ¶ 178.
[196] Final Award, ¶ 431.

CONFIDENTIAL

their sole LP defaulting on its capital commitments and taking improper actions that were aimed at undermining the Funds' operations, the 1955 Funds GPs have been undertaking investment activities to serve the interest of the Funds, and are entitled to the benefits of the Investment Agreements, including both the near-term management fees and the long-term benefits of their investments.

CONFIDENTIAL

# Appendix A Curriculum Vitae

CONFIDENTIAL

# Ilya A. Strebulaev

CURRICULUM VITAE

Graduate School of Business, Stanford University
655 Knight Way, Stanford, CA, 94305-7298
Tel: 650-725-8239; Fax: 650-725-8916
Email: istrebulaev@stanford.edu
`http://faculty-gsb.stanford.edu/strebulaev/`
This version: April 2021

## Education

| | |
|---|---|
| 2004 | Ph.D., Finance, London Business School |
| 2002 | M.Phil., Finance, London Business School |
| 1999 | M.A., Economics, New Economic School, Moscow |
| 1997 | B.A., Economics, Lomonosov Moscow State University |

## Academic Appointments

2016–   The David S. Lobel Professor of Private Equity and Professor of Finance (tenured), Graduate School of Business, Stanford University

2010–   Research Associate, National Bureau of Economic Research

2014–2016   Professor of Finance (tenured), Graduate School of Business, Stanford University

2010–2014   Associate Professor of Finance (tenured), Graduate School of Business, Stanford University

2009–2010   Visiting Associate Professor of Finance, London Business School

2008–2010   Associate Professor of Finance, Graduate School of Business, Stanford University

2004–2008   Assistant Professor of Finance, Graduate School of Business, Stanford University

## Non-Academic Appointments

2018–   Non-Executive Board Member, Board of Directors, Yandex N.V. (Nasdaq: YNDX)

## Publications

### A.   Refereed Publications

1. "Proactive Capital Structure Adjustments: Evidence from Corporate Filings," forthcoming, *Journal of Financial and Quantitative Analysis* (with Arthur Korteweg and Michael Schwert)

2. "Beyond Random Assignment: Credible Inference and Extrapolation in Dynamic Economies," 2020, *Journal of Finance* 75, 825–866 (with Christopher Hennessy)

3. "Corporate Taxes and Capital Structure: A Long-Term Historical Perspective," 2020, *Critical Finance Review* 9, 1–28 (with Matthias Fleckenstein and Francis A. Longstaff)

CONFIDENTIAL

Curriculum Vitae: Ilya A. Strebulaev                                              2

- Lead article

4. "Empirical Analysis of Corporate Tax Reforms: What Is the Null and Where Did It Come From?" 2020, *Journal of Financial Economics* 135, 555–576 (with Christopher Hennessy and Akitada Kasahara)

   - Lead article

5. "Squaring Venture Capital Valuations with Reality," 2020, *Journal of Financial Economics* 135, 120–143 (with Will Gornall)

   - Best Paper, Private Equity Research Consortium Best Paper Award
   - Highly commended paper, Best Private Equity paper 2017, Savvy Investor Awards

6. "How Do Venture Capitalists Make Decisions?" 2020, *Journal of Financial Economics* 135, 169–190 (with Paul A. Gompers, Will Gornall, and Steven N. Kaplan)

   - The Inaugural Doriot Award for the Best Private Equity Research Paper, 2021

7. "Macroeconomic Risk and Idiosyncratic Risk-Taking," 2019, *Review of Financial Studies* 32, 1148–1187 (with Zhiyao Chen)

8. "Financing as a Supply Chain: The Capital Structure of Banks and Borrowers," 2018, *Journal of Financial Economics* 129, 510–530 (with Will Gornall)

9. "Firm Size and Capital Structure," 2015, *Quarterly Journal of Finance* 5, 3, 1–46 (with Alexander Kurshev)

10. "Macroeconomic Effects of Corporate Default Crises: A Long-Term Perspective," 2014, *Journal of Financial Economics* 111, 297–310 (with Kay Giesecke, Francis A. Longstaff, and Stephen M. Schaefer)

11. "Investment, Reputation, and the Temptation to Blend in with the Crowd," 2014, *Journal of Financial Economics* 111, 137–157 (with Steven R. Grenadier and Andrey Malenko)

12. "Government Policy and Ownership of Financial Assets," 2014, *Journal of Financial Economics* 111, 70–85 (with Kristian Rydqvist and Joshua Spizman)

    - Finalist, 2014 TIAA-CREF Paul A. Samuelson Award
    - Short version reprinted in *Finance and Accounting Memos*, 2016, 3.

13. "Dynamic Corporate Finance is Useful: A Comment on Welch (2013)," 2013, *Critical Finance Review* 2, 173–191 (with Toni M. Whited)

14. "The Mystery of Zero-Leverage Firms," 2013, *Journal of Financial Economics* 109, 1–23 (with Baozhong Yang)

    - Lead article
    - Winner, the Emerald Citations of Excellence for 2016

15. "Dynamic Models and Structural Estimation in Corporate Finance," 2012, *Foundations and Trends in Finance* 6, 1–163 (with Toni M. Whited)

16. "Cash Holdings and Credit Risk," 2012, *Review of Financial Studies* 25, 3573–3609 (with Viral Acharya and Sergei Davydenko)

17. "A Market-Based Study of the Costs of Default," 2012, *Review of Financial Studies* 25, 2959–2999 (with Sergei Davydenko and Xiaofei Zhao)

18. "Corporate Bond Default Risk: A 150-Year Perspective," 2011, *Journal of Financial Economics* 102, 233–250 (with Kay Giesecke, Francis A. Longstaff, and Stephen M. Schaefer)

    - Lead article
    - First Place, Fama–DFA Prize for the best papers published in the areas of capital markets and asset pricing in the *Journal of Financial Economics* in 2011

19. "The Aggregate Dynamics of Capital Structure and Macroeconomic Risk," 2010b, *Review of Financial Studies* 23, 12, 4187–4241 (with Harjoat S. Bhamra and Lars-Alexander Kühn)

    - Lead article

20. "Temporary versus Permanent Shocks: Explaining Corporate Financial Policies," 2010, *Review of Financial Studies* 23, 7, 2591–2647 (with Alexander S. Gorbenko)

    - Lead article
    - The Best Paper Award, 13th Mitsui Symposium on Finance, U. of Michigan, 2007

21. "Long-Run Risks, Credit Markets, and Financial Structure," 2010, *American Economic Review, Papers & Proceedings* 100, 2, 547–551 (with Harjoat S. Bhamra and Lars-Alexander Kühn)

22. "The Levered Equity Risk Premium and Credit Spreads: A Unified Framework," 2010a, *Review of Financial Studies* 23, 2, 645–703 (with Harjoat S. Bhamra and Lars-Alexander Kühn)

23. "Repo Auctions and the Market for Liquidity," 2009, *Journal of Money, Credit and Banking* 41, 7, 1391–1421 (with Ulrich Bindseil and Kjell Nyborg)

24. "Structural Models of Credit Risk Are Useful: Evidence from Hedge Ratios on Corporate Bonds," 2008, *Journal of Financial Economics* 90, 1–19 (with Stephen M. Schaefer)

    - Lead article
    - Third Prize, Q Conference, 2004

25. "Strategic Actions, Capital Structure, and Credit Spreads: An Empirical Investigation," 2007, *Journal of Finance* 62, 6, 2633–2671 (with Sergei Davydenko)

26. "Do Tests of Capital Structure Theory Mean What They Say?," 2007, *Journal of Finance* 62, 4, 1747–1788

    - First Paper Prize, Brattle Award, Journal of Finance, 2007
    - Trefftzs Award, Western Finance Association, 2004
    - Dimitris Chorafas Award, 2004

27. "Multiple Unit Auctions and Short Squeezes," 2004, *Review of Financial Studies*, 17, 545–580 (with Kjell Nyborg)

28. "Collateral and Short Squeezing of Liquidity in Fixed Rate Tenders," 2001, *Journal of International Money and Finance*, 20, 769–792 (with Kjell Nyborg)

## B.   Working papers

1. "A Valuation Model of Venture Capital-Backed Companies with Multiple Financing Rounds," (with Will Gornall)

2. "Venture Capitalists and COVID-19," 2020 (with Paul A. Gompers, Will Gornall, and Steven N. Kaplan)

3. "Gender, Race, and Entrepreneurship: A Randomized Field Experiment on Venture Capitalists and Angels," 2020 (with Will Gornall)

4. "Strategic Risk Shifting and the Idiosyncratic Volatility Puzzle," 2020 (with Zhiyao Chen, Yuhang Xing, and Xiaoyan Zhang)

5. "A Unified Model of Distress Risk Puzzles," 2020 (with Zhiyao Chen and Dirk Hackbarth)

6. "The Economic Impact of Venture Capital: Evidence From Public Companies," 2018 (with Will Gornall)

7. "Returns on Venture Capital Investments: Insiders vs. Outsiders," 2017 (with Michael Ewens and Matt Rhodes-Kropf)

8. "Optimal Issuance under Information Asymmetry and Accumulation of Cash Flows," 2016 (with Haoxiang Zhu and Pavel Zryumov)

9. "An $(S, s)$ Model of Capital Structure: Theory and Evidence," 2014 (with Arthur Korteweg)

10. "Capital Structure and Systematic Risk," 2014 (with Michael Schwert)

## C.   Work in progress

1. "Evolution of Corporate Governance in VC-Backed Companies," (with Will Gornall)

2. "How Do Corporate Venture Capitalists Make Decisions?," (with Paul A. Gompers, Will Gornall, and Steven N. Kaplan)

3. "The Economics of VC Funds," (with Will Gornall)

## D.   Teaching cases and notes

(many cases are co-authored with Stanford case writers, PhD/MBA/MSx students, or faculty)

1. "Evaluating Venture Capital Term Sheets (Parts A, B)," 2014, Revised 2017

2. "Sand Hill Angels: To Fund or Not To Fund?" 2013, Revised 2019

3. "Floodgate: Business Model of a Seed Fund," 2016

4. "SelfScore: Series A2 or SeriesB?" 2016

5. "Broadway Angels: Preparing for the Future," 2014

6. "Dropbox – Series B Financing", 2014

7. "Trulia: IPO or Sale?", 2014

8. "Angel Investing in India," 2013

9. "VC Decision-Making in India: Aavishkaar and Milk Mantra (Parts A, B, C)," 2013

10. "Venture Capital Deal Sourcing and Screening," 2013

11. "Note on Angel Financing," 2013

12. "SunRun: Raising Series A Round," 2013

13. "OpenLane: M&A or IPO?" 2013

14. "A Day in the Life of a Venture Capitalist," 2013

15. "Wikimart: Raising the Angel Round," 2013

**E.   Select other work**

1. "How Venture Capitalists Make Decisions" 2021, *Harvard Business Review* March – April, 70–78 (with Paul A. Gompers, Will Gornall, and Steven N. Kaplan)

2. "Check the fair value estimate of your shares and options for ANY U.S. public company," LinkedIn posting, March 12, 2020.

3. "Fair Value of Uber Estimated at $49 Billion," LinkedIn article, January 31, 2018.

4. Letter to the SEC Re: Proposed Rule on Good Faith Determinations of Fair Value (Release No. IC-33845; File No. S7-07-20 RIN 3235-AM71) (with Will Gornall).

# Presentations

## A.   Presentations at conferences (including by co-authors)

| | |
|---|---|
| 2020 | American Finance Association Meeting, San Diego |
| 2019 | European Finance Association, Portugal |
| | National Bureau of Economic Research, Summer conference, Boston |
| | London Business School Private Equity conference |
| | Private Equity Research Consortium, Rome |
| 2018 | Western Finance Association Meeting, San Diego |
| | American Finance Association Meeting, Philadelphia (2 papers) |
| | Financial Intermediation Research Society Conference |
| | ASU Sonoran Finance Conference |
| | Stanford Financing of Innovation Summit |
| 2017 | Anniversary NES Academic Conference |
| | Private Equity Conference, UNC Kenan-Flager Business School |
| | Workshop on Finance and Innovation, University of California, Berkeley |
| | New Frontiers in Banking Research Conference |
| 2016 | National Bureau of Economic Research, Summer conference, Boston |

|      | |
|------|-------------------------------------------------------------------|
|      | Private Equity Conference, Duke University |
|      | American Finance Association Meeting, Chicago |
| 2015 | American Finance Association Meeting, Boston |
|      | Causal Inference in Finance and Economics, London Business School |
| 2014 | Causality in Social Sciences, Stanford |
| 2013 | National Bureau of Economic Research Meeting, Stanford |
|      | American Finance Association Meeting, San Diego |
|      | Duke-UNC Finance Conference |
| 2012 | American Finance Association Meeting, Chicago (2 papers) |
|      | American Economic Association Meeting, Chicago |
|      | Finance Theory Group, HBS Meeting |
|      | New Economic School 20th Anniversary Conference (2 papers) |
| 2011 | European Finance Association Meeting, Stockholm |
| 2010 | American Economic Association Meeting, Atlanta |
|      | Corporate Finance Workshop, Carlson School of Management, University of Minnesota |
| 2009 | Western Finance Association Meeting, San Diego |
|      | 2nd FARFE conference in honor of Hayne Leland |
| 2008 | American Finance Association Meeting, New Orleans (2 papers) |
|      | UNC Tax Symposium |
|      | UBC Summer Finance Conference, Whistler |
|      | Western Finance Association Meeting, Hawaii |
|      | Shifting Capital Markets & Corporate Performance, Yale SOM |
| 2007 | Western Finance Association Meeting, Montana (2 papers) |
|      | Duke-UNC Asset pricing conference |
|      | 13th Mitsui Symposium on Finance, U. of Michigan |
|      | European Finance Association Meeting, Ljubljana |
| 2006 | Western Finance Association Meeting, Keystone |
|      | Asset Returns and Firm Policies, Verona, Italy |
| 2005 | European Finance Association Meeting, Moscow |
|      | American Finance Association Meeting, Philadelphia |
| 2004 | American Finance Association Meeting, San Diego |
|      | Western Finance Association Meeting, Vancouver |
|      | European Finance Association Meeting, Maastricht (2 papers) |
|      | Recent Advances in Credit Risk Research, New York |
| 2003 | American Finance Association Meeting, Washington (2 papers) |
|      | European Finance Association Meeting, Glasgow |
|      | Credit Risk and Risk Management, Verona |
| 2002 | American Finance Association Meeting, Atlanta |
|      | European Finance Association Meeting, Berlin |
|      | Financial Management Association European Meeting, Paris |
|      | European Financial Management Association Meeting, Lugano |
|      | Auctions and Market Design, Milan, Italy |
| 2001 | European Finance Association Meeting, Barcelona |

## B.   Invited presentations

| | |
|---|---|
| 2020 | Virtual finance seminar, Michigan State University |
| 2018 | Harvard University; UNC Kenan-Flager Business School; Columbia Business School |
| 2016 | University of Melbourne; NVCA Board of Directors; University of British Columbia; |
| 2015 | Imperial College, London; University of Amsterdam; University of Lausanne |
| 2014 | Bank of Canada; University of Zurich; Tsinghua University School of Economics and Management; Cheung Kong Graduate School of Business |
| 2013 | University of Texas at Austin; University of Oklahoma; Mendoza College of Business, University of Notre Dame; ESSEC Business School |
| 2012 | Darden School of Business, University of Virginia; Lancaster University; London Business School |
| 2011 | Ohio State University; Simon School of Business, University of Rochester; Olin Business School, University of Washington; Federal Reserve Bank of Philadelphia; New Economic School, Moscow; Higher School of Economics, Moscow |
| 2010 | University of Vienna; Brunel University; Copenhagen Business School; Said School of Business, Oxford University; University of Exeter; London School of Economics; Arizona State University; Erasmus University, Rotterdam; Nova School of Economics & Business, Lisbon |
| 2009 | Georgia State University; Marshall School of Business, USC; Michigan Business School; Stern School of Business, NYU; Imperial College |
| 2008 | Owen School of Management; Vanderbilt University; University of Illinois at Urbana-Champaign; Boston College; London Business School; Stockholm School of Economics; University of Maryland; Columbia Business School; Yale School of Management; Florida State University; Anderson School of Management, UCLA; Colorado University at Boulder |
| 2007 | Norwegian School of Business, University of Bergen; Wharton School, University of Pennsylvania; National University of Singapore; Singapore Management University; Nanyang Technological University; Smeal College of Business, Penn State University, Hong Kong University of Science and Technology; Chicago GSB |
| 2006 | Baruch College, City University of New York; Fuqua School of Business, Duke University; Kenan-Flagler School of Business, University of North Carolina; University of Toronto; MIT Sloan |
| 2005 | Arizona State University; Joint Stanford/Berkeley Finance seminar; Toulouse Business School; University of Lausanne; University of Vienna |
| 2004 | Binghamton University; Federal Bank of New York; Federal Reserve Board, Washington, D.C.; University of Wisconsin - Madison; McCombs School of Business, University of Texas at Austin; GSIA, Carnegie-Mellon University; Johnson School of Management, Cornell University; Graduate School of Business, Stanford University; Anderson School of Management, UCLA; Kellogg School of Management, Northwestern University; Simon School of Business, Rochester University; Columbia Business School; Stern School of Business, New York University; Goizueta Business School; Emory University; Harvard Business School; Michigan Business School; Wharton School, University of Pennsylvania; London School of Economics |

CONFIDENTIAL

Curriculum Vitae: Ilya A. Strebulaev                                                    8

| | |
|---|---|
| 2003 | Bologna University; Verona University; Said Business School, Oxford University; The Judge Institute of Management, Cambridge University; Venice University; Turin University |
| 2002 | Hebrew University, Jerusalem; School of Business, Tel Aviv University |
| 2001 | Padova University; Toulouse Business School |

## Awards and Distinctions

| | |
|---|---|
| 2021 | The Inaugural Doriot Award for the Best Private Equity Research Paper |
| 2020 | Professor of The Week, Poets & Quants |
| 2017 | Best Paper, Private Equity Research Consortium Best Paper Award |
| 2017 | Highly commended paper, Best Private Equity paper 2017, Savvy Investor Awards |
| 2014–2015 | Dhirubhai Ambani Faculty Fellow in Entrepreneurship, Stanford GSB |
| 2014 | Finalist, 2014 TIAA-CREF Paul A. Samuelson Award |
| 2013–2014 | Shanahan Family Faculty Scholar, Stanford GSB |
| 2013 | The Sloan Teaching Excellence Award, Stanford GSB |
| | • Awarded annually to one faculty member by Stanford Sloan fellows |
| 2011 | First Place, Fama–DFA Prize, *Journal of Financial Economics* |
| 2010–2011 | Spence Faculty Scholar, Stanford GSB |
| 2010 | The Masters in Management Inaugural Best Teacher Award, London Business School |
| | • Awarded annually to one faculty member by LBS MiM students |
| 2009 | The MBA Distinguished Teacher Award, Stanford GSB |
| | • Awarded annually to one faculty member by Stanford MBA students |
| 2008 | The MBA Distinguished Teacher Award (shortlisted), Stanford GSB |
| 2007 | First Paper Prize, Brattle Award, *Journal of Finance* |
| 2007 | Distinguished Alumni Award, New Economic School |
| 2007 | The Best Paper Award, 13th Mitsui Symposium on Finance, U. of Michigan |
| 2007 | The MBA Distinguished Teacher Award (shortlisted), Stanford GSB |
| 2006–2007 | Fletcher Jones Faculty Scholar, Stanford GSB |
| 2005 | Moody's Grant for $30,000 (with S. Schaefer) |
| 2004 | The Dimitris N. Chorafas Foundation Award for the best paper |
| 2004 | The Trefftzs Award, Western Finance Association |
| 2003–2004 | Inquire UK research grant for GBP10,000 (with S. Schaefer) |
| 2003–2004 | Inquire Europe research grant for euro 10,000 (with S. Schaefer) |
| 2003 | Lehman Brothers Fellowship for Research Excellence in Finance (finalist) |
| 2002–2004 | Kaplanis Fellowship, London Business School |

2001–2002  Citigroup Ph.D. Scholar, London Business School

1996–1997  MacArthur Foundation grant for $10,000

1995–1997  Moscow Mayor Scholarship

## Select Ongoing Professional Academic Activities

- Director, European Finance Association, 2019–
- Faculty Director, Stanford GSB Venture Capital Initiative, Stanford University, 2015–
- Faculty Advisor, Center for Entrepreneurial Studies, Stanford GSB, 2012–
- Faculty Director, The Emerging CFO, Stanford GSB Executive Education Program, 2012–
- Board Member, American Friends of NES (AFNES), 2008–

## Select Ongoing Professional Industry Activities

- Faculty leader, executive workshops and economic consulting, 2010–
- Expert witness, multiple legal cases, 2015–

## Select Expert Witness Work, including all expert testimony within the last four years

- Expert witness, in Sean Rad et al., v. IAC/InteractiveCorp, Match Group, Inc., and Match Group, LLC, Supreme Court of the State of New York, Index No. 654038/2018, Report 2021
- Expert witness, in YA Global Investments, et al., v. Commissioner of Internal Revenue, Docket No. 14546-15, 28751-15, Report 2020, Deposition 2020, Testimony 2020
- Expert witness, Confidential dispute, Investors v. Company, U.S. District Court for the Northern District of California, Mediation Report 2020
- Expert witness, in Robinson and Moorthy v. Koo et al., JAMS ADR, Case No. 1100101991, Report 2020, Testimony 2020
- Expert witness, in Facebook, Inc. & Subsidiaries v. Commissioner of Internal Revenue, Docket No. 21959-16, Report 2019, Report 2021
- Expert witness, in ICSID UNCT/19/1: Maria Lazareva v. The State of Kuwait, Report 2019, Report 2020, Testimony 2021
- Expert witness, in In Re: Packaged Seafood Products Antitrust Litigation, Case No. 15-md-02670-JLS-MDD (S.D. Cal.), Report 2019, Deposition 2019
- Expert witness, in Allison Huynh v. Scott Hassan, Case No. 615FL013853, Deposition 2017, Report 2018, Deposition 2018

## Editorial Activities

- Associate Editor, *Finance Research Letters*, 2013–2017
- Associate Editor, *Management Science*, 2012–2016

- Referee for *American Economic Review*, *Econometrica*, *European Finance Review*, *Journal of Corporate Finance*, *Journal of Economic Dynamics and Control*, *Journal of Finance*, *Journal of Financial and Quantitative Analysis*, *Journal of Financial Economics*, *Journal of Financial Intermediation*, *Journal of Financial Markets*, *Journal of Political Economy*, *Journal of Royal Statistical Society*, *Management Science*, *Quarterly Journal of Economics*, *Rand Journal of Economics*, *Review of Finance*, *Review of Financial Studies*.

## Past Professional Activities

- Member, Committee on Graduate Studies, Stanford University, 2017–2020
- Member, Dean's Advisory Group, Stanford GSB, 2012–2015
- Faculty Director, Strategic Leadership for CFOs, Enterprise Ireland/Stanford GSB Executive Education Program, 2010–2015
- Member, AFA Nominating Committee, 2014
- Board Member, Finance Theory Group, 2011–2013
- Finance Ph.D. Liaison, Stanford GSB, 2011–2013
- Member, Executive Education Faculty Oversight Committee, Stanford GSB, 2011–2013
- Member, CREEES (Stanford Center for Russian, East European, and Eurasian Studies) Steering Committee, 2010–2013
- Finance Ph.D. admission coordinator, Stanford GSB, 2010–2011
- Co-chair, Corporate Theory workshop committee, 2010–2011
- Co-organizer, NBER Corporate Finance meeting, Stanford, November 2011
- Co-organizer, 4th Corporate Theory workshop, Stanford, May 2011
- Member, Conference Program Committee, "Stability and Risk Control in Banking, Insurance and Financial Markets", Venice, 2011
- Chairman, Conference Program Committee, "Credit Risk, Financial Crisis, and the Macroeconomy", Venice, 2009
- Panelist, PhD in Finance Project, WFA 2009 meeting, San Diego; WFA 2010 meeting, Victoria
- Session organizer, AFA 2010 Meeting; WFA 2011 Meeting
- Associate Chair, WFA 2010 meeting program committee; Member, WFA 2008, 2011 meetings program committee
- Discussant, NBER Corporate Meeting, 2010; NBER Asset Pricing Meeting , 2012 (scheduled)
- Discussant, American Finance Association Meetings (2005, 2006 (2), 2007, 2009 (2))
- Discussant, Western Finance Association Meetings, (2005, 2009, 2010)
- Discussant, European Finance Association Meetings (2000–2003, 2005 (2))
- Reviewer, Social Sciences and Humanities Research Council of Canada
- Co-organizer, SITE Workshop on "Dynamic Investment and Financing", Stanford, 2007
- Member, EFA meeting program committee (2005, 2009)
- Faculty leader, PhD Corporate Finance reading group, Stanford GSB, 2004–2005
- Member, Spencer Award Committee, Stanford GSB, 2006

CONFIDENTIAL

- Finance seminar co-organizer, Stanford GSB, 2005–2006
- Faculty member, MBA academic committee, Stanford GSB, 2006–2007
- Co-founder of weekly Ph.D. Lunch Seminars at LBS

## Giving back

2004–2020 Anna S. Dvornikova and Ilya A. Strebulaev Fund, New Economic School, Moscow

- Financial support for NES students applying to Ph.D. Programs (GRE, GMAT, TOEFL, applications, airfare)
- 159 students have received support over these years

## Teaching Experience

| | |
|---|---|
| MBA Program | *Venture Capital and Angels: Finance and Decision-Making*, Stanford GSB: Fall 2019 (119 students), Fall 2018 (110 students), Fall 2017 (123 students), Fall 2016 (117 students), Fall 2014 (84 students), Fall 2013 (80 students), Winter 2013 (85 students) |
| | *Corporate Finance* (core/elective, case-based), Stanford GSB: 2012 (46 students), 2011 (56 students), 2008 (110 students), 2006 (179 students), 2007 (101 students), 2005 (45 students); LBS: 2010 (65 students) |
| Sloan/MSx Program | Finance (core), Stanford GSB (Fall 2017, Fall 2014, Fall 2013, Winter 2013) |
| Executive Education | Innovation, venture capital, angel investment; Financial decision-making, strategic judgment in decision-making, behavioral finance; Finance strategy, corporate finance, risk management, 2010–2020 |
| Masters in Management Program | Finance (core): LBS, 2010 (115 students) |
| Ph.D./Research Programs | Venture Capital and Innovation, Stanford GSB, 2018–2020 |
| | Advanced Corporate Finance, Stanford GSB, 2007–2009, 2011–2015 |

## Graduate Students

2014–2019 Roy Roth (Ph.D. advisor), 1st job: Analysis Group

2013–2018 Daria Anosova (Ph.D. co-advisor), 1st job: Cornerstone Research

2012–2017 Akitada Kasahara (Ph.D. co-advisor), 1st job: Waseda University

2011–2016 Michael Schwert (Ph.D. advisor), 1st job: Ohio State University

2010–2015 Will Gornall (Ph.D. advisor), 1st job: University of British Columbia

2010–2015 Pavel Zryumov (Ph.D. advisor), 1st job: Wharton School,
          University of Pennsylvania

2008–2013 Will Cong (Ph.D. co-advisor), 1st job: Booth Graduate School of Business,
          University of Chicago

2007–2010 Alexander Gorbenko (Ph.D advisor), 1st job: London Business School

2006–2009 Zhipeng Zhang (Ph.S. co-advisor), 1st job: Boston College

2005–2008 Baozhong Yang (Ph.D. co-advisor), 1st job: Georgia State University

2005–2007 Scott Joslin (Ph.D. reading committee), 1st job: MIT Sloan

2004–2006 Leandro Saita (Ph.D. reading committee), 1st job: Goldman Sachs

## Research Interests

- Venture capital, angel investments, private equity
- Financing innovation, corporate innovation, innovative ecosystems, entrepreneurial finance
- Financial decision-making, dynamic corporate finance, behavioral biases, real options

## Teaching Interests

| | |
|---|---|
| MBA | Venture capital, private equity, entrepreneurial finance |
| Executive Education | Venture capital, innovation, Silicon Valley; Finance strategy, strategic judgment in decisions |
| Ph.D. | Corporate finance, Financing innovation |

## Personal Information

- Date of Birth: 17 May 1975
- Marital Status: Married, 2 children
- Languages: English, Russian (mother tongue), Italian (basics)
- Hobbies: Wine, Science and Innovation, Classical Music, Opera, Philately, Travel, History and Culture (in particular: British, Italian, Russian)

# Appendix B Documents Relied Upon

Materials provided by counsel:
- Statement of Claim
- Statement of Counterclaim
- Meadow Report
- A. Chung Witness Statement
- B. Tseng Witness Statement
- J. Wyatt Witness Statement
- P. Wong Witness Statement
- R. Gilliam Witness Statement
- Second Witness Statement of A. Chung
- R-2 (Final Arbitration Award)
- R-6
- R-7 (CAP0279)
- R-8 (CAP0023)
- R-12 (1955-ARB-0001961 )
- R-13 (CAP1283)
- R-14 (1955-ARB-0000433)
- R-15
- R-22
- R-34 (China Fund LP's Limited Partnership Agreement )
- R-35 (Fund I LP's Limited Partnership Agreement )
- R-40 (GIIL_00001559)
- R-52
- R-53
- R-54
- R-55
- R-56 (1955-2020ARB-0000858)
- R-58 (GIIL_00001426)
- R-60 (GIIL_00000418)
- R-63 (GIIL_00000473)
- R-64
- R-65
- R-67
- R-93
- R-108
- R-110
- R-114 (1955-2020ARB-0004528)
- R-115 (1955-2020ARB-0008352)
- R-119 (1955-2020ARB-0001153)
- R-124 (1955-2020ARB-0012658)
- R-125 (1955-2020ARB-0008342)

- R-126 (1955-2020ARB-0008350)
- R-137 (China Fund Subscription Agreement)
- R-138 (Fund I Subscription Agreement)
- R-146
- R-150 (1955-2020ARB-0006619)
- R-164 (1955-2020ARB-0000943)
- R-173
- R-174
- R-175 (1955-2020ARB-0000966)
- R-177 (1955-2020ARB-0016399 )
- R-182 (1955-2020ARB-0004732)
- R-184 (1955-2020ARB-0004735)
- R-186 (1955-2020ARB-0000045)
- R-217 (China Fund Escrow Agreement)
- R-218 (Fund I Escrow Agreement)
- R-219
- R-220
- R-221
- R-222
- R-223
- R-224
- R-225
- R-226
- R-227
- R-228
- R-229 (C70 CAP1417)
- R-230 (C72 CAP1420)
- R-231 (1955-2020ARB-0000077)
- R-232 (1955-2020ARB-0000348)
- R-233 (1955-2020ARB-0000482)
- R-234 (1955-2020ARB-0000492)
- R-235 (1955-2020ARB-0000542)
- R-236 (1955-2020ARB-0000553)
- R-237 (1955-2020ARB-0000564)
- R-238 (1955-2020ARB-0000601)
- R-239 (1955-2020ARB-0000725)
- R-240 (1955-2020ARB-0000756)
- R-241 (1955-2020ARB-0000972)
- R-242 (1955-2020ARB-0000982)
- R-243 (1955-2020ARB-0000991)
- R-244 (1955-2020ARB-0001093)
- R-245 (1955-2020ARB-0001614)
- R-246 (1955-2020ARB-0001898)
- R-247 (1955-2020ARB-0002258)

- R-248 (1955-2020ARB-0002349)
- R-249 (1955-2020ARB-0002506)
- R-250 (1955-2020ARB-0002569)
- R-251 (1955-2020ARB-0002602)
- R-252 (1955-2020ARB-0002735)
- R-253 (1955-2020ARB-0002988)
- R-254 (1955-2020ARB-0004626)
- R-255 (1955-2020ARB-0004749)
- R-256 (1955-2020ARB-0005061)
- R-257 (1955-2020ARB-0007407)
- R-258 (1955-2020ARB-0007418)
- R-259 (1955-2020ARB-0007432)
- R-260 (1955-2020ARB-0008907)
- R-261 (1955-2020ARB-0008923)
- R-262 (1955-2020ARB-0011290)
- R-263 (1955-2020ARB-0011856)
- R-264 (1955-2020ARB-0012748)
- R-265 (1955-2020ARB-0014147)
- R-266 (1955-2020ARB-0014323)
- R-267 (1955-2020ARB-0014340)
- R-268 (1955-2020ARB-0014992)
- R-269 (1955-2020ARB-0015000)
- R-270 (1955-2020ARB-0019576)
- R-271 (1955-2020ARB-0019595)
- R-272 (1955-2020ARB-0019601)
- R-273 (1955-2020ARB-0026754)
- R-274 (1955-2020ARB-0026761)
- R-275 (1955-2020ARB-0030187)
- R-277 (1955-2020ARB-0008810)
- C-147

Materials used in Figure 4:
- R-278 (1955-2020ARB-0023191)
- R-279 (1955-2020ARB-0023195)
- R-280 (1955-2020ARB-0023200)
- R-281 (1955-2020ARB-0023206)
- R-282 (1955-2020ARB-0023209)
- R-283 (1955-2020ARB-0023211)
- R-284 (1955-2020ARB-0023213)
- R-285 (1955-2020ARB-0023215)
- R-286 (1955-2020ARB-0023218)
- R-287 (1955-2020ARB-0023220)
- R-288 (1955-2020ARB-0023222)
- R-289 (1955-2020ARB-0023224)

- R-290 (1955-2020ARB-0023227)
- R-291 (1955-2020ARB-0030072)
- R-292 (1955-2020ARB-0030075)
- R-293 (1955-2020ARB-0030077)
- R-294 (1955-2020ARB-0030079)
- R-295 (1955-2020ARB-0030082)
- R-296 (1955-2020ARB-0030085)
- R-297 (1955-2020ARB-0030087)
- R-298 (1955-2020ARB-0030089)
- R-299 (1955-2020ARB-0030091)
- R-300 (1955-2020ARB-0030094)
- R-301 (1955-2020ARB-0030097)
- R-302 (1955-2020ARB-0030102)
- R-303 (1955-2020ARB-0030111)
- R-304 (1955-2020ARB-0030116)
- R-305 (1955-2020ARB-0030122)
- R-306 (1955-2020ARB-0030126)
- R-307 (1955-2020ARB-0030130)
- R-308 (1955-2020ARB-0030133)
- R-309 (1955-2020ARB-0030136)
- R-310 (1955-2020ARB-0030141)
- R-311 (1955-2020ARB-0030145)
- R-312 (1955-2020ARB-0030148)
- R-313 (1955-2020ARB-0030152)
- R-314 (1955-2020ARB-0030155)
- R-315 (1955-2020ARB-0030159)
- R-316 (1955-2020ARB-0030163)
- R-317 (1955-2020ARB-0030167)
- R-318 (1955-2020ARB-0030171)
- R-319 (1955-2020ARB-0030175)
- R-320 (1955-2020ARB-0030178)
- R-321 (1955-2020ARB-0030181)
- R-322 (1955-2020ARB-0030184)

Academic literature:
- Andrew Metrick and Ayako Yasuda, 2011, *Venture Capital & the Finance of Innovation,* 2nd Edition, John Wiley & Sons, Inc.
- Fang Xue, et al, "Recent Trends and Issues in Outbound Acquisitions by Chinese Companies," *The M&A Lawyer*, 20(10), (2016)
- Paul Gompers, Will Gornall, Steven Kaplan, and Ilya Strebulaev, "How Do Venture Capitalists Make Decisions?" *Journal of Financial Economics*, 135 (2020)
- Paul Gompers, Will Gornall, Steven Kaplan, and Ilya Strebulaev, "How Venture Capitalists Make Decisions," *Harvard Business Review*, March – April 2021

- Kate Litvak, "Venture capital limited partnership agreements: Understanding compensation arrangements." *The University of Chicago Law Review*, 76 (2009)
- Mahendra Ramsinghani, 2014, *The business of venture capital: insights from leading practitioners on the art of raising a fund, deal structuring, value creation, and exit strategies.* John Wiley & Sons, Inc.
- Manju Puri, and Rebecca Zarutskie, "On the Life Cycle Dynamics of Venture-Capital and Non-Venture-Capital-Financed Firms," *The Journal of Finance*, Vol LXII No. 6, December 2012
- Paul Gompers, "Grandstanding in the venture capital industry," *Journal of Financial Economics*, 42 (1996)
- Zvi Bodie, Alex Kane, Alan Marcus, 2014, *Investments*, 10th Edition, Mc Growth Hill Education

Publicly available sources:
- "Andrew Chung and 1955 Capital, a New Fund to Bridge China, U.S.," *The Startup Magazine*, March 1, 2020, https://www.thestartupmag.com/andrew-chung-1955-capital-new-fund-bridge-china-u-s/
- "Beyond Meat, Inc. Prices Upsized $1 Billion Convertible Senior Notes Offering," Beyond Meat Press Release, March 2, 2021, https://investors.beyondmeat.com/news-releases/news-release-details/beyond-meat-inc-prices-upsized-1-billion-convertible-senior/
- "History," New Enterprise Associates, https://www.nea.com/history/
- "US Venture Capital Index and Selected Benchmark Statistics," Cambridge Associates, December 31, 2017, https://www.cambridgeassociates.com/wp-content/uploads/2018/05/WEB-2017-Q4-USVC-Benchmark-Book.pdf/
- "Venture Monitor, Q4 2020," *National Venture Capital Association and Pitchbook*, December 31, 2020, https://www.nvca.org/research/pitchbook-nvca-venture-monitor/
- Charles Ching, "China Tightens Regulatory Approvals for Outbound Investments," Weil, Gotshal & Manges, March 17, 2017, https://www.privateequity.weil.com/insights/china-tightens-regulatory-approvals-outbound-investments/
- Jan Bogaert, "China Newsletter: Challenges to Chinese outbound M&A in the year of the rooster," Stibbe, March 3, 2017, https://www.stibbe.com/en/news/2017/march/china-newsletter-chinese-outbound-ma-in-the-year-of-the-rooster
- Jay Yarow, "Blood in the Water –90% of the billion dollar unicorn startups are in trouble," *Business Insider*, January 26, 2016, https://www.businessinsider.com.au/blood-in-the-water-90-of-the-billion-dollar-unicorn-startups-are-in-trouble-2016-1/
- Michael Eisenberg & Harry Stebbings (February 8, 2021), *The Twenty Minute VC* [Audio podcast], https://www.thetwentyminutevc.com/michael-eisenberg/

Materials used in Table 3:
- https://1955.capital/team-andrew-chung/
- https://www.acuamarkdx.com/technology/
- https://www.ambri.com/technology/
- https://www.ampaire.com/flight-plan
- https://www.avertana.com/

- https://www.bioconsortia.com/about-us/
- https://www.cngmotive.com/technology/
- https://www.crop-enhancement.com/about/
- https://www.crunchbase.com/organization/cogenra-solar/
- https://www.crunchbase.com/organization/ecomotors/
- https://www.crunchbase.com/organization/ls9/
- https://www.ddmsys.com/about-1/
- https://www.forterausa.com/
- https://www.gridtential.com/technology/
- https://www.impossiblefoods.com/
- https://www.lanzatech.com/
- https://www.natera.com/company/about-us/
- https://www.naturesfynd.com/
- https://www.personalis.com/about/company/
- https://www.quantumscape.com/technology/faqs/
- https://www.solaredge.com/us/corporate/about-us/
- https://www.solazymeindustrials.com/
- https://www.woodoo.com/our-technology/

CONFIDENTIAL

# Appendix C Supporting Analysis

## 1.    Snapshots of Fund I Default Remedies

**4.5       Noncontributing Partners.**

**(a)**      The Partnership shall be entitled to enforce the obligations of each Limited Partner to make the contributions of capital set forth in paragraph 4.2, and the Partnership shall have all remedies available at law or in equity in the event any such contribution is not so made.  If any legal proceedings relating to the failure of a Limited Partner to make such contribution are commenced, the prevailing party shall be entitled to reimbursement from the opposing party of all costs and expenses incurred, including attorneys' fees and expenses, in connection with such proceedings.  The General Partner shall not seek any remedy under this paragraph 4.5 (other than as set forth in paragraph 4.5(b)(i) or (ii)) unless the default continues for at least 10 calendar days after notice by the General Partner to the defaulting Limited Partner of the default.

**(b)**      Additionally, without in any way limiting any remedy which the Partnership may pursue pursuant to paragraph 4.5(a), should any Limited Partner fail to make any of the capital contributions required under this Agreement, such Limited Partner shall be in default, and the General Partner may, in its sole discretion, elect to enforce one or more of the provisions of this paragraph 4.5(b), to which each Limited Partner hereby expressly consents, by providing notice of such election to such defaulting Limited Partner.

**(i)**      The General Partner may borrow, or cause the Partnership to borrow, the due and unpaid amount for or on behalf of the defaulting Limited Partner, in which case the interest and all other expenses incurred in connection with such borrowing shall be paid by the defaulting Limited Partner (or if borne by the Partnership, shall be specifically allocated against the Capital Account of the defaulting Limited Partner and such amounts shall offset distributions which would otherwise be made to such defaulting Limited Partner pursuant to Article 7 or Article 10).

**(ii)**      The General Partner may offer to any non-defaulting Partner the right to make a disproportionate voluntary capital contribution in order to enable the Partnership to make any investment for which the defaulting Limited Partner's contribution was required.  Upon such additional contributions, the General Partner shall equitably allocate any Profit or Loss to take into account that the Partners have not contributed capital proportionately with respect to each investment made by the Partnership.

**(iii)**      The General Partner may require such defaulting Limited Partner to pay interest on the amount of the contribution to the Partnership then due at an interest rate per annum equal to 8% (or if less, the maximum rate permitted by applicable law), such interest to accrue from the date the contribution to the Partnership was required to be made pursuant to paragraph 4.2 until the date the contribution is made.  The accrued interest shall be paid by such defaulting Limited Partner to the Partnership upon payment of such contribution.  The accrued interest so paid shall not be treated as an additional contribution to the capital of the Partnership, but shall be deemed to be income of the Partnership which will be allocated to the Partners (other than the defaulting Limited Partner) in accordance with paragraph 5.1.

**(iv)**      Until such time as the unpaid contribution and accrued interest thereon shall have been paid, the General Partner may elect to withhold any or all distributions to be made to such defaulting Limited Partner pursuant to Article 7 or Article 10 and recover any such unpaid contribution and accrued interest thereon by setoff against any such distributions so withheld.

**(v)**      The General Partner may deny the defaulting Limited Partner the right to participate in any vote or consent of the Partners required under this Agreement or permitted under the Act, whereupon the capital contribution of such defaulting Limited Partner shall not be included for

purposes of calculating a Majority or other Percentage-in-Interest of the Limited Partners for purposes of this Agreement.

(vi)   The General Partner may prohibit the defaulting Limited Partner from paying additional installments of such Limited Partner's Capital Commitment, other than installments to fund Management Fees and other expenses of the Partnership.

(vii)   The General Partner may terminate the defaulting Limited Partner's right to receive further allocations and distributions from the Partnership pursuant to Articles 5, 7 and 10, *provided, however*, that such defaulting Limited Partner shall, subject to the Act, be entitled to receive as a distribution from the Partnership (in such defaulting Limited Partner's capacity as a Limited Partner and not as a creditor of the Partnership) promptly after dissolution of the Partnership, without interest, the amount (the "***Withdrawal Amount***") equal to the lesser of (A) such defaulting Limited Partner's Capital Account balance calculated as of the due date of the additional contribution as if the Partnership were in liquidation or (B) the aggregate amount of such defaulting Limited Partner's capital contributions actually made less distributions (valued at their fair market value on the date of distribution) on or prior to such due date, but in no event less than $0.00.

(viii)   The General Partner may require the defaulting Limited Partner to sell (and each defaulting Limited Partner hereby agrees to sell) such Limited Partner's interest in the Partnership to such persons or entities designated by the General Partner (which may include the General Partner or its Affiliates) who agree to pay the due and unpaid amount of such defaulted contribution and to assume the defaulting Limited Partner's other obligations under this Agreement at a purchase price equal to the pro rata portion of the amount of the defaulting Limited Partner's interest acquired by such purchaser multiplied by the Withdrawal Amount, such price shall be payable by a noninterest bearing nonrecourse promissory note (in such form as the General Partner shall designate) due 60 days following the final liquidation of the Partnership.  Notwithstanding the sale of any portion of the defaulting Limited Partner's interest, such defaulting Limited Partner shall not be released from its Remaining Commitment except as actually funded by the acquirer of any such portion of the defaulting Limited Partner's interest.

(c)   The General Partner shall have the discretion to remove any defaulting Limited Partner (or its representative) from the LP Advisory Committee upon delivery of written notice thereof to the defaulting Limited Partner.

(d)   Notwithstanding any other provision of this Agreement, if at least three business days prior to a date on which any unpaid capital contribution is payable hereunder, any ERISA Partner shall obtain and deliver to the General Partner an opinion of legal counsel, which opinion and counsel are reasonably acceptable to the General Partner, to the effect that the making of one or more investments by the Partnership with the proceeds of such unpaid capital contribution will result, or there is a material likelihood that the same will result, in a violation of ERISA or in the fiduciaries of such ERISA Partner being deemed under ERISA to have delegated investment discretion over plan assets (as determined by or under ERISA) to any person or entity which is not an "investment manager" (as determined by or under ERISA), then (i) such ERISA Partner shall be released from any further obligation to make the portion of the capital contribution to be used for the investment giving rise to such violation, (ii) such ERISA Partner shall not be deemed to have an indirect ownership interest in any investment giving rise to such violation and no Profit or Loss shall be allocated to such ERISA Partner with respect to any such investment and all such Profit or Loss that would have been allocated to such ERISA Partner shall be allocated to all other Partners (including the General Partner) in accordance with their respective Partnership Percentages, and (iii) the Capital Commitment and Remaining Commitment of such ERISA Partner shall either, as determined by the General Partner in its sole discretion, (A) be reduced, effective

CONFIDENTIAL

as of the date of delivery of such notice, by an amount equal to the portion of the capital contribution of such ERISA Partner not being made in accordance with this paragraph 4.5(d), or (B) remain unchanged, and such ERISA Partner's pro rata interest in investments made with the proceeds of future capital contributions shall increase accordingly, and the General Partner shall equitably allocate any Profit and Loss to take into account that the Partners have not contributed capital proportionately with respect to each investment made by the Partnership.

(e)     Notwithstanding any other provision of this Agreement, if at least three business days prior to a date on which any unpaid capital contribution is payable hereunder, any Governmental Plan Partner shall obtain and deliver to the General Partner an opinion of legal counsel, which opinion and counsel are reasonably acceptable to the General Partner, to the effect that the making of one or more investments by the Partnership with the proceeds of such unpaid capital contribution will result, or there is a material likelihood that the same will result, in the violation by the Governmental Plan Partner of any applicable statute, law, rule, regulation, or action of or taken by any governmental authority having jurisdiction over the Governmental Plan Partner (such applicable statutes, laws, rules, regulations and actions, the "*Governmental Plan Regulations*"), then (i) such Governmental Plan Partner shall be released from any further obligation to make the portion of the capital contribution to be used for the investment giving rise to such violation, (ii) such Governmental Plan Partner shall not be deemed to have an indirect ownership interest in any investment giving rise to such violation and no Profit or Loss shall be allocated to such Governmental Plan Partner with respect to any such investment and all such Profit or Loss that would have been allocated to such Governmental Plan Partner shall be allocated to all other Partners (including the General Partner) in accordance with their respective Partnership Percentages, and (iii) the Capital Commitment and Remaining Commitment of such Governmental Plan Partner shall either, as determined by the General Partner in its sole discretion, (A) be reduced, effective as of the date of delivery of such notice, by an amount equal to the portion of the capital contribution of such Governmental Plan Partner not being made in accordance with this paragraph 4.5(e), or (B) remain unchanged, and such Governmental Plan Partner's pro rata interest in investments made with the proceeds of future capital contributions shall increase accordingly, and the General Partner shall equitably allocate any Profit and Loss to take into account that the Partners have not contributed capital proportionately with respect to each investment made by the Partnership.

(f)     Notwithstanding any other provision of this Agreement, if at least three business days prior to a date on which any unpaid capital contribution is payable hereunder, any BHC Partner shall obtain and deliver to the General Partner an opinion of legal counsel, which opinion and counsel are reasonably acceptable to the General Partner, to the effect that the making of one or more investments by the Partnership with the proceeds of such unpaid capital contribution will result, or there is a material likelihood that the same will result, in the violation by the BHC Partner of any provision of the BHC Act (without regard to Section 4(k) thereof), including any regulation, written interpretation or directive of any governmental authority having regulatory authority over the BHC Partner, enacted or promulgated after the date of formation of the Partnership, then (i) such BHC Partner shall be released from any further obligation to make the portion of the capital contribution to be used for the investment giving rise to such violation, (ii) such BHC Partner shall not be deemed to have an indirect ownership interest in any investment giving rise to such violation and no Profit or Loss shall be allocated to such BHC Partner with respect to any such investment and all such Profit or Loss that would have been allocated to such BHC Partner shall be allocated to all other Partners (including the General Partner) in accordance with their respective Partnership Percentages, and (iii) the Capital Commitment and Remaining Commitment of such BHC Partner shall either, as determined by the General Partner in its sole discretion, (A) be reduced, effective as of the date of delivery of such notice, by an amount equal to the portion of the capital contribution of such BHC Partner not being made in accordance with this paragraph 4.5(f), or (B) remain unchanged, and such BHC Partner's pro rata interest in investments made with the proceeds of

CONFIDENTIAL

future capital contributions shall increase accordingly, and the General Partner shall equitably allocate any Profit and Loss to take into account that the Partners have not contributed capital proportionately with respect to each investment made by the Partnership.

(g)     Notwithstanding any other provision of this Agreement, if at least three business days prior to a date on which any unpaid capital contribution is payable hereunder, any Foundation Partner shall obtain and deliver to the General Partner an opinion of legal counsel, which opinion and counsel are reasonably acceptable to the General Partner, to the effect that the making of one or more investments by the Partnership with the proceeds of such unpaid capital contribution will result, or there is a material likelihood that the same will result, in (a) payment by the Foundation Partner of excise taxes imposed by Subchapter A of Chapter 42 of the Code (other than Sections 4940 and 4942 thereof), or (b) a material breach of the fiduciary duties of its trustees under any federal or state law applicable to private foundations or any rule or regulation adopted thereunder by any agency, commission, or authority having jurisdiction over the Foundation Partner, then (i) such Foundation Partner shall be released from any further obligation to make the portion of the capital contribution to be used for the investment giving rise to such violation, (ii) such Foundation Partner shall not be deemed to have an indirect ownership interest in any investment giving rise to such violation and no Profit or Loss shall be allocated to such Foundation Partner with respect to any such investment and all such Profit or Loss that would have been allocated to such Foundation Partner shall be allocated to all other Partners (including the General Partner) in accordance with their respective Partnership Percentages, and (iii) the Capital Commitment and Remaining Commitment of such Foundation Partner shall either, as determined by the General Partner in its sole discretion, (A) be reduced, effective as of the date of delivery of such notice, by an amount equal to the portion of the capital contribution of such Foundation Partner not being made in accordance with this paragraph 4.5(g), or (B) remain unchanged, and such Foundation Partner's pro rata interest in investments made with the proceeds of future capital contributions shall increase accordingly, and the General Partner shall equitably allocate any Profit and to take into account that the Partners have not contributed capital proportionately with respect to each investment made by the Partnership.

(h)     Following any release pursuant to paragraphs 4.5(d), (e), (f) or (g) above of any ERISA Partner, Governmental Plan Partner, BHC Partner or Foundation Partner, respectively, from the obligation to contribute the entire amount of its original Capital Commitment, the General Partner may, in its sole discretion, provide notice to all Limited Partners that additional Capital Commitments to the Partnership may be requested on account of such shortfall.  No Limited Partner shall be required to make any additional Capital Commitment as a result of such notice.  If any Limited Partner makes, in its sole discretion, any additional Capital Commitment to the Partnership as a result of such notice, the General Partner shall cause the books and records of the Partnership to be amended to reflect all necessary changes resulting from such contribution, including, without limitation, adjustments to any such contributing Partner's Capital Commitment and Partnership Percentage, and Profit or Loss shall be equitably allocated by the General Partner to take into account that the Partners have not contributed capital proportionately with respect to each investment made by the Partnership.

(i)     Without in any way limiting any remedy which the Partnership may pursue pursuant to this paragraph 4.5 with respect to a failure to contribute capital under this Agreement, should any Limited Partner fail to make any of the capital contributions required under the operative agreement of an Alternative Vehicle, such Limited Partner shall also be deemed to be in default under this Agreement, and the General Partner may, in its sole discretion, elect to enforce one or more of the provisions contained in paragraph 4.5(b)(iv) (by using withheld amounts to satisfy such Limited Partner's obligations to such Alternative Vehicle), clauses (v) through (viii) of paragraph 4.5(b) and paragraph 4.5(c) as if such Limited Partner had defaulted under this Agreement, to which each Limited Partner hereby expressly consents, by providing notice of such election to such defaulting Limited Partner.

(j)     The provisions set out in this paragraph 4.5 may be exercised in respect of part only of a Feeder Fund's interest in circumstances where some, but not all, of the underlying investors in the Feeder Fund are treated as defaulting limited partners in accordance with the terms and provisions of the relevant Feeder Fund.

CONFIDENTIAL

## 2.        Snapshots of China Fund Default Remedies

**4.4        Noncontributing Partners.**

**(a)**        The Partnership shall be entitled to enforce the obligations of each Limited Partner to make the contributions of capital set forth in paragraph 4.2(a), and the Partnership shall have all remedies available at law or in equity in the event any such contribution is not so made.  If any legal proceedings relating to the failure of a Limited Partner to make such contribution are commenced, the prevailing party shall be entitled to reimbursement from the opposing party of all costs and expenses incurred, including attorneys' fees and expenses, in connection with such proceedings.  The General Partner shall not seek any remedy under this paragraph 4.3 (other than as set forth in paragraph 4.4(b)(i) or (ii)) unless the default continues for at least 10 calendar days after notice by the General Partner to the defaulting Limited Partner of the default.

**(b)**        Additionally, without in any way limiting any remedy which the Partnership may pursue pursuant to paragraph 4.4(a), should any Limited Partner fail to make any of the capital contributions required under this Agreement, such Limited Partner shall be in default, and the General Partner may, in its sole discretion, elect to enforce one or more of the provisions of this paragraph 4.4(b), to which each Limited Partner hereby expressly consents, by providing notice of such election to such defaulting Limited Partner.

CONFIDENTIAL

(i)     The General Partner may borrow, or cause the Partnership to borrow, the due and unpaid amount for or on behalf of the defaulting Limited Partner, in which case the interest and all other expenses incurred in connection with such borrowing shall be paid by the defaulting Limited Partner (or if borne by the Partnership, shall be specifically allocated against the Capital Account of the defaulting Limited Partner and such amounts shall offset distributions which would otherwise be made to such defaulting Limited Partner pursuant to Article 7 or Article 10).

(ii)    The General Partner may offer to any non-defaulting Partner the right to make a disproportionate voluntary capital contribution in order to enable the Partnership to make any investment for which the defaulting Limited Partner's contribution was required.  Upon such additional contributions, the General Partner shall equitably allocate any Profit or Loss to take into account that the Partners have not contributed capital proportionately with respect to each investment made by the Partnership.

(iii)   The General Partner may require such defaulting Limited Partner to pay interest on the amount of the contribution to the Partnership then due at an interest rate per annum equal to 8% (or if less, the maximum rate permitted by applicable law), such interest to accrue from the date the contribution to the Partnership was required to be made pursuant to paragraph 4.2 until the date the contribution is made.  The accrued interest shall be paid by such defaulting Limited Partner to the Partnership upon payment of such contribution.  The accrued interest so paid shall not be treated as an additional contribution to the capital of the Partnership, but shall be deemed to be income of the Partnership which will be allocated to the Partners (other than the defaulting Limited Partner) in accordance with paragraph 5.1.

(iv)    Until such time as the unpaid contribution and accrued interest thereon shall have been paid, the General Partner may elect to withhold any or all distributions to be made to such defaulting Limited Partner pursuant to Article 7 or Article 10 and recover any such unpaid contribution and accrued interest thereon by setoff against any such distributions so withheld.

(v)     The General Partner may deny the defaulting Limited Partner the right to participate in any vote or consent of the Partners required under this Agreement or permitted under the Act, whereupon the capital contribution of such defaulting Limited Partner shall not be included for purposes of calculating a Majority or other Percentage-in-Interest of the Limited Partners for purposes of this Agreement.

(vi)    The General Partner may prohibit the defaulting Limited Partner from paying additional installments of such Limited Partner's Capital Commitment, other than installments to fund Management Fees and other expenses of the Partnership.

(vii)   The General Partner may terminate the defaulting Limited Partner's right to receive further allocations and distributions from the Partnership pursuant to Articles 5, 7 and 10, *provided, however*, that such defaulting Limited Partner shall, subject to the Act, be entitled to receive as a distribution from the Partnership (in such defaulting Limited Partner's capacity as a Limited Partner and not as a creditor of the Partnership) promptly after dissolution of the Partnership, without interest, the amount (the "*Withdrawal Amount*") equal to the lesser of (A) such defaulting Limited Partner's Capital Account balance calculated as of the due date of the additional contribution as if the Partnership were in liquidation or (B) the aggregate amount of such defaulting Limited Partner's capital contributions actually made less distributions (valued at their fair market value on the date of distribution) on or prior to such due date, but in no event less than $0.00.

CONFIDENTIAL

(viii)    The General Partner may require the defaulting Limited Partner to sell (and each defaulting Limited Partner hereby agrees to sell) such Limited Partner's interest in the Partnership to such persons or entities designated by the General Partner (which may include the General Partner or its Affiliates) who agree to pay the due and unpaid amount of such defaulted contribution and to assume the defaulting Limited Partner's other obligations under this Agreement at a purchase price equal to the pro rata portion of the amount of the defaulting Limited Partner's interest acquired by such purchaser multiplied by the Withdrawal Amount, such price shall be payable by a noninterest bearing nonrecourse promissory note (in such form as the General Partner shall designate) due 60 days following the final liquidation of the Partnership.  Notwithstanding the sale of any portion of the defaulting Limited Partner's interest, such defaulting Limited Partner shall not be released from its Remaining Commitment except as actually funded by the acquirer of any such portion of the defaulting Limited Partner's interest.

(c)    Without in any way limiting any remedy which the Partnership may pursue pursuant to this paragraph 4.3 with respect to a failure to contribute capital under this Agreement, should any Limited Partner fail to make any of the capital contributions required under the operative agreement of an Alternative Vehicle, such Limited Partner shall also be deemed to be in default under this Agreement, and the General Partner may, in its sole discretion, elect to enforce one or more of the provisions contained in paragraph 4.4(b)(iv) (by using withheld amounts to satisfy such Limited Partner's obligations to such Alternative Vehicle) and clauses (v) through (viii) of paragraph 4.4(b) as if such Limited Partner had defaulted under this Agreement, to which each Limited Partner hereby expressly consents, by providing notice of such election to such defaulting Limited Partner.

# 3.       Selected Quotes from Due Diligence

| Portfolio Company | Source | Selected quotes |
|---|---|---|
| [A] | [B] | [C] |
| **Acuamark Diagnostics** | | |
| [1] | R-239 (1955-2020ARB-0000725) | (1) "Can you share a bit more on how you picked / validated the ███ How many of the ██████ are proprietary to Acuamark (as opposed to have been previously identified or used by other groups)?" |
| | | (2) "The deck you shared points out that you have completed ███████ ████████████████████ - can you share some of that data with us so we understand what kind of sensitivity / specificity across different types of cancer you've seen?" |
| [2] | R-240 (1955-2020ARB-0000756) | (1) "Does this budget include the expenditures necessary on collecting additional clinical samples?" |
| | | (2) "What are you using for the initial ████ training & validation? Is it the same data you've collected / used for ████?" |
| | | (3) "Based on the ████ test development slide - are you planning for the n=██ ████████████████ to be complete prior to raising the A?" |
| | | (4) "We think it'd be good to go set up the technology review we had discussed previously -- in particular, we'd like to better understand:<br>(i) What sort of markers have you tested I validated<br>(ii) The ████ and ████ -assay CVs<br>(iii) Other standard assay parameters (i.e. performance of spike recovery, performance under serial dilution, volume of blood required, sample prep & lab protocol/ required equipment & reagents, etc)<br>(iv) A review of what you've demonstrated on ████ and the ██████<br>(v) The initial read on sensitivity & specificity and what you expect to get from ████████ vs ████████ and from ██████████<br>(vi) A deeper comparison on approach and diagnostic attributes of Acuamark vs Grail / Freenome / Exact (and others -just picking those 3 for now)<br>(vii) Technical roadmap going forward" |

| Ampaire | | |
|---|---|---|
| [3] | R-241 (1955-2020ARB-0000972) | (1) "Let us know if we're interpreting this correctly, but it appears that the airline can save ▮ annually by switching all of its routes ▮ planes) to electricity. Just doing a quick back-of-the-envelope: the upfront capital cost of going electric would be an initial outlay of ▮ per plane ▮ batteries, ▮ charging stations, electric motor, Ampaire's retrofit charge) and imply ▮ years payback from the annual fuel savings, and upwards of ▮ years if only ▮ of jet fuel was displaced. Similarly, looking at IRR (over 10 yrs) the return is around ▮ This is somewhat ▮ ▮ than what we're used to seeing - has your airline partners expressed any thoughts around whether this is a justifiable economic profile?" |
| | | (2) "We'd love to get more clarify on how the ▮ would operate. We see you've assumed a ▮ ratio per plane -- given planes are flying into different airports, would you end up needing more redundancy? Is there a max number of pods a fueling hanger can accommodate or additional investment to arrange for this? Just curious how you see this infrastructure would actually form around an airline and its routes." |
| [4] | R-242 (1955-2020ARB-0000982) | (1) "Could you help us understand the underlying ▮ ▮ to airlines? What drives the large difference vs. ▮ for a comparable ICE 5-seat plane? We also saw in the Unit Economics spreadsheet that there was a ▮ ▮ so curious what might be contributing to the ▮ range in rates." |
| | | (2) "It was really helpful to get your commentary on the regulatory dynamics and process during our last meet. To that end, would you have any documents that show the timeline and milestone to track the compliance and certification process with FAA and any other relevant regulatory bodies? It'd be helpful to give us a picture of where/how the recent pilots ▮ and the eventual ▮ hours of flight tests will fit in." |
| [5] | R-243 (1955-2020ARB-0000991) | (1) "Thank you for sharing the route breakdown; its enlightening to see how power and fuel is used across take-off, cruise and landing and how hybrid costs stacks against the status quo. We understand that customers who see the greatest fuel benefits are likely on the ▮ -- just to get some bounding, is there a length of flight where the cost delta start to diminish? It seems that the economics for flights ▮ are fairly compelling, how much of the market are in such ▮ using ▮" |
| [6] | R-244 (1955-2020ARB-0001093) | (1) "We discussed this briefly during the visit, but one thing we'd like to have a better sense of is flexibility around extending runway in case the FAA requires more time and/or more testing. Just on the cost side, what are the specific spend categories & amounts that Ampaire would be able to defer and how much additional capital would the team need to keep going for another year?" |
| | | (2) "Re: the ▮ economics, does the ▮ cost in your models include costs that would be undertaken in a typical overhaul (ie refurbishing interiors, adding modern GPS, touching up the outsides, etc)? How do you think about the traditional ▮ market and the extent to which Ampaire may have to play a role there & how that affects your margins? We've seen estimates that typical ▮ are making something like ▮ margins (which if a typical ▮ plane sells at south of ▮ -say ▮ to pick a round number, would mean fairly sizable costs just for doing that ▮ on its own)" |

CONFIDENTIAL

| Avertana | | | |
|---|---|---|---|
| [7] | R-249 (1955-2020ARB-0002506) | (1) | "My concern is that the ███ is only ██ of the overall product make. If the other products don't meet spec, they will have to treat all of that for disposal...So, when they say that ██████ supporting all their revenue, that is true - if they are able to sell the other products cheap and don't have any disposal costs" |
| | | (2) | "For the China plant, did they get feedstock and utilities costs from the host site? From my understanding of China, power costs are typically ███████ natural gas are up to █ their price..." |
| | | (3) | "re: royalty structure -- they think their net sales royalty will be in the ███ range (not ████) – they cited ██████████████████████████ ██████ and others as precedents -- I've asked them to send those examples over" |
| [8] | R-268 (1955-2020ARB-0014992) | (1) | "can you share a bit more detail on what's behind the OPEX and the CAPEX budget -- trying to understand what drives the totals / what can swing" |
| [9] | R-269 (1955-2020ARB-0015000) | (1) | "The math doesn't quite check out for us re: the ████████████ The data you sent over suggests that you have ████████ but by our math with ████████████ it should be ██? Given all the other ████████ you tested for are within spec, what is making up the additional mass?" |
| CNGmotive | | | |
| [10] | R-250 (1955-2020ARB-0002569) | (1) | "Has the R&D on the ████████ begun? What is required from a design/development and regulatory approval aspect to complete this and what does the Company perceive as the most challenging pieces?" |
| | | (2) | "We looked up ████████████ and it looks like they are approaching this in a different way - Could we get more context around this company, how their method compares to what CNG Motive is doing and the progress/validation they've shown to date?" |
| | | (3) | "We saw some infor around earlier conversations with ███ - how has these discussions progressed over time and what's the current status with regards to ███ Given their not-too-recent experiment in ███ what is the corporate's appetite to explore CNG?" |
| | | (4) | "Could we get more context on the rationale behind the revenue ramp in the first 5/6 years? Are these based on customer discussions /  analysis of their appetite to convert?" |
| [11] | R-251 (1955-2020ARB-0002602) | (1) | "I want to mainly understand (1) what this technical advantage is -- how are they getting better ████████████████ that someone else can't copy and (2) what does it take to get to ██████ business with ████████growth (i.e. to hopefully justify a better than ██ revenue -- is that based on some set of comps?)" |

CONFIDENTIAL

| DDM Systems | | |
|---|---|---|
| [12] | R-253 (1955-2020ARB-002988) | (1) "The substantial advantage of ███ in reducing costs from ███ is something we'd love to get a better handle of. Would you be able to share a more detailed cost build that demonstrates where exactly the ███ cost reduction comes from?" |
| | | (2) "The ███ precision of the printed molds is quite impressive. Would you be able to share other data points on how ███ performs across quality metrics vs. conventional?" |

| Woodoo | | |
|---|---|---|
| [13] | R-265 (1955-2020ARB-0014147) | (1) "I saw in your updated investor deck that there are two direct competitors, ███ and ███ called out. We recall that you did an ███ but don't believe anything was mentioned on these ███ Could you give us a bit more detail around these ███ and implications for Woodoo?" |
| | | (2) "On a related note, regarding your plans to ███, how are you thinking about IP protection? Are there certain inputs/processes that you think would be necessary to keep in-house/cloaked?" |

## 4.       Reference Calls Made During Due Diligence

| Portfolio Company [A] | | Reference calls made [B] | Topics discussed [C] | Reference calls with [D] |
|---|---|---|---|---|
| Acuamark Diagnostics | [1] | 1 | Technology | ▮▮▮▮ (Acuamark advisor and past technical reference of Andrew Chung while at Khosla Ventures) |
| Ampaire | [2] | 5 | Technology | ▮▮▮▮ (Pilot and aviation documentation specialist) ▮▮▮▮ (VP of Engineering at▮▮▮) ▮▮▮▮ (Representatives at ▮▮▮▮ and Innovation under the Small Airplane Standards Branch) ▮▮▮▮ (Independent aviation consultant, spent time with many electric aviation companies) ▮▮▮▮ (Director of Sales at ▮▮▮ an aircraft services firm that specializes in custom upgrades/retrofits and the supplemental type certificate (STC)) |
| Avertana | [3] | 8 | Founder, technology, market | ▮▮▮▮ (MIT Chemistry Professor and metallurgical chemistry expert) ▮▮▮▮ (Former ▮▮▮ CEO) GM of ▮▮▮ COO of ▮▮▮ (potential South African feedstock partner) Country head of ▮▮▮ (top paints/pigment producer and user of TiO2) Former CEO of ▮▮▮ (leading consulting/research firm for mineral sands industries) ▮▮▮▮ large Chinese & global TiO2 player) ▮▮▮▮ operator of potential South African project / partner for Avertana) |
| CNGmotive | [4] | 9 | Founder, technology, market | ▮▮▮▮ (Manager of Locomotive Engineering at ▮▮▮▮ in charge of the initiative with CNGmotive) ▮▮▮▮ (Operational Awareness and Response at ▮▮▮▮) ▮▮▮▮ (Manager Government Relation at ▮▮▮▮) President of ▮▮▮▮ supplier of pressure reduction systems and data collection system of CNGmotive tender) ▮▮▮▮ (Co-President of ▮▮▮ supplier and manufacturer of CNGmotive's tender car) ▮▮▮▮ Co-President of ▮▮▮ supplier and manufacturer of CNGmotive's tender car) ▮▮▮▮ (Rail financing banker and investor in CNGmotive) ▮▮▮▮ investor in CNGmotive) ▮▮▮▮ (Investor in CNGmotive and Industry Veteran, retired VP at ▮▮▮ and GM of the ▮▮▮▮ |



| DDM Systems | [5] | 8 | Founder, technology, market | ████ (Founder of ████████, 30 years experience in the investment casting industry, particularly for gas turbine components) ████ (President of ██████ a major supplier of cast parts for various commercial segments) ████████ extensive experience in the investment casting industry, including serving in senior executive roles at prominent foundries) ████ (Senior engineering manager at ████ currently engaging with DDM to trial various printed molds) ████ (GM ████ potential collaborator in investment casting and foundry operations) ████ (Senior Materials Scientist at ██████ overseeing current collaborations with DDM ) ████ (Independent Board Member at ██████ previously the CEO of UK-listed industrial player ████ a major supplier of aerospace parts) ████ (led ██████ investment in DDM Systems) |
|---|---|---|---|---|
| Woodoo | [6] | 5 | Market | ████ (Founder and CEO of ██████ a major European architecture firm) ████ (Global Supply Chain Director at ████ a leading supplier of wood paneling to major automotive companies) ████ (Design Head at ████ ████ (Development Manager at ███ leading a team with sustainable materials and new retail technology focus) ████ (Managing Director of ████ Global Design Department) |

Sources

[1]: R-238 (1955-2020ARB-0000601), p. 5, R-239 (1955-2020ARB-0000725), p. 1.
[2]: R-164 (1955-2020ARB-0000943), pp. 7 - 8, R-177 (1955-2020ARB-0016399), p. 1.
[3]: R-247 (1955-2020ARB-0002258), p. 5.
[4]: R-270 (1955-2020ARB-0019576), p. 7.
[5]: R-252 (1955-2020ARB-0002735), p. 5.
[6]: R-254 (1955-2020ARB-0004626), p. 6, R-182 (1955-2020ARB-0004732), R-184 (1955-2020ARB-0004735), R-255 (1955-2020ARB-0004749).

# Appendix D Inaccurate Characterizations of the VC Industry in the Meadow Report

163.    The Meadow Report mischaracterizes several aspects of the VC industry. A key mischaracterization presented in the Meadow Report is the notion of industry norms or customary practices, being a standard, typical framework that VC firms follow. As I discussed in the body of my report, my research and experience interacting with hundreds of venture capitalists and investors, both in Silicon Valley and across the US, indicate that there is no commonly accepted template or strategy adopted in VC investing; rather, venture capitalists adopt vastly different approaches in managing their funds and pursuing investment opportunities based on their strengths and the circumstances at hand.

164.    The Meadow Report states that "[t]he primary source of income for a venture capital firm is the carry that it receives. The management fee is supposed to be used to pay expenses for running the firms, such as office rent and investment team salaries; it is not intended to be compensation for the management company."[197] This is incorrect. As I explained in section IV.A, the management fee is an essential component of the fund manager compensation. The carry can provide the largest portion of the fund manager compensation if the VC fund turns out to be successful. This is the case for usually only the top quartile[198] of VC funds. Many other VC funds might not have enough success to receive a significant carry, if any at all. For these VC funds, the management fee is the primary source of compensation to the fund manager.

165.    The Meadow Report, through citing other sources, claims that VC funds "specialize because [their] principals hold sector-specific expertise that affords them advantages when selecting or managing ventures," and that "venture capitalists historically have been sector focused [and] tend to concentrate their investments in one or two industries."[199] This is inaccurate. The results

---

[197]   Meadow Report, ¶ 26.

[198]   Andrew Metrick and Ayako Yasuda, 2011, *Venture Capital & the Finance of Innovation 2nd Edition*, John Wiley & Sons, Inc., p. 60. "US Venture Capital Index and Selected Benchmark Statistics," Cambridge Associates, December 31, 2017, p. 13.

[199]   Meadow Report, ¶ 30.

of my survey of hundreds of VC firms indicate that more VC firms invest in three or more industries than in a single industry, and almost 40% of my survey sample of VC firms describe themselves as generalists without an industry focus.[200] There is considerable variation in how venture capitalists approach investing. Some venture capitalists have expertise in a specific industry and invest mostly in their domain of knowledge, whereas some venture capitalists have a diverse range of networks and connections and invest more broadly. VC firms are even less likely to have a specific geographic focus. Only about half of the VC firms in my survey paper specialize in a particular geography.[201]

166.   The Meadow Report also claims that "it is customary for a [VC] fund to be "stage agnostic" thereby investing in companies at different stages of the business lifecycle in specific sectors that they understand. Venture capital funds typically invest only a limited portion of their funds into companies at the seed-stage round."[202] Mr. Meadow estimates, from his experience, that VC funds "tend to invest approximately 40% of funds into seed-stage companies and 60% into companies at the growth-equity round."[203] This, again, is inaccurate. My research and experience indicate that the majority of VC firms (over 60% of my survey sample) do in fact specialize in a particular stage of the business lifecycle. There are some VC funds that take a more generalized approach to stage investing, but these are typically funds with a very large amount of capital under management. Mr. Meadow may be conflating the VC fund stage specialization with the tendency of VC funds to invest in follow-on rounds of their portfolio companies. For example, a VC fund that invests in a seed- or an early-stage round, often reserves $1 for each $1 invested in that round to invest in the follow-on round of that portfolio company.

167.   The Meadow Report inaccurately depicts the economics of VC investing. The Meadow Report claims that GPs will mitigate the risks involved in investing in early-stage businesses by "structur[ing] their portfolios in a manner that diversifies risk and minimizes the fund's 'loss

---

[200]   Paul Gompers, Will Gornall, Steven Kaplan, and Ilya Strebulaev, "How Do Venture Capitalists Make Decisions?" *Journal of Financial Economics*, 135 (2020), p. 174.

[201]   Paul Gompers, Will Gornall, Steven Kaplan, and Ilya Strebulaev, "How Do Venture Capitalists Make Decisions?" *Journal of Financial Economics*, 135 (2020), p. 174.

[202]   Meadow Report, ¶ 36.

[203]   Meadow Report, ¶ 36.

ratio' [which refers to] the percentage of companies in the portfolio that fail."[204] The Meadow Report further claims that "for a given expected return, limited partners prefer to invest in funds with lower loss ratios, as such funds are not as dependent upon the massive success of one company and thus spread risk more evenly across the portfolio."[205] As I explained in section IV.A, in my academic, research and consulting experience, in which I interacted with hundreds of venture capitalists and investors, both in Silicon Valley and across the US, I have never encountered the concept of the "loss ratio" in the context of VC investing as described by the Meadow Report. For example, in a leading graduate textbook on venture capital, "loss ratio" is not mentioned even once.[206] The nature of investing in new businesses is such that most often these businesses ultimately fail. A VC fund's loss ratio is therefore, by default, expected to be high, and it is the VC fund's overall return that matters most. Mr. Meadow may be conflating the concept of loss ratio with the concept of risk, which is fundamental in modern finance theory. It is true that for any given expected return, an investor wants to minimize the risk of the investment,[207] but there is no direct relationship between loss ratio and risk. The correct way to characterise the financial objective of a VC fund is that it maximizes expected return for any given level of risk.

168. The Meadow Report asserts that "it is standard practice for general partners, even those managing 'blind pools,' to inform their investors about portfolio investments, the reasoning behind such investments, how those investments achieve the fund's stated goals, and the overall financial performance of the fund."[208] It is unclear what Mr. Meadow means with regard to the level of information that a GP needs to provide since his statement is generic and broad. However, Mr. Meadow seems to suggest that LPs play an active role in the investment decision making of VC funds. This opinion does not align with my experience interacting with hundreds of venture capitalists and VC investors. As I detailed in section IV.A of my report, LPs receive only limited information regarding the investments made by the GP. The GP of a VC fund is

---

[204]   Meadow Report, ¶ 34.
[205]   Meadow Report, ¶ 35.
[206]   *See* Andrew Metrick and Ayako Yasuda, 2011, *Venture Capital & the Finance of Innovation*, 2nd Edition, John Wiley & Sons, Inc.
[207]   Zvi Bodie, Alex Kane, Alan Marcus, 2014, *Investments*, 10th Edition, Mc Growth Hill Education, p. 10.
[208]   Meadow Report, ¶ 41.

solely responsible for the investment and operating decisions regarding the fund, and therefore, is not expected to have to provide "justification" regarding the "reasoning" of their investments or "how [the] investments achieve the funds' stated goals," as asserted by Mr. Meadow.[209]

169.   Specifically with respect to capital calls, Mr. Meadow claims that in his experience "the general partner typically describes to the limited partner specifically why the capital call is needed and what it will be used for."[210] While this statement is unclear as to what level of detail Mr. Meadow considers is appropriate for a capital call, I explained in section IV.A that most capital calls simply take the form of a short letter from a GP to the LPs. Since LPs neither participate in the day-to-day life of the VC fund nor decide on specific investments and the VC industry and its players are particularly concerned about confidentiality, it is neither customary nor mandatory for a GP to provide information to its LPs regarding specific investments.

170.   With regard to the due diligence and investment selection process, the Meadow Report again fails to capture the significant variation that exists across VC firms, and as a result, presents several inaccurate portrayals of what he claims to be industry norms or customary practices.

171.   The Meadow Report lists an array of information that Mr. Meadow considers as "customary" for a GP to include in an investment memo.[211] However, the format of an investment memo varies considerably across VC funds and Mr. Meadow's opinions seem to be limited to the VC funds that he has been associated with. For example, Mr. Meadow states that detailed company projections and projected returns are typical components of an investment memo.[212] My survey paper, and my experience interacting with hundreds of venture capitalists, indicates that many

---

[209]   Meadow Report, ¶¶ 41, 53.

[210]   Meadow Report, ¶ 42.

[211]   Meadow Report, ¶ 52. ("Customarily, a general partner's due diligence for a prospective investment is summarized in a detailed memo that memorializes the basis for the investment. A typical investment memo includes, among other things, an explanation of the rationale for the investment, how the venture capital firm can add value, projected returns on the investment, detailed company projections, a rationale for how the investment fits with the fund's investment objectives, and the risks associated with the investment. Critically, investment memos must include original insights and analyses such as written summations of independent or third-party reference checks that verify or disprove the assertions of the entrepreneur.")

[212]   Meadow Report, ¶ 52.

CONFIDENTIAL

VC firms do not perform any forecast of future cash flows nor use financial metrics, especially for early-stage firms.

172. The Meadow Report claims that "[in] a typical venture capital investment process, a general partner learns about a potential investment opportunity, performs intensive due diligence over a period of months, determines the price at which it will purchase a portion of the portfolio company's equity, and, if it is going to be the 'lead' investor, helps gather a syndicate of other reputable investors to invest alongside the venture capital firm."[213] This generalized statement again fails to consider the wide variation that exists across VC funds investment opportunities. The length and steps required in a due diligence process vary, depending on a variety of factors. Further, while VC firms predominantly use convertible preferred stock to invest in their portfolio companies, convertible notes are also used as an alternative form of investment. When convertible notes are used, often a valuation of the start-up company is not needed— the noteholders can delay the valuation process to be undertaken by investors in later rounds.

---

[213]   Meadow Report, ¶ 60.