# EXHIBIT F

**American Arbitration Association**

**International Centre for Dispute Resolution**

---

Global Industrial Investment Limited
(Claimant)

v.

1955 Capital Fund I GP LLC
1955 Capital China Fund GP LLC
(Respondents)

v.

China Fortune Land Development
(Counterclaim-Respondent)

Case # 01-19-0003-4556

Date Submitted: 16 April 2021

---

### SECOND FACT WITNESS STATEMENT OF ANDREW CHUNG

**Arif Hyder Ali**
DECHERT LLP
1900 K Street, NW
Washington, D.C. 20006-1110
arif.ali@dechert.com

**Sole Arbitrator**


Andrew Chung

**1955 CAPITAL**
650B Fremont Ave., #155
Los Gatos, CA 94024

CONFIDENTIAL

1.      My name is Andrew Chung.  I previously submitted a witness statement in this

arbitration in connection with Respondents' Statement of Counterclaim.  I submit this second

witness statement to further address selected points in Claimants' Statement of Claim, the

witness statement of Patrick Wong, and the expert report of Scott Meadow, which I did not have

at the time my first witness statement was submitted.  I addressed a good deal of what Claimants

say in my first witness statement, and I will not repeat it in my testimony below, but I will cross-

reference that document when appropriate.  I solemnly affirm that the following testimony is true

and correct to the best of my knowledge and belief, based on my personal knowledge,

observations, and experience.

**<u>Comments on Mr. Meadow's Report</u>**

2.      Because Mr. Meadow's expert report focuses on venture capital practices, the

operation of the Funds, and events I experienced personally in real time, I was especially

interested in its contents.  I read the report carefully and measured it against my personal

knowledge of the underlying facts and more than 15 years of experience as a venture capitalist at

two leading VC firms in Silicon Valley.

3.      One thing that was immediately apparent is that Mr. Meadow does not appear to

have significant experience (if any) regarding VC practices in Silicon Valley, which is in many

respects a unique ecosystem.  His experience seems to have been derived largely from private

equity work and with PE or VC firms that are significantly larger than 1955 Capital, operate

outside Silicon Valley, or both.  In any event, many of his comments indicate a lack of

understanding of VC practices in Silicon Valley and have little or no application to custom and

practice in Silicon Valley or the environment in which 1955 Capital operates.

4.      I was also struck by Mr. Meadow's complete failure to acknowledge or account

for a great many facts that were critical to the events described in the report and the actions we

took in operating the Funds.  Many of the criticisms contained in the report are seriously uninformed and entirely disconnected from what actually happened.  Most importantly, the report does not even **mention** any of the many actions CFLD took prior to the January 21, 2020 capital calls to undermine the Funds and cut off our ability to make investments, including by conducting a relentless public relations, social media, and letter-writing campaign that attacked my reputation, claimed that the GPs were operating a scheme to steal CFLD's money, asserted that the Funds were not authorized to make the investments, targeted and harassed known portfolio companies, and sowed fear that companies would be drawn into litigation if they accepted investments from the Funds.  As I described in paragraphs 83, 87-89, and 141-85, of my first witness statement, those actions (and others) were totally unjustified and had profound effects on the Funds and the investments we were able to make despite CFLD's efforts.

     **<u>Industry Specialization</u>**

     5.     I know from my own experiences and associations with many other VC practitioners and funds that, to be successful, a VC fund does not need to specialize in a specific industry or industries or be staffed by industry/sector specialists.  Mr. Meadow's suggestions to that effect are incorrect, particularly with respect to Silicon Valley.  Many extremely successful VC firms in Silicon Valley (and elsewhere), including Khosla, Lightspeed, and Sequoia Capital, do not specialize in particular industries or have a specific sector focuses.  In terms of my own personal experiences, as I explained in paragraphs 12-15 of my first witness statement, I have succeeded in the VC industry by investing in a wide variety of industries and geographies for many years, including cleantech, education, genomics, and food tech while at Khosla and Lightspeed and at 1955 Capital.  I have been directly involved in the investment and management of multiple "unicorn" companies (those with over $1 billion in market value) and startups that have achieved successful exits across these diversified sectors.  The partners I

CONFIDENTIAL

worked with at Khosla and Lightspeed also employed similarly diversified strategies with great success.

6.      More recently, 1955 Capital's diversified strategy has produced early successes in two of the Funds' investments in entirely different industries: one in food tech and the other in clean energy.  As discussed in paragraph 140 of my prior witness statement, Sustainable Bioproducts (now known as Nature's Fynd but referred to here as "SBP"), an alternative proteins company, achieved a large increase in valuation between its Series A financing (at a ███████ pre-money valuation), in which 1955 Capital was the lead investor, and its Series B financing (at a ███████ pre-money valuation).  And SBP has recently begun negotiating another funding round and this week received a term sheet that would value the company at a ██████ pre-money valuation.  If that comes to fruition, the shares the Funds purchased for ██████ in 2018 would be worth approximately ████ times that amount, creating approximately ████████ in value to the Funds in three years.  (The increase would have been greater if 1955 Capital had been able to fully utilize its pro rata rights, but as explained in paragraphs 148-60 of my prior witness statement, CFLD's actions made that impossible.)

7.      Another of the Funds' portfolio companies in a completely different industry sector, Ampaire, which has developed a hybrid-electric propulsion system for aircraft, is on track to be the Funds' first exit.  Ampaire is in the process of merging with a regional airline mobility platform, and the combined company has plans to go public later this year.  If this happens, the Funds' shares in Ampaire could be sold for ██████ times their initial cost in a very short time frame.  (In that instance, the amount of gain for the Funds would have been as high as ████ ██████ had CFLD completed its January 2020 capital calls).

8.      In sum, contrary to Mr. Meadow's suggestion, a diversified investment strategy is common in Silicon Valley venture capital and has been highly lucrative for me and others at

CONFIDENTIAL

Lightspeed, Khosla Ventures, and at 1955 Capital. In fact, the increase in value that can be created for the Funds from SBP and Ampaire alone could exceed $33 million, and that amount would have been as much as $62 million if CFLD had met its capital calls and 1955 Capital could have invested the full amounts it had intended to invest.

**Geographic Focus**

9.      Mr. Meadow's suggestion that to be successful a VC firm needs to have geographic focus or specialization is also incorrect, which I know from personal experience and interactions with other VC firms. Many extremely successful VC firms, particularly in Silicon Valley, including Khosla, do not specialize in specific geographies. While at Khosla and Lightspeed, I invested in companies in a wide range of geographies, including Bioconsortia and Lanzatech (both out of New Zealand), and many in various parts of the United States. It would make little sense to artificially restrict a venture capital firm to a particular geography, which could cause it to lose out on highly promising investments. Geographic diversification can also help moderate risks that might impact one geography but not another. The recent success of the Funds' investments in SBP (headquartered in Chicago, Illinois) and Ampaire (headquartered in Los Angeles, California) described above and in my prior witness statement further illustrate the fact that geographic specialization is not necessary to success and may be counterproductive.

**Stage Focus**

10.     Mr. Meadow's statements that successful VC funds need to be "stage agnostic" or make a majority of investments at later stages rather than seed investments, is also incorrect and particularly off base with respect to Silicon Valley. I know that based on my personal experience and interactions with numerous VCs over many years. Numerous extremely successful VC firms, including Khosla and Lightspeed, focus on seed- or early-stage investments and do not make a majority of investments at later stages. At Khosla we often invested in seed-

and early-stage companies and achieved great success; when I was general partner, we invested out of a $400 million seed-stage fund in concert with a $1 billion main fund to execute on this strategy.  Indeed, one of the companies that I was involved with since its launch, first at Lightspeed and later at Khosla Ventures, was a battery technology company called Quantumscape.  Lightspeed and Khosla both invested in the Series A of the company more than a decade ago at approximately a ███████ valuation, helped incubate the company out of Stanford's labs, and the company went public in 2020 as one of the most successful clean technology companies ever at a market capitalization of $17 billion, a valuation more than ██ times that of the original investment.

11.     At 1955 Capital, we generally focus on early-stage companies that have progressed beyond the laboratory and have a working product, and the major challenges are how to get the product to market and scale up production – which are areas where 1955 Capital has significant experience and connections.  We try to identify the most promising investments, rather than dispersing them according to stage, and have invested in companies at various stages of product development and funding.  This strategy has worked for us so far in identifying quality investments like SBP, Ampaire, and others.

**1955 Capital's Staffing**

12.     In my personal experience and interactions throughout the VC industry I have observed many successful firms that are operated by small teams of capable individuals who do not specialize in particular industry sectors or technologies.  Mr. Meadow's statements to the effect that VC firms need "staffs" and specialists in specific technologies and industries may apply to private equity firms, or certain large VC operations, but they are clearly incorrect with respect to a great many distinguished VC firms, particularly in Silicon Valley.  Based on my experience and interactions with innumerable VC firms during the past 15 years, there is no

6

question that having an agile team of capable and highly motivated individuals who work well together, as opposed to bureaucratic structures populated by specialists, is the approach that has succeeded over and over in Silicon Valley and the VC industry more broadly.

13.     Mr. Meadow's criticisms of the 1955 Capital as "understaffed," and of team members as relatively inexperienced generalists, appear to be based on his erroneous view of how successful VC firms of modest size operate.  Close-knit teams with strong venture capital skills, well-developed VC networks, and ready access to entrepreneurs, technologists, and industry experts are well-positioned to succeed.  Silicon Valley again provides many examples. At Khosla Ventures, I was one of six general partners (including Vinod Khosla, the founder of the firm) who managed several hundred portfolio companies, with $5 billion under management. I was personally responsible for $500 million of those assets, served on ten boards, and managed five to seven other investments at any given time with no "staff."  To date, the Funds have invested in ten companies,[1] and I serve on only three boards, with a highly qualified team that works together to support our portfolio companies.  Our portfolio companies benefit from each of our teammates contributing different capabilities to help support them – from market entry strategy, to capital raising support, to recruiting, to operational scale-up.  I do not believe we are "understaffed" by any means.

14.     In addition to reflecting a misguided view of how VC firms such as 1955 Capital operate, Mr. Meadow's report seems to either (a) ignore the facts regarding the individuals who comprise the 1955 Capital team or (b) to not appreciate them due to a preconceived and incorrect notion regarding the necessary qualifications.  In any event, the criticisms are not well-founded. As I explained in paragraphs 66-75 of my prior witness statement, Ben Tseng, Kathy Chen, and

---

[1] Fund I made a $1.5 million investment in a new portfolio company at the end of March 2021.

Ryan Gilliam are each highly capable VC professionals, and Jim Hinson is an experienced CFO who has worked with hundreds of VC firms over a period of two decades. Without repeating the facts set forth in my prior witness statement, or the statements that have been submitted by other team members, it is readily apparent that they have qualifications and skill sets that, in conjunction with my own experience and skills, are extremely well-suited to accomplishing the Funds' investment objectives. Ryan holds a Ph.D. in Materials Science and Engineering and is an expert in catalysis and electrochemistry. He has authored 10 peer-reviewed papers on the subjects and holds more than 60 patents as an inventor in energy, sustainability, products and materials spaces. He is also an accomplished entrepreneur who has raised more than $100 million from VCs, global strategic investors, and Fortune 500 companies, and developed strategic partnerships across five continents. His experience, expertise, and skills are directly relevant to, and valuable in accomplishing, 1955 Capital's investment mission. Ben is a Phi Beta Kappa graduate of Harvard, with a degree in biochemical sciences. His prior experience in energy, healthcare, food, agriculture, and new manufacturing models, and his at work at a leading early-stage VC firm, a successful venture-backed start-up and Bain & Company, have also been invaluable to 1955 Capital and its investment mission. Kathy has an MBA from the Wharton School and prior experience in industrial, consumer, and healthcare sectors. She worked for three years at a cross-border private equity firm and as an investment banker. Her expertise, venture capital judgment, and due diligence skills are well-suited to 1955 Capital's mission, and she has consistently excelled in helping us accomplish it. Beyond this core team, 1955 Capital also benefits from access to prominent advisors and industry experts with deep operating experience who advise the firm on strategy and assist with due diligence, among other things. I have worked with many talented VC and operating professionals during my career, and the 1955 Capital team is among the best that I have encountered.

**Identifying and Sourcing Investments**

15.     Mr. Meadow's comments and criticisms regarding the process we employed to identify and source investments are ill-informed.  Contrary to the impression conveyed in his report, we identified and considered numerous companies, over a period of years, before choosing to make the November 2019 investments and the January 21, 2020 capital calls. We utilized our collective networks and experiences to develop investment theses regarding the ideal attributes of companies in each of the industries that might be target areas within the Funds' investment focus, including the factors that would enable such companies to effectively compete and succeed.  For example, based on my prior experiences and learnings at Khosla Ventures, where we were the seed investors in a number of successful food-tech companies like Impossible Foods (which has raised over $1.5 billion in funding) and Eat Just (which has raised nearly $600million in funding), 1955 Capital had a good understanding of many of the characteristics of early-stage start-ups that could potentially lead to success in the food technology space.  These included companies that had (a) production processes that were highly scalable, (i.e., had the ability to be efficiently produced at large quantities), (b) products that were versatile (i.e., the ability to be used in different lines of products), and (c) an ability and willingness to partner with current food manufacturers.  Application and analyses of those factors enabled us to identify SBP for investment, and SBP's subsequent successes are due in large measure to those three attributes.  We employed similar analytical approaches in identifying and deciding to invest in the other companies, including Ampaire, which as noted above is likely to provide the Funds' first exit.

**Due Diligence Process**

16.     Mr. Meadow's comments regarding 1955 Capital's due diligence process and investment memos indicate a lack of knowledge regarding the work that was performed, and a

CONFIDENTIAL

misunderstanding of the function of the investment memos in 1955 Capital's decision-making process.  As I noted at paragraph 81 of my prior witness statement, Ben, Ryan, Kathy, and I conducted extensive due diligence on each of the companies the Funds invested in (and many not invested in).  Although I had ultimate decision-making authority regarding the investments, we made investment decisions collaboratively, based on team discussions.

17.     The team spent months (typically four-to-six) conducting due diligence on each of the Funds' portfolio companies, including all of the companies included in the January 21, 2020 capital calls.  We had long-standing relationships with many of the companies and had gathered substantial information and input through contacts in the VC community.

18.     For example, I had previously led detailed due diligence on Avertana for its Series-A round while still at Khosla – I also knew most of its management team from their days at Lanzatech (for whom I served as a director) – in which we studied the technical feasibility of the company's technology, economics, its applicability to the Chinese market and other markets more generally, and team references.  The 1955 Capital team conducted our initial due diligence of Avertana in mid-2016, when we took a deep dive into its pilot strategy and financial economics, but Avertana decided in the third quarter of 2016 to hold off on further fundraising. We re-engaged with Avertana in 2017, completing a detailed technology review and preparing an investment memorandum, which is included in the appendix of exhibits at R-186 (1955-2020ARB-0000045).  We ultimately decided not to invest at that time in part due to the continued uncertainty surrounding the dispute with CFLD, including CFLD's challenges to the validity of the investment agreements and refusal to meet its escrow obligations.

19.     The opportunity to invest in Avertana arose again in 2019.  Because of 1955 Capital's contacts in China—something that was very attractive to Avertana—we had the opportunity to participate in a bridge financing in late 2019.  Given all the work we had already

10

done, we were able to quickly complete an update to our due diligence, focusing on updated economic and technical data—a summary of which is included in our November 2019 investment memorandum, included in the appendix of exhibits at R-247, and examples of that work is shown in a lengthy email chain between the 1955 Capital team and the Avertana team from the late October to early November 2019 time frame, included in the appendix of exhibits at R-323.  We were able to complete an investment in Avertana on November 26, 2019 and thereafter included it in the January 21, 2020 capital calls.

20.     Our diligence for each of the companies included in the January 2020 capital calls was detailed and thorough.  Our initial diligence for each of the November 26, 2019 investments had commenced at least six months prior to completing them and typically lasted four to six months.  The level of diligence we conducted for these investments was more detailed and thorough than I often experienced for other partners' deals at Khosla and Lightspeed, especially considering the size of the investments.  And we definitely did not, as Mr. Meadow insinuates, simply take the information the companies gave us at face value.  We asked detailed follow-up questions, conducted our own modeling, and consulted advisors, outside experts, and references to verify the information we were provided and to obtain additional information and insights.

21.     For example, with regard to Ampaire, a hybrid aviation company, we consulted Broc Tenhouten, an expert in electric powertrains, as an independent third party to provide technical feedback, particularly around system architecture and technical readiness and remaining risks.  A copy of the email chain Ben exchanged with Mr. ███████ which illustrates some of the matters they discussed, including expected costs and margins, technical issues, potential vendors, and other issues, is included in the appendix of exhibits at R-199.  In addition, we consulted contacts at the Federal Aviation Administration, an aircraft services firm, and an independent aviation consultant.

CONFIDENTIAL

22.     Our due diligence process is reflected in the investment memoranda we prepared for each company, but the investment memoranda were not intended to record or document the entire scope of our due diligence, or all of the underlying details, which was not necessary given the role of the memoranda in our decision-making process, which involved extensive internal meetings and discussions about each of the proposed investments.  Copies of our investment memoranda for each of the November 26, 2019 investments included in the January 2020 capital calls are available as Exhibits C-55, C-59, C-65, C-73, C-75, and C-150.

23.     The comments in the Meadow Report indicating a need for extensive detail and documentation in investment memoranda reflect a lack of understanding regarding VC practices in small Silicon Valley VC firms (and some larger ones as well), and the process that we used to make investment decisions.  Investment sourcing and diligence in Silicon Valley often focus on the relationships and personal interactions in the VC community and universities.  Investment decisions are often made through face-to-face discussions among individuals who either performed or had some involvement in the sourcing and due diligence, rather than on investment memos or details and documentation included in documents.  Mr. Meadow's expectations regarding the content and role of investment memoranda appear to be based on his experience with larger private equity or VC firms outside the Silicon Valley ecosystem, in which investment decisions are made in a more bureaucratic fashion, perhaps by individuals who are not intimately familiar with the due diligence and rely largely on written documentation to obtain relevant information.

24.     Investment memoranda did not play a major role in the decisions we made regarding the investments included in the January 21, 2020 capital calls.  I was the ultimate decision-maker, but in all cases, we reached a consensus based on detailed discussions, often over many weeks or months, and consensus among Ben, Kathy, Ryan, and me.  The details of

CONFIDENTIAL

the due diligence and rationale for making the investment were well-known to the participants in the discussions because they were the ones who did the sourcing, performed the due diligence, and formulated the investment rationale.  In contrast to some of the practices that Mr. Meadow has encountered under what appear to be very different circumstances, there was no need to include copious detail and documentation in investment memoranda to provide decision-makers with information that would not otherwise be available.

25.     Despite their subsidiary role in our internal processes, we took the preparation of investment memoranda seriously, and used them where they were helpful.  The memos typically included, among other things, summaries of the reasons for investing, detailed descriptions of the relevant technology, market, and potential challenges, descriptions of the management team, the relevance of the investment to 1955's mission and potential applicability to China, and summaries of the due diligence process (often including summaries of feedback from references and independent experts) – were more than sufficient to serve their intended purpose for our team.

**Impacts of CFLD's Conduct on the Funds**

26.     The most striking shortcoming that I saw in Mr. Meadow's report was the absence of any reference to the events and facts regarding CFLD's actions, which were centrally important in the situations he attempts to address, and critical to many of the challenges we faced and the decisions that we made.  The report also omits many key facts regarding actions that we took, and inaccurately describes what we did and did not do.  It appears that Mr. Meadow was either ignorant of critical facts, or that he chose to ignore them.

27.     The conduct by CFLD that is nowhere mentioned in the report is summarized in paragraphs 58, 62, and 92-119 of my prior witness statement.  Without attempting to repeat that information here, Mr. Meadow says nothing whatsoever about the fact that in the months

13

following the end of the prior arbitration, CFLD waged an "all-out war" against me and 1955

Capital in an effort to cut off the Funds' ability to invest and force me to cave in to their demands

to dissolve the Funds, which was launched despite the arbitration ruling rejecting its attempt to

dissolve the Funds and confirming our right to operate them.  These efforts included refusing to

pay the $9.3million cost award (which could have been fed back into the Funds for investment

purposes), continuing to refuse to meet their escrow obligations, filing numerous baseless

lawsuits to drain the Funds of time and financial resources, and a direct-outreach and PR

campaign of false statements and accusations that attacked our reputation and attempted to scare

companies away from accepting investment from the Funds.

   28.  CFLD's actions made it exponentially more challenging to run the Funds in

numerous ways.  First, the lack of clarity regarding whether CFLD could be counted on to

provide any additional capital beyond the amounts held in escrow – even though it was

contractually obligated to do so – made it extremely difficult to plan an investment strategy.  We

had identified highly promising investment opportunities that we strongly believed would benefit

the Funds to pursue.  We hoped at the time that CFLD would honor its capital commitment but

could not count on that. Without being sure that CFLD would act in accordance with its

obligations we could not make substantial investments in these companies with the security of

knowing that we had the capital available to make them and would have additional capital

available for follow-on investments in the future.  If, however, we lined up these investments,

acting as a lead investor as we would have liked, but were unable to follow through because

CFLD refused to meet its capital obligations, the results would be disastrous both for the Funds

and the companies involved.  1955 Capital's reputation would be severely harmed as an

untrustworthy partner.  The companies' financing both then and in the future would be harmed

because the financing round would likely crumble, and future potential investors would be highly

CONFIDENTIAL

concerned about the reasons why a lead investor had pulled out at the last minute, or in the case of follow-on rounds, chose not to participate.

29.     This problem was made even more difficult due to the impending expiration of the China Fund's commitment period.  As I explained in my prior witness statement, the Funds had been severely constrained during the period between CFLD's October 2016 repudiation of the Investment Agreements and the end of the prior arbitration in mid-2019.  This left little time to negotiate equity investment structures and find syndicate partners.

30.     Second, CFLD's multiple baseless lawsuits and other actions required us to reserve significant amounts for litigation defense.  This decreased the amounts available for investments of both the initial and follow-on variety, further compounding the problems outlined above.  We addressed these challenges in the best manner we could through the use of relatively conservative investments, mostly made through convertible notes, as I explained in my prior witness statement.

31.     Third, CFLD's public attacks and letters that CFLD sent directly to companies we wanted to invest in obviously raised significant concerns among the Funds' portfolio companies and potential portfolio companies.  As I described in my prior witness statement, my team and I had to spend significant time and effort attempting to quell these concerns, which resulted in the Funds losing the ability to invest in Vicarious and SBP's ███████ round, put in jeopardy our investments in Woodoo and Avertana, and required us to reserve funds for follow-on investments to provide assurance to companies concerned that such funds would not be available due to the dispute with CFLD.

32.     Fourth, dealing with the impacts of CFLD's actions was incredibly stressful and time consuming.  Attention paid to responding to CFLD's baseless lawsuits, trying to protect 1955 Capital's reputation, and assuaging the concerns of my team, including convincing Ben and

CONFIDENTIAL

Ryan to stick with 1955 Capital after they tendered their resignations as a result of CFLD's campaign, could have been better spent lining up more investments, and providing support to existing portfolio companies.

33.     Fifth, despite advising that it had seriously considered funding investments by providing the capital we called on January 21, 2020, CFLD ultimately declined to provide any additional capital in violation of its capital commitments, which greatly limited the size of the investments we had negotiated.

34.     Nevertheless, the Funds have been able to complete and fund $22.6 million[2] in investments in ten promising companies, which we continue to support.  I am incredibly proud of what my team and I were able to accomplish under these monumentally challenging circumstances, which are simply ignored in Mr. Meadow's report.  However, CFLD's decision not to honor the January 2020 capital calls, and other actions, including forcing us to take reserves of capital that would otherwise have been invested, will greatly reduce the returns that the Funds and GPs will realize on those investments.

35.     The investment approach and execution that Mr. Meadow criticizes in his report, which included investments in geographically dispersed companies in multiple industries, have been very successful to this point, and would have been even more successful if CFLD had met its capital commitments and refrained from attempting to undermine our investment efforts.  Had CFLD complied with its contractual obligations, the Funds would have been able to participate in SBP's Series B round and could have taken advantage of all the rights 1955 Capital had

---

[2] Since my prior witness statement, Fund I made a $2 million follow-on investment in Gridtential in November 2020 and a $1.5 million investment in a new portfolio company at the end of last month.

CONFIDENTIAL

secured during the Series A round, including pro rata and mop-up rights, increasing their stake in a highly successful company that is on track for a ███████ valuation later this year.

36.     The Funds would have also invested significantly more in Ampaire and enjoyed a much larger investment return upon exit, which is anticipated later this year.  As of October 2019, the team's recommendation, as reflected in our draft investment memo (included in the appendix of exhibits as R-164), was to invest up to ███████ as part of a █████████████ with a right to invest an additional █████████ at a █████ markup to get a final ownership level of ████  By the time of the January 2020 capital calls, we had planned to invest an additional ████ █████████ in the first half of 2020 on top of our █████████ November 26, 2019 investment if CFLD met the January 2020 capital calls.  Had we been able to follow through on our plans, the █████████ the Funds expect to make when Ampaire's acquirer goes public later this year could have been anywhere from █████████ (assuming █████████ invested in early 2020) to █████ (assuming █████████ invested in November 2019 and █████████ invested at a 50% premium to the November 2019 share price) (and perhaps even more, since the additional investment from the Funds could have put Ampaire in a ███████████████████████ █████████.

37.     Together, these two companies are likely to create significant value for the Funds and could have created even more if CFLD had honored the January 2020 capital calls and the Funds' had been able to invest in early 2020 as planned and as demonstrated in the chart below:

| Company | Initial Investment | Likely increase in value of investment:[3] | Additional amount the Funds intended to invest in first half of 2020 if CFLD met January 2020 Capital Calls | Likely total increase in value of investments if Funds had invested as planned:[3] |
|---|---|---|---|---|
| SBP | $5 million | $ 28 million | $6.1-8 million | $37-40 million |
| Ampaire | $1 million | $5-6 million | $4-5.7 million | $17-22 million |
| **Total** | $6 million | $33-34 million | $10.1-13.7 million | $54-62 million |

38.     The false accusations and threats that CFLD made prior to the last arbitration, made it impossible for us to make major investments or take on additional LPs.   If not for that bad-faith conduct and defaults, and the uncertainty they created, we also likely would have been able to convert earlier missed opportunities into investments, including in companies such as Evolve and Aerofarms, whose recent valuations represent a significant markup over the price at which we could have invested.  For example, Evolve recently announced a $55 million Series D, with a reported pre-money valuation of $210 million – a significantly greater valuation than the ▮▮▮▮▮ pre-money valuation it had at the time the Funds' had the opportunity to invest in it. Aerofarms recently announced it will go public at an estimated valuation of $1.2 billion – a large increase from the ▮▮▮▮▮ valuation it had when the Funds had an opportunity to invest in it. These represent significant missed opportunities for the Funds.

39.     The Meadow Report also ignores the impact of CFLD's conduct on the Funds' ability to assist CFLD in identifying potentially suitable companies for its industrial parks.  As Arbitrator Ghikas found in the prior arbitration, prior to CFLD's default and bad-faith

---

[3]Assumes SBP's next investment round is completed with ▮▮▮▮▮ valuation and the Ampaire transactions are completed as expected.

accusations, my team and I had identified and introduced to CFLD several companies with potential to locate in CFLD's industrial parks (and Aerofarms was one of them). But those prospects were lost when CFLD repudiated the Investment Agreements. And CFLD's actions both before and after the end of the prior arbitration obviously erected major obstacles to any effort to encourage portfolio companies to do business with CFLD.

### Information Provided in Connection with the January 2020 Capital Calls

40.     Mr. Meadow's criticisms regarding the information provided to CFLD/GIIL in connection with the capital calls are directly contrary to my experience in Silicon Valley, and my understanding of practices in the VC industry generally. Capital calls typically take the form of concise notices regarding the funds needed and logistics for wiring the money and are accompanied by neither detailed information regarding the underlying investments nor the rationale for making them. At Khosla, capital call notices typically included the amount called, the due date, and a very general description of the purpose of the call—e.g., to pay fees or make investments—with no details beyond that. Limited partners typically do not have input regarding investments or investment decisions, and the Investment Agreements vest the GPs with sole authority for all investment decisions. In addition, detailed business and financial information regarding portfolio companies and potential portfolio companies is generally not shared with limited partners due to confidentiality concerns. As I explained at paragraphs 21-23 of my prior witness statement, disclosure of the confidential and proprietary information venture capitalists obtain regarding portfolio companies and potential portfolio companies can seriously harm those companies, and they expect venture capitalists to strictly maintain the confidentiality of that information. Much of the information CFLD sought, including in Mr. Wong's January 31, 2020 letter, was highly confidential and/or proprietary and could not have been disclosed to a limited partner under any circumstances.

CONFIDENTIAL

41.     The Meadow Report also ignores the nature and extent of the information that was provided in connection with the January 2020 capital calls.  Among other things, it does not mention the nearly five-hour meeting that I held with CFLD/GIIL's appointed representative, Patrick Wong, on February 13, 2020 to provide additional information regarding the investments included in the call, or the detailed information that my team prepared and I provided at the meeting.  As I explained in significant detail in paragraphs 128-37 of my first witness statement, that information was extensive.  It included, among other things, a lengthy slide presentation covering each of the investments, a detailed portfolio review, China market entry strategy presentation for multiple companies, industry overview presentations for the food and health sectors, the investment memoranda (with confidential information redacted) for each of the companies listed in the January 2020 capital calls, and a full hour or longer discussion regarding the SBP Series B opportunity alone.

42.     Mr. Meadow's report also suggests that he was unaware of, or ignored, the significantly enhanced risks to portfolio companies and the Funds if we provided still more information to CFLD in light of the prior conduct – conduct, which, again, is nowhere mentioned in Mr. Meadow's report.  Based on CFLD's actions in the period preceding the capital calls, those risks were concrete and substantial, and we could not afford to take actions that would further harm portfolio companies or injure the Funds in the process.  As I explained in detail in paragraphs 101-19 of my prior witness statement, from November 2019 to January 2020, CFLD engaged in a direct outreach and public relations campaign designed to interfere with the Funds' relationship with their portfolio companies and potential portfolio companies, that included, among other things, baseless allegations that the Funds were violating a nonexistent investment mandate and harassment of portfolio companies that included tagging them and their business partners on social media and making barely veiled litigation threats against them.  Given this

20
CONFIDENTIAL

conduct, there was a great risk that any confidential information shared with CFLD would be misused, including by targeting the Funds' portfolio companies. I obviously could not allow that to happen.

43.      The report further fails to mention that we repeatedly offered (including in letters dated January 24, February 5, February 11, and February 12, 2020) to provide additional information (beyond the extensive details we furnished) if CFLD would commit not to misuse it, which CFLD declined to do. CFLD's campaign had already raised great concern among several of the Funds' portfolio companies and potential portfolio companies, as I detailed in my prior witness statement at paragraphs 142-71. I simply could not risk providing CFLD with any more fodder to attack the Funds or their portfolio companies under these circumstances. Mr. Meadow's failure to consider these important facts renders his opinions simply inapplicable here.

**Book and Records Inspections**

44.      The comments in Mr. Meadow's report regarding the information provided in connection with the books and records inspections similarly fail to acknowledge or address important facts that made it unreasonable – and dangerous to the Funds and their portfolio companies – to provide certain information, and the reasons certain limited information (principally the names of portfolio companies), was not provided. As I explained in paragraph 59 of my prior witness statement, CFLD has requested "books and records inspections" of information far exceeding that typically provided to a limited partner. Nonetheless, the GPs have facilitated three books and records inspections since the end of the prior arbitration and have provided all categories of information requested except for three: (1) audited financial statements from 2018 forward, which as I explained in my prior witness statement have been delayed as a result of CFLD's conduct, (2) information regarding the Funds' portfolio companies, which is not typically provided to limited partners due to confidentiality concerns (which were greatly

21
CONFIDENTIAL

amplified by CFLD's conduct), and (3) information related to 1955 Capital's management company expenses, which are not in fact books and records of the partnerships and are therefore not subject to the inspection provisions of the LPAs. The scope of information provided in the inspections, as was explained to CFLD by my experienced Fund counsel at the time, was in accordance with industry practice, in compliance with the applicable provisions of the LPAs and appropriate under the circumstances

**Advisory Committee Meetings**

45.        Mr. Meadow's comments regarding advisory committee meetings again fail to mention critical facts regarding CFLD's conduct that are essential to understanding what happened. During the Funds' first year, I regularly met with CFLD to provide updates on the status of the Funds, discuss their investment pipeline, and efforts to introduce companies to CFLD for potential inclusion in its industrial parks. These meetings served all of the purposes of advisory committee meetings as defined in the Investment Agreements, and CFLD did not make a request for formal meetings of the advisory committees during that period. Those periodic meetings came to a halt after the October 2016 "ambush" meeting in which CFLD repudiated its obligations under the Investment Agreements, falsely accused me of fraud, and demanded that I dissolve the Funds. It was obviously impractical and unreasonable to hold such meetings after that. CFLD did not request advisory committee meetings during the pendency of the prior arbitration. It only began making such requests after the Final Award issued, and after it became crystal clear that CFLD did not intend to participate in such meetings in good faith. The requests were made amid CFLD's multipronged and bad-faith attempts to force a shutdown of the Funds, which I described in detail in paragraphs 56-59 and 92-119 of my first witness statement. There was no possibility that a meeting with CFLD would be productive in any way, and discussion of the kinds of things that might otherwise be included in an advisory committee meeting could

CONFIDENTIAL

easily be used by CFLD to inflict further damage on the Funds and the portfolio companies. Nevertheless, as Fund counsel made clear to CFLD/GIIL's counsel in a November 25, 2019 email, (included in the appendix of exhibits as R-198) the GPs were (and remain) willing to hold such a meeting if CFLD demonstrated that it intended to proceed in good faith. Indeed, as discussed in my prior witness statement, I agreed to meet with Mr. Wong on February 13, 2020, after his January 31, 2020 letter suggested that he was willing to consider the January 2020 capital calls in good faith and spent nearly five hours discussing the Funds' investment opportunities with him, including the potential applicability of those investments to China.

### The Funds' Level of Investment

46.     As the managing member of the Funds' GPs, my objective was to invest as much capital as prudently possible, which in the absence of CFLD's conduct would have been considerably more than we were able to invest under those circumstances. Mr. Meadow's criticisms that the Funds have invested a relatively small percentage of the LPs' committed capital and did not invest all the funds held in the escrows may be valid in normal circumstances, but the circumstances created by CFLD were anything but normal. As I noted in paragraph 53 of my prior witness statement, the Funds' ability to make substantial investments (and enlist additional LPs) was substantially constrained by CFLD's conduct and the prior arbitration, beginning with the October 2016 ambush and threats, continuing through the lengthy arbitration, and extending until after the failed mediation that occurred after the Final Award was issued. It was only after the arbitrator rejected CFLD's attempt to invalidate the Investment Agreements and ruled that CFLD/GIIL continued to be bound by their capital commitments, that the Funds were able to proceed with substantial investments. But just as the Funds reached that critical phase, CFLD launched an extraordinary campaign designed to force me to agree to dissolve the Funds, including by sabotaging our ability to make investments. Needless to say, CFLD's

conduct created obstacles and delays and made it impossible to invest capital as we intended and planned.

47.     The Funds have never received $120 million of CFLD's capital commitments because CFLD/GIIL has declined to honor the capital commitments that the arbitrator in the prior arbitration ruled were valid and binding on CFLD and GIIL.  The additional investments the GPs planned to make in the first half of 2020, if CFLD had met the January 2020 capital calls, ranged from $30.5 million to $68.9 million in total and are set out in a January 20, 2020 spreadsheet, included in the appendix of exhibits at R-165.

48.     The GPs carefully considered the amounts to call in the January 2020 capital calls and issued them for the reasons specified in the notices.  As I explained in my first witness statement, CFLD's initiation of a litigation assault and threat to run the Funds out of money and the PR campaign that preceded the January 2020 capital calls ███████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████The GPs repeatedly advised CFLD/GIIL of these facts and requested that they change course.  For example, the January 2020 capital call notices (included in the appendix of exhibits as R-20 and R-21) themselves each explained "The General Partner . . . believes that it would serve the interests of GIIL and CFLD to cease efforts to impair the operation of the Fund and efforts to force the Fund to incur expenses in defending the litigation, which would reduce the need to call capital to provide assurances requested by portfolio companies, and enable the Fund to devote capital consumed by defense costs to investments as originally intended. The General Partner hereby requests that they do so."  They also explained that should CFLD/GIIL refuse to provide the called capital, the investments outlined in the letters would need to be scaled back.

49.     Without acknowledging any of these facts, or indicating that he was even aware of them, ███████████████████████████████████████████████████████████ ████████████████████████████████████ A January 20, 2020, cash flow forecast prepared by Jim Hinson, the Funds' Chief Financial Officer (included in the appendix of exhibits as R-172), provides the answer. ████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████ The Funds therefore could not make the substantial investments they had outlined in the January 2020 capital call letters when CFLD refused its obligation to provide the requested capital.  Given these constraints and CFLD's past behavior, it would have been irresponsible to use the remaining amounts in escrow to make substantial investments in these companies, without any assurance that CFLD would provide additional capital when called to fund follow-on investments, expenses, management fees, and litigation costs.  I can say with confidence that, had CFLD met its capital contribution obligations, as we had hoped, the Funds would have proceeded with the planned investments, which would have been highly beneficial.

50.     Mr. Meadow's pronouncement that the January 2020 capital calls were "economically unjustified" is uninformed and clearly incorrect.  As I noted above, CFLD's filing of multiple unfounded litigation claims in an effort to coerce me into acceding to its demands, and the social media, public relations and direct outreach campaign described in detail in my first witness statement, required the Funds to reserve substantial amounts of capital for defense costs, future funding for portfolio companies, and other expenses. The portions of the capital calls and escrowed funds that were consumed by such reserves were appropriate, and necessary, in light of CFLD's conduct.  The investments for which the GPs called capital were high-quality

opportunities, many of which were time sensitive. The amounts called for investment were determined based on the attractiveness of the opportunity, what was required to get into the deal and/or secure attractive terms, what it would take to coalesce a strong investment syndicate around 1955 Capital, future reserve requirements, and portfolio budgeting to account for proper stage and sector diversification (assuming $200 million in total capital under management). As indicated by the early successes of the investments, including in SBP and Ampaire, CFLD/GIIL would have benefitted had the calls been fully funded in accordance with their capital commitments and the arbitration award.

51.     Mr. Meadow's comments regarding "just-in-time" financing are generally correct, but do not apply to CFLD's investment. Based on my personal experience and interactions with many VCs over many years, under certain circumstances, VC firms sometimes depart from the normal approach of calling capital only when needed and employ various devices, including requiring that capital be paid into escrow accounts at the inception of the fund and/or periodically thereafter, well before there is a need to deploy it. These circumstances include situations in which there are issues regarding an LP's willingness or ability to honor its capital commitment or capital calls, due to currency regulations or other factors. Such measures are necessary for a variety of reasons, including because uncertainty regarding the availability and timing of capital can cause VC firms to lose out on the ability to invest in the most promising companies, who have the ability to pick and choose among potential investors in a highly competitive environment. Such concerns are particularly acute with respect to LPs in China, which have a history of defaulting on capital commitments, due to currency or regulatory restraints and other factors. I was keenly aware of these dynamics, and the risks they entailed, when I negotiated the terms of the Funds with CFLD and insisted that capital be paid into escrow

before it was required for investment in order to avoid or minimize the impact of a default situation that eventually occurred.

52.     Other VC firms, including other firms in Silicon Valley, have required escrows and other mechanisms to deal with the risks associated with obtaining committed capital from LPs in mainland China.  For example, I learned confidentially of a high-profile U.S.-based, cross-border venture fund affiliated with a well-known Silicon Valley investment platform that received a $100 million commitment from a Chinese LP in or about the same time that CFLD made its investment in 1955 Capital.  The fund called 20% or more of the total capital at the outset and half of its total capital in less than a year – before it was ready to invest in specific deals – with no objections from the LP in order to be certain the money would be available when it was ready to invest.  It is my understanding that the fund was then unable to call any additional capital because its Chinese LP was unable to move money out of China to fund subsequent capital calls and that the fund had default remedies similar to those included in the CFLD Escrow Agreements. The fund was, as a result, placed in the precarious situation of having invested in a number of portfolio companies, but unable to invest in any follow-on rounds, putting the fund and the entire platform at risk due to the damage to its reputation with entrepreneurs.

**The Timing of the Funds' Investments**

53.     Mr. Meadow's criticisms regarding making investments at the end of the China Fund commitment period also omits key facts.  CFLD's repudiation of the Investment Agreements, the lengthy arbitration, and failed mediation consumed most of the commitment period and dramatically reduced the time frame in which the Funds could make investments, and CFLD's campaign to cut off the Funds' ability to make investments prior to the January 2020 capital calls resulted in additional obstacles and delay.  Despite these difficulties, 1955 Capital

identified attractive investments and conducted rigorous due diligence, as described above and in

paragraphs 80-87 of my first witness statement, before making investments in November 2019.

**Use of Convertible Notes**

54.     Similarly, Mr. Meadow's comments regarding "non-standard" investments made

via convertible notes for amounts less than referred to in the investment memos is also wholly

disconnected from reality and indicates that he was either ignorant of key facts or decided to

ignore them.  Convertible notes are often used in "bridge rounds" to provide seed- and early-

stage companies with additional needed capital between equity financing rounds.  They can

provide flexibility and advantages for VC investors, including giving the holders a senior claim

in dissolution or, conversely, the ability to convert the debt into equity and participate in later

rounds of financing.  Convertible note deals are also quicker and easier to put together because it

is not necessary to come to an agreement on the company's valuation.  Convertible notes are

becoming more prevalent for larger capital raises.  For example, Impossible Foods (in which

Khosla is a large investor) reportedly raised $114 million in convertible notes in early 2018.  The

April 3, 2018 press release announcing the note closing is included in the appendix of exhibits as

R-324.

55.     As I explained in paragraphs 87-88 of my first witness statement, convertible

notes in conservative amounts provided a useful way to deal with the uncertainties CFLD had

created and the compressed time frame we were operating under, while preserving the Funds'

ability to invest in these promising companies.  They provided the flexibility necessary to ensure

that the Funds would be able to obtain the full benefit of the contemplated investments if

CFLD/GIIL honored its capital commitments, and to accommodate the possibility that CFLD

would fail to do so.  Equally important, they enabled us to structure the investments in a manner

that avoided undue prejudice to portfolio companies in the process.

CONFIDENTIAL

56.     Again, there was a limited amount of time between the end of the prior arbitration, when we obtained needed certainty regarding the validity of the Investment Agreements, and the end of the China Fund's commitment period, and that same period included a month-long "standstill" period in which we pursued resolution of our dispute with CFLD through mediation.  Catalyzing and negotiating an equity financing round takes significant time, including finding co-investors and negotiating a valuation and other terms with the target company and co-investors.  For one of the six companies the Funds invested in on November 26, 2019, Acuamark, an equity financing round was already under way at the time, and the Funds were able to join that.  Another, CNGmotive, had recently negotiated convertible notes as part of a bridge financing with a number of investors, and the Funds agreed to invest through convertible notes on the same terms, in advance of considering a lead position on a Series B round.  For the other four, we negotiated convertible notes to provide bridge financing, with plans to lead or co-lead upcoming equity investment rounds if CFLD provided capital when called.

57.     Making these investments was clearly in the best interest of the Funds, for reasons that are grounded in the facts that are conspicuously absent from Mr. Meadow's report.  If CFLD followed through with its capital obligations, the Funds would be able to catalyze investment rounds and make significantly larger investments.  And if CFLD defaulted on its obligations, the Funds could still benefit from the investments – as they will likely do with Ampaire, and both the companies and the Funds would be protected from the significant reputational and financial damage that typically occur when an equity round falls apart at the last minute.

58.     Another critical fact that is not acknowledged or mentioned in the Meadow report is that at the time of the January 2020 capital calls, CFLD was apparently experiencing extreme liquidity problems and financial distress, which would likely have had an impact on a decision

not to honor a large capital call and to offer pretextual reasons for failing to do so.  I noted that the liquidity issues were acknowledged, although somewhat obliquely, in Mr. Wong's witness statement, which was filed contemporaneously with Mr. Meadow's report.  In paragraph 35 of his witness statement, Mr. Wong notes that Chinese real estate companies like CFLD "faced liquidity issues," a "credit crunch" and "a tightening of the Chinese real estate market" in "late 2019," which appear to have only gotten worse with time.  By the first quarter of 2021, CFLD had reportedly defaulted on US $1.68 billion in loans and offshore bonds and owes billions in debt.  Reports about these defaults are included in the Appendix of Exhibits as R-158 through R-163.  Although it is not possible for an outsider to know for certain, that is the most obvious reason for CFLD's default.

### Comments on Patrick Wong's Witness Statement

59.     I was also personally involved in many of the events described in Mr. Wong's witness statement, which is incorrect in a number of important respects.

60.     Although Mr. Wong makes statements to the contrary, the GPs never made any "representation" to the arbitrator that they would dissolve the Funds.  Mr. Wong was not involved in the first arbitration and may not have a complete understanding of the underlying events.  The actual facts are that we sought assistance from the arbitrator in connection with issues that would arise after the Final Award, which included the possibility of a resolution that would disband the Funds.  The arbitrator declined to provide such assistance, and CFLD was unwilling to discuss any resolution on anything approaching reasonable terms.  When I was unwilling to capitulate to CFLD's demands that I dissolve the Funds and basically return its investment, CFLD and its counsel made various threats and then carried them out by waging a totally unprincipled campaign to intimidate me, and my wife Coral, by filing baseless lawsuits and conducting a social media, public relations, and direct outreach campaign in an effort to

CONFIDENTIAL

force me to submit to their demands, as described in detail in paragraphs 56-62 and 92-119 of my prior witness statement.

**The Default and Interest Accrual Notices**

61.     CFLD repudiated and breached its capital commitments, and the Investment Agreements authorize the GPs to accrue and eventually charge interest on capital not transferred to the escrow accounts until the arrearages are paid.  We would have greatly preferred that CFLD had abided by the contracts and provided the capital it promised, so we could make the investments that everyone intended when the Funds were created, and did everything we could to make that happen.  Mr. Wong's suggestions that the GPs sent interest accrual notices as part of a scheme to transfer money from CFLD to the GPs, or that the January 21 capital calls were made for the purpose of triggering default provisions that would result in further accruals of interest are incorrect.  CFLD's failure to fulfill its obligations has had a severe impact on our ability to operate the Funds and make investments, as explained in my first witness statement.  We issued the interest accrual notices in September 2019, in the hope that they would prompt CFLD to meet its obligations and to obtain the clarity we needed to make the investments that were intended when the Funds were created, and to do so effectively.  Among other things, we needed additional capital and visibility on the availability of funds in the future to compete for promising investments on the most favorable terms.  If CFLD had met its obligations to provide capital in September 2019 or in the months that followed, we would have been able to make the full-scale investments we intended, and the Funds, CFLD, and the GPs would have benefitted significantly.  That was not possible because, after advising in early 2020 that it was seriously considering providing the capital necessary to complete the investments, and that it had in fact given them serious consideration, CFLD declined to do so.  If CFLD wanted to avoid the interest

accruals authorized by the Investment Agreements, it should have honored its capital commitments.

62.     The default remedy that authorizes the GPs to accrue interest in the event of an LP's breach of its capital commitment is a standard term in limited partnership agreements used in Silicon Valley and elsewhere in the VC industry.  It was included in the limited partnership agreements utilized by Khosla and Lightspeed, along with a series of other far more rigorous default remedies that are also commonly used in VC limited partnership agreements, for a reason.  Including harsh default remedies in VC fund documents is standard practice because honoring contractual commitments to transfer money to a VC fund, and access to stringent default remedies when such commitments are breached, are essential to the operation of a VC fund.  The facts of this case provide a clear example why.  As I explained in my first witness statement, a VC fund cannot function effectively without reliable access to capital, and a failure to provide committed capital can wreak havoc on a fund and damage portfolio companies that rely on the fund's ability to provide additional capital.

63.     Mr. Wong's statements regarding the legal effect of the prior arbitration ruling on the default remedies set forth in the Investment Agreements are directly contrary to my understanding, but I regard that as a legal matter to be addressed by the lawyers.  In any event, the GPs have not "taken" anything from CFLD.  We have simply sent notices of accrual of interest as a result of CFLD/GIIL's breaches of their capital commitments, in accordance with the Investment Agreements.

**The January 2020 Capital Calls**

64.     Mr. Wong's attempts to characterize the January 21, 2020 capital calls as illegitimate are unfounded.  The capital calls were made pursuant to the Investment Agreements that the arbitrator had ruled were valid and fully binding on CFLD.  As explained above, and in

CONFIDENTIAL

my prior witness statement, the calls were made to complete promising investments on favorable

terms and after rigorous due diligence.  The investments will benefit the Funds and would have

been considerably more beneficial if CFLD/GIIL had honored their capital commitments and

funded them accordingly.  Mr. Wong's attempts to disparage the investments are uninformed and

incorrect.  The investment in Ampaire alone could soon create ███████████ in value to the

Funds.  The GPs' objective was to complete promising investments that Ben, Kathy, Ryan, and I

worked hard to source, diligence, and negotiate, and to take full advantage of what we concluded

were excellent opportunities.  Investing in bad deals would be harmful in many ways and would

undermine the reputations of 1955 Capital and the individuals involved, as well as their ability to

succeed in a highly competitive VC industry.

65.     Contrary to suggestions made in Mr. Wong's witness statement, there were good

reasons why the Funds reserved substantial capital for defense costs, providing additional

funding support for portfolio companies, management fees and other expenses.  Indeed, it would

have been irresponsible and very risky to not have established such reserves, as I explained

above and in paragraph 90 of my prior witness statement.  This was explained to Mr. Wong in

letters, calls, and by me directly at the February 13, 2020 meeting described in my prior witness

statement.  Large capital reserves for litigation expenses were required to pay and indemnify

defense costs in connection with the numerous unfounded claims that CFLD initiated as part of

its campaign to drain the Funds' resources and force me to submit to their unreasonable

demands.  Mr. Wong told me that CFLD would stop at nothing to exact revenge, and should

understand precisely why we needed these reserves.  Additional capital also needed to be

reserved to satisfy portfolio companies that the Funds would be able to support them as they

grew, which resulted directly from the campaign that CFLD pursued prior to the January 21,

2020 capital calls.  The GPs repeatedly advised CFLD that such reserves were required by their

CONFIDENTIAL

conduct, and that the reserves reduced the capital that could be profitably used for investments. The GPs requested CFLD to stop the underlying conduct for the benefit of all concerned, including in letters written in connection with the January 2020 capital calls which are included in the Appendix of Exhibits as R-20, R-21, and R-106 through R-109. But CFLD declined to do so. Accordingly, it was necessary, and entirely appropriate, to utilize funds held in escrow for the reserves.

66.     Mr. Wong's lengthy description of the convoluted process he and CFLD undertook to determine whether to fund the capital calls, and the detailed information claimed to be necessary to enable CFLD to complete its internal approval processes, at paragraphs 55 and 61-69 of his witness statement, clearly shows that CFLD was not following the obligations under the Investment Agreements. In VC funds, investment decisions are made by the general partners, not the limited partners, and no internal limited partner approvals – whether by a limited partner's investment committee, executives or budgeting authorities – are contemplated or authorized. The reasons for refusing to honor CFLD's capital commitment stated in Mr. Wong's witness statement are irrelevant to the obligation to honor a VC fund capital call, and Mr. Wong's recitation of them reinforces the fact that CFLD had no valid reason for breaching its contractual obligations. As noted in my first witness statement and above, the GPs went far out of their way to provide as much information as possible under difficult circumstances. We went far beyond normal practice despite those circumstances because we very much wanted CFLD to provide the additional capital as it is required to do, not to trigger further defaults.

67.     Mr. Wong's assertions in paragraph 59 of his witness statement regarding a "blanket refusal to provide relevant information" in connection with the capital calls is puzzling. As I explained in paragraphs 124-37 of my prior witness statement, there was no blanket refusal. Rather, we went to great lengths to provide CFLD with information in connection with the

CONFIDENTIAL

capital calls, beyond what I have ever provided to limited partners in connection with capital calls, including at the five-hour meeting held on February 13, 2020.  And we repeatedly offered to provide even more information if CFLD would simply commit not to misuse it, which CFLD declined to do.

68.     Mr. Wong's description of our February 13, 2020 meeting, and the information I provided is incorrect and incomplete.  As the February 12, 2020 letter that preceded the meeting (captioned "Meeting to Discuss Investments") and the March 3, 2020 letter sent by CFLD's counsel after the meeting make clear, the primary purpose of the meeting was to provide additional information regarding the investments outlined in the January 21, 2020 capital calls, and I provided a great deal of such information in the course of the nearly five-hour meeting, as I described in detail in my first witness statement at paragraphs 128-37. In addition to the information provided orally, extensive information was provided in writing, including in a lengthy PowerPoint presentation and investment memos (with appropriate redactions).

69.     The statement that the information Mr. Wong requested would have been provided by any fund manager to "properly evaluate a capital call" in paragraph 60 of Mr. Wong's witness statement is incorrect for several reasons, including because the process of calling capital does not require evaluation or approval by a limited partner, very little information is typically provided in connection with a capital call, and a great deal of the specific information requested in Mr. Wong's January 31, 2020 letter was highly confidential and proprietary and would never be disclosed to a limited partner, as discussed above at paragraph 40 and in my prior witness statement at paragraph 125.

70.     Mr. Wong's statement in paragraph 60 of his witness statement that he did not tell me not to have the Funds invest in Sustainable Bioproducts is incorrect.  He told me specifically not to do so and threatened to take action adverse to SBP and the Funds if I did.  The fact that

35

CFLD did not want the Funds to invest in SBP was thereafter confirmed in writing in the March 3, 2020 letter from CFLD's counsel.  I very much wanted to invest as much of 1955 Capital's pro rata rights as possible in SBP, which would have benefitted all concerned.  As discussed in detail in paragraphs 148-60 of my prior witness statement, I was not in a position to do so in light of Mr. Wong's instruction/threat and SBP's refusal to accept money from the Funds without extensive written indemnifications and guarantees, which were the direct result of the campaign CFLD conducted prior to the January 21, 2020 capital calls.

### Requests for Advisory Committee Meetings

71.     Mr. Wong's statements about the lack of advisory committee meetings leave out critical facts and can only be regarded as disingenuous.  As explained at paragraph 45 above, the GPs specifically advised CFLD and Mr. Wong in response to requests for a meeting of the Strategic Advisory Committee, it was not reasonable to hold such a meeting under the circumstances that CFLD created at the time of requests, which included the actions described in paragraphs 56-62 of my first witness statement.  The decision not to hold such a meeting was made based on a review of the LPAs and in consultation with counsel.  Also, as noted above and in my prior witness statement, Mr. Wong and I had a lengthy and detailed discussion regarding the Funds and the contemplated investments at the February 13, 2020 meeting and subsequent phone calls.  I was trying to do everything I possibly could to get CFLD to do what it is required to do, not trigger defaults, but in the end they refused.

### The China Recognition Action and the Hong Kong Enforcement Action

72.     Mr. Wong's assertion in paragraphs 45-47 of his witness statement that the GPs are attempting "to enforce the arbitration award" in China is incorrect.  Instead, the suit the GPs filed there is merely requesting recognition of the award, not enforcement.  Filing the recognition action became necessary to aid in the defense of GIIL's suit against my wife and me in China,

which is predicated on allegations that were considered and rejected in the prior arbitration.  I understand that when our counsel in that suit argued that the prior arbitration award should be dispositive of the suit against Coral and me, GIIL responded that the Chinese court could not consider it because it had not been formally recognized in China.  The GPs are therefore seeking recognition of the award in China, incurring yet more legal expense to defend against yet another baseless lawsuit.

73.     Mr. Wong's description of the GPs' attempt to enforce the Final Award in Hong Kong, and the surrounding events, is incorrect and incomplete.  After the Final Award issued, it soon became clear that CFLD had no intention of voluntarily satisfying its $9.3 million cost award.  Promptly securing those funds could have increased the amount available for the Funds to invest, and it was therefore in the Funds' best interest for the GPs to seek prompt satisfaction.

74.     In response to our requests for CFLD to promptly satisfy the cost award, CFLD first sought to force the Funds to satisfy the award from the amounts held in escrow—which of course would have decreased the amounts available for the Funds to invest and would have been against their interest – by requesting that the Arbitrator "clarify" the Final Award to require that we do so.  When Arbitrator Ghikas rejected that request, CFLD sent the GPs an August 29, 2019 letter, which, in addition to making a host of threats to wage war against the Funds, made clear that CFLD would not voluntarily satisfy the award outside of a global settlement.

75.     I pursued such a settlement in good faith, but CFLD's demands proved unreasonable, and the mediation between the parties held failed.  The GPs therefore determined that it would be in the best interest of the Funds to pursue court-ordered enforcement of the cost award and engaged experienced counsel in Hong Kong to assist.  It was never my intention to do anything but enforce the GP's adjudicated rights for the Funds' benefit, in full conformance with procedural requirements.

CONFIDENTIAL

76.     It was never my intention to interfere with CFLD's bond issuance.  I did not know about CFLD's bond issuance in advance of its public announcement or know the enforcement action against GIIL would have any impact on the bond issuance.

### CFLD's Perjury Allegation

77.     CFLD's accusations that I committed perjury during the prior arbitration is incorrect and offensive.  As was explained in detail in the letters the GPs' counsel submitted in connection with CFLD's motion to amend the protective order, I believed at the time of my testimony that the post-closing changes had been made in December 2015 and that I had executed the LPAs at that time.   When I later reviewed correspondence that I had not looked at for a long time and, did not review in preparation for my testimony, it was clear that, although all substantive changes were discussed in December 2015, and I had believed they had been made, certain changes were not incorporated into the LPAs until mid-2016 because of a clerical error.  I had forgotten about that correspondence at the time of my November 2018 testimony about events that had occurred over two years prior.  I continue to believe that I executed signature pages for the LPAs in December2015, but I have been unable to locate documentary evidence of that fact.  My memory was not perfect on this point, but I did not, and would not, lie under oath.

78.     After the changes to the LPAs were discussed and agreed upon with Fund counsel in December 2015, I left the ministerial tasks associated with finalizing them to Fund Counsel and Mr. Park, while I focused on all the tasks associated with formally launching the Funds and getting them off to a successful start.  This included reaching out to potential limited partners such as Jerry Yang.  When I sent Mr. Yang the Fund I LPA in late December 2016, I did not realize that the changes I had requested and believed had been made had not yet been added to it. I also anticipated that further revisions would be made to the Fund I LPA as part of the final closing process with additional limited partners that were expected to join Fund I in the course of

38
CONFIDENTIAL

2016 and would likely wish to negotiate changes to the agreements to which all limited partners, including GIIL/CFLD would need to agree.

79.     As I testified during the prior arbitration, it was never my intent to hide the post-closing changes from CFLD.  In fact, as shown in a May 2016 email between Mr. Park, the Funds' then Chief Financial Officer, and me, I believed that CFLD already had the fully executed LPAs.  A copy of that email is included in the appendix of exhibits as R-276.

**Concerns Regarding Provision of Information to CFLD**

80.     The highly sensitive information about our portfolio companies, including their finances, investors, products, and road maps, that has been provided to CFLD in discovery in this arbitration gives them access to the types of confidential information that an LP would never have access to.  If that information would ever be misused, the repercussions would be devastating for the portfolio companies, for the Funds, and for me.

81.     This is not an idle concern.  Although CFLD ceased its efforts after the January 2020 capital calls, CFLD has shown a willingness to disregard its confidentiality obligations under both the LPAs and protective orders, with severe consequences.  In addition to the examples discussed in my prior witness statement and Respondents' Statement of Counterclaim, I understand that CFLD filed confidential documents it obtained through discovery during the prior arbitration in support of its lawsuit against my wife and me in China.  I understand that my counsel in China has made a proposal to CFLD's counsel there to jointly request confidential treatment of these materials and that CFLD's counsel has not agreed, nor even responded to the request.

82.     As I explained in paragraphs 19-24 of my previous witness statement, confidentiality, trust, discretion, and reputation are of paramount importance in virtually all aspects of the venture capital industry.  Venture capitalists obtain extensive confidential and

CONFIDENTIAL

proprietary information regarding their prospective and actual portfolio companies as part of the due diligence and investment monitoring process. Those companies expect, and often contractually require, recipients to treat that information with upmost confidentiality because disclosure could seriously harm their ability to compete.

83.     The same is true with respect to the information the Funds have received related to their portfolio companies – information which has been shared with CFLD through discovery in this action. If CFLD were to disclose or inappropriately use that information, serious harm would result to the impacted companies' ability to compete in their own markets, and to 1955 Capital's and the Funds' reputation. Companies would understandably no longer wish to share confidential information (or even do business with) with 1955 Capital, which would make it impossible to sufficiently monitor the Funds' investments and would prevent the Funds from making further investments.

84.     Similarly, if CFLD were to again reach out to the Funds' portfolio companies to disparage 1955 Capital, make litigation threats, and/or target their social media announcements, in the way it did with SBP, Gridtential, and Crop Enhancement, as described in paragraphs 112-115 and 118 of my prior witness statement – it would have a devastating impact on the Funds' relationships with those companies, making it harder for 1955 Capital to monitor and guide the Funds' investments.

85.     Woodoo provides a good example of this. As I explained in my prior witness statement, when Woodoo learned of CFLD's accusations against me and the GPs, it reacted extremely negatively and demanded that the Funds' withdraw their investments in the company. I was able to negotiate with Woodoo to try to preserve the Funds' stake in the company. To this point, Woodoo has not returned the Funds' investment, but the status of the Funds' investment remains unresolved. If not for CFLD's public relations campaign, the Funds would have had a

CONFIDENTIAL

much better working relationship with Woodoo and would be in a much better position to guide it as it grows.

I declare under the penalty of perjury that the foregoing is true and correct.  Executed in Moab, Utah, this 16th day of April 2021.

_____
Andrew Chung

CONFIDENTIAL