CHERYL CAULEY (SBN 252262)
Cheryl.cauley@bakerbotts.com
YAN ZHANG (SBN 248531)
Yan.zhang@bakerbotts.com
**BAKER BOTTS LLP**
1001 Page Mill Road, Suite 200
Palo Alto, CA 94304
Phone: 650-739-7500
Fax: 650-739-7699

ANDREW M. BEHRMAN (admitted *pro hac vice*)
Andrew.behrman@bakerbotts.com
**BAKER BOTTS LLP**
30 Rockefeller Plaza
New York, NY 10112
Phone: 212-408-2500
Fax: 212-408-2501

Attorneys for Petitioners Global Industrial
Investment Limited and China Fortune Land
Development

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| GLOBAL INDUSTRIAL INVESTMENT LIMITED and CHINA FORTUNE LAND DEVELOPMENT, <br><br> Petitioners, <br><br> v. <br><br> 1955 CAPITAL FUND I GP LLC and 1955 CAPITAL CHINA FUND GP LLC, <br><br> Respondents. | Case No.: 4:21-cv-08924-HSG <br><br> **PETITIONERS' OPPOSITION TO RESPONDENTS' MOTION TO VACATE FINAL ARBITRATION AWARD AND REPLY IN FURTHER SUPPORT OF PETITION TO CONFIRM FINAL ARBITRATION AWARD** |

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

        II.      BACKGROUND ...........................................................................................2

        A.      The Final Award .............................................................................3

        B.      The Award And Dissolution ..........................................................11

        C.      Subsequent Procedural Posture......................................................12

        D.      Time Is Of The Essence .................................................................13

III.    LEGAL STANDARD..........................................................................................14

IV.     ARGUMENT .......................................................................................................15

        A.      There Is No Res Judicata With Respect To The Chung Action. ...........15

                1.      The GPs Waived Their Res Judicata Argument. ........................16

                2.      The Second Arbitration Would Have Been The Proper Forum To
                        Determine The GPs' Res Judicata Argument. .............................18

                3.      Even If The GPs Did Not Waive Their Res Judicata Argument, There
                        Is No Res Judicata.......................................................................20

        B.      The Arbitrator Had Authority To Order Dissolution of The Funds.....................25

        C.      There Is No Basis For A New Arbitrator To Re-Evaluate Indemnification Or
                The Prevailing Party Analysis. ..............................................................31

        D.      GIIL And CFLD's Fees Should Be Awarded.........................................33

V.      CONCLUSION....................................................................................................35

# TABLE OF AUTHORITIES

CASES                                                                                                        Page(s)

*Allen v. McCurry*,
    449 U.S. 90 (1980)..................................................................................................24

*Alvarado v. Newcon Concrete Constr., Inc.*,
    2006 WL 8459697 (N.D. Cal. June 22, 2006) ......................................................33

*Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Disease & Related Disorders
    Ass'n of San Diego, Inc.*,
    2018 WL 1562012 (S.D. Cal. Mar. 29, 2018) ......................................................29

*Am., Etc., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*,
    2017 WL 6622993 (N.D. Cal. Dec. 28, 2017)..........................................28, 30, 32

*Aspic Engineering & Construction Co. v. ECC CENTCOM Constructors, LLC*,
    268 F. Supp. 3d 1053 (N.D. Cal. July 18, 2017) ..................................................28

*Bosack v. Soward*,
    586 F.3d 1096 (9th Cir. 2009) ......................................................................15, 26

*BU8 Sdn. Bhd. v. CreAgri, Inc.*,
    2015 WL 1010090 (N.D. Cal. Mar. 6, 2015)........................................................14

*Caprio v. Hartford Life Ins. Co.*,
    2008 WL 1766747 (N.D. Cal. Apr. 15, 2008) ......................................................20

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
    1998 WL 865284 (N.D. Cal. Dec. 7, 1998), *aff'd*, 207 F.3d 1126 (9th Cir. 2000) ................19

*Chiron Corp. v. Ortho Diagnostic Systems, Inc.*,
    207 F.3d 1126, 1129 (9th Cir. 2000) ..................................................................19

*Coast Trading Co. v. Pac Molasses Co.*,
    681 F.2d 1195, 1198 (9th Cir. 1982) ..................................................................28

*Collins v. D.R. Horton, Inc.*,
    505 F.3d 874, 880 (9th Cir. 2007) ................................................................18, 26

*Coutee v. Barington Cap. Grp., L.P.*,
    336 F.3d 1128 (9th Cir. 2003) ............................................................................30

*Cruz v. Select Portfolio Servicing, Inc.*,
    2019 WL 2299857 (N.D. Cal. May 30, 2019) ......................................................23

*Cypress Equip. Fund, Ltd. v. Royal Equip., Inc.*,
    1997 WL 106137 (N.D. Cal. Jan. 13, 1997)........................................................33

*Dastime Grp Ltd. v. Moonvale Invs. Ltd.*,
　2017 WL 4712179 (N.D. Cal. Oct. 11, 2017).................................................................33

*Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'rs Beneficial Ass'n, AFL-CIO*,
　889 F.2d 599 (5th Cir. 1989) ......................................................................................26

*First Options of Chicago, Inc. v. Kaplan*,
　514 U.S. 938 (1995)....................................................................................................15

*Freedom Investors Corp. v. Gantan*,
　2017 WL 8772097 (N.D. Cal. Sept. 7, 2017) ...........................................................26

*French v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
　784 F.2d 902 (9th Cir. 1986) ......................................................................................25

*Gilmer v. Interstate/Johnson Lane Corp.*,
　500 U.S. 20 (1991)......................................................................................................29

*Global Industrial Investment Limited v. Chung*,
　No. 5:19-cv-07670-LHK, 2020 WL 5355968 (N.D. Cal. Sept. 7, 2020) 4, 5, 17, 21, 22, 23, 24

*Hall Street Assoc., LLC v. Mattel, Inc.*,
　552 U.S. 576 (2008).....................................................................................................14

*Harry v. KCG Americas LLC*,
　2021 WL 2711746 (N.D. Cal. July. 1, 2021).............................................................23

*Holly Sugar Corp. v. Distillery, Rectifying, Wine & Allied Workers Int'l Union, AFL-CIO, et al.*,
　412 F.2d 899 (9th Cir. 1969) ......................................................................................14

*Immersion Corp. v. Sony Computer Entm't Am. LLC*,
　188 F. Supp. 3d 960 (N.D. Cal. 2016) ..................................................................18, 26

*John Hancock Mut. Life Ins. Co. v. Olick*,
　151 F.3d 132 (3d Cir. 1998)........................................................................................20

*Kern Oil & Ref. Co. v. Tenneco Oil Co.*,
　840 F.2d 730 (9th Cir. 1988) ......................................................................................17

*Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*,
　341 F.3d 987 (9th Cir. 2003) (en banc) .............................................................14, 15, 25, 32

*Laughlin v. VMWare, Inc.*,
　2012 WL 6652487 (N.D. Cal. Dec. 20, 2012)...........................................................26

*Lawlor v. Nat'l Screen Service Corp.*,
　349 U.S. 322 (1955).....................................................................................................24

*Marin v. HEW, Health Care Financing Agency*,
　769 F.2d 590 (9th Cir. 1985) ......................................................................................24

PETITIONERS' OPPOSITION TO RESPONDENTS' MOTION TO VACATE FINAL ARBITRATION AWARD
AND REPLY IN FURTHER SUPPORT OF PETITION TO CONFIRM FINAL ARBITRATION AWARD

*Marino v. Writers Guild of America, East, Inc.*,
   992 F.2d 1480 (9th Cir. 1993) ................................................................................................18

*Marker Volkl (Int'l) GmbH v. Epic Sports Int'l, Inc.*,
   965 F. Supp. 2d 308 (S.D.N.Y. 2013) ....................................................................................14

*Medi-Soft, Inc. v. Royco, Inc.*,
   21 F. App'x 570 (9th Cir. 2001) .............................................................................................29

*Ministry of Def. & Support for Armed Forces of Islamic Republic of Iran v. Cubic Def. Sys., Inc.*,
   2013 WL 55828 (S.D. Cal. Jan. 3, 2013) ...............................................................................35

*Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*,
   665 F.3d 1091 (9th Cir. 2011) ................................................................................................34

*Mpoyo v. Litton Electro-Optical Sys.*,
   430 F.3d 985 (9th Cir. 2005) ...........................................................................................21, 22

*Ortega v. Richie*,
   2019 WL 251482, at *1 (N.D. Cal. Jan. 17, 2019) ................................................................23

*Oxford Health Plans LLC v. Sutter*,
   569 U.S. 564 (2016) ................................................................................................................15

*Phoenix Newspapers, Inc. v. Phoenix Mailers Union Local 752, Int'l Broth. Of Teamsters*,
   989 F.2d 1077 (9th Cir. 1993) ...........................................................................................27, 28

*Sailfrog Software, Inc. v. Theonramp Grp., Inc.*,
   1998 WL 30100 (N.D. Cal. Jan. 20, 1998) ............................................................................33

*Schoenduve Corp. v. Lucent Techs., Inc.*,
   442 F.3d 727 (9th Cir. 2006) ...........................................................................................25, 26

*Sheet Metal Workers' Int'l Ass'n Local Union No. 359 v. Madison Indus., Inc.*,
   84 F.3d 1186 (9th Cir. 1996) ............................................................................................14, 34

*Sidhu v. Flecto Co.*,
   279 F.3d 896 (9th Cir. 2002) ..................................................................................................21

*Tectura Corp. v. LaBudde Grp., Inc.*,
   2009 WL 4723340 (N.D. Cal. Dec. 4, 2009) .........................................................................19

*Thomas Kinkade Co. v. Hazlewood*,
   2007 WL 9812853 (N.D. Cal. Jun. 6, 2007) ....................................................................26, 28

*Todd Shipyards Corp. v. Cunard Line, Ltd.*,
   943 F.2d 1056 (9th Cir. 1991) ................................................................................................25

*U.S. Life Ins. Co. v. Superior Nat. Ins. Co.*,
    591 F.3d 1167 (9th Cir. 2010) ....................................................................25, 31

*U.S. v. Park Place Assocs., Ltd.*,
    563 F.3d 907 (9th Cir. 2009) ...............................................................................26

*United Computer Sys., Inc. v. AT & T Corp.*,
    298 F.3d 756 (9th Cir. 2002) ...............................................................................19

*United Steelworkers of America, AFL-CIO-CLC v. Smoke-Craft, Inc.*,
    652 F.2d 1356 (9th Cir. 1981) .............................................................16, 17, 18

*W. Sys., Inc. v. Ulloa*,
    958 F.2d 864 (9th Cir. 1992), *as amended* (June 23, 1992) ..................................22

**STATUTES**

9 U.S.C. § 10 ...............................................................................................................15

9 U.S.C. § 10(a)(4) .....................................................................................................25

9 U.S.C. § 201 .............................................................................................................14

9 U.S.C. § 207 .......................................................................................................14, 35

28 U.S.C. § 1961 ...................................................................................................34, 35

**OTHER AUTHORITIES**

Int'l Centre for Dispute Resolution, Int'l Dispute Resolution Procedures, Article 21(3) ............17

Restatement (Second) Judgments § 24(2)....................................................................22

Petitioners Global Industrial Investment Limited ("GIIL") and China Fortune Land Development ("CFLD") respectfully submit this opposition to Respondents' Motion to Vacate Arbitration Award (Dkt. 35) ("Motion to Vacate") and reply in further support of their Petition to Confirm Final Arbitration Award and Direct Entry of Judgment (Dkt. 1) ("Petition to Confirm").[1]

## I.   INTRODUCTION

In an effort to delay the dissolution of the China Fund and Fund I before April 30, 2022 as ordered in the Final Award, Respondents 1955 Capital Fund I GP LLC and 1955 Capital China Fund GP LLC (together, the "GPs") have moved to vacate the Final Award, putting forth meritless bases in order to prolong their unfettered access to and control of the Funds, despite their numerous and repeated breaches of fiduciary duties.  The GPs would have this Court believe that the sole arbitrator in the underlying arbitration, Arif H. Ali ("Arbitrator Ali"), the co-chair of Dechert LLP's international arbitration practice, who has been highly recognized by Chambers in international arbitration from 2007-2020 and frequently sits as an arbitrator in a wide variety of international commercial disputes, so egregiously ignored his authority and disregarded the law that this award warrants vacatur.  This is simply false.  The underlying claims brought by all parties have been thoroughly litigated and none of the extraordinary circumstances required to vacate an arbitration award apply here.  Instead, the GPs are inappropriately attempting to create a second chance at litigating their claims because they do not like the outcome of the Final Award.

GIIL and CFLD are not the only ones who see through the GPs' gamesmanship—notably, in denying the GPs' recent Application to Correct, Modify, or Interpret the Final Award ("Application"), Arbitrator Ali also noted that the GPs were attempting to raise new claims after the arbitration was completed under the "cloak of a request for interpretation[,]" which was improper.  *See* Disposition of Respondents' Application to Clarify, Interpret, and Correct the Final Award ("Disposition") at ¶ 17.

The Motion to Vacate is not the only instance of the GPs' efforts to delay the arbitration's outcome.  The GPs have continuously maintained their frivolous positions with respect to sealing the

---

[1] Capitalized terms used without definition shall have the same meaning as in the Petition or Motion to Vacate.

Final Award, knowing full well that their sealing requests are meritless, so that they can control the public narrative.[2]  The GPs once again cherry-pick certain facts out of context, while omitting material findings in the Final Award to provide an incomplete, misleading and completely biased account of their conduct, almost all of which is irrelevant to the analysis here.  In the instant Motion to Vacate, the GPs seek to vacate the Final Award on two unjustifiable bases, in order to avoid facing the consequences of their numerous reckless breaches of fiduciary duties.  The real reason for the GPs' meritless submissions on vacatur and sealing are obvious—as the GPs made clear in a letter to GIIL and CFLD, the GPs believe (incorrectly) that their performance obligations under the Final Award are "indefinitely" suspended because of the pending legal actions.  The Court should end the GPs' gamesmanship by denying the GPs' Motion to Vacate and granting GIIL and CFLD's Petition to Confirm.

## II.   **BACKGROUND**

The GPs raise only two grounds to support their Motion to Vacate, both of which are baseless, as described further below.  Knowing the weakness of their legal arguments, the GPs spend over half of their brief on a factual recitation that is irrelevant to the Court's determination of those limited issues, continuing their tactic of publicly smearing GIIL and CFLD through a mischaracterization of events, all while trying to keep the actual findings of bad acts hidden from the public.  GIIL and CFLD will not waste the Court's time and resources responding to each and every misrepresentation and omission present in the GPs' brief, but note that they do not agree with the GPs' false and misleading recitation.  Notably, the GPs simplistically cite to Mr. Chung's witness statement and their expert report, *see* Mot. to Vacate at 10-13, 15, both of which were submissions to the underlying arbitration.  What they ignore are the factual findings of Arbitrator Ali after considering all of this evidence before him.[3]  *See* Final Award at ¶ 121; Disposition at ¶ 3 ("I

---

[2] GIIL and CFLD have further demonstrated this in their Response to Respondents' Statement in Support of Permanently and Temporarily Sealing Portions of Final Arbitration Award (Dkt. 20) ("First Response") and their Opposition to Administrative Motion to File Under Seal (Dkt. 39) ("Second Response").

[3] For example, the GPs claim that GIIL and CFLD "engaged in numerous litigations and reputational attacks against Mr. Chung, his wife Coral Chung [], and their livelihoods," *see* Mot. to Vacate at 12, when in reality Arbitrator Ali determined that targeted reputational attacks were "not actually implemented[,]" Final Award at ¶ 217.  Arbitrator Ali detailed his analysis of the so-called "PR Campaign" in more than 30 paragraphs in the Final Award, and rejected the GPs' claims one by one.

included a considerable amount of detail in the Final Award with the intention of assuring the Parties of my careful review of the record and their respective contentions. . . My assessment of the substance of the witness' testimony at the merits hearing played a central role in how I decided this case."). Thus, GIIL and CFLD's narrative relies on Arbitrator Ali's factual findings, which take into account both parties' evidentiary submissions.

### A.   The Final Award

Before the underlying arbitration commenced, the parties were involved in several other disputes. The GPs first initiated arbitration against GIIL, their sole LP, in July 2017 ("First Arbitration"), based on GIIL's failure to deposit additional money into the Funds. Ex. G to Declaration of Cheryl Cauley in Support of Petition to Confirm (unredacted version filed under seal at Dkt. 2-5) ("Final Award") at ¶ 4.[4] The First Arbitration addressed the conduct between the parties from 2015-17 regarding the formation of the Funds, the GPs' fraudulent and hidden attempt to alter the Investment Agreements, and GIIL's refusal to make the second and third installments. *See* Ex. A to Declaration of Cheryl Cauley ISO Petitioners' Response to Respondents' Statement (Dkt. 20-4) ("First Award") at ¶¶ 55-56, 58-64, 67-84, 86-91.

On June 26, 2019, Arbitrator Ghikas issued the First Award. He found that the GPs made numerous secret post-closing changes to the LPAs and that they did not have authority to make those changes without GIIL's knowledge. Final Award at ¶ 160; First Award at ¶ 108. Arbitrator Ghikas found that the GPs' actions were a reckless breach of their fiduciary duties. First Award at ¶ 302; Final Award at ¶ 161. Contrary to the GPs' assertion that the arbitrator found the changes to be "immaterial," Mot. to Vacate at 9, Arbitrator Ghikas actually held that they were "material changes" that "fundamentally changed the risks associated with the investment from the perspective of GIIL." First Award at ¶ 289. However, Arbitrator Ghikas ultimately awarded nominal damages for the breaches of fiduciary duty because the GPs had enforced only one of the unauthorized changes and

---

*See id.* at ¶¶ 530-60; *see also id.* at ¶ 536 (Arbitrator Ali finding that "the contemporaneous evidence suggests that GIIL/CFLD's objective was to protect their investment in the portfolio companies. The information about Mr. Chung's breach of fiduciary duties was also shared for this purpose.").
[4] The GPs have created a false narrative that GIIL did not make the additional deposits due to CFLD's alleged "liquidity issues," rather than because of the GPs' misconduct. This is false. The only supposed "evidence" the GPs reference for this assertion is press reports from 2021 (post-COVID)—which have nothing to do with CFLD's status in 2016. *See also* Final Award at ¶ 225.

GIIL and CFLD did not suffer any losses.  Final Award at ¶ 176.  His solution for addressing the changes was to have the parties revert back to draft versions of the LPAs that did not contain the changes.  First Award at ¶ 123.  Arbitrator Ghikas also awarded nominal damages to the GPs for GIIL and CFLD's breaches, as the GPs could not establish that they suffered any damages.[5]  Final Award at ¶ 179.  Despite awarding only nominal damages to both sides, he determined that the GPs were the prevailing parties and awarded them over $9 million in attorneys' fees and costs.  First Award at ¶ 492(e).

After the first arbitration award, on October 28, 2019, the GPs filed an *ex parte* proceeding against GIIL in Hong Kong (the "Hong Kong Action") in order to enforce the costs awarded in the First Award—and in doing so purposely misled the Hong Kong court.[6]  Final Award at ¶ 192.  Counsel for the GPs, Mr. Robert Varian, submitted an affidavit omitting key language.  *Id.*; *see also* First Award at ¶ 492(g).  Based on that concealment, the GPs were able to obtain garnishee orders that froze GIIL's bank accounts, disrupting CFLD's $1.5 billion bond offering (of which Mr. Chung was fully aware).  Final Award at ¶¶ 198, 410.  On June 3, 2020, the Hong Kong court discharged its *ex parte* order "because of material non-disclosure by the [GPs,]" finding that "[t]he expunging of the Omitted Words by Mr. Varian was plainly deliberate. [. . .] [T]he only sensible inference to be drawn is that this was done because if the judge was made aware of the Omitted Words, she may have taken a course of action unfavourable to the [GPs]."  *Id.* at ¶ 202.

After the First Award was issued but before it was confirmed, on November 18, 2019, GIIL filed suit against Mr. Chung in California Superior Court for the County of Santa Clara, which was removed to the United States District Court for the Northern District of California.  *Id.* at ¶ 204-05; *see also Global Industrial Investment Limited v. Chung*, No. 5:19-cv-07670-LHK, 2020 WL 5355968 (N.D. Cal. Sept. 7, 2020) ("Chung Action").  Neither of the GPs were defendants in that action.  *See* Ex. A to Notice of Removal (Dkt. 1-2) ("Chung Complaint") at ¶ 5-6, *Chung Action*.

---

[5] Arbitrator Ghikas also found that there was zero evidence that the GPs would have successfully raised money from any additional limited partners but for GIIL and CFLD's actions, contrary to the GPs' assertions in their briefing.  *Compare* Mot. to Vacate at 7 *with* First Award at ¶¶ 457, 460-64.
[6] GIIL and CFLD note that the GPs, somewhat ironically, omitted any discussion of the Hong Kong Action, which was an important issue in the underlying arbitration and involved the GPs' omission of material fact to a Hong Kong tribunal.  *See* Final Award at ¶ 190-202, 412.

GIIL's requested relief was to remove Chung as the manager, not to dissolve or terminate the Funds. Chung Compl. at 7, *Chung Action*.  On September 7, 2020, Judge Koh dismissed the complaint with prejudice based on res judicata, finding that the claims were based on the same nucleus of facts as those in the First Arbitration.  Final Award at ¶ 205; *Chung Action*, 2020 WL 5355968 at *8.

After the First Award was issued in June 2019, the GPs engaged in new conduct that gave rise to the underlying arbitration, much of which was pointedly omitted from the GPs' recitation of the factual background.  *See* Mot. to Vacate at 3-15.  During the course of the arbitration in front of Arbitrator Ali (which GIIL commenced in October 2019), the parties each submitted a Statement of Claim/Counterclaim and a Statement of Defense, there was a five day in-person evidentiary hearing, and then the parties submitted post-hearing briefs.  Final Award at ¶¶ 34-39.  In total, the GPs submitted 401 pages of briefing, together with witness statements from six individuals (including 3 from Mr. Chung) and two reports from their expert.

On October 29, 2021, Arbitrator Ali issued his 240-page Final Award with extensive citations to evidence and legal authority, in which he found numerous reckless breaches by the GPs of their fiduciary duties in 2019 and 2020 and ordered the Funds to be dissolved.  In the Final Award, Arbitrator Ali *meticulously* outlined the substantial inappropriate conduct by the GPs.

First, after the First Award was issued in June 2019, the GPs served retroactive notices of accrual of interest on GIIL and CFLD on September 5, 2019, claiming that the GPs were accruing interest at a rate of 8% per annum on the second installment of $60 million due December 2016 and third installment of $60 million due December 2017 ("2019 Notices").  *Id.* at ¶ 229.  As the only other partner in the Funds, the GPs would collect all of that interest for themselves.  *Id.* at ¶ 400.  Arbitrator Ali determined that "the GPs did not exercise their discretion in a *reasonable* manner, or for a 'legitimate partnership purpose[]'" when the GPs issued the 2019 Notices almost *three* years after the initial default and only after the First Award awarded merely $100 in damages to the GPs for GIIL's failure to pay the second and third installments.  *Id.* at ¶ 404-05.  Arbitrator Ali concluded that the GPs "recklessly disregarded their duties as GIIL and CFLD's fiduciaries" by seeking to exercise a contractual right—interest accrual default provisions—in bad faith and "in retaliation," with the "'primary motivation' . . . to injure their business partners, GIIL and CFLD."  *Id.* at ¶ 405.

1    Second, on January 21, 2020, the GPs sent GIIL capital calls of $65.4 million for the two

2    Funds ("2020 Capital Calls"), despite having no imminent plans to make investments with that

3    money.  *Id.* at ¶¶ 252-53.[7]  The GPs noted in their 2020 Capital Calls that "additional future reserves

4    were necessary to address certain portfolio companies' concerns regarding the Funds' ability to

5    make future follow-on investments."  *Id.* at ¶ 254 (brackets omitted).  However, Arbitrator Ali found

6    that "[t]he GPs have not submitted any documentary evidence [in the arbitration] that shows the

7    portfolio companies were expressing concerns and demanding calling capital (essentially reserves)

8    to assuage their fears over the Funds' liquidity."  *Id.*  "If anything, based on the record, it is evident

9    that calling reserves was Mr. Chung's idea[.]"  *Id.*  After extensive discussions, including a

10   principals-only meeting, GIIL and CFLD refused to meet the capital calls, believing that they were

11   not made for a legitimate purpose.  *Id.* at ¶ 256.  Once GIIL and CFLD refused to meet the 2020

12   Capital Calls, the GPs sent notices of default to GIIL and informed GIIL's counsel that, because

13   GIIL refused to make the capital contribution of $65.4 million, "the GPs had little choice but to

14   transfer the amounts that were remaining in the LP Escrow Accounts (approximately $38 million) to

15   the Fund accounts in partial satisfaction of the capital calls."  *Id.* at ¶ 255 (quoting a letter from GPs'

16   counsel to GIIL and CFLD's counsel).

17       With respect to the capital calls, Arbitrator Ali concluded that the GPs breached their duty of

18   loyalty and acted in reckless disregard of their fiduciary duties because the 2020 Capital Calls were

19   "clearly intended to derive [the GPs] a personal benefit[,]" the GPs completely lacked candor[8] in

20

21   [7] To put a positive spin on why the GPs invested a small amount in November 2019 but called capital of $65.4 million to do follow-on investments in January 2020, the GPs raise the concept of

22   investing in "two tranches" for the first time in their motion; they never made this claim during the pendency of the arbitration.  *See* Mot. to Vacate at 10.  In reality, the GPs invested a small amount in

23   November 2019 (*i.e.* before the January 2020 capital calls) and had no concrete plans for additional investments thereafter.  Final Award at ¶¶ 233-36.  In the capital call notices and throughout the

24   arbitration, the GPs always maintained that calling capital was in response to the portfolio companies' demands for assurances.  *See id.* at ¶¶ 252, 423.  Arbitrator Ali rejected this pretense and

25   concluded that "[b]y stating that they were raising money to address the portfolio companies' concerns, when there do not appear to have been any such concerns, the GPs were not honest."  *Id.*

26   at ¶ 424.  After this "reserve" story failed in the underlying arbitration, the GPs changed their story in this Motion to Vacate and now want this Court to hear a "two-tranches" story.

27   [8] Arbitrator Ali specifically pointed out that "I also consider that the GPs breached their fiduciary duties by calling capital associated with prospective investments in [portfolio company] Woodoo.

28   [. . .]  Considered in the contemporary context, I find that the GPs were not honest; and, as such, I find that the GPs acted in reckless disregard of their fiduciary duties."  Final Award at ¶ 425.

making the 2020 Capital Calls, and the GPs continued to misrepresent the number of portfolio companies the GPs invested in and were raising funds for. *Id.* at ¶ 422-25. Arbitrator Ali also concluded that the GPs recklessly disregarded their fiduciary duties and acted in bad faith when the GPs relied on the capital calls styled as drawdown notices, as the drawdown notices "contained incorrect statements and misrepresentations." *Id.* at ¶ 460.

Third, the GPs reserved $20.8 million out of $38 million for management fees and decided to pay all expenses from Fund I's accounts in order to preserve China Fund's funds for future management fees to the GPs. *Id.* at ¶ 258. Arbitrator Ali concluded that the amount reserved for management fees and the allocation method were "wholly unjustified." *Id.*

Fourth, from February through March 2020, instead of investing in promising portfolio companies with the Funds, the GPs instead invested through Mr. Chung's own special purpose vehicles ("SPVs"), all while using money from the Funds to conduct due diligence regarding the potential investments. *Id.* at ¶ 270. Arbitrator Ali found that the GPs' decision to do so was a "reckless[] disregard[] [of] their fiduciary duties to GIIL and CFLD" because "investing via SPVs is more lucrative to Mr. Chung, and allocation of the pro rata rights to other entities [was] not in the best interest of the Funds and/or GIIL and CFLD[.]" *Id.* at ¶ 429. Moreover, the GPs' usage of the Funds' money to conduct due diligence for SPV investments was also a reckless disregard of the GPs' fiduciary duties to GIIL and CFLD. *Id.* at ¶ 430.

Fifth, the GPs also repeatedly refused to give GIIL and CFLD access to the Funds' information and documents pursuant to the LPAs. GIIL and CFLD began requesting to inspect the Funds' books and records on August 29, 2019 and were repeatedly not allowed to inspect the books and records nor provided with the information they requested. *See id.* at ¶ 278-83. Namely, the GPs withheld portfolio company-related information, including basic information such as the companies' names and other information that "would have required little more than the proverbial push-of-a-button" to provide. *Id.* at ¶¶ 283, 285. Moreover, at one inspection on February 3, 2020, the only documents the GPs provided were "two pieces of paper showing the amounts and dates of the investments in portfolio companies, without naming the portfolio companies, as well as two, one-page high-level summaries of the Funds' expenses between 2015 and 2019." *Id.* at ¶ 287. The GPs'

refusal to provide pertinent financial information regarding the Funds continued into February 2021. *Id.* at ¶ 288. Arbitrator Ali found that "the GPs' failure to provide the proper and complete books and records was designed to keep GIIL and CFLD in the dark and deprive them of their contractual rights" and "done in bad faith." *Id.* at ¶ 446. Arbitrator Ali concluded that "the GPs recklessly disregarded their fiduciary duties by refusing to provide proper and complete books and records." *Id.* at ¶ 447.

Sixth, in addition to obscuring financial information from GIIL and CFLD, the GPs stalled GIIL and CFLD's access to the Funds' audited financial statements for 2018. *See id.* at ¶ 290-91. Namely, Mr. Chung repeatedly delayed providing the necessary information to the auditor so that the 2018 financial audit could be completed on time. *See id.* at ¶ 294-95. The GPs also refused to hold any advisory committee meetings, which were mandated by the LPAs. *Id.* at ¶ 302-03. Notably, "[i]t is uncontroverted that no advisory committee meetings have ever taken place for either of the Funds[,]" despite requests by GIIL and CFLD that the GPs repeatedly refused. *Id.* at ¶¶ 303, 305-10. The GPs' conduct in hiding the Funds' financial statements—both by delaying finalization of the 2018 audited financials and by refusing to hold any of the mandated advisory committee meetings— were found by Arbitrator Ali to be a reckless disregard of the GPs' fiduciary duties to GIIL and CFLD. *See id.* at ¶¶ 449, 456-57.

Despite the GPs' repeated claims of the Funds' success in their Motion to Vacate, for which they cited only to the GPs' own witness statements, the GPs have not provided *any* proof of the Funds' performance, and Arbitrator Ali concluded that the GPs' claim of "top tier" investment performance was "a questionable assessment . . . and one for which no proof was tendered[.]"[9] *Id.* at ¶ 504. Nonetheless, throughout the lifetime of the Funds, Mr. Chung has collected $25 million in management fees. GIIL and CFLD's PHB at ¶¶ 86, 259.

Further, while the GPs selectively discussed only GIIL and CFLD's "PR campaign," in their motion, Mot. to Vacate at 14-15, in reality, *both* parties made public statements about each other.

---

[9] In fact, even if the GPs' claims of supposed success from their post-hearing brief could be credited, the Funds have still lost tens of millions of dollars for GIIL out of its original $80 million investment. *See* Ex. B ("GIIL and CFLD's PHB") to Declaration of Cheryl Cauley in Support of Opposition, filed herewith, ("Cauley Decl.") at ¶¶ 52 fn.76, 90.

*See* Final Award at ¶¶ 211-26.

GIIL and CFLD issued three press releases addressing the ongoing dispute between the parties, the first of which was issued in November 2019. *Id.* at ¶¶ 213-14.  GIIL and CFLD also sent letters to the portfolio companies of the Funds discussing the same. *Id.* at ¶ 219.  But contrary to the GPs' repeated claims of GIIL and CFLD's malicious intentions, Mr. Sam Singer, who works for the PR firm retained by GIIL and CFLD, *inadvertently* sent the initial arbitration demand to media outlets and, on the same day that the parties' counsel discovered it, Mr. Singer told the publishing website to take down the demand, which the website did. *Id.* at ¶ 220.  Arbitrator Ali found that, "[f]inally, turning to what the GPs have characterized as the 'most egregious' breach of the LPAs' confidentiality provisions: the transmission of the Initial Arbitration Demand by Mr. Singer to reporters . . . There is no evidence that Mr. Singer's disclosure of the document was intentional[.]" *Id.* at ¶ 575.

Unlike Mr. Singer's inadvertent publication of the initial arbitration demand, however, the GPs themselves *intentionally and publicly* filed the amended arbitration demand—which "contain[s] largely identical information" as the initial arbitration demand—in a Chinese court proceeding last year. *Id.* at ¶ 576.  Although they have made numerous conclusory allegations and engaged in much hand-waving about rhetoric, the GPs have never been able to demonstrate that they were harmed by GIIL and CFLD's alleged "PR campaign." *See id.* at ¶ 581 ("[The GPs] have not made any showing that they were harmed by any of the alleged breaches [of the LPAs' confidentiality provisions.]"); *id.* at ¶ 577 ("Even if [the GPs] had shown any breaches of the LPAs' confidentiality provisions, they would not have been able to prove any resulting damages."). *See also id.* at ¶ 570 ("I find that [the GPs] have failed to prove breach of the LPAs' confidentiality provisions."); *id.* at ¶ 571 ("I find no breach of the confidentiality provisions with respect to information related to Ms. Chung's employment relationship with 1955 Capital and her salary."); *id.* at ¶ 572 ("GIIL and CFLD did not breach the confidentiality provisions by sharing information about the Funds' activities and strategy, specific technologies in which the Funds had invested, and the Funds' decision-making processes, as the GPs are not themselves treating this type of information as confidential."); *id.* at ¶ 573 ("I find no breach of the confidentiality provisions with respect to information related to the Post-Closing

Changes."); *id.* at ¶ 574 ("I find that there was no breach of the confidentiality provisions" with respect to "sharing information about the name of a potential investor.").

In his Final Award, Arbitrator Ali found that GIIL and CFLD's PR campaign was undertaken to protect their investment in the portfolio companies, and he did not find that GIIL and CFLD breached any implied obligation to the GPs or any confidentiality obligations.  *Id.* at ¶¶ 536 ("GIIL and CFLD were not acting in bad faith, while trying to safeguard their investments in the portfolio companies"), 560.  Moreover, contrary to the GPs' assertions, the portfolio companies that the Funds invested in were *not* impacted by the PR campaign and the GPs have not—because they cannot— identified any actual harm.  *See id.* at ¶ 237 (Mr. Chung confirming that "1955 Capital closed all six investments it intended to close on behalf of the Funds."); ¶ 240 (Arbitrator Ali finding "no documents showing that [the portfolio company] Vicarious refused the Funds' or later Fund I's investment because of the 'PR Campaign.'"); ¶ 243 (Arbitrator Ali finding that the GPs' allegation of the portfolio company Avertana's "unattractive" pricing "d[id] not . . . hav[e] anything to do with the 'PR Campaign.'"); ¶ 249 (Arbitrator Ali concluding that "it was not so much the 'PR Campaign' that impacted the GPs' relationship with Woodoo, but rather the fact that the GPs did not tell Woodoo about the dispute [with GIIL and CFLD], a matter regarding which the GPs should have been forthcoming with all of their portfolio companies."); ¶ 269 (Arbitrator Ali concluding that the term sheet for portfolio company Gridtential was "disadvantageous to all investors" and the GPs failed to show how the "'PR Campaign' adversely affected the GPs' bargaining position."); ¶ 544 ("The GPs have failed to show how the 'PR Campaign' caused them any damage in relation to the KPMG audits."); ¶ 546 (finding that the PR campaign did not cause 1955 Capital to nearly lose two employees); ¶ 548 ("the GPs have not presented any evidence that the 'PR Campaign' 'severely undercut the Funds' ability to recruit topflight venture partners and employees in the future.'"); ¶ 552 (finding that the GPs failed to show "they lost fruits of their bargain" in investing in Sustainable Bioproducts' Series B round because of the PR campaign); ¶ 558 ("the GPs have not shown that they have indeed suffered any damages [of out-of-pocket expenses] as a result of the 'PR Campaign.'").  Arbitrator Ali found that the GPs did not show *any* damages as a result of the alleged "PR Campaign."  *Id*. at ¶ 538.

1    The GPs hired three PR firms and also engaged in PR tactics.  Starting in February 2020, the

2   GPs issued press releases disclosing the GPs' claims against GIIL and CFLD in the First Arbitration

3   and published on their website a discussion of the First Arbitration.  *Id.* at ¶¶ 223-24.  The GPs also

4   speculated on their website that CFLD reneged on its contractual obligations because of "liquidity

5   issues," which was further repeated in other media reports, while completely ignoring the real

6   reason—that CFLD did not want to send additional money to the GPs because the GPs and Mr.

7   Chung engaged in misconduct regarding the Funds.  *Id.* at ¶¶ 148-59, 225.

8    Arbitrator Ali found that "the GPs' own conduct indicates that they do not think there is in

9   fact such an obligation" by the parties to not make any negative statements about the Funds or each

10   other, because the GPs made their own public statements "that do not portray GIIL and CFLD in a

11   good light."  *Id.* at ¶ 529.  "If Mr. Chung's, Mrs. Chung's, the GPs' and 1955 Capital's reputation

12   matters, so also does GIIL's and CFLD's."  *Id.*

13    **B.    The Award And Dissolution**

14    As a result of the conduct described above, Arbitrator Ali issued an award with several

15   components in addition to finding the aforementioned breaches of fiduciary duty.  First, with respect

16   to the Hong Kong Action, Arbitrator Ali concluded that "the GPs acted with reckless disregard of

17   their fiduciary duties to GIIL and CFLD" because the GPs "knew that they were freezing GIIL's

18   accounts at a crucially important time" and, as a result, ordered the GPs to not be indemnified for

19   and instead bear any fees and expenses that the Hong Kong court awarded to GIIL and CFLD.  *Id.* at

20   ¶ 410-13.  To the extent the GPs used the Funds' money to pay for fees and costs associated with the

21   Hong Kong Action, the GPs were ordered to provide an accounting and return such fees.  *Id.* at

22   ¶ 598(d).

23    Second, Arbitrator Ali also dismissed outright the GPs' counterclaims of breach of implied

24   covenant of good faith and fair dealing, *id.* at ¶ 560, and breach of the LPAs' confidentiality

25   provisions, *id.* at ¶ 570.

26    Finally, after determining that he had the authority to dissolve the Funds (as described further

27   below in Section IV.B.), Arbitrator Ali ordered the Funds to be dissolved "within six (6) months of

28   the date of the transmittal of this Final Award to the Parties and in accordance with the terms and

procedures of the RULPA and Section 10 of the LPAs." *Id.* at ¶¶ 483, 491, 508, 515-16, 598(b).
The Arbitrator ordered for the parties to "jointly select a liquidator for each fund within three (3)
months of the date of the transmittal of this Final Award," and if the parties do not agree on a
liquidator by that date, then GIIL "may appoint a suitably qualified liquidator of international
standing and repute." *Id.* ¶ 598(b).  The Final Award was transmitted to the parties on October 30,
2021; thus, a liquidator must be appointed by January 31, 2021 and the Funds must be fully
dissolved by April 30, 2021.  The appointed liquidator (jointly or by GIIL and CFLD) would wind
down the Funds pursuant to Section 10 of the LPAs, which prescribes the wind down procedures.
*Id.*

Because he determined that GIIL and CFLD were the prevailing parties in the arbitration,
Arbitrator Ali also ordered that the GPs reimburse GIIL and CFLD for their attorneys' fees and
costs, and ordered that the GPs could not be indemnified by the Funds for any fees or costs due to
their reckless breaches of fiduciary duty.  *Id*. at ¶ 598(i)-(k).

### C.  **Subsequent Procedural Posture**

In the more than two months since the issuance of the Final Award, the GPs and Mr.
Chung—who have been found to have recklessly breached their fiduciary duties to GIIL in two
different arbitrations, and found to have misled a court in a third litigation (the Hong Kong
Action)—continue to retain complete control over the Funds, where GIIL is the sole LP, without any
accountability.

As mentioned in the Petition to Confirm, on November 12, 2021, the GPs filed their
Application seeking to clarify or correct Arbitrator Ali's order that "Respondents shall not be
indemnified under the LPAs for the fees and costs incurred in this arbitration and for the fees and
costs awarded against them [in favor of GIIL]."  *See* Disposition at ¶ 7 (quotations omitted).
Specifically, the GPs argued that Arbitrator Ali's denial of the GPs' indemnification under the LPAs
for fees and costs arising from the underlying arbitration failed to address that the GPs incurred
"millions" on GIIL and CFLD's "investment mandate" claim, that a large portion of the GPs' fees
"were in connection with and resulted from GIIL and CFLD's conduct," and ignored the LPAs'
indemnification provisions.  *Id*.  The GPs also claimed that most of their fees and costs were related

to claims against them "that did not involve [the GPs'] grossly negligent, reckless, intentionally wrongful, or criminally unlawful conduct[,]" and instead were related to GIIL and CFLD's conduct. *Id.* at ¶ 8.  On November 19, 2021, GIIL and CFLD submitted their Opposition to Respondents' Application.

On December 20, 2021, Arbitrator Ali rejected all of the GPs' arguments.  Arbitrator Ali noted that, instead of requesting an interpretation or clarification of the Final Award, the GPs were "requesting that [Arbitrator Ali] make an additional award in respect of the issue of indemnification"—specifically, that some of their fees and costs should be indemnified regardless of the outcome of the arbitration—"wrapped in the cloak of a request for interpretation." *Id.* at ¶ 17. Arbitrator Ali denied such a request because the GPs did not raise this issue at any point during the arbitration.  *Id.*  Instead, Arbitrator Ali noted that he took into account the GPs' costs incurred in defending GIIL's claims when making his cost allocation decision, and the critical analysis he made was that "[GIIL] prevailed on its dissolution claim, and further that, in the round, [Arbitrator Ali] consider[ed] that [the GPs] were reckless in respect of the exercise of their fiduciary duties." *Id.* at ¶ 18.  Arbitrator Ali also denied the GPs' request for a correction of the indemnification award, as the GPs failed to raise this argument in the arbitration and "correction is an inappropriate measure here[.]" *Id.* at ¶ 21.  Finally, Arbitrator Ali rejected the GP's supplemental request to jointly award the parties costs and fees of the arbitration, as the GPs failed to identify the requisite claim, counterclaim, or setoff that was omitted from the Final Award to seek a supplementation and also failed to raise this issue during the arbitration.  *Id.* at ¶¶ 23, 25, 28.

### D.  **Time Is Of The Essence**

Since receiving the Final Award, the GPs have taken the position that they do not need to perform any portion of that award while legal proceedings are pending—and have initiated this meritless campaign to delay dissolution of the Funds.  This strategy of delay is apparent because, before the GPs even filed their Motion to Vacate, they told GIIL and CFLD that they were going to continue to refuse to perform *while their appeal is pending*.  Ex. P to Declaration of David M. Cooper (Dkt. 34-16) at 1 (Letter from R. Cohen to A. Behrman, dated December 2, 2021, describing how the GPs believe that performance of the award will be suspended "indefinitely.").

The Funds are due to expire on their own terms on October 27, 2022 for China Fund and October 27, 2025 for Fund I.  *See* Final Award at ¶ 133.  If the GPs are given the opportunity to delay until that time, they will continue to have unfettered access to and control of the Funds, GIIL, the sole limited partner of the Funds, will have no control over what happens to its remaining funds totaling nearly $21 million or current investments, and the portfolio companies will not be aware that they are dealing with entities that have been found to have repeatedly placed their own interests above those of their sole limited partner, in reckless breaches of fiduciary duties.  The GPs have refused to provide an accounting of the funds that were spent on the Hong Kong action and GIIL and CFLD have no insight into what the GPs are currently doing with the Funds.

GIIL and CFLD therefore request that this matter be decided at the earliest practical time.

## III.   <u>LEGAL STANDARD</u>

Article IV of the Convention and the FAA govern the confirmation of foreign arbitral awards.  *See* 9 U.S.C. §§ 201, 207.  Under the FAA, any party to an arbitration may seek confirmation of an arbitral award falling under the Convention within three years of the arbitral award.  9 U.S.C. § 207.  Absent a statutory basis to vacate or modify the award, the Court "must grant" a judicial order confirming an arbitration award.  *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 994 (9th Cir. 2003) (en banc); *Hall Street Assoc., LLC v. Mattel, Inc.*, 552 U.S. 576, 584 (2008) (holding that "§§ 10 and 11 respectively provide the FAA's exclusive grounds for expedited vacatur and modification").  Judicial review of an arbitration award is "both limited and highly deferential."  *Sheet Metal Workers' Int'l Ass'n Local Union No. 359 v. Madison Indus., Inc.*, 84 F.3d 1186, 1190 (9th Cir. 1996).  "[I]f, on its face, the award represents a plausible interpretation of the contract in the context of the parties' conduct, judicial inquiry ceases and the award must be affirmed."  *Holly Sugar Corp. v. Distillery, Rectifying, Wine & Allied Workers Int'l Union, AFL-CIO, et al.*, 412 F.2d 899, 903 (9th Cir. 1969).  Therefore, "confirmation proceedings are necessarily 'summary' in nature and are 'not intended to involve complex factual determinations, other than a determination of the limited statutory conditions for confirmation or grounds for refusal to confirm.'"  *BU8 Sdn. Bhd. v. CreAgri, Inc.*, 2015 WL 1010090, at *3 (N.D. Cal. Mar. 6, 2015) (quoting and citing *Marker Volkl (Int'l) GmbH v. Epic Sports Int'l, Inc.*, 965 F. Supp. 2d 308, 311

(S.D.N.Y. 2013)).

The FAA provides only four limited bases to vacate an arbitration award: (1) the arbitration award was procured by corruption, fraud, or undue means; (2) there was evidence of partiality or corruption of the arbitrator(s); (3) the arbitrators were guilty of misconduct in conducting the hearing or other misbehavior that prejudiced the rights of a party; or (4)  the arbitrators exceeded their powers or executed their powers such that "a mutual, final, and definite award upon the subject matter submitted was not made"—but there are no facts or evidence to support any of them.  *See* 9 U.S.C. § 10.  Courts will set aside an arbitration decision "only in very unusual circumstances." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995).

Neither "erroneous legal conclusions nor unsubstantiated factual findings justify federal court review of an arbitral award under the [FAA], which is unambiguous in this regard."  *Kyocera*, 341 F.3d at 994.  "[A]n arbitral decision even arguably construing or applying the contract must stand, regardless of a court's view of its (de)merits."  *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2016) (quotations and citation omitted).  "[Courts] will not vacate an award simply because we might have interpreted the contract differently."  *Bosack v. Soward*, 586 F.3d 1096, 1106 (9th Cir. 2009) (citation omitted).

## IV.   <u>ARGUMENT</u>[10]

As discussed in GIIL and CFLD's Petition to Confirm, not only are all of the requirements for confirmation of the Final Award met, but the GPs cannot demonstrate that any of the bases for either vacating or modifying an arbitration award exist.  The GPs' Motion to Vacate confirms this.

### A.   <u>There Is No Res Judicata With Respect To The Chung Action.</u>

As an initial matter, the GPs do not explain how their res judicata argument relates to any of the four *exclusive* grounds for vacatur under the FAA.  *See* 9 U.S.C. § 10.  In any event, the Court should deny the GPs' Motion to Vacate on this ground because the GPs waived this argument and

---

[10] GIIL and CFLD note that the GPs filed a Supplemental Statement Regarding Motion to Vacate Arbitration Award and Opposition to Petition to Confirm Arbitration Award (Dkt. 40) ("Supplemental Statement") stating that, because Arbitrator Ali's Disposition resolved the GPs' Application, the GPs withdraw their argument that the Application precluded a finding that the Final Award was final and therefore not a proper subject for a petition to confirm.  Supplemental Statement at 2.  Accordingly, GIIL and CFLD will address only the remaining arguments in the Motion to Vacate.

1   there is no res judicata.

2             **1.**       **The GPs Waived Their Res Judicata Argument.**

3         The GPs, for the first time in over two years and after the entirety of the underlying

4   arbitration has been fully briefed and concluded, now raise the issue that the underlying arbitration

5   should not have commenced or moved forward because the claims in the underlying arbitration are

6   precluded based on the Chung Action.

7         Setting aside the completely meritless substantive argument, which is addressed below, the

8   GPs cannot raise this argument for the first time in their Motion to Vacate.  The GPs try to claim that

9   they raised the res judicata effect of the Chung Action in their post-hearing brief, but even they

10   tacitly acknowledge that they did not do so.  *See* Mot. to Vacate at 21 ("To be sure, the [post-

11   hearing] brief focused on the res judicata effect of the *First Arbitration* . . . ." (emphasis added)).

12   And indeed, the GPs' entire res judicata argument in the arbitration was unquestionably that the First

13   Arbitration—and not the Chung Action—precluded GIIL and CFLD's claims in the underlying

14   Arbitration.  Ex. J to Cooper Decl. (Dkt. 34-10) ("GPs' PHB") at ¶¶ 109-18.  The GPs' cherry-

15   picked sentences of their post-hearing brief do not belie this fact, and a closer look at the GPs' post-

16   hearing brief makes it very clear that they did not attempt to raise the issue of whether res judicata

17   barred GIIL and CFLD's claims based on the Chung Action.  *See* GPs' PHB at ¶ 113 ("CFLD's

18   claims for dissolution and injunctive and declaratory relief are obvious efforts to prevail on causes of

19   action here that it lost *in the prior arbitration* and effectively overrule key aspects of the Final

20   Award." (emphasis added)); ¶ 116 ("The causes of actions *in the two arbitrations* are styled

21   differently . . . but the end goal is the same." (emphasis added)).

22         The Ninth Circuit has stated that a failure to raise an argument during an arbitration

23   precludes that argument from being raised after the fact.  In this regard, *United Steelworkers of*

24   *America, AFL-CIO-CLC v. Smoke-Craft, Inc.*, 652 F.2d 1356 (9th Cir. 1981) is instructive.  In

25   *United Steelworkers*, an employer and two unions arbitrated a dispute about a union grievance

26   regarding a collective bargaining agreement.  652 F.2d at 1358.  The arbitrator halted the arbitration

27   proceedings upon request by one of the parties because the parties believed that there was a

28   possibility of settlement.  *Id.*  After not engaging in any communication with the arbitrator for some

PETITIONERS' OPPOSITION TO RESPONDENTS' MOTION TO VACATE FINAL ARBITRATION AWARD
AND REPLY IN FURTHER SUPPORT OF PETITION TO CONFIRM FINAL ARBITRATION AWARD

time, one of the unions submitted its brief to the arbitrator and other parties.  *Id.* at 1358-59.  The employer requested an extension to file its response brief, but ultimately no brief was filed so the arbitrator rendered his decision and closed the matter.  *Id.* at 1359.  Notably, "[n]othing in the record indicates that [the employer] requested that the arbitrator not proceed[.]"  *Id.*  The union then moved to confirm the arbitration award, which the district court granted, before the employer then contended on appeal that unresolved issues of material fact remained.  *Id.*  In affirming the district court's confirmation, the Ninth Circuit rejected the employer's arguments because the employer failed to raise those issues before the arbitrator.  *Id.* at 1360.  The Ninth Circuit pointed out that the employer "had an affirmative obligation to present to the arbitrator any arguments why the arbitration should not proceed[,]" and that "[p]arties to arbitration proceedings cannot sit idle while an arbitration decision is rendered and then, if the decision is adverse, seek to attack the award collaterally on grounds not raised before the arbitrator."  *Id.*

The GPs in this matter are doing exactly what the Ninth Circuit held is not permitted.  The GPs disingenuously claim that "[t]he Chung Action was not resolved at the time of [the GP's] pleading in the Second Arbitration[,]" Mot. to Vacate at 20, but do not address all the time that passed after the Chung Action *was* resolved.  Judge Koh issued her decision in the Chung Action on September 7, 2020.  *See Chung Action*, 2020 WL 5355968.  Since then, the GPs have had ample time to raise this issue as they submitted their Statement of Counterclaim on October 30, 2020, their Statement of Defense on April 17, 2021, and their post-hearing brief on July 20, 2021.  *See* Final Award ¶¶ 35-38.  The parties also participated in an evidentiary hearing in May 2021.  *Id.* at ¶ 38.  As the Ninth Circuit pointed out in *United Steelworkers*, the GPs had an affirmative obligation to present to Arbitrator Ali why the Second Arbitration should not proceed.  *See United Steelworkers*, 652 F.2d at 1360.  Moreover, the ICDR rules require that the parties raise issues to the arbitral jurisdiction "no later than the filing of the Answer . . . to the claim . . . that gives rise to the objection."  Int'l Centre for Dispute Resolution, Int'l Dispute Resolution Procedures, Article 21(3).  By failing to do so and instead waiting over a year to raise their res judicata claim in a Motion to Vacate—notably, after the entirety of the Second Arbitration concluded and the GPs learned that the arbitrator ruled against them in every way—the GPs have waived their argument.  *See also Kern Oil*

& *Ref. Co. v. Tenneco Oil Co.*, 840 F.2d 730, 735 (9th Cir. 1988) (rejecting appellant's res judicata argument because appellant invoked res judicata only on appeal and noting that res judicata has always been required to be raised before trial).

The GPs' reliance on *Immersion Corp. v. Sony Computer Entm't Am. LLC* is misplaced. In *Immersion*, the court found that Sony did not waive its public policy concerns about being precluded from asserting a patent invalidity defense in the underlying arbitration in part because Sony argued during the arbitration that its patent invalidity defense should be included in the scope of the arbitration. 188 F. Supp. 3d 960, 967 (N.D. Cal. 2016). The *Immersion* court noted that "although Sony did not expressly argue that the arbitrator was violating public policy during the arbitration, Sony raised the facts it now uses to support its public policy argument and maintained that waiver of an invalidity defense must be clear and unambiguous." *Id.* But here, the GPs are in a very different position than Sony. As detailed above, the GPs had ample opportunities to raise their Chung Action res judicata defense during the course of the underlying arbitration and failed to do so *at all*. Instead, the GPs "s[a]t idle while an arbitration decision was rendered" but now seek to attack the award collaterally on grounds not raised before the arbitrator because the arbitration decision was adverse. *See United Steel Workers*, 652 F.2d at 1360; *Marino v. Writers Guild of America, East, Inc.*, 992 F.2d 1480, 1484 (9th Cir. 1993) ("[P]arties must be encouraged, nay required, to raise their complaints about the arbitration during the arbitration process itself, when that is possible.").

### 2.    The Second Arbitration Would Have Been The Proper Forum To Determine The GPs' Res Judicata Argument.

In another effort to evade the fatal issue of waiver of the res judicata argument, the GPs now claim that the proper forum to raise their res judicata defense is in this Court. They are wrong.

One of the cases cited by the GPs, *Collins v. D.R. Horton, Inc.*, makes clear that arbitrators "generally are entitled to determine in the first instance whether to give the prior judicial determination preclusive effect." 505 F.3d 874, 880 (9th Cir. 2007). Incredibly, the GPs argue that, although arbitrators should generally be the ones to decide res judicata issues, it's necessary for this Court to decide the issue because the Final Award "did not consider the res judicata effect of the dismissal of the Chung Action." Mot. to Vacate at 20. Of course, the Final Award did not address the issue *because the GPs never raised it*. The GPs' own waiver cannot be a basis for this Court to

make a determination that was properly in the ambit of the arbitrator.

The GPs do not dispute that the parties' arbitration agreements are valid, and the dispute between the parties clearly falls within the scope of the arbitration agreements.  The parties' arbitration clause is broad in scope, requiring the parties to arbitrate "any claim, dispute, or controversy of whatever nature arising out of or relating to this Agreement, including, without limitation, any action or claim based on tort, contract, or statute . . . or concerning the interpretation, effect, termination, validity, performance and/or breach of this Agreement[.]"  Final Award at ¶ 17 (internal brackets omitted).  *See Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 1998 WL 865284, at *5 (N.D. Cal. Dec. 7, 1998), *aff'd*, 207 F.3d 1126 (9th Cir. 2000) ("Ninth Circuit case law is clear that the merits of a claim and any defenses thereto are for the arbitrator and not the court to decide.  [. . .] Since [the defendant's] res judicata objection is a merits-related defense, the arbitrator and not the court should decide the issue." (citation omitted)).  *See also United Computer Sys., Inc. v. AT & T Corp.*, 298 F.3d 756, 763-64 (9th Cir. 2002) (determining that the res judicata effect of a prior arbitration confirmation should be addressed by an arbitration panel, not the court that confirmed the award); *Tectura Corp. v. LaBudde Grp., Inc.*, 2009 WL 4723340, at *2 (N.D. Cal. Dec. 4, 2009) ("The law is clear that once a court has determined the dispute at issue is within the scope of a valid arbitration clause, any defenses to that dispute are questions for the arbitrator, not the court, to decide.").

The GPs cite no binding authority to support their proposition that an arbitrator cannot decide the res judicata effect of a prior judicial decision, as opposed to a prior arbitration.  They rely on *Chiron Corp. v. Ortho Diagnostic Systems, Inc.*, but they misstate that case.  In *Chiron*, the plaintiff moved to compel arbitration and the defendant moved to confirm a prior arbitration award and for summary judgment to dismiss the complaint in its entirety because the action was barred by res judicata due to a judgment confirming a previous arbitration.  207 F.3d 1126, 1129 (9th Cir. 2000).  The *Chiron* court ultimately concluded that the defendant's claim preclusion argument "falls within the parties' agreement to arbitrate" and therefore "a res judicata objection based on a prior arbitration proceeding is a legal defense that, in turn, is a component of the dispute on the merits and must be considered by the arbitrator, not the court."  *Id.* at 1131-32.  That the court distinguished

other cases that involved prior court decisions is of no moment; the Chiron court pointed out that a res judicata defense to an arbitration proceeding "necessarily involves an inquiry into [the plaintiff's] underlying claims[,]" which were found to be arbitrable, and at no point did the court affirmatively hold that a court is the *exclusive* forum to decide res judicata involving a court judgment.  Similarly, here, the GPs' res judicata argument is a defense to the merits of GIIL and CFLD's claims in the Second Arbitration, which have been determined to be arbitrable by Arbitrator Ali.  *See* Final Award at ¶¶ 346-47.  Moreover, unlike in *Chiron*, in which one party was moving to compel a new arbitration, the entirety of the Second Arbitration has already been fully completed.

The other cases cited by the GPs cite are also not applicable.  *Caprio v. Hartford Life Ins. Co.*, 2008 WL 1766747, *2 (N.D. Cal. Apr. 15, 2008) addresses res judicata between two court cases, not an arbitration.  And in *John Hancock Mut. Life Ins. Co. v. Olick*, 151 F.3d 132 (3d Cir. 1998), the relevant issue on appeal was whether the district court had authority to enjoin a pending arbitration on res judicata grounds arising from a prior judgment, which the Third Circuit concluded the district court had authority to do.  However, here, the Second Arbitration is completed and there are no grounds to overturn it now.

### 3.   Even If The GPs Did Not Waive Their Res Judicata Argument, There Is No Res Judicata.

Even crediting the GPs' assertion that they tangentially raised the res judicata issue in front of Arbitrator Ali, the GPs' argument still fails on the merits.  It is noteworthy that the GPs' do not explain that they raised res judicata with respect to the *First Arbitration* and Arbitrator Ali soundly rejected that argument, finding that that there was no res judicata based on the First Arbitration.  The GPs argued that GIIL and CFLD were attempting to "undo" and "render the 2019 Award meaningless" through the instant Arbitration, and that "the doctrines of collateral estoppel and res judicata bar[red] [GIIL and CFLD's] claims."  Final Award at ¶ 339.  This was rejected for several reasons.  First, Arbitrator Ali found that GIIL and CFLD's claims for dissolution and various breaches of fiduciary duties "are not identical to the claims that were the subject of the [First] Arbitration; they arise out of the Parties' relationship and submissions regarding the GPs' conduct and the Parties' relationship following the [First] Award."  *Id.* at ¶ 344.  Instead, Arbitrator Ali found that "[GIIL's] claims, and the facts upon which they rely are new in a meaningful way."  *Id.*

Specifically, "the GPs have not shown that the material acts complained of—the GPs' conduct following the 2019 Award—are the same as those which were the subject of the [First] Arbitration." *Id.* at ¶ 346.  Notably, the GPs themselves acknowledged that the claims were different, but instead based their collateral estoppel and res judicata arguments on the fact that GIIL and CFLD included the same causes of action and sought the same end goal, both of which Arbitrator Ali rejected.  *Id.* at ¶ 346-47.  Instead, Arbitrator Ali concluded that the "[n]either the acts complained of—the GPs' conduct after the [First] Award—and the main demand for relief—dissolution—are the same as the acts complained of and the relief requested in the [First] Arbitration."  *Id.* at ¶ 346.  Arbitrator Ali was also very clear in the following:

> Nothing in this award overturns any findings of Arbitrator Ghikas.  This award adjudicates upon the Parties' claims regarding the events that took place after the 2019 Award was issued.  The only exception to this is the finding concerning the testimony Messrs. [Andrew] Chung and Ahmedani gave before Arbitrator Ghikas.  Notably, even this finding, which is based on evidence that was not before my colleague, does not in any way disturb Arbitrator Ghikas' findings, including, most importantly, that the Investment Agreements are valid instruments that continue to be effective between the Parties.

*Id.* at ¶ 347.

Thus, knowing that they cannot argue res judicata relating to the First Arbitration based on Arbitrator Ali's conclusion, the GPs now desperately try to point to res judicata based on the Chung Action.  But nothing in the underlying arbitration would be barred by the Chung Action, because the Chung Action was determined to be related to the same transactional nucleus of facts as the First Arbitration and dismissed on those grounds.  *Chung Action*, 2020 WL 5355968 at *5.  Notably, Judge Koh refused within a day to relate this matter to the Chung Action.  Order Determining That Cases Are Not Related (Dkt. 54), *Chung Action*.  Because Arbitrator Ali found there is no res judicata as to the First Arbitration, he implicitly also found that there is no res judicata for the Chung Action.

"Res judicata applies when the earlier suit (1) involved the same 'claim' or cause of action as the later suit, (2) reached a final judgment on the merits, and (3) involved identical parties or privies."  *Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985, 987 (9th Cir. 2005) (quotations and ellipses omitted) (quoting and citing *Sidhu v. Flecto Co.*, 279 F.3d 896, 900 (9th Cir. 2002)).

The underlying arbitration does not involve the same claim or cause of action as the Chung

Action.  To determine whether the two cases involve the same claim or cause of action, courts in the Ninth Circuit consider the following four factors: "(1) whether the two suits arise out of the same transactional nucleus of facts; (2) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (3) whether the two suits involve infringement of the same right; and (4) whether substantially the same evidence is presented in the two actions." *Mpoyo*, 430 F.3d at 987.  None of the factors have been met here.

First and most importantly, the Chung Action and the underlying arbitration do not arise out of the same transactional nucleus of facts.  "Whether two events are part of the same transaction or series depends on whether they are related to the same set of facts and whether they could conveniently be tried together." *W. Sys., Inc. v. Ulloa*, 958 F.2d 864, 871 (9th Cir. 1992), *as amended* (June 23, 1992) (citing Restatement (Second) Judgments § 24(2)).  The Ninth Circuit has often held "the common nucleus criterion to be outcome determinative under the first res judicata element." *Mpoyo*, 430 F.3d at 988.

Indeed, the facts at issue in the underlying arbitration are completely different from those in the First Arbitration.  The conduct at issue in the Chung Action and the First Arbitration spanned from November 2015 through October 2016.  First Amended Compl. (Dkt. 29), *Chung Action*, at ¶¶ 10-22, and the First Arbitration's final award was issued on June 26, 2019, *see* First Award at 140.  The earliest conduct in dispute in the underlying arbitration did not occur until after that date.  For example, the 2019 Notices were served by the GPs on September 5, 2019, and the Hong Kong Action was filed on October 28, 2019.  Final Award at ¶¶ 192, 229.  GIIL and CFLD's records inspection requests spanned between August 2019 through February 2021, and the GPs' illegitimate capital call was issued on January 21, 2020.  *Id.* at ¶ 231, 278-88.

The GPs argue that the claims in the underlying arbitration "certainly could have been brought in the same action" as the Chung Action, Mot. to Vacate at 23-25, but they ignore one fundamental issue: GIIL and CFLD could not have brought claims against the *GPs* in the Chung Action because they were bound by the arbitration agreements in the LPAs.  And the claims they brought against Mr. Chung were not the same as those in the already-pending Second Arbitration, despite the GPs' misguided oversimplification that in both cases GIIL and CFLD alleged breaches of

1    fiduciary duties and were based on the same investment agreements. *Id.* at 23. In reality, the breach

2    claims were based on completely different conduct. The Chung Action alleged a breach of fiduciary

3    duty relating to Mr. Chung's unauthorized changes to the LPAs, *Chung Action*, 2020 WL 5355968 at

4    *1, while the Second Arbitration alleged breaches of fiduciary duty by the GPs due to a variety of

5    egregious conduct, including making unnecessary capital calls and obscuring financial information

6    from GIIL and CFLD, all of which occurred after the First Arbitration.

7         The GPs also claim that GIIL and CFLD alleged certain violations in the Second Arbitration

8    that relate to the ones alleged in the Chung Action. Mot. to Vacate at 24. This is false.[11] The Final

9    Award's mention of the GPs' and Mr. Chung's unauthorized post-closing changes does not alter the

10   fact that the two actions are completely unrelated, and the GPs' citations to the Final Award

11   demonstrate as much. Arbitrator Ali discusses the unauthorized changes in his discussion of the

12   First Award, *see* Final Award at ¶¶ 160-72, and also as background to the GPs' subsequent conduct

13   at issue in the Second Arbitration, *see id.* at ¶¶ 299, 512, as the GPs' additional misconduct relating

14   to those changes was not discovered until the during the Second Arbitration. But the unauthorized

15   post-closing changes were not a basis for any of Arbitrator Ali's findings. The GPs also state that

16   the Final Award "explored" and "considered" issues of Mr. Chung raising other funds and staffing

17   the current funds, Mot. to Vacate at 25, but again, the conduct the GPs point to in the Final Award

18   occurred after the First Arbitration concluded, *see* Final Award at ¶¶ 414-19, 427-31.

19        Second, the rights and interests established in the Chung Action were not destroyed or

20   impaired by the underlying arbitration. The GPs once again make a false equivalency between

21

22   _____

     [11] The cases cited by the GPs are also inapplicable. In *Ortega v. Richie*, the plaintiff attempted to

23   include multiple other incidents while alleging the same claim as a previously dismissed case, all
     within the same time period as the claims in the previous case. 2019 WL 251482, at *1 (N.D. Cal.

24   Jan. 17, 2019). In *Harry v. KCG Americas LLC*, the court concluded that res judicata of a previous
     suit barred the plaintiffs' claims because "a large portion of the allegations in the complaints are

25   nearly identical[,]" "Plaintiffs did not allege distinct and unrelated facts[,]" and Plaintiffs' additional
     RICO claims "are premised on the same underlying facts[.]" 2021 WL 2711746, at *4 (N.D. Cal.

26   July. 1, 2021). And in *Cruz v. Select Portfolio Servicing, Inc.*, the court concluded that "[t]he claims
     all stem from the same common nucleus of facts relating to the loan repayment and agreement into

27   which the Dela Cruzes entered in May 2007 and the related deed of trust regarding the Property.
     2019 WL 2299857, at *4 (N.D. Cal. May 30, 2019). Again, as repeated several times, the claims

28   GIIL and CFLD brought in the underlying arbitration arise from separate and distinct conduct from
     the conduct at issue the Chung Action or the First Arbitration, and are both factually and temporally
     different from each other.

seeking removal of Mr. Chung from the affairs of the Funds and dissolution of the Funds.  That Mr. Chung was permitted to continue operating the Funds in 2020 after the Chung Action has no bearing on whether or not the Funds that he is operating should be dissolved in 2022 due to substantial misconduct on behalf of the GPs.  And again, Arbitrator Ali was very clear that "[n]othing in [his] award overturns any findings of Arbitrator Ghikas[,]" which involved the same rights and claims as the Chung Action.  *Chung Action*, 2020 WL 5355968 at *6.  Indeed, a previous judgment "cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case."  *Lawlor v. Nat'l Screen Service Corp.*, 349 U.S. 322, 328 (1955).  Holding otherwise would cause the unjust result that once the GPs won the first arbitration, they could commit as many breaches of fiduciary duty as they liked over the remaining lifetime of the Funds and GIIL would have no recourse to do anything about it.

Third, the two suits involve infringement of separate rights.  The Chung Action involved a breach of fiduciary duty by Mr. Chung when he made the unauthorized post-closing changes, while the underlying arbitration addresses numerous breaches of fiduciary duties by the Funds' GPs, including numerous actions taken to enrich themselves to the detriment of GIIL and CFLD.

Finally, the evidence presented in the Chung Action is completely different than the evidence presented in the underlying arbitration.  The GPs have not pointed to any similar evidence because they cannot—the two actions involved completely different conduct.

Crucially, GIIL and CFLD note that the GPs' belated claim of res judicata belies the true policy behind res judicata—to conserve resources and avoid duplication.  *See Marin v. HEW, Health Care Financing Agency*, 769 F.2d 590, 594 (9th Cir. 1985) (noting that the underlying policy of res judicata was to "relieve parties of the cost and vexation of multiple law suits, conserve judicial resources and, by preventing inconsistent decisions, encourage reliance on adjudication." (citing *Allen v. McCurry*, 449 U.S. 90, 94 (1980)).  Rather than trying to conserve judicial resources, the GPs are trying to compound them.  After two years of arbitration, with a Final Award already issued, the GPs are only now claiming that the underlying arbitration should not have proceeded because it was precluded by the Chung Action.  Such a meritless argument demonstrates how, once again, the GPs intend to delay the confirmation of the Final Award because it was not in their favor.

1  Accordingly, res judicata based on the Chung Action does not bar the Second Arbitration.

2  **B.  The Arbitrator Had Authority To Order Dissolution of The Funds.**

3  The GPs also move to vacate the Final Award on the ground that Arbitrator Ali "exceeded

4  his authority by imposing a remedy of dissolution of the Funds." Mot. to Vacate at 27.  However,

5  the GPs conspicuously omit that not only was this issue thoroughly litigated in the underlying

6  arbitration, but that Arbitrator Ali concluded—after careful analysis of the LPAs and governing

7  law—that he did have authority to dissolve the funds under the Revised Uniform Limited

8  Partnership Act ("RULPA"), the LPAs, and equitable dissolution doctrine under Delaware law.

9  Final Award at ¶¶ 474-516.  After obtaining an unfavorable result, the GPs are now attempting to

10  relitigate this issue under the guise that Arbitrator Ali exceeded his authority.[12]

11  Under the FAA, a final arbitration award may be vacated "where the arbitrators exceeded

12  their powers[.]" 9 U.S.C. § 10(a)(4).  Arbitrators exceed their powers "not when they merely

13  interpret or apply the governing law incorrectly, but when the award is completely irrational, or

14  exhibits a manifest disregard of law[.]" *Kyocera*, 341 F.3d at 997 (quotations and citations omitted)

15  (citing to *French v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 784 F.2d 902, 906 (9th Cir. 1986)

16  and *Todd Shipyards Corp. v. Cunard Line, Ltd.*, 943 F.2d 1056, 1059-60 (9th Cir. 1991)).  However,

17  "[a]n arbitrator does not exceed its authority if the decision is a 'plausible interpretation' of the

18  arbitration contract." *U.S. Life Ins. Co. v. Superior Nat. Ins. Co.*, 591 F.3d 1167, 1177 (9th Cir.

19  2010).  "Accordingly, the court must defer to the arbitrator's decision as long as the arbitrator . . .

20  even arguably construed or applied the contract." *Id.* (quotations and brackets omitted).

21  "The scope of the arbitrator's authority is determined by the contract requiring arbitration, as

22  well as by the parties' definition of the issues to be submitted in the submission agreement."

23  *Schoenduve Corp. v. Lucent Techs., Inc.*, 442 F.3d 727, 732 (9th Cir. 2006).  "Furthermore, the

24  ―――――――――

[12] GIIL and CFLD note that the GPs appear to also suggest that Arbitrator Ali disregarded the LPAs'
25  provisions stating that a general partner "shall not be deemed to have breached any duties (including
fiduciary duties) it owes to the Partnership or any Limited Partner in taking any action that is
26  permitted by the terms of this Agreement." Mot. to Vacate at 5-6 (emphasis removed) (citing to Ex.
F to Declaration of Cheryl Cauley ISO Petition to Confirm (Dkt. 1-7) ("Fund I LPA") at § 15.4(g)
27  and Ex. E to Declaration of Cheryl Cauley ISO Petition to Confirm (Dkt. 1-6) ("China Fund LPA")
at § 14.4(g)).  However, aside from referencing this in their factual recitation, the GPs do not address
28  this argument any further.  Moreover, this argument has already been addressed and rejected by
Arbitrator Ali in the underlying arbitration. *See* Final Award at ¶¶ 396-97.

1  arbitrator's interpretation of the scope of his powers is entitled to the same level of deference as his

2  determination on the merits."[13]  *Id.* at 733.

3        Here, the GPs are attempting to relitigate GIIL and CFLD's dissolution claim under the guise

4  that Arbitrator Ali disregarded the LPAs.  As an initial matter, the GPs have fallen short of

5  demonstrating the requisite standard that Arbitrator Ali's interpretation of the LPAs or the applicable

6  law was not "plausible," was irrational, or was a "manifest disregard of the law."  Instead, the GPs'

7  argument rests solely on their disagreement with how Arbitrator Ali interpreted the LPAs, and they

8  now claim that Arbitrator Ali's interpretation "disregard[ed]" the LPAs' supposed limitation of an

9  arbitrator's remedial authority.  Mot. to Vacate at 30-32.  "[F]ederal courts of appeals have

10  repeatedly held, 'manifest disregard of the law' means something more than just an error in the law

11  or a failure on the part of the arbitrators to understand or apply the law.  It must be clear from the

12  record that the arbitrators recognized the applicable law and then ignored it.  As such, mere

13  allegations of error are insufficient."  *Collins*, 505 F.3d at 879 (quotations and citation omitted).

14  "There must be some evidence in the record, other than the result, that the arbitrators were aware of

15  the law and intentionally disregarded it."  *Bosack*, 586 F.3d at 1104 (quotations, brackets, and

16

17  [13] The GPs misrepresent the district court's standard of review of whether an arbitral award
exceeded the authority under the contract, claiming it should be de novo.  *See* Mot. to Vacate at 28-

18  29.  But "[d]e novo review [of an arbitral award] is not appropriate because the parties agreed that
the arbitrator would interpret the contract, and an arbitrator's interpretation of the scope of his

19  powers is entitled to the same level of deference as his determination on the merits."  *Immersion*,
188 F. Supp. 3d at 970 (quotations omitted) (rejecting argument that a violation of public policy

20  requires de novo review of an arbitrator's conclusions).  The *Immersion* court also noted that de
novo review of an arbitrator's conclusions on grounds other than public policy "find no support in

21  Ninth Circuit precedent."  *Id.*  Moreover, the cited authority in *Thomas Kinkade Co. v. Hazlewood*,
2007 WL 9812853, at *7 (N.D. Cal. Jun. 6, 2007), which the GPs in turn cite to, is a *non-binding*

22  Fifth Circuit case reviewing de novo a *district court's* ruling on whether an award is grounded in the
underlying collective bargaining agreement.  *See Delta Queen Steamboat Co. v. Dist. 2 Marine*

23  *Eng'rs Beneficial Ass'n, AFL-CIO*, 889 F.2d 599, 602 (5th Cir. 1989).  Ninth Circuit review of a
district court's confirmation or denial of an arbitration award is de novo, not a district court's review

24  of an arbitral award.  *See U.S. v. Park Place Assocs., Ltd.*, 563 F.3d 907, 918 (9th Cir. 2009).
Moreover, courts in this district have declined to review arbitration awards de novo.  *See, e.g.*,

25  *Freedom Investors Corp. v. Gantan*, 2017 WL 8772097, at *5 (N.D. Cal. Sept. 7, 2017) ("This Court
may not question the award because this is not a case where there has been manifest disregard of the

26  law.  This Court's function is not to evaluate the merits of the action *de novo*."); *Laughlin v.
VMWare, Inc.*, 2012 WL 6652487, at *5 (N.D. Cal. Dec. 20, 2012) ("Defendant's motion to vacate

27  essentially takes issue with the result of the arbitration and asks this Court to sit in de novo review of
the arbitration proceedings and the Arbitrator's determination.  Because the Court's discretion is

28  limited by the well-established standard of review of arbitration awards, the Court cannot review the
determination as Defendant requests.").

1   citation omitted).

2         The GPs' mere disagreement with Arbitrator Ali's conclusion is not a basis to find that an

3   arbitrator exceeded his authority, and the GPs conveniently ignore Arbitrator Ali's discussion in the

4   Final Award that addresses and rejects the GPs' exact argument.  Specifically, the LPAs provide that

5   "[t]he Arbitrator also shall be authorized to grant any temporary, preliminary or permanent equitable

6   remedy or relief he or she deems just and equitable and within the scope of this Agreement,

7   including, without limitation, an injunction or order for specific performance."  Fund I LPA at

8   § 15.5(a); China Fund LPA at § 14.5(a).  After determining that an arbitrator has jurisdiction to

9   dissolve Delaware partnerships pursuant to Section 17-802 of the RULPA and the Delaware Court of

10  Chancery, Arbitrator Ali also concluded that he had jurisdiction to dissolve the partnership based on

11  the parties' arbitration agreements in the LPAs, which "include the Parties' consent to arbitrate a

12  dissolution claim under Section 17-802 of the RUPLA."  Final Award at ¶¶ 478-79.  Arbitrator Ali

13  analyzed the parties' arbitration agreements, noting that "[t]he language is very broad and non-

14  exclusionary" such that the parties agreed to arbitrate "any claim, dispute, or controversy of

15  whatever nature arising out of or relating to this Agreement, including, without limitation, any action

16  or claim based on statute[,]" which a dissolution claim "clearly 'arises out of' and 'relates to' the

17  Investment Agreements."  *Id.* at ¶ 479 (quoting China Fund LPA § 14.5 and Fund I LPA § 15.5)

18  (brackets and ellipses omitted)).  In addition, the parties chose Delaware law to govern the LPAs,

19  and that law includes the RULPA and the power of equitable dissolution.

20        The GPs have not explained how GIIL and CFLD's dissolution claim does not arise out of or

21  does not relate to the Investment Agreements, or how Arbitrator Ali's analysis is implausible,

22  irrational, or manifestly disregarded the law.  Instead, the GPs merely conclude that the LPAs

23  "expressly limited the remedial authority of the Sole Arbitrator, such that if [it] goes beyond

24  compensatory damages, any such remedy must be 'within the scope of the agreement.'"  Mot. to

25  Vacate at 29.

26        The cases that the GPs rely on are also inapposite, as those cases involved arbitration or

27  contractual agreements that *expressly* prohibited the *exact* remedy issued by the arbitrator, which is

28  not the case here.  In *Phoenix Newspapers, Inc. v. Phoenix Mailers Union Local 752, Int'l Broth. Of*

*Teamsters*, the parties submitted to arbitration their dispute over the wages, hours, and working conditions of employees, and the Ninth Circuit concluded that the arbitrator's order for the parties to negotiate additional hourly compensation exceeded the arbitrator's authority because the parties' collective bargaining agreement, which contained the arbitration clause, expressly included a zipper clause stating that the parties fully bargained the wages, hours, and other terms and conditions of employment.  989 F.2d 1077, 1082 (9th Cir. 1993).  Thus, the arbitrator's remedy for the parties to negotiate additional hourly compensation "violate[d] the Agreement's zipper clause[.]"  *Id.*  In *Coast Trading Co. v. Pac Molasses Co.*, the Ninth Circuit affirmed vacatur of the arbitration award that extended the delivery date of a sale of goods because it exceeded the remedies permitted under the parties' contract, which permitted the buyer to either amend the contract so the seller could comply or cancel the contract and seek damages, and the arbitration submission requested only damages as permitted by the contract.  681 F.2d 1195, 1198 (9th Cir. 1982).  In *Thomas Kinkade Co. v. Hazlewood*, the district court determined that the arbitration panel's award to the defendants for lost profits and business value exceeded the arbitration panel's authority because the underlying agreement "explicitly and unequivocally" excluded liability of the plaintiff for damages (including lost profits) that arose out of the agreement.  2007 WL 9812853, at *7.  And in *Aspic Engineering & Construction Co. v. ECC CENTCOM Constructors, LLC*, the arbitrator voided the contracts based on the belief that the parties did not have a meeting of the minds, when "neither party presented this argument to the Arbitrator" and the briefs were "replete with admissions that a valid contract existed."  268 F. Supp. 3d 1053, 1059-60 (N.D. Cal. July 18, 2017).  In contrast, in the instant case, there is nothing in the LPAs that expressly, explicitly, or unequivocally prohibits dissolution of the Funds; therefore, contrary to the baseless assertions by the GPs, Arbitrator Ali's order for dissolution does not "conflict" with the LPAs.  Instead, the LPAs expressly give an arbitrator authority for broad remedies, including "permanent equitable remedy or relief."  Fund I LPA at § 15.5(a); China Fund LPA at § 14.5(a).  GIIL and CFLD also submitted to arbitration the explicit request for the Funds to be dissolved.  *See* Final Award at ¶ 317.

Moreover, courts have consistently upheld an arbitrator's authority to issue equitable relief.  *See Am., Etc., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 2017 WL 6622993, at

*4-5 (N.D. Cal. Dec. 28, 2017) (upholding arbitrator's order of equitable relief in the form of petitioner's payment to respondent's related entity); *Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Disease & Related Disorders Ass'n of San Diego, Inc.*, 2018 WL 1562012, at *4 (S.D. Cal. Mar. 29, 2018) (upholding arbitration award that included injunctive relief because "courts have recognized an arbitrator's power to award equitable relief," citing to Ninth Circuit cases); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 32 (1991) (recognizing that "arbitrators do have the power to fashion equitable relief"). Accordingly, the Final Award's ordered dissolution of the Funds is clearly within the scope of Arbitrator Ali's authority pursuant to the LPAs and the arbitration submissions.[14]

The GPs argue that the LPAs prohibit dissolution based on clauses governing the terms of the partnerships and early termination of the partnerships. Mot. to Vacate at 30-32. First, the GPs falsely equate authority to dissolve the Funds with grounds for early termination of the Funds. In rejecting the GPs' argument that the LPAs provide only two exclusive grounds for termination, Arbitrator Ali pointed out that the two grounds for termination under Section 10.2(a) of the LPAs "suggests that the Parties merely agreed on additional scenarios that would allow them to dissolve the Funds; it does *not* suggest that the Parties, in fact, agreed to exclude the statutory dissolution option under Section 17-802 of the RULPA." Final Award at ¶ 480 (emphasis in the original). Instead, Arbitrator Ali noted that if the parties intended to provide two *exclusive* grounds for dissolution, "they could have drafted these provisions differently." *Id.* Even the GPs acknowledged that Arbitrator Ali concluded that the termination provision of the LPAs did not limit his remedial authority, and they have not presented any evidence—other than their own interpretation of the LPAs—of the implausibility, irrationality, or manifest disregard of the law of Arbitrator Ali's conclusion. As the other clauses the GPs rely on—namely, sections 2.1 and 2.4—incorporate by reference the non-exclusive grounds for early termination, *see* Mot. to Vacate at 30-31, those clauses

---

[14] Even if the LPAs do not expressly provide the remedy of dissolution, courts have upheld an arbitral award that was not explicitly provided for in the underlying agreement. *See Medi-Soft, Inc. v. Royco, Inc.*, 21 F. App'x 570, 572 (9th Cir. 2001) (holding that arbitral award did not exceed authority under California law because "[t]he remedy ordered in an arbitration does not need to be specifically provided for in the agreements, as long as the remedy is intended to provide an appropriate remedy to resolve all the disputes between the parties.").

1  would also not prohibit Arbitrator Ali from ordering dissolution.

2  Although unclear, the GPs appear to also seek vacatur on the basis that Arbitrator Ali

3  "ignored the investment agreements' express requirements for how a dissolution must occur when it

4  is permissible." Mot. to Vacate at 31-32. But again, Arbitrator Ali addressed this argument in his

5  Final Award, noting that:

> Section 10.2(b) of the LPAs state that 'the General Partner shall carry out
6  the duties of the liquidator' absent certain circumstances that are not present here.
   However, using my power under Sections 14.5(a)/15.5(a) of the LPAs to 'grant any
7  temporary, preliminary or permanent equitable remedy or relief he or she deems
   just and equitable and within the scope of this Agreement,' I order that the GPs
8  shall not serve as the Funds' liquidators in light of their reckless breaches of their
   fiduciary duties. Using the same powers, I order the Parties to jointly select a
9  liquidator for each Fund within three months of this award. The Parties may agree
   to extend this period further. Should the Parties be unable to reach a consensus,
10  GIIL may appoint a reputable liquidator in its own discretion.

11  Final Award at ¶ 516. Further, Section 10.2(b) of the LPAs only applies when "the Partnership is

12  dissolved pursuant to the provisions of paragraph 10.2(a)(i)." Fund I LPA at § 10.2(b); China Fund

13  LPA at § 10.2(b). Because the Funds are not being dissolved pursuant to 10.2(a)(i), Section 10.2(b)

14  is therefore inapplicable. As Arbitrator Ali correctly determined that the LPAs authorized him to

15  issue any equitable award that he deems appropriate, the dissolution procedure ordered also does not

16  conflict with the LPAs.[15]

17  More importantly, the GPs' arguments are essentially inviting the Court to reweigh the

18  evidence, which the Court does not have authority to do. *Am., Etc., Inc.*, 2017 WL 6622993, at *5

19  ("Whether the arbitrator's findings about the relationship between [respondent and its related

20  entities] or his decision to order equitable relief in the form of [petitioner's] payment to

21  [respondent's related entity] were erroneous is not for the court to decide, as neither erroneous legal

22  conclusions nor unsubstantiated factual findings justify federal court review of an arbitral award

23  under the FAA statute, which is unambiguous in this regard." (original brackets and quotations

24  omitted)); *Coutee v. Barington Cap. Grp., L.P.*, 336 F.3d 1128, 1134 (9th Cir. 2003) ("The

25  arbitrators considered this factual dispute and resolved it in favor of the [petitioner]. We have no

26

27  _____
   [15] The GPs also erroneously complain that GIIL and CFLD "cho[se] their own agent, Mr. Wong, as
   liquidator[,]" Mot. to Vacate at 32, when in reality, GIIL and CFLD offered Mr. Wong as a proposed
28  jointly appointed liquidator, to which the GPs could object or offer a counterproposal. As of the date
   of this Opposition, the GPs have yet to propose a liquidator.

authority to re-weigh the evidence.").  The parties have already thoroughly litigated this issue, and Arbitrator Ali ultimately found that he had the authority to order dissolution based on the parties' evidence and submissions over the course of the arbitration.  *See* Final Award at ¶¶ 473-516. Therefore, the Court should give deference to Arbitrator Ali's interpretation of the LPAs' grounds for termination to be non-exclusive and encompass statutory and equitable dissolution, as it is a plausible interpretation and the GPs have not demonstrated otherwise.  *See U.S. Life Ins. Co.*, 591 F.3d at 1178-79.

Under the GPs' reading, they have sole control over when they want to terminate the Funds despite their repeated and consistent misconduct.  The GPs have been using the Funds as a reservoir of cash for their own benefit, and they are seeking to keep control of the Funds so that they may drain out as much money as possible.  Even Arbitrator Ali recognized the same when finding that dissolution is necessary because the parties are not furthering the purpose of the LPAs.  Namely, Arbitrator Ali noted that the GPs' refusal to hold any advisory meetings or "share the necessary information with GIIL and CFLD" prohibits GIIL and CFLD from achieving the China Fund's purposes as laid out in the LPAs, Final Award at ¶ 497; the GPs' reservation of "over 80% of the Funds' investment capital for expenses other than future investments and using Fund I's money for management fees rather than investments . . . have turned China Fund's and Fund I's activities into purely a residual, inertial status quo justifying their dissolution," *id.* at ¶ 499 (internal quotations omitted); the parties' completely eroded and deteriorated relationship, *id.* at ¶ 500; and the GPs' continuously untrustworthy conduct as a general partner to the Funds, *id.* at ¶ 501.  Accordingly, the Court should deny the Motion to Vacate and confirm the Final Award.

### C.     There Is No Basis For A New Arbitrator To Re-Evaluate Indemnification Or The Prevailing Party Analysis.

The GPs also request that, in addition to vacating the dissolution order in the Final Award, the Court should also vacate "the [Final] Award's determination that [GIIL and CFLD] are the prevailing parties" and that the GPs are not entitled to indemnification.  Mot. to Vacate at 32-33. For these two grounds of vacatur, the GPs request the Court to remand to a new arbitrator.  *Id.* at 33.

As an initial matter, the GPs offer no basis whatsoever for vacatur of Arbitrator Ali's conclusion that GIIL and CFLD were the prevailing parties and that the GPs are not entitled to

indemnification.  The GPs merely proffer their own opinion on why Arbitrator Ali's conclusions are erroneous.  But again, as GIIL and CFLD repeatedly emphasized with the GPs' other arguments, the GPs have not even tried to overcome the high deference given to an arbitrator's decision.  Assuming generously that the GPs are moving to vacate those two issues on the same basis as the dissolution issue, which the GPs have not explained, the GPs completely fail to demonstrate how Arbitrator Ali's analysis regarding the prevailing parties and the indemnification denial were completely irrational or manifestly disregarded the law.  *See Kyocera*, 341 F.3d at 997.

Even setting aside the fact that the GPs have not met the standard for vacatur, the GPs once again misrepresent the findings and conclusions in the Final Award.  First, Arbitrator Ali not only found GIIL and CFLD to be the prevailing party in their dissolution claim, but also found that GIIL and CFLD "prevailed in respect of their other claims and defenses[,]" including six different claims for breaches of fiduciary duties by the GPs.  *See* Final Award at ¶¶ 412, 426, 430, 449, 456, 460, 593.  Indeed, the GPs attempt to circumvent this by arguing that "the Second Award does not suggest that this fact alone would suffice to render [GIIL and CFLD] the prevailing parties in the Second Arbitration" and that "this sentence (in sharp contrast with the one before) does not say that the prevailing-party ruling can rest on the determination of breach alone."  Mot. to Vacate at 33.  The GPs are essentially asking the Court to review the evidence of whether the GPs should be considered the prevailing party such that their fees would be covered under the LPAs, which the Court does not have the authority to do.  *See Am., Etc., Inc.*, 2017 WL 6622993 at *5.

Second, the GPs' objection to the indemnification denial likewise is another impermissible invitation for the Court to reweigh the evidence.  Specifically, Arbitrator Ali denied the GPs indemnification by the Funds for their costs and fees explicitly "because they have recklessly breached their fiduciary duties."  Final Award at ¶ 597.  There is nothing that ties the denial of indemnification to GIIL and CFLD's dissolution claim, and the GPs conspicuously do not point to anything, either.  In fact, the GPs attempted and failed to seek indemnification in their Application—Arbitrator Ali rejected the GPs' arguments for indemnification, noting that the GPs "are not requesting an interpretation or clarification with respect to specific language used or a determination made on the indemnification rights in the Final Award," but instead are requesting Arbitrator Ali to

"make an additional award in respect of the issue of indemnification" by "present[ing] a new claim wrapped in the cloak of a request for interpretation."  Disposition at ¶ 17.  He also rejected the GPs' request for a supplemental indemnification award because the GPs "failed specifically to raise [this] claim . . . in a timely fashion" and therefore "cannot at this stage request a reconsideration under the guise of a request for an additional award."  *Id.* at ¶ 28.  Thus, Arbitrator Ali made a determination on the merits of the GPs' argument, and this Court has no authority to disturb his findings.  *See Dastime Grp Ltd. v. Moonvale Invs. Ltd.*, 2017 WL 4712179, at *6-7 (N.D. Cal. Oct. 11, 2017) (upholding arbitral award of attorney's fees because the underlying agreement authorized discretionary award of attorney's fees).

Accordingly, there is no basis for vacating the Final Award with respect to the prevailing party or indemnification issues, and thus the Court does not need to appoint a new arbitrator.

### D.   GIIL And CFLD's Fees Should Be Awarded.

In addition to the attorney's fees awarded in the Final Award, GIIL and CFLD respectfully request that the Court award GIIL and CFLD attorneys' fees and interest relating to and arising out of this action to confirm the Final Award.

Courts have held that in actions to confirm an arbitration award, the prevailing party is entitled to attorneys' fees if authorized by the parties' agreements.  *See Sailfrog Software, Inc. v. Theonramp Grp., Inc.*, 1998 WL 30100, at *5 (N.D. Cal. Jan. 20, 1998) (awarding attorneys' fees and costs to party seeking confirmation of an arbitration award because the underlying agreement permits awarding costs in both the arbitration and confirmation proceeding); *Cypress Equip. Fund, Ltd. v. Royal Equip., Inc.*, 1997 WL 106137, at *14 (N.D. Cal. Jan. 13, 1997) (same).  In addition, courts have held that an award of fees is appropriate in a confirmation proceeding where the arbitrator awarded fees to the prevailing party.  *Alvarado v. Newcon Concrete Constr., Inc.*, 2006 WL 8459697, at *4 (N.D. Cal. June 22, 2006), *report and recommendation adopted*, 2006 WL 8459698 (N.D. Cal. July 14, 2006) (awarding attorneys' fees and costs because "reasonable attorneys' fees and costs of this proceeding were awarded by the arbitrator in both [arbitration] awards" so "confirmation of the awards necessarily includes an award of reasonable attorneys' fees and costs").

Under the LPAs, if "any legal proceedings relating to the failure of a Limited Partner to make [contributions of capital] are commenced, the prevailing party shall be entitled to reimbursement from the opposing party of all costs and expenses incurred, including attorneys' fees and expenses, in connection with such proceedings."  Fund I LPA at § 4.4; China Fund LPA at § 4.4.  Here, the underlying arbitration contained numerous claims relating to GIIL's refusal to comply with the GPs' illegitimate capital calls and interest accrual notices relating to the missed escrow payments, and therefore was unquestionably related to GIIL's failure to make capital contributions.  For example, in the Amended Demand for Arbitration GIIL and CFLD sought a finding of breach of fiduciary duty based on the GPs' attempt to enforce the deposit requirements and issuance of illegitimate capital calls, and requested that the arbitrator determine that they need not provide further capital to the Funds.  *See* Ex. Q to Cooper Decl. (Dkt. 34-17) ("Amended Demand") at ¶¶ 2, 111-16; *see also* Ex. C to Cauley Decl., filed herewith ("Initial Demand") at ¶¶ 62, 76-87.  This confirmation proceeding is, in turn, a legal proceeding relating to those same issues.  Moreover, Arbitrator Ali awarded GIIL and CFLD their costs and fees, including post-award interest of 8%, in the Second Arbitration, *see* Final Award at ¶ 598(i), (j), (l), so confirmation of his award includes an award of reasonable attorneys' fees and interest.  And 28 U.S.C. § 1961 permits post-judgment interest.  As such, GIIL and CFLD are entitled to their attorneys' fees and interest upon confirmation of the Final Award and denial of the GPs' motion to vacate.

Additionally, the Ninth Circuit has confirmed that, for actions brought under the Convention, "[i]t is well settled . . . that even absent express statutory authority, federal courts have authority to award attorney's fees when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons."  *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1104 (9th Cir. 2011).  "An unjustified refusal to abide by an arbitrator's award, moreover, may equate an act taken in bad faith, vexatiously or for oppressive reasons."  *Id.* (quoting and citing to *Sheet Metal Workers*, 84 F.3d at 1192).

Here, with each of their filings, the GPs have demonstrated that they are seeking to delay publication and enforcement of the award as much as possible.  First, the GPs' stance that a majority of the Final Award should be "temporarily" or "permanently" placed under seal, based on only

1   conclusory claims of harm and meritless bases to seal even public information, has resulted in

2   countless hours and volleys of briefing by both parties.  *See, e.g.*, Dkts. 2, 16, 20, 21, 26, 29, 34, 39.

3   Moreover, both the GPs' Application and Motion to Vacate continue to demonstrate their meritless

4   efforts to delay enforcement of the Final Award.  As Arbitrator Ali noted, the GPs attempted to bring

5   new claims before Arbitrator Ali "wrapped in the cloak of a request for interpretation[,]" *see*

6   Disposition at ¶¶ 17, 21, 28, and the GPs now attempt to do the same with their res judicata claim,

7   *see supra*, Section IV.A.  Additionally, the GPs now improperly seek judicial review of the findings

8   and conclusions of Arbitrator Ali, which a court is not permitted to do barring exceptional

9   circumstances, none of which apply here.  Because the GPs' bases for vacatur are meritless, the

10  Court should grant GIIL and CFLD attorneys' fees in connection with this action to confirm the

11  Final Award.  *See Ministry of Def. & Support for Armed Forces of Islamic Republic of Iran v. Cubic*

12  *Def. Sys., Inc.*, 2013 WL 55828, at *6 (S.D. Cal. Jan. 3, 2013) (awarding attorneys' fees because

13  "Cubic's opposition to confirmation of the award was weak, and Cubic raised entirely new

14  arguments on appeal.").

15  **V.      CONCLUSION**

16         For the foregoing reasons, GIIL and CFLD respectfully request that the Court issue an order

17  confirming the Final Award, as authorized by 9 U.S.C. § 207, and directing that the Final Award be

18  entered as a judgment of this Court.  GIIL and CFLD also respectfully request that the Court issue an

19  order denying the GPs' Motion to Vacate the Final Award, and an order awarding GIIL and CFLD

20  attorneys' fees and costs and post-judgment interest under 28 U.S.C. § 1961 in connection with this

21  Action.  Finally, Petitioners respectfully request that the Court retain jurisdiction over this action,

22  pursuant to Rule 69 of the Federal Rules of Civil Procedure, permit any discovery that may be

23  proper to aid in the enforcement of the judgment, and grant any other relief that this Court, in the

24  interest of justice, deems necessary and proper.

25

26   DATED: January 7, 2022                    Respectfully submitted,

27                                             By: /s/     *Cheryl Cauley*
                                               Cheryl Cauley (SBN 252262)
28

Cheryl.cauley@bakerbotts.com
Yan Zhang (SBN 248531)
Yan.zhang@bakerbotts.com
BAKER BOTTS LLP
1001 Page Mill Road, Suite 200
Palo Alto, CA 94304
Phone: 650-739-7500

Andrew Behrman (admitted *pro hac vice*)
Andrew.behrman@bakerbotts.com
BAKER BOTTS LLP
30 Rockefeller Plaza
New York, NY 10112
Phone: 212-408-2500
Fax: 212-408-2501

*Attorneys for Petitioners Global Industrial Investment Limited and China Fortune Land Development*

PETITIONERS' OPPOSITION TO RESPONDENTS' MOTION TO VACATE FINAL ARBITRATION AWARD
AND REPLY IN FURTHER SUPPORT OF PETITION TO CONFIRM FINAL ARBITRATION AWARD