UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GLOBAL INDUSTRIAL INVESTMENT
LIMITED, et al.,

Plaintiffs,

v.

1955 CAPITAL FUND I GP LLC, et al.,

Defendants.

Case No. 21-cv-08924-HSG

**ORDER GRANTING IN PART AND DENYING IN PART POST-JUDGMENT MOTIONS**

Re: Dkt. Nos. 115, 117, 122, 136, 156, 158, 159, 160

As is apparent from even the most cursory review of the docket in this case, the parties and their respective counsel have been unable or unwilling to agree on how to move this case forward efficiently.  The parties are familiar with the facts of this case, and the Court has detailed the relevant background in its order granting the motion to confirm the final arbitration award and denying the motion to vacate the award.  *See* Dkt. No. 106 at 1–3.  In short, the Court concluded that the underlying arbitration was not barred by res judicata and the arbitrator did not exceed his authority in ordering the dissolution of the two Delaware limited partnership venture capital investment funds at issue in this case (the "Funds").

Following the Court's order confirming the arbitration award, Petitioners Global Industrial Investment Limited ("GIIL") and China Fortune Land Development ("CFLD") and Respondents 1955 Capital Fund I GP LLC and 1955 Capital China Fund GP LLC have filed serial motions regarding enforcement of the judgment and the arbitration award.  *See* Dkt. Nos. 115, 117, 122, 136, 156, 158, 159, 160.  The Court finds these matters appropriate for disposition without oral argument and the matters are deemed submitted.  *See* Civil L.R. 7-1(b).  For the reasons detailed below, the Court **GRANTS IN PART** and **DENIES IN PART** the motions.

//

## I.      MOTIONS FOR ATTORNEYS' FEES

### A.      Petitioners' Motion for Fees

As an initial matter, Petitioners argue that they are entitled to their attorneys' fees as the prevailing party, not only in the underlying arbitration, but also in this case to enforce the arbitration award.  *See* Dkt. No. 115.  They seek fees in the amount of $976,913.16 for the 1,141.10 hours spent confirming the final arbitration award and litigating this case.  *Id.*  Respondents oppose the request, arguing that Petitioners are not entitled to any attorneys' fees, but even if they were, their request is unreasonable.  *See* Dkt. No. 137.

#### i.      Entitlement to Fees

Petitioners argue that they are entitled to attorneys' fees based on the language of the parties' agreements.  As relevant here, the parties entered into a set of agreements regarding the governance, operation, and implementation of the Funds.  *See* Dkt. Nos. 1-2, 1-3, 1-4, 1-5, 1-6, 1-7, Exs. A–F ("Investment Agreements").  The Limited Partnership Agreements ("LPAs") provide that in certain circumstances, the "prevailing party" may be entitled to attorneys' fees:

> The Partnership shall be entitled to enforce the obligations of each Limited Partner to make the contributions of capital [], and the Partnership shall have all remedies available at law or in equity in the event any such contribution is not so made.  *If any legal proceedings relating to the failure of a Limited Partner to make such contribution are commenced, the prevailing party shall be entitled to reimbursement from the opposing party of all costs and expenses incurred, including attorneys' fees and expenses, in connection with such proceedings*.  The General Partner shall not seek any remedy under this paragraph . . . unless the default continues for at least 10 calendar days after notice by the General Partner to the defaulting Limited Partner of the default.

*See* Dkt. No. 1-6, Ex. E at § 4.4(a) ("China Fund LPA"); Dkt. No. 1-7, Ex. F at § 4.5(a) ("Fund I LPA") (emphasis added).  Respondents contend that this provision of the LPAs is inapplicable.

*First*, Respondents argue that this provision is only a "tool" available to the General Partner when he initiates proceedings to enforce Petitioners' capital contribution obligations.  *See* Dkt. No. 137 at 2–5.  They urge that the arbitration and this lawsuit were commenced by Petitioners, and Petitioners therefore cannot recover fees.  *Id.* at 2.

United States District Court
Northern District of California

Respondents take an overly narrow view of the attorneys' fees provision of the LPAs. This provision does not state that attorneys' fees are only available for proceedings commenced by General Partners. Rather, the provision broadly provides that the prevailing party will be entitled to fees when "*any* legal proceedings relating to the failure of a Limited Partner to make [a capital] contribution *are commenced* . . . ." *See* China Fun LPA at § 4.4(a) (emphasis added). Similarly, the provision states that "*the prevailing party* shall be entitled to reimbursement from *the opposing party* of all costs and expenses incurred . . . ." *Id.* (emphasis added). If the parties had intended that attorneys' fees were only available to the General Partner, there would be no need to discuss "prevailing" and "opposing" parties. The provision could have simply stated that if the General Partner prevails, he will be entitled to reimbursement of all costs and expenses by Petitioners.

*Second*, Respondents argue that the arbitration and this lawsuit were not legal proceedings "relating to the failure of [Petitioners] to make [capital] contributions." *See* Dkt. No. 137 at 2–5. Respondents point out that Petitioners commenced the arbitration based on claims of breaches of fiduciary duty, and the parties' arguments in this case turned on questions of res judicata and the scope of the arbitrator's authority. *See id.* at 2–3. But again, Respondents ask the Court to adopt a narrow view of both the LPAs and this case. Such a narrow reading is not required under the LPAs. To the contrary, the phrase "relating to" is broad. The fact that Petitioners' claims in the arbitration were couched as breaches of fiduciary duty or that Respondents raised procedural defenses to the arbitration award in this case is not dispositive. When properly contextualized, both the arbitration and this case clearly "relate to" Petitioners' alleged failure(s) to make capital contributions to the Funds.

Some additional background is instructive. This is not the first lawsuit among the parties: they have been involved in a lengthy and complex contractual dispute for many years regarding the same Funds. Under the Investment Agreements, Petitioner GIIL agreed to provide $200 million of venture capital to the Funds in three installments over a two-year period. *See* Dkt. No. 1-8, Ex. G ("Second Arbitration Award") at ¶ 3. It is undisputed that GIIL made an initial investment of $80 million, but did not make the second or third installments in December 2016 and December 2017. *See id.*; *see also* Dkt. No. 1 at 4; Dkt. No. 35 at 8–9. Because of GIIL's

failure to make the capital contributions:

- Respondents initiated the first arbitration against Petitioners, arguing that they had breached the Investment Agreements by failing to pay these last two installments (the "First Arbitration").  *See* Dkt. No. 35-3, Ex. B ("First Arbitration Award") at ¶¶ 55, 60–63, 370; *see also* Second Arbitration Award at ¶ 4.  Petitioners argued, in turn, that Respondents had breached their fiduciary duties, the agreements were thus void and unenforceable, and the initial $80 million they paid to the Funds should be returned.  *See* First Arbitration Award at ¶¶ 67–85, 371.

- In June 2019, the arbitrator issued a final award, concluding that the Investment Agreements were valid and enforceable, and that Petitioners had breached the agreements by failing to make the installment payments.  *See id.* at ¶¶ 135–207, 216–230, 349–69, 394–98, 422.  He further found that Respondents had breached their fiduciary duties.  *Id.* at ¶¶ 288–325, 391–93.  The arbitrator awarded each side nominal damages, but also awarded Respondents attorneys' fees and costs in the amount of approximately $9.3 million.  *Id.* at ¶¶ 393, 492, 466, 473, 487–92.

- Respondents sought to enforce the First Arbitration Award through an *ex parte* proceeding in Hong Kong (the "Hong Kong Enforcement Action"), despite the fact that Petitioners had already filed a petition to vacate the award in the United States. *See* Second Arbitration Award at ¶¶ 184–85, 192–202.  Around the same time, Respondents also issued notices of default and accrual of interest for the missed capital contribution installments.  *See id.* at ¶¶ 228–29.  They also made additional capital calls.  *See id.* at ¶¶ 231, 250–56, 272–73.

- In October 2019, Petitioners initiated a second arbitration that is the subject of this case (the "Second Arbitration").  *See id.* at ¶¶ 5, 27.  Petitioners argued that Respondents had again breached their fiduciary duties under the Investment

Agreements, by *inter alia*, attempting to enforce the default provisions to collect interest on the unpaid capital contributions and by initiating the Hong Kong Enforcement Action. *See id.* at ¶¶ 318–19, 321, 383. They also argued that Respondents had improperly issued subsequent capital calls, and issued notices of default when Petitioners refused to comply. *See id.*

- In the Second Arbitration Award, the arbitrator agreed that Respondents had breached or acted in reckless disregard of their fiduciary duties, including by enforcing the default provisions and making additional capital calls. *Id.* at ¶¶ 382, 398–405, 412, 422–25, 598.

Respondents do not engage with the actual bases for Petitioners' breach of fiduciary duty claims. *See* Dkt. No. 137 at 1–2. But as is clear from this recitation of events, Petitioners' failure to make capital contributions lies at the heart of the parties' disputes—including the Second Arbitration and this action. Petitioners failed to make two installment payments and refused to respond to subsequent capital calls; Respondents sought to apply default provisions under the agreements under which they could collect interest on the unpaid capital contributions; and the arbitrator concluded in the Second Arbitration that Respondents' conduct breached their fiduciary duties. Petitioners filed this case to enforce the Second Arbitration Award. That Respondents do not challenge the arbitrator's factual findings as to their breaches of fiduciary duty does not render this case *unrelated* to the capital calls.

*Third*, Respondents suggest that even if some attorneys' fees may be awarded under the LPAs, Petitioners were not the prevailing party as to their motion for preliminary injunction. *See* Dkt. No. 137 at 5–7. Respondents urge that Petitioners should therefore be precluded from recovering any fees associated with that motion. *Id.* But this argument defies the plain language of the LPAs. Under the agreements, "the prevailing party shall be entitled to reimbursement from the opposing party of *all costs and expenses incurred, including attorneys' fees and expenses, in connection with such proceedings*." *See* China Fund LPA at § 4.4(a); Fund I LPA at § 4.5(a)

1    (emphasis added).  The Court therefore need not parse through every hour billed to ensure that

2    Petitioners only collect based on those arguments or motions on which they prevailed.  Petitioners

3    clearly filed the motion for preliminary injunction "in connection" with these proceedings.  And in

4    any event, as discussed in Section I.B below, Respondents did not "prevail" in opposing the

5    motion for preliminary injunction.  The Court ultimately terminated the motion as moot without

6    reaching the substance.

7                    **ii.    Reasonableness of Fees**

8           Respondents lastly contend that even if Petitioners are entitled to attorneys' fees, their

9    request is unreasonable.  *See* Dkt. No. 137 at 7–9.  Respondents urge that "[t]his proceeding

10   should have been a straight-forward dispute over whether to confirm or vacate an arbitration

11   award that would require only a few attorneys per side."  *Id.* at 8.  Respondents therefore balk at

12   the fact that Respondents' legal team included 10 attorneys from two law firms.  *Id.*  But from the

13   outset, this hyper-litigated case has been anything but straightforward.  The underlying arbitrations

14   were fact-intensive and lengthy.  And as the volume of post-judgment motions illustrates, both

15   sides have aggressively litigated every conceivable issue.  Simply keeping track of the materials

16   that Respondents have sought to seal in over thirty distinct administrative motions has been a

17   time-intensive task.  *See* Dkt. Nos. 108, 175.

18          Respondents point out that they staffed fewer attorneys and fewer partners on this matter.

19   *See* Dkt. No. 137 at 8.  But neither Respondents' strategic choice nor the lack of parity between

20   the legal teams is the touchstone of reasonableness.  And counsel have provided an explanation for

21   their lodestar in this case, detailing the hours each attorney billed on specific tasks associated with

22   this case.  *See* Dkt. No. 115-1; Dkt. No. 115-2, Ex. A; Dkt. No. 115-3.  Respondents do not point

23   out with any specificity where Petitioners engaged in duplicative or inefficient work.

24   Respondents' claims of unreasonableness are also belied by their own motion for attorneys' fees.

25   Although all counsel ultimately gave their respective clients discounts, the attorneys for both sides

26   billed at similar hourly rates.  The hourly rates for the attorneys working on Petitioners' case were

27   between $645 and $960 for associates and $1,085 and $1,650 for counsel and partners, depending

28   on their experience levels.  *See* Dkt. No. 115-1; Dkt. No. 115-2, Ex. A; Dkt. No. 115-3.  Likewise,

United States District Court
Northern District of California

6

United States District Court
Northern District of California

1   the hourly rates for the attorneys working on Respondents' case ranged between approximately

2   $1,200 and $1,600.  *See* Dkt. No. 117-1; Dkt. No. 117-2, Ex. A.  Moreover, Respondents' smaller

3   team of attorneys still billed over 158 hours and incurred fees based on these rates of over

4   $190,000 for a single motion in this case (the opposition to the motion for preliminary injunction).

5   *See* Dkt. No. 117 at 8–9; Dkt. No. 117-1 at ¶¶ 5–6.

6          Nevertheless, as discussed in more detail in Sections II and III.A below, the Court has

7   concerns that Petitioners' attempt to enforce the Second Arbitration Award by appointing a

8   liquidator even before this case was resolved was premature.  In their motion for attorneys' fees,

9   Petitioners note that they "commence[d] the liquidation process by appointing a liquidator" and

10  have been trying to work with Respondents as part of this process since November 2021.  *See* Dkt.

11  No. 115 at 16; *see also* Dkt. No. 142 at 9, n.6 (arguing that counsel is entitled to fees for this time).

12  But Respondents were clear that they intended to challenge the award in general and the

13  dissolution of the Funds more specifically in court through a motion to vacate.  *See* Dkt. No. 35-

14  17, Ex. P.  Proceeding with the selection of a liquidator and the dissolution of the Funds over these

15  objections could have denied Respondents meaningful review of the Second Arbitration Award if

16  this Court had agreed with their arguments (or if the Ninth Circuit does on appeal).  It is not clear

17  what, if any fees, Petitioners are seeking from this liquidation process, or if any of this time is

18  included in their requested $976,913.16.  One of the declarations Petitioners filed in support of

19  their motion lists 4.6 hours incurred on "other" tasks, which may include "work in relation to the

20  liquidator."  *See* Dkt. No. 115-3 at ¶¶ 22, 23.

21         But the Court finds that any fees associated with appointing a liquidator and commencing

22  liquidation are not properly sought here.  The Court accordingly **GRANTS IN PART** and

23  **DENIES IN PART** the motion for attorneys' fees.  The Court **DIRECTS** Petitioners to provide a

24  supplemental filing and detailed billing records identifying the hours spent and fees incurred

25  appointing a liquidator and seeking to commence dissolution of the Funds that are reflected in the

26  $976,913.16 in fees requested in their motion.  Dkt. No. 115.  Petitioners are cautioned that this is

27  not an opportunity to pad their requested fees with the additional time they may have spent on this

28

7

United States District Court
Northern District of California

1    case since initially filing their motion for attorneys' fees.[1]  Petitioners shall provide the requested

2    documents by email, with Respondents' counsel cc'd, to hsgpo@cand.uscourts.gov, by October

3    13, 2023.

4          **B.    Respondents' Motion for Fees**

5          Respondents, for their part, have also filed a motion for attorneys' fees.  *See* Dkt. No. 117.

6    Although not the prevailing party in this action, Respondents urge that they are entitled to the

7    $190,269.10 in fees that they incurred in opposing Petitioners' motion for preliminary injunction.

8    According to Respondents, the motion for preliminary injunction, filed in April 2022, was wholly

9    frivolous since it was filed several months after Petitioners filed this case and briefing on the

10   motion to confirm and motion to vacate the arbitration award was already complete.  *See* Dkt. No.

11   117 at 4–7.

12         The Court never substantively ruled on the motion for preliminary injunction.  Rather, the

13   Court took the motion under submission in July 2022, Dkt. No. 104, and ultimately terminated it

14   as moot two months later in its order granting the motion to confirm the arbitration award, Dkt.

15   No. 106 at 14.  Nevertheless, Respondents urge that the timing and substance of the motion for

16   preliminary injunction were suspect and thus demonstrate Petitioners' bad faith.  *See generally*

17   Dkt. No. 117.

18         **i.    Legal Standard**

19         The Ninth Circuit has explained that courts have "[t]hree primary sources of authority" to

20   impose sanctions for improper conduct:  "(1) Federal Rule of Civil Procedure 11, which applies to

21   signed writings filed with the court, (2) 28 U.S.C. § 1927, which is aimed at penalizing conduct

22   that unreasonably and vexatiously multiplies the proceedings, and (3) the court's inherent power."

23   *Fink v. Gomez*, 239 F.3d 989, 991 (9th Cir. 2001).  Respondents ask the Court to exercise its

24

25   [1] In its initial motion, Petitioners suggested that they would file supplemental documentation to

26   support an award of additional fees incurred in the preparation of the motion for attorneys' fees
     itself and any related motions to seal.  *See* Dkt. No. 115 at 1–2, n. 3.  They have not done so.  In a
     footnote Petitioners also argue that they should be awarded fees in opposing Respondents' own

27   motion for attorneys' fees.  *See* Dkt. No. 142 at 8, & n.5.  But Petitioners have not provided
     sufficient support for the requests of additional fees, despite having ample time to do so.  The

28   Court **DENIES** any such request and looks only to whether their requested $976,913.16 in fees is
     reasonable.

inherent power to award attorneys' fees in this instance.  *See* Dkt. No. 117 at 4–5.

Under their inherent power, federal courts may impose sanctions only when there is a "specific finding of bad faith." *In re Keegan Mgmt. Co., Sec. Litig.*, 78 F.3d 431, 436 (9th Cir. 1996).  Bad faith "includes a broad range of willful improper conduct." *Fink*, 239 F.3d at 992.  However, "mere recklessness, without more" is insufficient.  *Id.* at 993–94.  For purposes of imposing sanctions, recklessness must be "combined with an additional factor such as frivolousness, harassment, or an improper purpose." *Id.* at 994.  Nevertheless, "a finding of bad faith does not require that the legal and factual basis for the action prove totally frivolous; where a litigant is substantially motivated by vindictiveness, obduracy, or mala fides, the assertion of a colorable claim will not bar the assessment of attorney's fees." *Id.* at 992 (quotations omitted).

### ii.    Discussion

The Court finds that sanctions in the form of attorneys' fees are not warranted here under the Court's inherent powers.  The Court declines the parties' invitation to wade into the substance of the now moot motion for preliminary injunction.  But critically, there is nothing in the record establishing that Petitioners acted in bad faith, or knowingly or recklessly raised a frivolous claim in filing the motion for preliminary injunction.  As Petitioners explain, their motion was prompted by growing concern that the money from Petitioners' investment in the Funds had been disbursed or transferred such that only a small fraction remained.  *See* Dkt. No. 134 at 11–12.  As discussed in Sections II and III below, this appears to be an ongoing concern in advance of the Funds' ordered dissolution.  Petitioners therefore filed the motion out of concern that they were "likely to suffer irreparable harm in the absence of preliminary relief" since the motion to confirm the arbitration award remained pending.  *See id.* at 12 (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).  The Court recognizes that Respondents disagree with Petitioners' rationale, but that is insufficient to find that the motion for preliminary injunction was frivolous or filed in bad faith.  From the outset, both sides have litigated this case aggressively, including through the filing of successive motions, and the motion for a preliminary injunction is simply one example.  The Court declines to exercise its discretion to award attorneys' fees to Respondents on this basis.

United States District Court
Northern District of California

United States District Court
Northern District of California

In the alternative, Respondents suggest that if Petitioners are entitled to fees under the LPAs as the prevailing party, then they too are entitled to fees under the LPAs as the prevailing party on the motion for preliminary injunction. *See* Dkt. No. 117 at 7–8. This argument is not well taken. Even if the LPAs permitted an award of attorneys' fees based on interim steps in the litigation, Respondents are not the "prevailing party" on the motion for a preliminary injunction. The Court found that the motion was moot, and did not rule in favor of either party on that particular motion. The Court reached no conclusion on the merits of the motion for preliminary injunction because it ultimately found in favor of *Petitioners* on their motion to confirm the arbitration award. *See* Dkt. No. 106. That Respondents may have argued that efficiency would counsel in favor of deciding the motion to confirm the arbitration award first, *see* Dkt. No. 85 at 10, does not elevate them to the prevailing party for purposes of the motion for preliminary injunction. Respondents' motion for attorneys' fees is therefore **DENIED**.

## II.    MOTION FOR STAY OF ENTRY OF JUDGMENT

Respondents also move to stay enforcement of the judgment pending the appeal before the Ninth Circuit. Dkt. No. 136. As relevant here, in the Second Arbitration Award, the arbitrator ordered:

- The Funds should be dissolved, and in doing so, Respondents shall not serve as the liquidators and the parties should instead "jointly select a liquidator for each Fund." If the parties are unable to agree, Petitioners "may appoint a suitably qualified liquidator of international standing and repute." *See* Second Arbitration Award at ¶ 598(b).

- Respondents "shall reimburse the Funds for any fees, expenses, and sanctions paid out of the Funds' bank accounts and/or escrow accounts in relation to the Hong Kong Enforcement Action and shall provide a detailed accounting in connection with the foregoing amounts to [Petitioners]." *See id.* at ¶ 598(d); *see also id.* at ¶ 413 (ordering the return of any of the Funds' money used to pay "for the fees and expenses that the Hong Kong court awarded to GIIL and CFLD").

10

- Petitioners are awarded their costs and fees for the arbitration in the amount of $8,826,634.64. *See id.* at ¶ 598(i).

- Respondents shall pay the administrative fees and compensation of the arbitrator and research assistant in the amount of $839,503.21. *See id.* at ¶ 598(j). Accordingly, Respondents were ordered to reimburse Petitioners for the $425,014.11 that they previously incurred for these costs and expenses. *Id.*

- The amounts awarded are subject to post-award interest. *See id.* at ¶ 598(l).

Respondents argue that a stay is warranted as to both the dissolution of the Funds and the payment of any monetary portions of the award under Federal Rule of Civil Procedure 62. *See* Dkt. No. 136 at 5–15.

## A. Legal Standard

Federal Rule of Procedure 62(c) provides that "[a]t any time after judgment is entered, a party may obtain a stay by providing a bond or other security." Fed. R. Civ. P. 62(c). Similarly, "[w]hile an appeal is pending from a[ ] final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(d).

Whether to issue a stay pending appeal is "an exercise of judicial discretion . . . to be guided by sound legal principles." *Nken v. Holder*, 556 U.S. 418, 433–34 (2009). To determine whether to issue a stay, courts consider the following four factors:

> (1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

United States District Court
Northern District of California

1   *Leiva–Perez v. Holder*, 640 F.3d 962, 964 (9th Cir. 2011) (citing *Nken*, 556 U.S. at 434).  In

2   *Leiva-Perez*, the Ninth Circuit clarified that the Supreme Court's opinion in *Nken* "raised the

3   minimum permissible showing of irreparable harm necessary to justify a stay," requiring a

4   showing that "irreparable harm is probable" absent a stay.  *Id.* at 965, 968.  Nevertheless, the

5   Ninth Circuit has emphasized that determining whether to issue a stay requires a "flexible

6   approach," and courts should weigh these factors under a "general balancing" or "sliding scale"

7   approach, under which "a stronger showing of one element may offset a weaker

8   showing of another."  *Id.* at 964–66.

9       **B.    Stay of Dissolution**

10      Respondents contend that they meet all four factors under the *Leiva-Perez* test, and the

11  Court should therefore stay the dissolution of the Funds pending appeal.  *See* Dkt. No. 136 at 5–

12  13.  After carefully considering the parties' arguments, the Court finds that the factors weigh in

13  favor of staying the dissolution of the Funds.

14          **i.    Likelihood of Success**

15      Under the first factor, the movant "need not demonstrate that it is more likely than not that

16  [it] will win on the merits" of its appeal, but rather it need only "show, at a minimum, that [it] has

17  a substantial case for relief on the merits."  *See Leiva-Perez*, 640 F.3d at 966, 968.  Respondents

18  urge that they have a substantial case on the merits, at least to the question of the arbitrator's

19  authority to order dissolution under the LPAs.[2]  *See* Dkt. No. 136 at 6–9.  Although the Court did

20  not agree with Respondents' arguments in its order confirming the arbitration award, *see* Dkt. No.

21  106, the Court agrees that Respondents have nevertheless shown a substantial case for relief.

22      As in their motion to vacate the arbitration award, Respondents identify possible ambiguity

23  in the LPAs regarding the scope of the arbitrator's authority.  When discussing the powers of the

24  arbitrator, the LPAs state that he "shall [] be authorized to grant any temporary, preliminary or

25  permanent equitable remedy or relief he or she deems just and equitable and within the scope of

26

27  _____
    [2] Respondents suggest in a footnote that they also reserve the right to challenge the Court's finding
28  that res judicata did not bar the Second Arbitration Award.  *See* Dkt. No. 164 at 6, n.1.  But
    because Respondents do not explain why they are likely to succeed on the merits as to this res
    judicata argument, the Court does not address it here.

this Agreement . . . ."  *See* China Fund LPA at § 14.5(a); Fund I LPA at § 15.5(a).  Although this language is broad, it does require equitable relief to be "within the scope" of the agreements.  And in the same paragraph, the LPAs state that the arbitrator "shall not be authorized . . . to reform, modify or materially change this Agreement or any other agreements contemplated hereunder." *Id.*

Respondents argue that dissolution is only discussed—and permitted—under specific circumstances that do not apply here, such as an event of withdrawal or the election of both the General Partner and a majority of the Limited Partners.  *See* China Fund LPA at § 10.2(a); Fund I LPA at § 10.2(a).  And elsewhere, the LPAs state that "[t]he term of the Partnership shall commence upon the filing of the Partnership's Certificate of Limited Partnership . . . and shall continue, unless extended pursuant to paragraph 10.1 or sooner dissolved pursuant to paragraph 10.2, until the seventh anniversary of the Effective Date."  *See* China Fund LPA at § 2.1; Fund I LPA at § 2.1.  Respondents urge that when read in context, there is no reasonable interpretation of the LPAs that would grant the arbitrator the power to order dissolution of the Funds.  The Court may not have agreed with Respondents' arguments, concluding instead that the arbitrator's interpretation that he had authority to order dissolution was plausible, but Respondents nevertheless raise legitimate legal questions as to whether the Second Arbitrator Award was outside the scope of the arbitrator's authority.

### ii.   Irreparable Harm

Under the second factor, a movant's "burden with regard to irreparable harm is higher than it is on the likelihood of success prong, as [it] must show that an irreparable injury is the more probable or likely outcome."  *Leiva-Perez*, 640 F.3d at 968.  Respondents urge that liquidation of the Funds would cause them irreparable harm if the Ninth Circuit ultimately agreed with them that the Second Arbitration Award was barred by res judicata or the arbitrator exceeded his authority under the LPAs by ordering the dissolution of the Funds. Dkt. No. 136 at 9–10.  They explain that (1) their businesses would be destroyed since Respondents were created to manage the Funds; and (2) the Funds' portfolios could not be easily valued or recreated if the Ninth Circuit concluded that dissolution was improper since they invest in private, early-stage companies.  *Id.*  Petitioners

United States District Court
Northern District of California

respond that Respondents are exaggerating the possible harm they may suffer absent a stay. *See* Dkt. No. 149 at 7–10.

*First*, Petitioners suggest that the harm from dissolution is somehow inevitable even absent the stay. *See* Dkt. No. 149 at 7–8. They argue that the Funds should be dissolved soon under the plain terms of the LPAs anyway. Specifically, they state that the contractual termination date of the China Fund is November 26, 2022. *See id.* at 7. They do not explain when they believe the contractual term of the other Fund ends, so at best this argument would only address part of Respondents' anticipated harm. It also appears inconsistent with the facts in the record.

The LPAs provide:

> The term of the Partnership . . . shall continue unless extended pursuant to paragraph 10.1 or sooner dissolved pursuant to paragraph 10.2, until the Seventh Anniversary of the Effective Date.

*See* China Fund LPA at § 2.1; Fund I LPA at § 2.1. Paragraph 10.1, in turn, provides:

> The General Partner shall be entitled, by delivery of notice to the Limited Partners at least 45 days' prior to the end of the Partnership's term, to extend the term of the Partnership for two additional 12-month periods to allow for the orderly termination of the Partnership and liquidation of its assets.

*See* China Fund LPA at § 10.1; Fund I LPA at § 10.1. Petitioners suggest that Respondents never gave the required notice to extend the term of the Funds. *See* Dkt. No. 149 at 7–8; *see also* Dkt. No. 149-1 at ¶ 3.

Yet the Second Arbitration Award itself indicates that Respondents *did* extend the Funds under § 10.1 of the LPAs. The arbitrator explained that Respondents "decided that they would activate these provisions years in advance." *See* Second Arbitration Award at ¶ 422. Although the arbitrator concluded that Respondents' capital calls based on these extensions were improper, the arbitrator did not deny that Respondents had the right to—and did in fact—extend the terms of the two Funds. Petitioners do not grapple with these findings in the Second Arbitration Award at all, but the Court has no reason to question that the extension occurred. The contractual termination date of the China Fund would therefore be November 26, 2024. Dissolution of the

14

United States District Court
Northern District of California

1   Funds in the near term, therefore, would only occur absent a stay.

2           *Second*, Petitioners suggest that any harm from the dissolution is remote because it will

3   take considerable time for dissolution actually to occur.  *See id.* at 8–9.  They assert that

4   "[d]issolution is not a fire sale, and it hardly happens overnight."  *Id.*  They state that at most,

5   allowing dissolution now would just transfer authority over the Funds from Respondents to their

6   liquidator.  *Id.*  Petitioners cite to a declaration filed by Thomas FitzGerald, the liquidator that

7   Petitioners appointed over Respondents' objections.  Putting aside for now whether Mr.

8   FitzGerald was properly appointed, his declaration says nothing about the anticipated timing of the

9   dissolution.  He simply disagrees with the suggestion that it may be "rushed or improper," and

10  instead states that he "intend[s] to dissolve the Funds in a deliberate, organized, and predictable

11  manner . . . ."  *See* Dkt. No. 149-7 at ¶ 7.  As to the form of any dissolution, he likewise concludes

12  that he "will evaluate the different options."  *Id.* at ¶ 8.

13          There is simply nothing in the record supporting Petitioners' suggestion that the

14  dissolution process would not take place in total or significant part during the course of the

15  pending appeal.  Absent a stay, there is nothing to prevent Petitioners from commencing, or even

16  completing, the dissolution before resolution of an appeal.  As Respondents point out, the Award

17  itself envisions that the dissolution would be completed within three months after appointment of

18  a liquidator.  *See* Second Arbitration Award ¶ 598(b) (providing the parties with three months

19  from the transmittal of the award to agree on a liquidator and six months from the transmittal of

20  the award to dissolve the Funds).  And although the parties both appear to agree that an expedited

21  appeal would be appropriate, the timing of the appeal is not entirely within the parties' control as it

22  will be based on the Ninth Circuit's own availability.

23          *Lastly*, Petitioners argue that any resulting harm from the loss of Respondents' business

24  and the dissolution of the Funds is a monetary harm that can be redressed, if necessary, following

25  the appeal.  *See* Dkt. No. 149 at 9–10.  In doing so, Petitioners ask the Court to ignore

26  Respondents' argument that if the dissolution proceeds, there are no practical means to determine

27  the value of the Funds or how much they would have been worth had the dissolution not happened

28  now.  *Id.* at 10.  Other than their bare assertions, however, Petitioners do not offer any explanation

why valuing the Funds would be practical under the circumstances.  Nor do they offer a means of quantifying the value of the Funds or the amounts owed to the respective parties under the LPAs. The Court credits Respondents' explanation that because the Funds do not invest in public companies, the Funds' investments do not have easily ascertained market values and, if the Ninth Circuit were to conclude that dissolution at this time was improper, there is no way to determine what a dissolution would have looked like—or been valued at—at a later time.  *See* Dkt. No. 136-1 at ¶¶ 11–14.  The Court accordingly finds that Respondents have established that absent a stay, it is more probable that they would suffer irreparable harm from the dissolution of the Funds.

### iii.    Injury to Petitioners

The parties dispute what harm, if any, Petitioners would suffer if the Court stayed the judgment.  *Compare* Dkt. No. 136 at 10–12, *with* Dkt. No. 149 at 10–13.

Petitioners, for their part, urge that they will suffer harm if Respondents are permitted to oversee their investments because Respondents "cannot be trusted to uphold their fiduciary obligations."  *See* Dkt. No. 149 at 10.  Petitioners point out that the arbitrator concluded that Respondents' past breaches of their fiduciary duties "materially hamper the Funds' ability to perform their business purpose."  *See* Second Arbitration Award at ¶ 503.  Petitioners state that they have "well-justified concerns that Respondents will continue to manage the investments in a self-interested way going forward . . . ."  *See* Dkt. No. 149 at 11.  They acknowledge that the investment periods prescribed by the LPAs "have long passed," but still suggest that there are "many decisions [Respondents] must make with respect to portfolio companies that could significantly affect the Funds' value and rights in portfolio companies."  *See id.* at 12.  Patrick Wong, Petitioners' Managing Project Manager, opines that Respondents could take actions that may negatively affect the Funds' value, such as giving up or exercising pro rata rights.  *See* Dkt. No. 149-1 at ¶ 24.  As Respondents point out, however, none of the supposed breaches of fiduciary duty that the arbitrator identified in the Second Arbitration Award concerned ongoing conduct that would impair the value of the Funds.  Petitioners' suggestion that Respondents may devalue the Funds is based purely on speculation, and seems illogical.  Respondents have their own incentives to ensure the value of the Funds since they believe they are owed further

United States District Court
Northern District of California

management fees upon the Funds' eventual dissolution or termination. *See* Dkt. No. 153 at 1.

At bottom, Petitioners' true concern is that they simply do not trust Respondents and believe that they have been intentionally hiding assets through fraudulent transfers. Petitioners emphasize that despite having received millions of dollars in management fees, Respondents' bank accounts now contain less than $500,000. *See* Dkt. No. 149-1 at ¶ 12. But Petitioners also acknowledge that to their knowledge, "the balances on these accounts have not changed since February 2022," *id.*, many months before the Court's order confirming the arbitration award and over a year and a half ago. Petitioners do not identify any evidence that Respondents are currently moving money around to obscure their assets. And even if they did, Petitioners' asserted injury— the ability to ultimately collect on a judgment—is purely monetary in nature. If the Second Arbitration Award is confirmed on appeal, Petitioners could still pursue the same kind of investigation of Respondents' assets that they seek now. *See* Section III below. The Court has no basis to conclude that Respondents have engaged in any fraud or wrongdoing in structuring their assets, or that they are at risk of doing so during the appeal. The Court understands Petitioners' concerns, but their misgivings or suppositions alone are insufficient to outweigh the harm Respondents would suffer if the dissolution commenced now.

Additionally, Respondents have stated that the Funds' bank accounts are frozen, and they say they will not move any money in those accounts during the appeal. *See* Dkt. No. 136 at 2, 11; Dkt. No. 153 at 5, 7. They further have agreed not to use Fund assets, including buying or selling investments, without Petitioners' consent during the pendency of the appeal. *See* Dkt. No. 136 at 2. The Court finds such assurances sufficient to assuage even Petitioners' speculative concerns that the Funds' assets will be misused in the interim. The Court will also condition the stay on these restrictions. The Court thus finds that this factor weighs in favor of a stay.

### iv.    Public Interest

Respondents argue that a stay would be in the public interest based on the portfolio companies in which the Funds have invested. *See* Dkt. No. 136 at 12–13. But notwithstanding the portfolio companies' concerns, this is a private dispute, and the Court finds that the interest in maintaining the Funds during this appeal is also wholly private. Respondents do not explain how

United States District Court
Northern District of California

the portfolio companies, which Respondents elsewhere describe as "private" and "early-stage," *id.* at 2, are representative of the public interest.  Respondents have not adequately shown how dissolution would affect the public interest.  Still, the Court finds that the remaining factors all weigh in favor of a stay.

### C.    Stay of Monetary Award

Respondents further argue that a stay of the monetary portion(s) of the judgment is similarly warranted here, and that the Court should issue the stay without a supersedeas bond.

"The purpose of a supersedeas bond is to secure the appellees from a loss resulting from the stay of execution," and "[d]istrict courts have inherent discretionary authority in setting supersedeas bonds." *Rachel v. Banana Republic*, 831 F.2d 1503, 1505, n.1 (9th Cir. 1987); *see also N.L.R.B. v. Westphal*, 859 F.2d 818, 819 (9th Cir. 1988) ("The posting of a bond protects the prevailing plaintiff from the risk of a later uncollectible judgment and compensates him for delay in the entry of the final judgment.").  Courts may therefore, if they deem it appropriate, "permit security other than a bond." *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1367 (9th Cir. 1990) (en banc).

Courts typically consider five factors to determine whether waiver is appropriate:

> (1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the [movant's] ability to pay the judgment is so plain that the cost of a bond wound be a waste of money; and (5) whether the [movant] is in such a precarious financial situation that the requirement to post a bond would place other creditors of the [movant] in an insecure position.

*See Dillon v. City of Chicago*, 866 F.2d 902, 904–05 (7th Cir. 1988) (quotations omitted); *accord Kranson v. Fed. Express Corp.*, No. 11-CV-05826-YGR, 2013 WL 6872495, at *1 (N.D. Cal. Dec. 31, 2013) (noting that "[c]ourts in the Ninth Circuit regularly use the *Dillon* factors in determining whether to waive the bond requirement.").  The movant "has the burden to objectively demonstrate the reasons for departing from the usual requirement of a full supersedeas bond." *See Cotton ex rel. McClure v. City of Eureka, Cal.*, 860 F. Supp. 2d 999, 1028 (N.D. Cal. 2012)

(quotation omitted).

Respondents have not met this burden here.  They point to the first and fifth *Dillon* factors in arguing that they do not currently have the ability to pay and the collection process would actually be more complicated if a stay were not issued and a bond were required.  *See* Dkt. No. 136 at 13–14.  But both factors seem only to underscore why a bond is appropriate under the circumstances.

Respondents acknowledge that "there may be some complexity in the collection process" in this case because of their limited funds.  *See id.* at 14.  They point out that the approximately $500,000 remaining in Respondents' accounts is far below the amount of money needed to pay any monetary portion of the Second Arbitration Award or a meaningful bond.  *See id.* ("Respondents' bank account statements make clear that they have far less than the amount of the judgment."); Dkt. No. 70-6, Ex. D and Dkt. No. 70-7, Ex. E (Respondents' bank statements); Dkt. No. 149 at 12–13.  As of February 2022, the Funds' accounts also only appear to contain approximately $21 million despite the $80 million contribution.  *See* Dkt. No. 149-1 at ¶¶ 4–9. Rather than provide assurances that they will pay the judgment promptly and in full if it is affirmed on appeal, Respondents contend that they are currently unable to post a bond, seemingly of any size, and suggest they will be unable to pay the judgment later given their current finances.  *See* Dkt. No. 136 at 13–14.

Courts often find an inability to pay weighs in favor of requiring a bond in order to protect the interests of the appellees.  *See, e.g.*, *Opticurrent, LLC v. Power Integrations, Inc.*, No. 17-CV-03597-EMC, 2019 WL 2389150, at *26 (N.D. Cal. June 5, 2019), *aff'd*, 815 F. App'x 547 (Fed. Cir. 2020) (requiring a bond where the party's ability to pay the judgment was "not beyond question" given the risks from its other pending litigation); *Clark v. Hidden Valley Lake Ass'n*, No. 16-CV-02009-SI, 2018 WL 2412136, at *3 (N.D. Cal. May 29, 2018) (finding that the defendant's "financial frailty" indicated that a bond was in fact necessary); *AngioScore, Inc. v. TriReme Medical, Inc.*, No. 12-CV-03393-YGR, 2015 WL 13387576, at *2 (N.D. Cal. Oct. 23, 2015) (noting that lack of assets may make the collection process arduous and the availability of future funds was questionable).  This is especially true where, like here, the amount of the

1    judgement is large. *See Hardesty v. Sacramento Metro. Air Quality Mgmt. Dist.*, No.

2    210CV02414KJMKJN, 2019 WL 2715616, at *3 (E.D. Cal. June 28, 2019) (collecting cases).

3         In *Hardesty*, for example, a jury found Sacramento County and county officials liable for

4    more than $100 million related to multiplate constitutional violations. *Id.* at *1. The County

5    argued that a bond was unnecessary because it could readily satisfy the judgment if needed. *Id.* at

6    *3–4. It pointed out that its discretionary revenue was projected to be over $600 million and that

7    its bond ratings were similarly high at A2, AA-1, and A. *Id.* at *4. But the County had not

8    offered proof of insurance or explained any plan in place to budget for the anticipated expenses of

9    the judgment. *Id.* The district court therefore concluded that the County's evidence did "not rise

10   to the level of certainty" required to warrant waiver of the bond, and ultimately required a bond of

11   50% of the judgment. *Id.* at *4–5; *cf. Kranson*, 2013 WL 6872495, at *1 (waiving bond

12   requirement because it was plain that FedEx could expeditiously pay the $380,000 judgment

13   following appeal).

14        Respondents point out that at times, courts have found a party's insolvency may weigh

15   against setting a large bond. *See* Dkt. No. 136 at 14. But their cited cases do not support their

16   suggestion that a bond is unwarranted here. In *FINOVA Capital Corp. v. Richard A. Arledge, Inc.*,

17   for example, judgment was entered in favor of FINOVA in the amount of approximately $1.6

18   million. No. 02-1277-PHX-RCB, 2008 WL 828504, at *1 (D. Ariz. Mar. 26, 2008). The

19   defendants asked the court to permit a stay without a bond, arguing that a bond would impose a

20   financial hardship because the only asset they had that was not protected from seizure was a piece

21   of real estate. *Id.* at *1–2, *4–5. They said that "they would agree to be enjoined from failing to

22   make timely mortgage payments, and from encumbering, transferring, assigning, or selling the

23   Property," and would post a $10,000 bond. *Id.* at *2. But the court ultimately concluded that the

24   proposal would not "furnish equal protection to" FINOVA, "especially given the relative

25   magnitude of the judgment." *Id.* at *5.

26        Respondents' reliance on *Federal Trade Commission v. Commerce Planet, Inc.*, No.

27   809CV01324CJCRNBX, 2012 WL 13015007, at *8 (C.D. Cal. Sept. 13, 2012), is similarly

28   misplaced. Following a bench trial, the court concluded that the defendant, an individual, had

United States District Court
Northern District of California

engaged in deceptive and unfair practices under the Federal Trade Commission Act and imposed monetary equitable relief in the amount of $18.2 million. *See id.* at *1. The defendant provided copies of the financial disclosures he made to the FTC, and claimed that the full bond would push him into bankruptcy. *Id.* at *9. The court did not find this showing adequate, and requested further briefing on the proper bond amount. *Id.* Even in the face of financial concerns, neither of the courts in these cases decided to waive the bond entirely.

Here, Respondents contend that aside from their bank accounts with approximately $500,000, they have no other assets currently available to them with which they could pay the judgment or post a bond. *See* Dkt. No. 136 at 14. Andrew Chung, Respondents' managing member, filed a declaration, in which he stated in conclusory fashion:

> There are currently no assets in Respondents' possession other than an amount of cash in their bank accounts that is far lower than the amount of the monetary judgment that has been issued in this case. [Respondents] possess no other assets with which they could pay the judgment or post a bond. In addition, other creditors of the [Respondents] may claim entitlement to the [Respondents'] assets.

*See* Dkt. No. 136-1 at ¶ 17. But the Court does not find this unsupported declaration persuasive. Far from the kind of objective evidence that might warrant a departure from the usual requirement of a bond, Mr. Chung's declaration is inherently self-serving. To the extent he suggests other creditors exist, he makes no effort to identify them, much less explain how requiring a supersedeas bond would affect those creditors even assuming they do exist. Respondents' pure *ipse dixit* is insufficient to support a finding that this is the unusual case in which the *Dillon* factors weigh in favor of waiving the normal bond requirement, particularly given the size of the award at issue here.

"Although practices vary among judges, a bond of 1.25 to 1.5 times the judgment is typically required." *See Cotton*, 860 F. Supp. 2d at 1029 (quotation omitted). The Court finds that a bond of approximately 125% of the judgment is appropriate here.

The Court understands that there may be some outstanding questions regarding the exact amount of the monetary award in the Second Arbitration Award and the judgment in this case.

21

*See* Section III.B below.  Petitioners urge that the Court should therefore permit a full accounting of the restitution actually owed under the Second Arbitration Award before determining the actual amount of the bond.  *See* Dkt. No. 149 at 14.  But the Court finds that this would further complicate rather than streamline matters in this case.  The parties would be litigating on two fronts:  before this Court, they would no doubt litigate the accounting and restitution required under the Second Arbitration Award, while arguing about the underlying validity of the Second Arbitration Award itself on appeal to the Ninth Circuit.  The Court finds that using the known monetary amounts of the Second Arbitration Award provides Petitioners sufficient assurances of future payment.  The Court therefore finds that a supersedeas bond of $11,564,560.90 is appropriate.[3]

*       *       *

The Court therefore **GRANTS IN PART** and **DENIES IN PART** the motion to stay the judgment.  The dissolution of the funds is **STAYED.**  The Court **ORDERS** Respondents to post a supersedeas bond of $11,564,560.90, to stay execution of the monetary portion of the judgment pending appeal.

During the pendency of the stay, Respondents may not (1) move or utilize any money from the Funds' bank accounts; or (2) use Fund assets, including buying or selling investments, without Petitioners' consent during the pendency of the appeal.  Respondents are further directed to continue providing Petitioners with monthly bank statements for Respondents' and the Funds' accounts.

### III.    MOTIONS REGARDING ENFORCEMENT OF JUDGMENT

As soon as Arbitrator Ali issued the Second Arbitration Award, Petitioners moved swiftly to enforce the award.  Petitioners point out that the Second Arbitration Award stated:

> The Funds shall be dissolved *within six (6) months* of the date of the transmittal of this Final Award to the Parties and in accordance with the terms and procedures of the RULPA and Section 10 of the LPAs. In this regard, Respondents shall not serve as the Funds' liquidators.

---

[3] This represents 1.25 times the $8,826,634.64 in costs and fees from the arbitration and the $425,014.11 in arbitration fees, or 1.25 times $9,251,648.75.

United States District Court
Northern District of California

> *The Parties shall jointly select a liquidator for each Fund within three (3) months of the date of transmittal of this Final Award, failing which, Claimant may appoint a suitably qualified liquidator of international standing and repute.*

Second Arbitration Award at ¶ 598(b) (emphasis added). Based on this language, within days after Arbitrator Ali issued his award, but before this Court confirmed the award, Petitioners sought to identify a liquidator and commence the dissolution of the Funds. *See* Dkt. No. 147 at 2–3; *see also* Dkt. No. 115 at 16; Dkt. No. 94-1 at ¶¶ 2–5; Second Arbitration Award at ¶ 598.

In November 2021, Petitioners initially proposed that their own Managing Project Manager, Patrick Wong, serve as liquidator of the Funds. *See* Dkt. No. 94-1 at ¶ 3. Respondents responded that it was premature to choose the liquidator because the award was not yet confirmed, and in any event, Mr. Wong was unsuitable given his lack of experience and conflicts with Respondents. *See* Dkt. No. 35-17, Ex. P. Respondents made clear that they had requested that the arbitrator correct or clarify his award, and that they also intended to move to vacate the award. *Id.* Given this response, Petitioners did not propose any alternatives, and instead in February 2022, declared that the time for agreeing jointly on a liquidator had expired, and that they had unilaterally selected Thomas FitzGerald of DriveTrain LLC. *See* Dkt. No. 94-1 at ¶ 4; *see also* Dkt. No. 85-7, Ex. F. Since then, and over Respondents' objections, Mr. FitzGerald has attempted to move forward with the dissolution of the Funds, including by soliciting Funds records. *See, e.g.*, Dkt. No. 122 at 7, 15.

Similarly, once the Court issued its order confirming the Second Arbitration Award, Petitioners filed multiple motions attempting to enforce the Court's judgment and seeking discovery to facilitate enforcement, despite Respondents' pending motion to stay the judgment. *See* Dkt. Nos. 122, 156, 158, 159, 160.

### A. Motion to Hold Respondents in Contempt

Less than two weeks after the Court confirmed the arbitration award and entered judgment, Petitioners filed a motion to hold Respondents in contempt. Dkt. No. 122. They ask the Court to find Respondents in contempt, issue a sanctions award, and award Petitioners their attorneys' fees and costs incurred in bringing this motion, because Respondents have not yet complied with the

United States District Court
Northern District of California

23

terms of the Second Arbitration Award. *Id.* Petitioners urge that once the Court confirmed the Second Arbitration Award, it became a final order of this Court and Respondents are in contempt for failing to comply with its terms. *Id.*

### i. Legal Standard

"A court has wide latitude in determining whether there has been contemptuous defiance of its order." *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1364 (9th Cir. 1987). A court may hold a party in civil contempt when the party has displayed "disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). A party's behavior "need not be willful" to justify a finding of civil contempt as "there is no good faith exception." *Id.* (quotation omitted). Still, "[t]he party alleging civil contempt must demonstrate that the alleged contemnor violated the court's order by clear and convincing evidence." *Id.* (quotation omitted). If a court finds a party in contempt, it has discretion in deciding whether to impose sanctions. "Sanctions for civil contempt may be imposed to coerce obedience to a court order, or to compensate the party pursuing the contempt action for injuries resulting from the contemptuous behavior, or both." *General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986). "Compensatory awards are limited to actual losses sustained as a result of the contumacy." *Id.* (quotations omitted).

### ii. Discussion

The Court declines to exercise its discretion to hold Respondents in contempt. Unlike criminal contempt, civil contempt "seeks only to coerc[e] the defendant to do what a court had previously ordered him to do." *See Turner v. Rogers*, 564 U.S. 431, 441 (2011) (quotations omitted). But this objective would not be well served by a contempt order in this case. Respondents filed a motion to vacate the Second Arbitration Award because they believed that the arbitration was barred by res judicata and that Arbitrator Ali had exceeded his authority in ordering the dissolution of the Funds. *See* Dkt. No. 35. Respondents further argued that even if dissolution was warranted, Respondents as the General Partners should manage the liquidation under the terms of the LPAs. *See id.* The Court rejected these arguments and ultimately

United States District Court
Northern District of California

confirmed the arbitration award.  *See* Dkt. No. 106.  But following the Court's order, Respondents timely filed a notice of appeal to the Ninth Circuit.  *See* Dkt. No. 135.  They also filed the above motion to stay the judgment pending appeal.  *See* Dkt. No. 136.

Notwithstanding these objections or Respondents' appeal, Petitioners urge that Respondents still had to comply with the Second Arbitration Award and should be sanctioned for failing to do so.  According to Petitioners, Respondents did not (1) agree with Petitioners on the selection of a liquidator within three months after the Second Arbitration Award issued; (2) abide by the requests of *Petitioners'* chosen liquidator, Thomas FitzGerald; (3) provide an accounting of certain fees and costs paid using the Funds' accounts; or (4) pay any restitution to the Funds for such expenditures.  *See* Dkt. No. 122 at 5–12; *see also* Dkt. No. 147 (stating without authority that the Award was "effective and impose[d] obligations of performance" on Respondents as soon as it issued).

The Court finds this reasoning nonsensical.  Respondents had the right to seek to vacate the arbitration award, to appeal this Court's order confirming the award, and to seek a stay of the judgment in the interim.  And Respondents did so here.  As the Second Arbitration Award itself notes, the LPAs contemplate that a party may seek to vacate an arbitration award.  *See* Second Arbitration Award at ¶¶ 17, 592 (quoting China Fund LPA at § 14.5(a)–(b); Fund I LPA at § 15.5(a)–(b)).  The LPAs state:  "*Absent the filing of an application to correct or vacate the arbitration award* under applicable law, each party shall perform and satisfy the arbitration award within 15 days of the service of the award."  *Id.* (emphasis added); *see also* 9 U.S.C. § 10(a) (permitting a party to an arbitration to request an order vacating an award); 9 U.S.C. § 12 (providing that a motion to vacate must be served within three months after an arbitration award is filed or delivered).  Federal Rule of Civil Procedure 62 also imposes an automatic stay of 30 days on the execution of a judgment for a monetary award, and permits the district court to otherwise stay a judgment, even if it provides injunctive relief.  *See* Fed. R. Civ. P. 62(a)–(d).  These rights would be illusory if Respondents had to immediately comply with the Second Arbitration Award

when it was issued or immediately after entry of the Court's order confirming the award.[4]

As the Court already noted, Respondents filed a motion to stay the judgment. Petitioners do not meaningfully grapple with the legal or practical implications of enforcing a judgment when there is a pending motion to stay that same judgment. It is not clear how, without an order on that motion, Respondents could understand the timing or scope of their obligations under the judgment. Moreover, the parties' briefs suggest that there may also be outstanding questions about the meaning of the Second Arbitration Award and the relief Arbitrator Ali awarded that were not directly raised before this Court in the parties' motion to confirm and motion to vacate the arbitration award. *Compare* Dkt. No. 122 at 8–11, *with* Dkt. No. 139 at 10–11. In short, the Court finds that Petitioners have not established that Respondents disobeyed a "specific and *definite* court order." *Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006) (quotation omitted) (emphasis added); *cf.* Fed. R. App. P. 8(a)(2)(A)(ii) (allowing party to seek to stay the judgment even where district court denied request).

Petitioners' cited cases do not suggest otherwise. For example, in *Satyam Computer Servs., Ltd. v. Venture Glob. Eng'g, LLC*, 323 F. App'x 421, 424–25 (6th Cir. 2009), the Sixth Circuit confirmed a contempt order for failure to comply with an order confirming an arbitration award. However, Petitioners leave out critical facts when citing this case. *See* Dkt. No. 122 at 14. In *Satyam*, before issuing a contempt order, the district court had addressed and denied in part the respondents' motion to stay pending appeal. *See* 323 F. App'x at 425. The Sixth Circuit had also denied the respondents' motion for a stay. *Id.* Only after the respondents' continued failure to comply with the district court's order to transfer stock did the district court hold the respondents in contempt. *Id.* at 425–27. Similarly in *Telenor Mobile Commc'ns AS v. Storm LLC*, 587 F. Supp. 2d 594, 602 (S.D.N.Y. 2008), *aff'd*, 351 F. App'x 467 (2d Cir. 2009), the district court had confirmed an arbitration award, and the respondents had appealed. The Second Circuit had issued a temporary stay of the order that was later vacated. *See id.* The district court only issued a

---

[4] By this logic, the Funds would have to be dissolved over Respondents' objections, even if this Court or the Ninth Circuit later determined that the arbitrator lacked the authority to issue their dissolution in the first instance.

United States District Court
Northern District of California

contempt order several months *after* the stay had been vacated and after the respondent had still failed to comply with the order confirming the arbitration award. *Id.*

Petitioners do not cite—and the Court is unaware of—a case in which a party was found in contempt for failing to comply with an arbitration award where (1) it appealed the district court's order confirming the award; and (2) filed a motion to stay the judgment pending that appeal. The motion to hold Respondents in contempt is **DENIED**.

**B.    Motion to Include Judgment Details**

Petitioners have additionally filed a motion requesting that the Court amend the judgment to include the specific details of the remedies awarded in the Second Arbitration Award, and to issue a writ of execution. Dkt. No. 156. Petitioners argue that to understand the scope of the judgment, one must look at the Second Arbitration Award, which Respondents attempted to seal. *Id.* However, the Court has since denied Respondents' requests to seal significant portions of the Second Arbitration Award. *See* Dkt. Nos. 108, 175. Petitioners nevertheless argue that the Clerk's Office cannot issue a writ of execution without more guidance from the Court in the form of a judgment that lists the specific relief awarded. *See* Dkt. No. 156 at 1, 3–4. Petitioners therefore have proffered a judgment that they say transcribes the relevant language from the Second Arbitration Award, as well as a calculates the prejudgment and post-judgment interest owed. *See* Dkt. No. 156-3, Ex. A (Proposed Judgment).

As is now clear from the briefs, the parties disagree about the nature and timing of the relief granted in the Second Arbitration. For example, and as already discussed, the parties dispute whether Petitioners appropriately appointed Mr. FitzGerald as the liquidator. They also dispute the appropriate interest rate and the scope of any money Respondents must return to the Funds. *Compare* Dkt. No. 161 at 3, *with* Dkt. No. 164 at 7–9. Despite Petitioners' suggestion, granting their requested relief would require the Court to address substantive aspects of the Second Arbitration Award not directly raised in the parties' motion to confirm or motion to vacate. And such issues are inextricably tied to the merits of this case and Respondents' pending appeal with the Ninth Circuit. The Court has stayed the judgment in this case, and the motion is accordingly **DENIED** without prejudice to raising following the appeal.

**C.   Discovery Motions**

Similarly, Petitioners have filed several discovery motions seeking to trace the money initially in the Funds.  Dkt. Nos. 158, 159, 160.  At bottom, Petitioners are concerned that Respondents have improperly moved money out of the Funds and into other accounts and now are asserting an inability to pay the judgment.  *Id.*  These motions are likewise **DENIED** without prejudice.  The judgment is stayed, and to the extent the Ninth Circuit ultimately affirms, Petitioners will be able to seek such discovery and engage in the kind of tracing of fraudulently transferred or concealed assets that they allege has occurred here.

**IV.   CONCLUSION**

The Court **GRANTS IN PART** and **DENIES IN PART** the motions:

- Petitioners' motion for attorneys' fees is **GRANTED IN PART** and **DENIED IN PART**.  Dkt. No. 115.  Petitioners are **DIRECTED** to provide the requested documents by email, with Respondents' counsel cc'd, to hsgpo@cand.uscourts.gov, by October 13, 2023, so the Court may determine the final amount of fees awarded;
- Respondents' motion for attorneys' fees is **DENIED**.  Dkt. No. 117;
- Respondents' motion to stay enforcement of the judgment is **GRANTED IN PART** and **DENIED IN PART**.  Dkt. No. 136.  The Court **ORDERS** Respondents to post a supersedeas bond of $11,564,560.90, to stay execution of the monetary portion of the judgment pending appeal;
- Petitioners' motion to hold Respondents in contempt is **DENIED**.  Dkt. No. 122;
- Petitioners' motion to include judgment details is **DENIED** without prejudice.  Dkt. No. 156; and
- Petitioners' discovery motions are **DENIED**.  Dkt. Nos. 158, 159, 160.

The Court is left with the firm suspicion that the parties have filed dueling motions in this case in an effort, at least in part, to exert leverage on the other side.  This has led to serial filings and an

1    inefficient use of the Court's time and resources.  All parties are represented by capable counsel,

2    and the Court expects that the parties will find a way to work together cooperatively and

3    professionally as this case continues on appeal.  Because Respondents have appealed the Court's

4    order confirming the Second Arbitration Award, the Court will not entertain any further filings in

5    this case during the pendency of the appeal without exceptionally good cause and advance leave of

6    court.

7            **IT IS SO ORDERED.**

8    Dated:   9/27/2023

9    _____

10   HAYWOOD S. GILLIAM, JR.
     United States District Judge